## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————— x
:
TREEHOUSE FOODS, INC., BAY VALLEY  :
FOODS, LLC, and STURM FOODS, INC.,  :
:   Civil Action No. _____
:
Plaintiffs,  :
:
:   **COMPLAINT AND DEMAND**
v.  :   **FOR JURY TRIAL**
:
:
GREEN MOUNTAIN COFFEE ROASTERS,  :
INC. and KEURIG, INCORPORATED,  :
:
:
Defendants.  :
———————————————— x

Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc., (collectively, "TreeHouse" or "Plaintiffs"), bring this action for damages and permanent injunctive relief against Defendants Green Mountain Coffee Roasters, Inc. ("GMCR"), and Keurig, Incorporated ("Keurig"), GMCR's wholly-owned subsidiary (collectively, "Green Mountain" or "Defendants"). Plaintiffs allege as follows:

1.      This is an action for damages and permanent injunctive relief against Green Mountain for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and state antitrust and unfair competition statutes and common law of the states of New York, Wisconsin, and Illinois.

2.      Green Mountain has monopolized the market for the sale of single-serve brewers, as well as the market for the sale of single servings or "portion packs" of coffees or other beverages that are used in those brewers. Green Mountain previously owned certain patents that allowed it to exclude competition for the sale of the most popular format of those "portion

packs" — the "K-Cup" format — but those patents expired in 2012. However, rather than compete for market share on the merits or fulfill its statutory obligation to enable competitors to practice its invention after its patents expired, Green Mountain has abused its dominance in the brewer market by coercing business partners at every level of the K-Cup distribution system to enter into anticompetitive agreements intended to unlawfully maintain Green Mountain's monopoly over the markets in which K-Cups are sold. Even in the face of these exclusionary agreements that have unreasonably restrained competition, some companies, such as TreeHouse, have fought hard to win market share away from Green Mountain on the merits by offering innovative, quality products at substantially lower prices. In response, Green Mountain has announced a new anticompetitive plan to maintain its monopoly by redesigning its brewers to lock out competitors' products. Such lock-out technology cannot be justified based on any purported consumer benefit, and Green Mountain itself has admitted that the lock-out technology is not essential for the new brewers' function. Like its exclusionary agreements, this lock-out technology is intended to serve anticompetitive and unlawful ends. Indeed, such an anticompetitive product redesign would force consumers to pay at least 15% to 25% more for K-Cups, would block consumers from their preferred beverages, and would restrain competition on the merits.

3.      Green Mountain's market dominance is clear. To this day, Green Mountain controls at least approximately 89% of the market for the sale of single-serve brewers and at least approximately 73% of the market for the sale of all portion packs used in single-serve brewers. Green Mountain's portion pack market share is even higher if considering only the market for the K-Cup and equivalent cup formats, which is the market Green Mountain analyzes for competitive purposes. As Green Mountain's President and Chief Executive Officer, Brian

Kelley, admitted during an investor call on February 5, 2014, Green Mountain controls approximately 86% of the market for cups that are compatible with brewers that use K-Cups.

4.     As Mr. Kelley acknowledged, for many years, Green Mountain controlled 100% of the market for the sale of these cups, which are used in brewers to prepare a single serving of coffee, tea, hot chocolate, cider, or other beverages.  Although competitors have entered the market, Green Mountain continues to sell K-Cups at supracompetitive prices for use with single-serve brewers manufactured or licensed for manufacture by Keurig to be compatible with K-Cups ("K-Cup Brewers").

## NATURE OF THE ACTION

5.     GMCR first partnered with Keurig in the late 1990s to manufacture and sell K-Cups, which, at that time, were covered by patents relating to the coffee filters in those cups ("K-Cup Filter Patents").

6.     Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, GMCR embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of competitive portion packs that, just like K-Cups, would be compatible with K-Cup Brewers, but that would be engineered, manufactured, and sold by unaffiliated competitors seeking to introduce new products to consumers at lower prices ("Competitive Cups" or, collectively with K-Cups, "Compatible Cups").

7.     After acquiring Keurig and its patents in 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte), all before the end of 2010.  But Green Mountain did not stop there.

8.     To monopolize through the foreclosure of potential competition, Green Mountain proceeded to systematically tie up vertical distribution channels for Competitive Cups by

entering into unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system — from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers that sell and market Compatible Cups to end user consumers, businesses, and institutions.

9.      The terms and number of these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

10.      For example, as suppliers subjected to Green Mountain's exclusionary terms have admitted — Green Mountain does not restrict the ability to sell these same products for other purposes — *just so long as those products are not sold to a Green Mountain competitor who intends to use them to make cups for use in K-Cup Brewers*.  Thus, these unduly restrictive and unreasonably lengthy, exclusive dealing agreements directly and effectively serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

11.      Moreover, upon information and belief, Green Mountain's exclusionary agreements with coffee brands also contain restrictions dictating where and how licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output.  This creates a further incentive for licensed coffee brands to conspire to exclude Competitive Cup makers from the market unless those competitors agree to take a license or become "authorized" by Green Mountain, thereby likewise subjecting the Competitive Cup makers to Green Mountain's territorial control and allocation.

12.     Green Mountain distributors, which according to Green Mountain exceed 500 in number, are also prohibited from dealing with Competitive Cup makers under the express terms of Green Mountain's Keurig Authorized Distributor, or "KAD," Agreement.

13.     Having grown into a billion dollar publicly traded company by restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that — raising its K-Cup prices 10% to 15% in the fourth quarter of 2010.

14.     The web of exclusive dealing agreements Green Mountain had created allowed it to leverage its monopoly over K-Cup Brewers in order to maintain its monopoly over the portion pack market, and indeed, this was the intended result of Green Mountain's business model — the profitability of which depends upon Green Mountain's ability to maintain supracompetitive K-Cup prices and to restrain competition from lower-priced Competitive Cups.

15.     Green Mountain sells K-Cup Brewers at cost or even at a loss for use by consumers and provides K-Cup Brewers to businesses for free, so long as those businesses agree to purchase K-Cups exclusively from Green Mountain.

16.     While Green Mountain sacrifices brewer profits to drive K-Cup sales, it recoups profits by charging a 50% margin on K-Cups.  Green Mountain admits, for instance, that it "sell[s] [] at home ("AH") brewers at attractive price points which are ... sometimes at a loss ... in order to drive the sales of profitable packs."

17.     Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain such a substantial K-Cup profit margin for as long as it has following the entry of Competitive Cup makers.

5

18.     Although Green Mountain was able to stave off virtually all competition until late 2010, it could not prevent TreeHouse from converting production lines it had previously used to produce a different product in order to bring the first Competitive Cups to the market in 2010 so that consumers could enjoy new brands of beverages without the monopoly mark-up in price.

19.     These Competitive Cups did not infringe any of Defendants' patents because they did not contain a filter.  But that did not stop Defendants from pursuing a baseless lawsuit to try to keep Competitive Cups off the market.  Within a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse Foods, Inc.'s subsidiary, Sturm Foods, Inc. ("Sturm"), alleging that the sale of these Competitive Cups to consumers infringed and induced infringement of Keurig's *brewer* method patents — not even asserting any patents covering K-Cups themselves.

20.     After Sturm incurred three years of litigation costs, the United States Court of Appeals for the Federal Circuit affirmed the district court's ruling, holding on appeal that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

21.     This lawsuit was not filed for any valid purpose of protecting patent rights, but was an objectively and subjectively baseless sham intended to squelch competition from Competitive Cups.  As the Federal Circuit expressly concluded, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*  Instead of any proper purpose, the lawsuit was filed to intimidate market entrants and to raise a rival's costs, thereby depriving TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

22.     While the litigation over Sturm's non-filtered Competitive Cups was pending, Green Mountain's K-Cup Filter Patents expired, and TreeHouse and others began selling Competitive Cups, now with and without filters, in competition with Green Mountain.  Although TreeHouse and others were able to enter the market, TreeHouse's ability to increase capacity and to bring Competitive Cups to consumers and businesses has been restrained by anticompetitive exclusive dealing agreements that have restricted access to cup-making machinery, cup components, coffee brands, and virtually entire categories of potential TreeHouse customers, like the highly profitable Office Coffee Services business.  These exclusive dealing agreements are anticompetitive because, among other reasons, they have facilitated Green Mountain's exercise of market power by impairing rivals' abilities to achieve the scale necessary to become competitively efficient and by depriving TreeHouse of efficient access to both upstream and downstream markets.

23.     Consumers who purchase Compatible Cups are highly price-sensitive.  Not surprisingly, demand has been growing for Competitive Cups, which are typically sold at prices that are at least 15% to 25% lower than prices for K-Cups.

24.     Rather than lowering K-Cup prices and their 50% K-Cup profit margins to a competitive level to compete on the merits, Defendants have instead announced a new anticompetitive plan to further exclude competition.  In yet another attempted "end-run" around the patent and competition laws, Defendants have announced that Keurig will stop selling existing K-Cup Brewers and will replace them with a new K-Cup Brewer called the Keurig 2.0 ("2.0 K-Cup Brewer") containing "interactive technology."  Defendants have announced that the new 2.0 K-Cup Brewers will be able to identify whether an inserted Compatible Cup is either a new generation Defendant-supplied or licensed K-Cup ("2.0 K-Cups") or a Competitive Cup, in

order to prevent the brewer from working with Competitive Cups. Defendants' technology is therefore intended to block Competitive Cups from working with 2.0 K-Cup Brewers, even though the shape of the Competitive Cups will be the same as the 2.0 K-Cups and Defendants do not currently have any patent protections extending to 2.0 K-Cups.

25.     To date, Green Mountain has failed to articulate any material and demonstrable consumer benefit that will be achieved by locking Competitive Cups out from 2.0 K-Cup Brewers, nor could it, as many consumers prefer the price, taste, and/or quality of Competitive Cups to K-Cups. Green Mountain's anticompetitive product redesign is thus not legitimately intended to benefit consumers, but is rather its latest of many anticompetitive acts designed to maintain its monopoly over the markets for the sale of portion packs and Compatible Cups by excluding competition and the lower-priced Competitive Cups that consumers demand. Indeed, Mr. Kelley has admitted that the proposed lock-out technology could be programmed by Green Mountain to be switched on or off after a certain number of uses, thus demonstrating that this technology cannot plausibly be considered to be integral or key to any consumer benefit offered by the new product.

26.     End user businesses, institutions, and consumers should be free to decide whether this pretextual and purported product "improvement" is worth the substantially higher price of 2.0 K-Cups over Competitive Cups, but Green Mountain is threatening to eliminate the freedom of consumer choice and the free and fair interplay of the market. End users of K-Cup Brewers should not be forced by Green Mountain to buy only 2.0 K-Cups when they would prefer to buy Competitive Cups, but this is precisely the goal and result of this anticompetitive and exclusionary scheme.

27.     Defendants have also been interfering with TreeHouse's business relations by systematically confronting TreeHouse's retail customers with their plan to lock out Competitive Cups in order to dissuade retail customers from purchasing Competitive Cups from TreeHouse, and then, on information and belief, foreclosing future competition by entering into unduly restrictive, long-term exclusive agreements with those customers.  Even if Competitive Cups ultimately can be made to work in 2.0 K-Cup Brewers, competition will have already been unlawfully restrained by these agreements prohibiting retailers from doing business with TreeHouse unless Defendants' anticompetitive exclusive dealing agreements are invalidated.

28.     In short, Green Mountain has committed numerous anticompetitive acts to unlawfully maintain its monopoly over the portion pack and Compatible Cup markets, including:

- Coercing machine manufacturers and component suppliers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to equipment and materials needed to make Compatible Cups;

- Conspiring with competitor roasters and coffee brands to allocate markets, reduce output, and to restrain competition from substantially lower-priced Competitive Cups, thereby maintaining supracompetitive prices and inducing would-be competitors to enter into an agreement with Green Mountain despite the expiration of its K-Cup Filter Patents;

- Coercing distributors and retailers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to retail customers and distribution channels;

- Filing sham litigation and continuing on appeal to pursue a "tactic" that had previously been "expressly admonished" by the Supreme Court in order to "impermissibly restrict" consumers from using Competitive Cups;

- Threatening to eliminate competitive access to 2.0 K-Cup Brewers, as well as retail customer and consumer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups, even though K-Cup Brewers and Compatible Cups are distinct products that consumers demand to purchase separately and that have been purchased separately for years; and

- Interfering with TreeHouse's business relations by confronting retail customers with Green Mountain's plan to lock out Competitive Cups in order to dissuade such customers from doing further business with TreeHouse.

29.     Because these anticompetitive acts were performed both to unlawfully maintain Green Mountain's monopoly over portion packs and Compatible Cups and by employing anticompetitive agreements with unaffiliated entities to unreasonably restrain trade without adequate justification or procompetitive benefits, Green Mountain's conduct violates both Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act, state antitrust and unfair competition statutes, and the common law of the states of New York, Wisconsin, and Illinois.

30.     These efforts, individually and collectively, were intended to, and have had the effect of, substantially foreclosing competition, restricting entry, constraining output, maintaining supracompetitive prices, restraining the free and fair interplay of the market, and curtailing consumer choices.

## **THE PARTIES**

31.     Plaintiff TreeHouse Foods, Inc. ("TreeHouse Foods"), is a corporation organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.

TreeHouse Foods is a food manufacturer that operates its business in the United States as Bay Valley Foods, LLC, and Sturm Foods, Inc.

32.     Plaintiff Bay Valley Foods, LLC ("Bay Valley"), is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.  Bay Valley is a wholly-owned subsidiary of TreeHouse Foods.  Bay Valley enters into supply arrangements with retailers for portion packs used in single-serve brewers.

33.     Plaintiff Sturm Foods, Inc., is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Manawa, Wisconsin.  Sturm is a wholly-owned subsidiary of Bay Valley that manufactures dry groceries, under private label brands as well as its own "Grove Square" and "Caza Trail" brand single-serve beverage cups, among other things.  Sturm enters into contracts with suppliers of the machinery and components required to manufacture Compatible Cups.

34.     Defendant Green Mountain Coffee Roasters, Inc., is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.

35.     Defendant Keurig, Incorporated, is a corporation organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

## AGENTS AND CO-CONSPIRATORS

36.     Various persons that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to monopolize the markets for the

sale of portion packs and Compatible Cups and the anticompetitive and unduly restrictive exclusive dealing agreements addressed in this lawsuit. Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

37.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restraints of trade.

## JURISDICTION AND VENUE

38.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs for their damages. This Court has jurisdiction over the federal antitrust law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

39.     This action arises, in part, under the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.* This Court has supplemental jurisdiction over Plaintiffs' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and New York law.

40.     This action arises, in part, under the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.*, the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. § 510/1, *et seq.*, and Illinois common law pertaining to unfair competition. This Court has supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Illinois law.

41.     This action arises, in part, under the Wisconsin Antitrust Act, Wis. Stat. § 133.03, *et seq.*, and Wisconsin common law pertaining to unfair competition. This Court has

supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Wisconsin law.

42.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

43.     This Court also has personal jurisdiction over GMCR because GMCR regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in the state of New York in 2003, maintaining a registered agent for service of process in New York, doing substantial business with third parties in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in New York.  In light of GMCR's substantial contacts with New York, the exercise of jurisdiction over GMCR would not offend traditional notions of fair play and substantial justice.    Furthermore, GMCR's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiffs, companies with a presence in this District.  The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by consumers, in this District.

44.     This Court also has personal jurisdiction over Keurig because Keurig regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in the state of New York in 2006, maintaining a registered agent for service of process in New York, and doing substantial business with third parties in New York.  In light of Keurig's substantial contacts with New York, the exercise of jurisdiction over Keurig would not offend traditional notions of fair play

13

and substantial justice. Furthermore, Keurig's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiffs, companies with a presence in this District. The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by consumers, in this District.

45.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

## RELEVANT MARKETS

### A.     Relevant Product Markets

46.     There are at least three relevant product markets in which to evaluate Defendants' anticompetitive conduct: (1) the market for the design, manufacture, and sale of single-serve brewers ("Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of "portion packs" or single-serve containers of coffee, tea, or other beverages ("Portion Packs") that are used in single-serve brewers ("Portion Pack Market"); and (3) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"), which is a sub-market of the Portion Pack Market. Green Mountain tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).

### 1.     Single-Serve Brewer Market

47.     The Single-Serve Brewer Market encompasses the design, manufacture, and sale of single-serve brewers. The single-serve brewer is a quick, convenient, and simple way for

14

consumers to brew a single cup of coffee, cocoa, cappuccino, cider, or other beverages ("Single-Server Brewer"). Single-Serve Brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

48. In part because of the unique convenience offered by Single-Serve Brewers, the price of traditional drip coffee makers typically does not fully constrain prices for Single-Serve Brewers.

49. Consumers pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers. While traditional drip coffee makers are frequently sold around a price point of $20 to $30, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars.

### a.   Keurig Single-Serve Brewers

50. Green Mountain designs, manufactures, and sells a variety of Single-Serve Brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers, each of which uses a different type of Portion Pack that is incompatible with the other types of brewers.

51. Keurig offers a variety of Single-Serve K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector (*e.g.*, hotels).

52. K-Cup Brewers are sold for a range of prices. For example, the Mr. Coffee KG2 brewer for home use has been priced at $89.95, while the Breville brewer for home use has been priced at $249.95. Keurig's website lists the prices of only two of its commercial brewers, which are either $129.95 or $249.95.

53.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

54.     As a 2012 New York Times article explained, "it's hard to tell how much coffee costs, even if you know what you spent[,] ... [which is] the case with many of the single-serve brewing machines."

55.     Many of Keurig's commercial K-Cup Brewers do not even have their price listed anywhere on the Keurig website.  An interested consumer must specifically "request a price" from a distributor.

56.     Businesses can request a "free trial" at the click of a button on the Keurig website, without being shown the price of the commercial K-Cup Brewers for which they are requesting a free trial.

57.     Green Mountain restricts the ability of distributors to advertise or display the prices of K-Cups that are used in office K-Cup Brewers.  For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack [ ] through or at any store operated by or for Distributor."  KAD Agreement § 2.1.

58.     In addition to the Single-Serve Brewers manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

59.     Keurig also sells Vue Brewers, which, like K-Cup Brewers, are marketed for home or office use.  Vue Brewers, however, use a different type of Portion Pack, known as "Vue

Cups," which are shaped differently than K-Cups.  The Vue Brewer is not compatible with K-Cups, and Vue Cups cannot be used in K-Cup Brewers or Rivo Brewers.

60.     Keurig also offers the Rivo cappuccino and latte brewer.   This brewer "exclusively uses Rivo Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers.  K-Cups thus cannot be used in Rivo brewers.

61.     More than half of the Keurig K-Cup Brewers, in both the home and commercial sectors, already offer consumers more than one brew size and a digital display.

**b.     Single-Serve Brewers Manufactured By Other Companies**

62.     Additional Single-Serve Brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavia;" Bosch's "Tassimo;" Philips Electronics N.V.'s "Senseo;" Nestlé's "Nespresso;" and Starbucks' "Verismo."

63.     Prices across these Single-Serve Brewers can vary by as much as several hundred dollars.

64.     These Single-Serve Brewers are fragmented and collectively represent a small share of the Single-Serve Brewer Market.

**c.     Green Mountain Has Monopoly Power In The Single-Serve Brewer Market**

65.     Green Mountain controls the dominant share of the Single-Serve Brewer Market. As brokerage and investment firm Stifel has noted, Green Mountain's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share."  A 2011 Morgan Stanley consumer survey report similarly observed, "Green Mountain and its Keurig system dominates [the single-serve brewer market]."

66.     Green Mountain reported in September 2013 that it had sold over 30 million Keurig Single-Serve Brewers, which are used in at least approximately 15 million U.S.

households.  In fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers.

67.     As of September 2013, Keurig Single-Serve Brewers represented the top four best-selling coffeemakers in the United States by dollar volume.

68.     From July 2012 to July 2013, Green Mountain sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value.  According to a 2013 market report, Green Mountain controls at least 88% of the Single-Serve Brewer Market of brewers used in the home, and on information and belief, Green Mountain controls nearly 100% of the share of K-Cup Brewers supplied to offices.

69.     In the first quarter of 2014, Green Mountain sold a record 5.1 million Keurig Single-Serve Brewers.

70.     Green Mountain has the power to exclude competition in the Single-Serve Brewer Market.  Green Mountain has exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

71.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market.  For example, Green Mountain still holds patents that cover its K-Cup Brewers.  Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.  Moreover, because retailers are reluctant to stock brewers unless the Portion Packs they use are readily and widely available, and Portion Packs that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular, potential market entrants face a substantial competitive disadvantage vis-à-vis established brewer suppliers.

### 2.    The Portion Pack Market

72.    The second relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Portion Packs that are used in Single-Serve Brewers.

73.    Compatible Cups (both K-Cups and Competitive Cups) are Portion Packs that are generally only used in Single-Serve Brewers that are K-Cup Brewers.

74.    Some Single-Serve Brewers besides K-Cup Brewers instead use Portion Packs that are packaged as "pods," which look like flat cookies, or "T-Discs," which are a type of sealed pod.

75.    Manufacturers of Single-Serve Brewers that use "pod" Portion Packs include Hamilton Beach, Gevalia, and Philips Electronics N.V.'s "Senseo."

76.    Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.

77.    The ability to increase Portion Pack prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers.  The price-per-pound of Portion Pack coffee is nearly five times greater than that of ground coffee.  This has been the case because consumers who utilize Single-Serve Brewers and compatible Portion Packs generally find such packs to be substantially more convenient and desirable in their quality as compared with the brewed coffee from multiple-serve formats.  Thus, were single-serve Portion Packs competitively priced, consumers who own a Single-Serve Brewer would generally not substitute away from its use in favor of multi-serve formats in reaction to a small but significant rise in the price for the corresponding single Portion Packs.

78.    Although there are different types of Portion Packs, such as K-Cups, T-Discs, and pods, each of these Portion Packs is generally only compatible with a corresponding type of

Single-Serve Brewer.  For example, Compatible Cups generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of Single-Serve Brewers.

79.    Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Portion Packs, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers.  Indeed, these other Portion Packs are generally incompatible with K-Cup Brewers.

80.    Green Mountain possesses and exercises monopoly power over the Portion Pack market.  Green Mountain controls approximately 73% of the Portion Pack Market.  Green Mountain touts its K-Cups as the "#1 single cup brand."

81.    Barriers to entry are high and challenging for potential entrants into the Portion Pack Market.  Potential manufacturers must either develop and manufacture their own brewers to be compatible with their own Portion Packs, or alternatively make Portion Packs that are compatible with Green Mountain's K-Cup Brewers or another existing Single-Serve Brewer (*e.g.*, pods or T-Discs).

82.    In the first instance, potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Portion Packs because Green Mountain has a number of patents covering brewer technology.  Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

83.    In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Portion Pack that is compatible with a particular Single-Serve Brewer format.

84.   Potential entrants are further restrained from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the machinery and components used to make Portion Packs.  These agreements have restricted the ability of TreeHouse and other competitors to purchase machinery and inputs needed to compete on a level playing field with Green Mountain in the Portion Pack Market.

85.   Because of Green Mountain's restrictive practices, TreeHouse has been forced to work with more expensive and less experienced suppliers, thereby raising TreeHouse's costs associated with entering the Portion Pack Market.  These restrictions also delayed entry by TreeHouse into the Portion Pack Market because TreeHouse had to encourage suppliers that had not previously manufactured Portion Pack components to manufacture and supply these components for the first time.  These new suppliers faced a significant learning curve and start-up costs when manufacturing Portion Packs for the first time.

86.   Green Mountain intends to further increase its monopoly power by launching the 2.0 K-Cup Brewer, which will reportedly contain "interactive technology" preventing 2.0 K-Cup Brewers from functioning with Competitive Cups, and by replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

### 3.   The Compatible Cup Market

87.   The third relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups that are either: (1) compatible with K-Cup Brewers; or (2) would be compatible with K-Cup Brewers, but for the proposed "interactive technology" designed to prevent Competitive Cups from working in 2.0 K-Cup Brewers.  The Compatible Cup Market is a sub-market of the Portion Pack Market.

88.     Green Mountain has itself acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market, inasmuch as Portion Packs that are incompatible with the K-Cup format do not offer much significant competition to compatible ones.

89.     Indeed, the Compatible Cup Market, as opposed to the Portion Pack Market, is the market in which Green Mountain tracks market shares of K-Cups for competitive purposes. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15.

90.     As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high.  The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."

91.     Yet, as Time Magazine pointed out, "[t]he [cup] numbers are highly variable based on where one shops, what kind of coffee you're buying, and whether you purchase in small packages or enormous quantities."

92.     Competitive Cup companies, exercising their right to produce Competitive Cups, offer prices that are substantially lower than Keurig-branded K-Cups, and, hence, appeal to large numbers of price-conscious consumers.

93.     Competitive Cups, such as those produced by TreeHouse, are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Green Mountain. *See, e.g.,* Green Mountain FQ1 2014 Earnings Call Tr. at 15 (Green Mountain admitting that Competitive Cups "came in … at mostly 15 to 25% lower prices").  Specifically, on average, the price per K-Cup is approximately $0.60 as opposed to Competitive Cups, which are sold at about $0.45. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28 (October 4, 2013).

94.    Green Mountain owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte).

95.    Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks.  Green Mountain either owns or licenses some forty-nine brands.

96.    In total, Green Mountain controls approximately 86% of the Compatible Cup Market, as Green Mountain's President and Chief Executive Officer, Brian Kelley, recently admitted during a conference call with financial analysts on February 5, 2014.  *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15 ("We had 100% of the system ... and all of a sudden we have 86% ...."); *see also* Citi Report, DD's K-Cup Corner v8.13 at 2 (July 18, 2013) (noting Green Mountain controlled 92% of the K-Cup market in 2013).

97.    The remaining 14% of the Compatible Cup Market is composed of sellers, like TreeHouse, of unlicensed and private label Competitive Cups that are compatible with K-Cup Brewers.  *See* Green Mountain FQ1 2014 Earnings Call Tr. at 6 (Green Mountain "estimate[s] that unlicensed packs represented a 14% share of the Keurig system as of the end of [their] first quarter" of 2014.).

98.    In fiscal year 2012, Green Mountain's net sales were $3.9 billion.  90% of these consolidated net sales resulted from the combined sales of K-Cup Brewers (which comprised 22%, or $760 million) and K-Cups (which comprised 78%, or $2.7 billion).  This is consistent with Green Mountain's strategy of selling its K-Cup Brewers at cost or at a loss.

99.   In fiscal year 2013, Green Mountain's net sales included approximately $3.187 billion for K-Cups and approximately $828 million for K-Cup Brewers.

100.   As discussed further above, Compatible Cups designed for use in K-Cup Brewers are not reasonably interchangeable with other Portion Pack formats, such as T-Discs, pods, or capsules, and consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups. *See supra* ¶ 79.

101.   Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Green Mountain locks consumers in to use the Compatible Cup format by selling its K-Cup Brewers at cost or at a loss and is able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups. *See* Green Mountain Investor Day Presentation at 164 (September 10, 2013).

102.   Indeed, Green Mountain has been able to exercise its monopoly power by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share or increasing demand for Portion Packs other than Compatible Cups or Single-Serve Brewers other than K-Cup Brewers.

103.   Green Mountain has also exercised, sustained, and magnified its monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

104.   For example, Green Mountain has succeeded in substantially foreclosing TreeHouse's access to the market for the sale of Compatible Cups to offices and has substantially restrained competition for Compatible Cup sales to consumers for home use.

105.     Barriers to entry for the Compatible Cup Market are high and difficult to surmount for the same reasons discussed above with respect to the Portion Pack Market. *See supra* ¶ 81.

106.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer. The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute to Portion Packs that are incompatible. The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups. TreeHouse, for example, bases the price for Competitive Cups on the price of K-Cups, but not on the price of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers. In general, TreeHouse seeks to price its Competitive Cups at least 15% to 25% lower than K-Cups.

### a.     The At-Home Market Segment

107.     The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment") and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

108.     The At-Home Market Segment is a billion dollar market.

109.     At least approximately 15 million U.S. households have a K-Cup Brewer for use at home.

110.     Green Mountain controls approximately 92% of the At-Home Market Segment for Compatible Cups. Competitive Cup manufacturers hold the remaining 8% of that market segment. *See* Green Mountain Investor Day Presentation at 98-99 (September 10, 2013).

25

### b.   The Away-From-Home And Office Coffee Services Market Segments

111.   K-Cups are also consumed outside of consumers' homes at, among other places, food service, workplace, higher education, and hospitality locations.

112.   The Away-From-Home Market Segment is a $600 million to billion dollar market.

113.   Since at least 2009, Green Mountain has been the Portion Pack leader in the Away-From-Home Market Segment.

114.   On information and belief, Green Mountain currently provides all or nearly all of the office K-Cup Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

115.   The Office Coffee Services Market Segment for Green Mountain is estimated to account for $175 million to $250 million worth of Green Mountain's sales.

116.   Green Mountain's distributors are prohibited from selling Competitive Cups to the Office Coffee Services Market Segment because doing so would violate the Keurig Authorized Distributor (KAD) Agreement.

117.   Green Mountain has substantially foreclosed TreeHouse from selling to the Office Coffee Services Market Segment through the use of anticompetitive conduct including Green Mountain's extensive web of agreements, such as the KAD Agreements.

118.   Green Mountain also enters into exclusionary agreements with office specialty stores, such as Staples.  TreeHouse sought to supply Compatible Cups to Staples, but Staples had an agreement with Green Mountain and was thus unable to enter into a supply arrangement with TreeHouse.

119.    Green Mountain has admitted that it has more than 500 KADs, which are contractually obligated to buy directly from Green Mountain and to only sell products that are "authorized" by Green Mountain.

120.    Green Mountain maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segments by leveraging its monopoly over the Single-Serve Brewer Market in order to exclude competition from Competitive Cups.  Specifically, Green Mountain and its distributors agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competitive Cup suppliers from this market segment by purchasing Compatible Cups exclusively from Green Mountain.

**B.      Geographic Market**

121.    The relevant geographic market is the United States.  To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States.  Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

**C.      Interstate Commerce**

122.    Defendants manufactured and/or sold Single-Serve Brewers, Portion Packs, and/or Compatible Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

123.    Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

124.    Green Mountain had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013.  This number includes $3.187 billion in Portion Pack net sales and

$827.6 million in Keurig Single-Serve Brewer and accessories net sales.  Green Mountain had the top four best-selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.

## ADDITIONAL FACTUAL ALLEGATIONS

A.  **Green Mountain's Business Model Depends Upon Its Ability To Leverage Its Single-Serve Brewer Monopoly In Order To Restrain Competition And Extract Monopoly Profits From Its Monopoly Power In The Portion Pack And Compatible Cup Markets**

125.   Green Mountain's business model depends upon its ability to leverage its monopoly power in the Single-Serve Brewer Market in order to extract monopoly profits from the K-Cups it sells in the Portion Pack and Compatible Cup Markets.  Specifically, this model relies on Green Mountain's ability to: (1) drive sales of Green Mountain's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (2) restrain price competition from Competitive Cups; and (3) maintain supracompetitive K-Cup prices for extended periods of time.

126.   As it admits in its own statements to the public and investors, Green Mountain sells K-Cup Brewers at cost or even a loss in order to saturate the market with brewers that are only compatible with the K-Cup format, thereby locking consumers in to using the cup format instead of other types of portion packs.

127.   K-Cups account for the bulk of Green Mountain's profit margin, and Green Mountain's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

128.   While Green Mountain sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging a 50% margin on K-Cups.

129.   Green Mountain's monopoly leveraging strategy has created an enormous installed base of consumers for Green Mountain, which currently supplies at least 88% of the Single-Serve Brewers purchased by consumers for use at home, and on information and belief, 100% or close to 100% of K-Cup Brewers supplied to offices.

130.   Green Mountain likewise controls at least 86% of the Compatible Cup Market, based on Green Mountain estimates, which corresponds closely with its share of Single-Serve Brewers sold to consumers for home use.

131.   About 2.5 million cups are brewed in K-Cup Brewers every day in offices and homes in North America, and billions of cups have been brewed with K-Cup Brewers since K-Cups were created in 1998.

132.   As discussed further below, Green Mountain has protected its monopoly K-Cup profits and has exercised its power to exclude competition by coercing companies that would like to do business with TreeHouse or other Compatible Cup makers — but whose business depends upon access to K-Cup Brewers — to sign anticompetitive agreements that prevent them from doing so.

133.   Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain K-Cup profit margins as substantial as it has since TreeHouse entered the market.

**B.     Green Mountain Eliminates Competition And Exercises Its Monopoly Power By Raising Prices 10% To 15%**

134.   Keurig developed K-Cup Brewers and K-Cups in the late 1990s and obtained patents on those brewers as well as on the filters in K-Cups.  For years thereafter, Keurig licensed various coffee company competitors, including GMCR, to manufacture and sell filtered K-Cups.

135.    GMCR first partnered with Keurig in the late 1990s to manufacture and sell Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

136.    Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, GMCR embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of Competitive Cups.

137.    After acquiring Keurig and its patents in June 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and LJVH Holdings, Inc. (Van Houtte) (in 2010).

138.    According to one analyst's presentation, "GMCR eliminated the licensees by buying them. ...  GMCR paid high prices to avoid having to compete with the licensees post patent expiration."

139.    By August 2010, Green Mountain was ranked number 2 on Fortune's List of Global 100 Fastest-Growing Companies.  When reporting the ranking, Green Mountain touted on August 19, 2010, that for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and ... earnings per share growth of 89% over the same period for fiscal year 2009."

140.    Having grown into a billion dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that.  On September 7, 2010, Green Mountain announced "a price increase" of "approximately 10 to 15 percent" on "all K-Cup portion packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."

### C.      TreeHouse Enters The Compatible Cup Market

141.    Prior to 2010, TreeHouse did not engineer, manufacture, or sell Competitive Cups.  In or about 2010, TreeHouse decided to undertake a substantial investment in order to enter the Compatible Cup Market.

142.    TreeHouse was well positioned to enter the Compatible Cup Market because it already possessed relevant technical expertise and know-how in light of its experience engineering, manufacturing, and selling similar types of cups used for other products.

143.    TreeHouse already owned production lines worth millions of dollars, which had previously been used to produce another product, that TreeHouse was able to convert into production lines capable of manufacturing Competitive Cups.

144.    Although Green Mountain controlled 100% or close to 100% of the Compatible Cup Market at that time, TreeHouse believed consumers would switch to its Competitive Cups because of the new brand offerings, substantially lower pricing, and/or the quality of the new products, and indeed, consumers in the Compatible Cup Market have proven to "have a high degree of price sensitivity" and to be willing to try a new brand "if it [is] less expensive."  As one 2013 market study concluded, "91.3% of Keurig users [stated] that they would try a new [Compatible Cup] brand if it were less expensive."

145.    Before beginning to sell Competitive Cups, TreeHouse hired counsel to analyze whether there would be any potential intellectual property issues that might arise from the manufacture and sale of its Competitive Cups.

146.    Because Green Mountain owned K-Cup Filter Patents covering the use of filters in single-serve cups that had not yet expired as of 2010, TreeHouse decided to manufacture and sell Competitive Cups that did not contain filters.

147.    Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Competitive Cups for use in K-Cup Brewers that were not sold by Green Mountain or under a Green Mountain license.

148.    As the expiration date of Green Mountain's K-Cup Filter Patents approached, retailers and distributors were eager to offer consumers additional lower-priced alternatives to the filtered K-Cup.   As retailers and distributors know, competition among Compatible Cup vendors allows such resellers to reduce prices, increase sales, and win business from competitors with higher prices.

149.    For example, Kroger Co., whose network of stores includes Ralphs, King Soopers, and Fred Meyer, announced plans on June 8, 2012 to offer store-branded, filtered Competitive Cups for use in Keurig brewers.   Likewise, Safeway, Inc., announced on June 15, 2012 that it would introduce its own branded, filtered Competitive Cups for use in K-Cup Brewers, but at prices below Green Mountain's K-Cups.

150.    Green Mountain's K-Cup Filter Patents expired in September 2012.

151.    In response, in part, to requests from grocery retailers and foodservice distributors, TreeHouse launched its first filtered Competitive Cups in the Fall of 2012 in order to supply a lower-priced alternative to Green Mountain's filtered K-Cup's.

152.    Between September 2012 and December 2013, TreeHouse subsidiary Bay Valley entered into supply arrangements with dozens of retailers for filtered Competitive Cups.

153.    Since TreeHouse entered the Compatible Cup Market, demand has been growing for Competitive Cups.

154.    TreeHouse's sales have grown as the result of new retail customers and consumers seeking competitive alternatives to Green Mountain's K-Cups.

155.    Although it still has only a small share of the Compatible Cup Market, TreeHouse has become the largest seller of Competitive Cups that compete with Green Mountain's K-Cups.

156.    After Competitive Cups like TreeHouse's hit the shelves, the market suddenly "shifted." Brian Kelley explained, during the Green Mountain 2014 first quarter earnings call, that "we had a 100% of the system, and all of a sudden we have 86% of the system, [or] something like that."

### D.  Green Mountain Retaliates Against TreeHouse By Filing A Sham Litigation And Appeal To Restrain Competition, Raise A Rival's Costs, And Intimidate Market Entrants

157.    As discussed above, prior to September 2012, Green Mountain enjoyed patent protection on certain aspects of its K-Cups. Green Mountain claimed that these patents, for example, prevented competitors from offering single-serve cups of coffee with filters.

158.    The Competitive Cups introduced by TreeHouse in 2010 did not infringe any Green Mountain patents because these cups did not contain any filters.

159.    But that did not stop Defendants from filing a baseless litigation (asserting various infringement, trademark, and false advertising claims) and appeal harming competition.

160.    Within just a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, alleging in bad faith that Sturm's Competitive Cups infringed Keurig's patents directed at *brewers* and methods of using *brewers — not even asserting any patents covering K-Cups themselves*. Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup *brewers* by using Sturm's unlicensed Competitive *Cups*, and that Sturm was thus also liable for "inducing" infringement by these consumers.

161.    Keurig's non-patent claims were likewise baseless. Keurig alleged, for example, that it was trademark infringement and false advertising for Sturm to say on its packaging that

33

the Compatible Cups were "[f]or use by owners of Keurig coffee makers." Second Am. Compl. ¶¶ 35, 104.

162.    No reasonable litigant could have realistically expected to succeed on the merits of such claims, and thus Keurig's complaint was objectively baseless.

163.    The litigation was also subjectively baseless.  This is indeed demonstrated, for example, by other allegations in the Complaint itself.  For example, while Keurig claimed that Sturm "falsely advertised" that its Competitive Cups were "for use by owners of Keurig coffee makers," other allegations in the Complaint demonstrated Keurig's knowledge that this statement was, in fact, true.

164.    Paragraph 50 of the Second Amended Complaint, for example, alleged that "Sturm is advertising such [Competitive Cups] for use in Keurig's brewers.  Sturm's cartridges have no other use except in Keurig's brewers."  Second Am. Compl. ¶ 50; *see also id.* ¶ 23 ("[T]he packaging for Sturm's [Competitive Cups] states they are 'For use by owners of Keurig coffee makers.'  In fact, Sturm's [Competitive Cups] have no other use.").

165.    Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of noninfringement.

166.    In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against Green Mountain.

167.    After Sturm incurred three years of litigation costs based on Keurig's frivolous argument that Sturm's Competitive Cups infringed Defendants' K-Cup Brewer patents, the

Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

168.     The court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'" *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))).

169.     On information and belief, and as supported by the allegations in the Complaint and the meritless legal claims, Keurig instituted this lawsuit in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation, and to deprive TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

170.     Indeed, Keurig also sued another early Compatible Cup Market entrant, Rogers Family Co., making similar claims.  In Keurig's litigation against Rogers Family Co., a different federal district court likewise held on summary judgment that the Competitive Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

171.     As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "Keurig is attempting to *impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law*." *Id.* (emphasis added).

**E.**   **Green Mountain Restrains Competition With Anticompetitive Exclusive Agreements, Cuts Rivals Off From Inputs Needed To Compete, And Raises Rivals' Costs**

172.   Green Mountain has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at every level of the Compatible Cup distribution system — from sellers of machinery used to make K-Cups; to sellers of K-Cup components; to coffee roasters and coffee brands whose coffee and/or trademarks are used in K-Cups; all the way down to the distributors and retailers that sell K-Cups to end-user consumers, businesses, and institutions.

173.   This web of anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  As parties to these agreements have admitted — Green Mountain does not restrict the ability to sell these same products for other purposes — just so long as those products are not sold to a Green Mountain competitor who intends to use them to make Competitive Cups for use in K-Cup Brewers.   Thus, these exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Green Mountain.

174.   Indeed, the web of exclusive dealing agreements Green Mountain has created allowed it to leverage its monopoly over the Single-Serve Brewer Market in order to maintain its monopoly over the Portion Pack and Compatible Cup Markets.

1. **Green Mountain Unreasonably Restrains Access To Machines Needed To Make Compatible Cups In Competition With Green Mountain**

   a. **Direct Evidence Confirms That Green Mountain Exercises, Sustains, And Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competition**

175.    Before TreeHouse entered the Compatible Cup Market in 2010, it owned Spee-Dee Holmatic machines that it had purchased from R.A. Jones & Co. ("R.A. Jones") to manufacture a commercial product that was not related to any type of brewer or Compatible Cup.

176.    At the time TreeHouse purchased the Spee-Dee Holmatic machines to produce this other product, R.A. Jones placed no restrictions on TreeHouse's ability to purchase such machinery.

177.    In order to enter the Compatible Cup Market TreeHouse retrofitted the Spee-Dee Holmatic machines it had previously purchased from R.A. Jones in order to convert these production lines into machines that were capable of manufacturing non-filtered Compatible Cups.

178.    In 2013, in response to positive consumer feedback and increased demand for TreeHouse's non-filtered Competitive Cups following its entry into the Compatible Cup Market, TreeHouse sought to increase its capacity to produce a higher output of non-filtered Compatible Cups by purchasing another Spee-Dee Holmatic machine from R.A. Jones.

179.    TreeHouse requested a price quote for a new machine, but on December 19, 2013, a Sales Manager from R.A. Jones responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done.  R.A. Jones is declining to quote the new machine for soluble, non-filtered product."

180.    Under "the rules," as described by the representative, "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."   However, R.A. Jones can still "build equipment for all types of packages, just not k-cups or anything that goes into a Keurig brewer."

181.    The Sales Manager expressed hope that the Green Mountain "*agreement* will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.  (emphasis added.)

182.    The December 19, 2013 R.A. Jones email, explaining that the "agreement" with Green Mountain prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that Green Mountain coerces suppliers into entering exclusionary agreements intended to restrain competition between Competitive Cup makers and Green Mountain.   Because R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Competitive Cups cannot be justified on the basis that it ensures a reliable supply when Green Mountain needs equipment.   Instead, it is merely intended to cut off Competitive Cup makers' access to machinery that is necessary to compete with Green Mountain on a level playing field.   This agreement, in and of itself, constitutes an unlawful conspiracy in restraint of trade and provides direct evidence that Green Mountain has exercised its monopoly power by excluding competitors from resources needed to compete with Green Mountain.

> **b.    Green Mountain Has Substantially Foreclosed Access To Machinery Used To Make Compatible Cups**

183.    In the December 19, 2013 R.A. Jones email, the Sales Manager further noted that "[f]rom my own personal perspective, it's very frustrating because I feel that I'm alienating a great customer in Sturm Foods."   He sympathized further, stating: "I can imagine this causes

problems for Sturm, because you now have to start over with another OEM. I can only offer my sincere apology."

184. Indeed, R.A. Jones's refusal did cause problems for TreeHouse. TreeHouse searched for, but was unable to find, a single other supplier in the United States that was willing to sell it machinery used to make non-filtered Compatible Cups.

185. Thus, on information and belief, by coercing R.A. Jones to enter into this anticompetitive and exclusionary agreement, Green Mountain substantially foreclosed competitors from the United States market for machinery used to make Compatible Cups.

### 2. Green Mountain Unreasonably Restrains Access To Inputs Necessary To Make Compatible Cups In Competition With Green Mountain

186. Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter. There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers and therefore cannot be purchased from suppliers "off the shelf."

187. As set forth below, upon information and belief, Green Mountain entered into exclusive dealing agreements with suppliers of each K-Cup component to prevent competitors from purchasing these necessary inputs. Such agreements have restrained TreeHouse's ability to purchase Compatible Cup components and to compete with Green Mountain. As a direct result of Green Mountain's exclusionary agreements with suppliers, TreeHouse has been forced to work with less experienced suppliers at higher cost to TreeHouse.

### a. Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Plastic Cups Used To Make Compatible Cups

188. Before TreeHouse entered the Compatible Cup market, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and

Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.

189.   TreeHouse approached all three of these companies to find a supplier for components to make Competitive Cups.

190.   At that time, Winpak was already supplying Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers.  TreeHouse contacted Winpak to see if Winpak could also supply cups and lids to make Competitive Cups.  After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply the components to TreeHouse.  Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.

191.   Upon information and belief, Winpak was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.  Also, on information and belief, such agreement has since been renewed and/or continues to this day.

192.   Because Winpak would have been free to supply the same cups and lids for use in products not intended for K-Cup Brewers, any Green Mountain restriction prohibiting Winpak from supplying cups and lids to TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of such cups and lids.

193.   TreeHouse also met with Phoenix Cups to see if Phoenix could supply the cup component to make Competitive Cups.  Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements.  However, shortly thereafter, Phoenix Cups informed TreeHouse that it could not supply TreeHouse with cups for use in K-Cup

Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Green Mountain.

194.   Upon information and belief, Phoenix Cups was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain. Also, on information and belief, such agreement has since been renewed and/or continues to this day.

195.   Because Phoenix Cups was free to supply cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix Cups from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Green Mountain.

196.   TreeHouse then contacted Curwood, the only remaining domestic supplier of cup components used to make Compatible Cups known at that time. Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with cups for use in K-Cup Brewers, Curwood informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."

197.   Upon information and belief, Curwood was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain. Also, on information and belief, such agreement has since been renewed and/or continues to this day.

198.   As a direct result of these suppliers' refusals to supply TreeHouse with materials needed to make Competitive Cups, TreeHouse's remaining option was to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components. Developing a new cup component was a more costly and lengthy process as

compared to purchasing cup components from a company that already produced such components.

199.    Because Green Mountain cut TreeHouse off from the experienced domestic cup suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers.  TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase cups from one of the experienced cup manufacturers.

**b.    Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Lids Used To Make Compatible Cups**

200.    The domestic suppliers of foil lids used to make Compatible Cups are Winpak and LMI Packaging Solutions ("LMI").   On information and belief, at or about the time TreeHouse entered the Compatible Cup market Winpak and LMI collectively accounted for all or nearly all of the share of the market for the sale of foil lids components used to make K-Cups.

201.    As detailed above, Winpak refused to supply TreeHouse with lids after learning that TreeHouse's intended to use the lids in Competitive Cups.

202.    LMI, then a supplier to Sturm of other cups and lids, also refused to supply TreeHouse with foil lids to make Competitive Cups, citing other business commitments.  Upon information and belief, LMI refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.

203.    Indeed, subsequent to their initial refusal, LMI later informed TreeHouse that they no longer had a relationship with Green Mountain, and were therefore now free to do business with TreeHouse.

204.    Because Green Mountain cut TreeHouse off from almost all of the experienced domestic lid suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing

with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase lids from one of the experienced lid manufacturers.

> **c.  Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Filters Used To Make Compatible Cups**

205. TreeHouse contacted many suppliers of filter components for K-Cups. Several filter suppliers declined to supply TreeHouse because they were already supplying Green Mountain with the same product. Upon information and belief, these companies refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.

206. Because Green Mountain cut TreeHouse off from experienced filter suppliers, TreeHouse was forced to find a new supplier and then adapt TreeHouse's production process in order to use the new product. TreeHouse had to incur additional costs than it would have if it was able to work with a company that already supplied filters used in Compatible Cups because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.

> **3.  Green Mountain Unreasonably Restrains Access To Roasters And Coffee Brands And Conspires To Allocate Markets, Exclude Competition, And Induce Competitive Cup Makers To Take An Anticompetitive License**

> **a.  Green Mountain Enlists Competitor Co-Conspirators To Restrain Price Competition By Excluding Competitive Cup Makers**

207. Over the years, Green Mountain has obtained trademark license and manufacturing agreements from numerous third parties to use their brand names on K-Cups. These companies include: Starbucks, Dunkin' Donuts, Caribou Coffee, Wolfgang Puck, and Newman's Own. Green Mountain currently owns or licenses some forty-nine coffee brands.

208.    Upon information and belief, many, if not all, of these agreements have multi-year terms and are exclusive, which prevents these brands from also licensing trademarks or entering into manufacturing agreements with Green Mountain's competitors, such as TreeHouse, in the Compatible Cup Market.

209.    Starbucks, Wolfgang Puck, and other coffee brands discussed entering into potential business relationships with TreeHouse, but declined to do so after entering into contracts with Green Mountain.

210.    Upon information and belief, Green Mountain's agreements with coffee brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output.  This creates a further incentive for licensed coffee brands to renew their agreements with Green Mountain and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Green Mountain, as demanded by Green Mountain as a precondition for selling Compatible Cups.

211.    Upon information and belief, Green Mountain has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee brands as part of its expansive campaign to maintain its monopoly position in the Compatible Cup Market by excluding competitors who refuse to allow Green Mountain to dictate the geographical territory, market segments, and/or channels of distribution in which Compatible Cups may be sold.

212.    This expansive system of exclusionary agreements is orchestrated by Green Mountain, and coffee brands that enter into a license or manufacturing agreement with Green Mountain do so with the express knowledge of Green Mountain's anticompetitive exclusionary

distribution agreements.   This is demonstrated, for example, by the Amended and Restated Purchase and License Agreement entered into between Green Mountain and Caribou Coffee Company, Inc. ("Caribou"), on December 20, 2011.   *See* Exhibit A at 2 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc. (December 20, 2011)).   The Caribou agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase ... of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale."

213.   As agreed to between Green Mountain and coffee brands, such as Caribou, Keurig Authorized Distributor (KAD) Agreements contain a corresponding restriction prohibiting distributors from selling K-Cups outside of the "Authorized Location" determined by Green Mountain. *See* Exhibit B at 2.1 (attaching KAD Agreement).

214.   On information and belief, Keurig Authorized Re-Distributor or "KARD" Agreements similarly prohibit bulk wholesalers from selling K-Cups outside of locations or stores specified by Green Mountain.

215.   Coffee brands further agree: (1) "not to sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (2) not to license any trademarks for use by third parties in connection with products "intended for use with the Keurig Brewing System." *See* Exhibit A at 7 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou).

216.   This massive hub-and-spoke conspiracy has the anticompetitive effect of allowing Green Mountain to allocate markets, restrain output, restrain price competition, and to exclude competitors.  Indeed, the coffee brands' agreements not to deal with Competitive Cup makers that could otherwise increase their product output and sales revenue do not make economic sense, but for a conspiracy to sustain supracompetitive K-Cup prices by restraining price competition with Competitive Cup makers.

217.   Moreover, as Green Mountain's K-Cup Filter Patents have expired, there is no legitimate justification for this division of markets across competitors or the restraints placed on dealing with Competitive Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for Green Mountain to demand that Competitive Cup makers take a purported "license" or become "authorized" to sell Competitive Cups.  Green Mountain's lawful right to exclude Competitive Cup makers from the Compatible Cup Market has expired and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.  Indeed, as a quid pro quo for its initial, now expired, right to exclude competition, it was statutorily required to enable competitors to practice its invention upon the expiration of its patent.  *See* 35 U.S.C. § 112.

### b.   Green Mountain Has Substantially Foreclosed Competition Through A Series Of Agreements Allocating The Compatible Cup Market Across Coffee Brands

218.   According to one analyst report, the "only meaningful coffee brands that [Green Mountain] does not have in its portfolio are Maxwell House (*i.e.*, Kraft) and Peet's."

219.   In December 2006, Green Mountain entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups.  The parties renewed and amended their agreement in December 2011.  Under this five-year agreement, Caribou sells Green Mountain its coffee, which Green Mountain packages into K-

46

Cups, and grants Green Mountain a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. The contract provides that Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only.

220. In February 2010, Green Mountain entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Green Mountain is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands. Under the agreement, Smucker sells the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

221. In February 2011, Green Mountain entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Green Mountain became the exclusive manufacturer of Dunkin' Donuts Compatible Cups. Green Mountain and Dunkin' Donuts agreed that Dunkin' Donuts K-Cups would be sold exclusively at Dunkin' Donuts restaurants — not at grocery stores, where Dunkin' Donuts sells its bagged coffee — and that some Dunkin' Donuts restaurants would also sell Keurig Brewers.

222. In May 2011, Green Mountain entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks is the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, Green Mountain began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Green Mountain sells

Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.

223.    In May 2013, Green Mountain entered into a multi-year agreement with The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea retailer in the United States," under which Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014.

224.    In July 2013, Green Mountain entered into a multi-year agreement with Cinnabon under which Green Mountain will manufacture Cinnabon K-Cups.  Under the terms of this agreement, Cinnabon K-Cups will be sold in the retail and Away-From-Home Market Segment, as well as in Cinnabon restaurants.

225.    Green Mountain has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies, such as Bigelow, Twinings, Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola.

### c.    Green Mountain Enters Into Contracts With Coffee Roasters That Unduly Restrict Competition From Competitive Cup Makers

226.    Green Mountain also enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the coffee and tea that Green Mountain purchases from coffee brands.

227.    In at least one such contract, Green Mountain subjected the roaster's ability to contract separately with Competitive Cup makers to Green Mountain's veto rights.  Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such

contract's compliance with the terms and conditions of this Agreement.  Keurig shall review and either approve or disapprove such contracts ... ."

228.   Upon information and belief, Green Mountain has entered into additional, anticompetitive agreements similarly restricting the ability to contract separately with Competitive Cup makers and impermissibly subjecting any such proposed contract to Green Mountain's veto rights.

> **d.   Green Mountain Ties Up Distributors And Retailers With Unduly Restrictive And Anticompetitive Exclusive Agreements**

229.   Green Mountain distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors (KADs), including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality service providers, and food-service management companies, such as Vistar and Aramark.

230.   Green Mountain requires distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing any and all Competitive Cups, thereby substantially foreclosing access to the Office Coffee Services Market Segment.  Specifically, Green Mountain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

> *See* Exhibit B (attaching KAD Agreement).

231.   These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

232.     Although TreeHouse has sought to supply Competitive Cups to the Office Coffee Services Market Segment, it has been repeatedly turned away on the basis that distributors, such as Vistar, Aramark, and United Stationers, have "several years left" on their KAD Agreements with Green Mountain.   On information and belief, Vistar, Aramark, and United Stationers collectively supply the majority share of K-Cups to the Office Coffee Services Market Segment.

233.     Without competition for distribution services from multiple Compatible Cup suppliers, many distributors have experienced margin erosion under the KAD distribution system and have expressed a preference to do business with multiple Compatible Cup manufacturers, but are prohibited from doing so.   Market research indicates that distributors feel "generally unhappy" with and "restricted" by the terms of Green Mountain's multi-year KAD Agreements. Distributors have also expressed dissatisfaction with Green Mountain's "arrogance" and lack of partnership in what they describe as a "contentious" relationship.

234.     Despite widespread displeasure with the KAD distribution system, it persists because Green Mountain has leveraged its monopoly over the Single-Serve Brewer Market to coerce distributors into unfavorable and exclusionary agreements, which protect Green Mountain's monopoly profits in the Compatible Cup Market.

235.     Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers that might otherwise switch if they were made better aware of Green Mountain's supracompetitive K-Cup prices because KAD Agreements restrict distributors' ability to display prices for K-Cups, further insulating Green Mountain from competitive pricing. *See* Exhibit B at 2.1, 2.3 (attaching KAD Agreement).

236.     Upon information and belief, Green Mountain also enters into anticompetitive, unjustified, and exclusionary agreements with distributors and retailers of K-Cups and Single-

Serve Brewers that ultimately are purchased by consumers in the At-Home Market. *See, e.g.*, *supra* ¶ 214 (discussing KARD Agreement).

### F. Green Mountain Plans To Eliminate Competition By Technologically Tying K-Cup Purchases To K-Cup Brewer Purchases To Lock Out Competitive Cups

237.    Faced with the expiration of its K-Cup Filter Patents, its brewer patents lawsuit rejected as overreaching, retailers seeking low-priced alternatives to the Green Mountain K-Cup, and TreeHouse and other market entrants overcoming the substantial hurdles to produce those alternatives, Green Mountain now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers that use a K-Cup Brewer from using Competitive Cups and to coerce retailers into replacing low-priced Competitive Cups with K-Cups.

238.    As explained by Green Mountain's CEO, Brian Kelley, "the [2.0 K-Cup Brewer] will not brew unlicensed packs" because of a new "interactive technology" intended to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew." Brian Kelley, Green Mountain Q4 2013 Earnings Call, Transcript at 4-5 (Nov. 20, 2013).

239.    Thus, as one analyst explained, "GMCR has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs."

240.    Rather than a true technological innovation, Green Mountain's announced "new" technology threatens to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups. By tying 2.0 K-Cup purchases to the purchases of the 2.0 K-Cup Brewers, Green Mountain intends to leverage its monopoly over the Single-Serve Brewer Market in order to exclude competition in the Compatible Cup Market.

241.   This is yet another attempted "end-run" around the patent and competition laws. While Green Mountain could lower K-Cup prices and their 50% K-Cup profit margins to compete on the merits, Green Mountain instead announced a new anticompetitive plan to lock out what it describes as "the many strong [Competitive Cup] brands that are unlicensed" from 2.0 K-Cup Brewers.

### 1. Green Mountain Has Announced That 2.0 K-Cup Brewers Will Lock Out Competitive Cups

242.   In November 2013, in the wake of increased competition from TreeHouse and other Competitive Cups following the expiration of Green Mountain's K-Cup Filter Patents, Green Mountain announced that it would "launch a new lineup" of 2.0 K-Cup Brewers over the next twelve months with an anticipated release date in Fall 2014.

243.   The 2.0 K-Cup Brewer will reportedly work with a special taggant ink built into the lid of Green Mountain-owned or licensed 2.0 K-Cups, which will be read by "interactive technology" in the 2.0 K-Cup Brewer in order to identify whether the user has inserted a 2.0 K-Cup that is owned or licensed by Green Mountain or a Competitive Cup.

244.   As Brian Kelley stated during a conference call with financial analysts on November 20, 2013, 2.0 K-Cup Brewers "will not brew unlicensed [Competitive Cup] packs." Green Mountain Q4 2013 Earnings Call, Transcript at 4-5 (Nov. 20, 2013).

245.   2.0 K-Cup Brewers will reportedly only work if a Green Mountain-owned or licensed 2.0 K-Cup is inserted and will prevent consumers from using Competitive Cups they wish to brew that lack the special taggant ink.

### 2. Green Mountain Has Announced That It Will Eliminate K-Cup Brewers That Work With Competitive Cups

246.   During the November 2013 financial analyst call, Mr. Kelley stated that Green Mountain "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup

Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015."

247.    Mr. Kelley reiterated Green Mountain's plan to eliminate alternative K-Cup Brewers during the investor call on February 5, 2014.  When asked if the 2.0 K-Cup Brewers would "have a more narrow retail footprint," as "retailers [ ] might not carry it [2.0 K-Cup Brewers], because it might not support their private label brand," Mr. Kelley responded in part that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's replacing the current Keurig system that's out there.  And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry."

248.    By eliminating the K-Cup Brewers that work with Competitive Cups and replacing them with brewers that lock out Competitive Cups, Green Mountain seeks to exercise its monopoly power to exclude competition and to maintain supracompetitive K-Cup prices by forcing consumers to give up the Competitive Cups they prefer to use.

249.    Brokerage and investment firm Stifel agrees that Green Mountain's "re-closing ... is primarily driven by share gains from unlicensed brands ... since patent expiration," rather than an interest in benefitting consumers.

250.    Bank of America has similarly observed that "the new Keurig platform [] not brew[ing] unlicensed portion packs ... is the strongest action management has taken to strengthen the moat around its profit pool," noting further that their "impression was that management felt a sense of urgency to [] protect its market share (and profits) from the incursion of unlicensed portion pack competitors ... ."

251.    As industry news editor, Keith Nunes, explains, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."

252.   Accordingly, Mr. Kelley "expect[s] [the] unlicensed [Competitive Cup] share of the system to … begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.

### 3.   Green Mountain's Lock-Out Strategy Is Intended To Coerce Competitive Cup Makers To Enter Agreements Restricting Competition

253.   Brian Kelley stated during the November 20, 2013 investor call that Green Mountain "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert … as many [Competitive Cup makers] as [it] can."

254.   Stifel has explained that Green Mountain views its "introduction of Keurig 2.0 … as an opportunity to convert unlicensed [Competitive Cup makers] to licensed partners."   It further observed that "Green Mountain is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

255.   In order to become an "authorized" or "licensed" "Keurig system partner," however, on information and belief, Green Mountain demands that its purported "licensees" cede their independent decision-making authority to Green Mountain as to where and how many Competitive Cups can be sold by the "licensee."   Such agreements have the effect of allocating markets, restraining output, and allowing Green Mountain to maintain supracompetitive prices.

256.   On information and belief, Green Mountain additionally demands a royalty payment or other consideration under the purported "license," despite the fact that its K-Cup Filter Patents expired over a year ago.   Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

257.    Indeed, Green Mountain's Investor Day slides, dated September 10, 2013, state that even Green Mountain's new "interactive" brewer technology that will be used to "recognize licensed portion packs" and to exclude Competitive Packs is "proprietary and exclusive" — not patented.

258.    Green Mountain has been further using the upcoming 2.0 K-Cup Brewer launch to coerce Competitive Cup makers to enter into anticompetitive agreements with Green Mountain by enlisting the help of Competitive Cup makers' retail customers.   Specifically, Green Mountain has been contacting retailers to inform them that the Competitive Cups they have been purchasing will not work in 2.0 K-Cup Brewers and then inducing those retailers to urge their supplier of Competitive Cups to contact Green Mountain to become an "authorized" or "licensed" partner.

### 4.    The 2.0 K-Cup Brewer's Lock-Out Feature Has No Legitimate Consumer Benefit and Actually Harms Consumers

259.    To date, Green Mountain has failed plausibly to substantiate its claim that locking Competitive Cups out of 2.0 K-Cup Brewers would benefit consumers.   Not only is there no consumer benefit to be gained by locking Competitive Cups out of the market, but the lock-out would actually harm consumers.

260.    Green Mountain asserts in its 2013 Investor Day slides that its "interactive technology" recognizing only "licensed portion packs" will allow 2.0 K-Cup Brewers to "deliver the perfect beverage."   Mr. Kelley claims that this function will provide "game-changing performance," allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed portion packs."

261.    However, these vague claims lack any real substance, are without merit, and are pretextual sham justifications for Green Mountain's anticompetitive and exclusionary conduct.

As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." As Green Mountain has openly acknowledged, "very much of the [2.0 K-Cup Brewer] technology … is technology [it is] very familiar with."

262.   As analysts at Stifel recently noted, what has been announced to date concerning Keurig 2.0 at best represents an "underwhelming innovation."

263.   The so-called "breakthrough innovation" is in fact old news.  For example, Bosch has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."  Despite this "interactive technology," consumers remained unconvinced and, as of January 2014, Tassimo had only captured a 2.9% share of the market of consumers who own a brewer at home (as opposed to 88% for Keurig).

264.   Green Mountain's claim that its lock-out technology benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied by Green Mountain's own experience with its Vue Brewer, which also touted the same feature, but was largely rejected by consumers.

265.   As the Vue V1200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage."  Just as Green Mountain now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue portion packs was touted by Green Mountain as promising the "perfect brew."

266.   Nonetheless, Vue's lock-out technology was recognized as a failure.  One analyst notes the "Vue platform was a poorly planned, researched and designed platform."

267.   A recent market report shows that the overwhelming majority of Keurig users do not own a Vue and are either unlikely or very unlikely to purchase a Vue.

268.   Even Mr. Kelley has acknowledged that the Vue Brewer lock-out technology was poorly received by consumers, noting in a May 2013 call with investors that Vue portion packs offer only about 25% of the variety of K-Cups. Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice. They want to have all of the brands available to them. And a lot of consumers who have [the] Keurig today, they don't want to give up the K-Cup. They love the K-Cup … And the most important thing they tell us about Vue is, give us more choice."

269.   Mr. Kelley further stated in a November 2013 investor call that Green Mountain "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0."

270.   Green Mountain says it "learned" from its prior Vue introduction, and indeed it did learn that consumers wanted more choice across Compatible Cup brands. But instead of responding to consumer demand, Green Mountain has decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively, and thus has decided "to replace" all existing K-Cup Brewers that can be used with Competitive Cups to ensure that Green Mountain can fully realize its monopoly power by excluding competitors and maintaining supracompetitive prices. Thus, the purported consumer benefit of a "perfect brew" delivered by interactive technology is a pretextual sham intended to conceal Green Mountain's true intention of excluding competition that threatens its ability to extract monopoly profits from the Compatible Cup Market.

271.    Even if Green Mountain were able to articulate a consumer benefit for the lock-out strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects.  Consumers often prefer the price, taste, and/or quality of Competitive Cups to K-Cups.

272.    Additionally, consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.  As of early 2012, there were already more than 200 K-Cup varieties on the market, allowing consumers the luxury of buying different flavors at drastically different price points.

273.    However, as one research analyst noted, "if you buy Keurig 2.0, you're actually limiting the amount of coffee that you can make."  As the analyst asked, "[d]ue to the fact that the original K-Cup is still growing, who is going to be eager to 'upgrade' their coffee maker and simply chuck the one they have now, that makes all brands accessible?"  But ultimately consumers will be forced to make the switch as prior generations of K-Cup Brewers need to be replaced.

274.    Green Mountain's anticompetitive product redesign is not legitimately intended to benefit consumers; it is just Green Mountain's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower-priced Competitive Cups that consumers demand.

275.    End user businesses, institutions, and consumers should be free to decide whether this pretextual and purported product "improvement" is worth the substantially higher price of K-Cups.  End users of the 2.0 K-Cup Brewer should not be forced by Green Mountain to buy only K-Cups, when they would prefer to buy Competitive Cups, but this is precisely the goal and result of this anticompetitive and exclusionary scheme that eliminates consumer and commercial customer choice.

276.   As one financial analyst recently observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups … will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know — a monopoly is good, but marketplace/consumer confusion isn't."

### 5.   Green Mountain Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That They Create A "System"

277.   Green Mountain deceptively claims that its K-Cup Brewers and K-Cups together create one purportedly unified "system," but this is false.  Indeed, Green Mountain has admitted that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the K-Cup Brewers and the K-Cups necessarily constitute a system is pretextual.

278.   As of October 2013, Mr. Kelley, admitted it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times before they no longer work," as reported by USA Today. *See* Dan D'Ambrosio, With K-Cup Patent Expired, Others Try To Cash In, USA Today (October 29, 2013).  Green Mountain therefore cannot plausibly assert that this lock-out technology, which could be programmed to be switched on or off or to work only a limited number of times, is in any way integral to any purported consumer benefit or a necessary aspect of any unified "system."

279.   Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demand to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

280.    While Keurig may choose to bundle K-Cups with K-Cup Brewers at the time the brewer is sold, the vast majority of K-Cups are sold without a K-Cup Brewer.

281.    Consumers frequently buy a mix of both Competitive Cups and K-Cups from a wide variety of sources at a wide variety of price points, such as high-end stores like Starbucks, bulk warehouses like BJs, budget mass retailers like Wal-Mart, or online meccas like Amazon.com — all typically at separate times from the time at which they purchase a K-Cup Brewer.

282.    Some retailers only sell K-Cups or Competitive Cups but not the corresponding K-Cup Brewers.

283.    As such, a diverse group of entities typically sell K-Cups and/or K-Cup Brewers alone and/or separately.

284.    Further, Green Mountain has successfully raised K-Cup prices above supracompetitive levels for extended periods of time without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.

285.    Indeed, Green Mountain's sales of K-Cup Brewers have experienced a high rate of growth, year after year, every year since Green Mountain increased its prices in 2010.

### 6.    Green Mountain Has Interfered With TreeHouse's Business Relations By Confronting Retailers With Its Plan To Lock Out Competitive Cups

286.    Green Mountain has been systematically confronting retailers with statements of its purported Keurig 2.0 product design and present intent and plan to lock out Competitive Cups, attempting to dissuade those retailers from doing business with TreeHouse, and then, on information and belief, seeking to foreclose future competition by entering into unduly restrictive, long-term exclusionary agreements with such retail customers.  In the alternative,

even if it turns out that 2.0 K-Cup Brewers are not ultimately able to lock out new Competitive Cups that may be created through reverse engineering, Green Mountain has been falsely or recklessly interfering with TreeHouse's business relations by suggesting otherwise.

**G.    Green Mountain Has Harmed Competition, Competitive Cup Makers, Suppliers, Retailers, Distributors, Commercial Customers, And Consumers**

287.    Green Mountain's anticompetitive acts, including requiring its K-Cup machinery and component suppliers, coffee brands and roasters, and K-Cup distributors and retailers to enter into exclusive agreements, have had serious anticompetitive effects on TreeHouse and on competition in the Compatible Cup Market overall, including on other Competitive Cup manufacturers, potential market entrants, distributors, retailers, commercial customers, and consumers.

**1.    Restraints On Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, And Distributors**

288.    With little to no competition, depending on the line of business, Green Mountain and its owned or licensed coffee brands have been able to charge supracompetitive prices for K-Cups.  As a result, consumers and commercial customers in both the Away-From-Home and At-Home Market Segments have been forced to pay at least 15% to 25% more for Green Mountain-owned and licensed K-Cups than they would have for Competitive Cups.  Indeed, a consumer or commercial customer pays on average $0.60 for a Green Mountain K-Cup, as opposed to $0.45 for a Competitive Cup.  *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28.

289.    The average K-Cup Brewer owner, moreover, uses more than 1,000 K-Cups per year, according to estimates.  At an estimated 60 cents per K-Cup, that translates into an expense of over $600 per year for the average K-Cup user.

61

290.    Competitive Cups are substantially less expensive, which can save consumers over $150 a year (assuming the same 1,000-cup per year consumption rate).

291.    Consumers and commercial customers do not willingly choose to pay supracompetitive prices for Green Mountain-owned and licensed K-Cups. On the contrary, market studies show that "Keurig users remain highly price sensitive and willing to try new K-Cup brands if they are less expensive." In fact, "90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive. This is more supportive evidence that K-Cup users would not necessarily be loyal to a particular brand if they found a more inexpensive option."

292.    By restraining price competition and the availability of Competitive Cups, Green Mountain has also harmed retailers, grocers, and distributors, which seek to reduce prices in order to increase sales and win business away from competitors with higher prices or less brands.

### 2.    Restraints On Competition Have Reduced Output And Availability Of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, And Consumers

293.    Green Mountain's conduct has also limited the number and variety of Compatible Cup beverages available to consumers and commercial customers. By foreclosing access to markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of Competitive Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by Competitive Cup manufacturers.

294.    Restricted access to Competitive Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of Competitive Cups over Green Mountain-owned or licensed K-Cups. Indeed, as one market study observed, "[w]hile there are more licensed K-

Cups in the top 100 on Amazon, unlicensed [Competitive Cups] actually had a better average ranking and had far more consumers who rated each flavor."

295.   Consumer choice has been further limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Competitive Cups.

296.   Green Mountain has further constrained Competitive Cup output and diversity by foreclosing access to lucrative licensing and manufacturing arrangements with most well-known coffee brands, such as Starbucks and Dunkin' Donuts.

### 3.   Green Mountain Has Substantially Foreclosed Access To The Office Coffee Services Market Segment

297.   Because Green Mountain is currently, on information and belief, the only provider of K-Cup Brewers in the Office Coffee Services Market Segment and has prohibited distributors from selling Competitive Cups, competition in this market has been substantially foreclosed.  TreeHouse, other Competitive Cup manufacturers, and other potential entrants have been substantially foreclosed from competing for this business.

298.   Distributors serving the Office Coffee Services Market Segment have also been deprived of competition for their services and the opportunity to bargain for their preferred sales terms, despite their expressed interest in doing business with multiple Compatible Cup manufacturers.

299.   Instead, distributors have been forced to do business with Green Mountain alone on a take-it-or-leave-it basis, and distributors and commercial customers have had to accept Green Mountain's unfavorable delivery and packaging terms.

300.   By eliminating the freedom to do business with Competitive Cup manufacturers, distributors have also been harmed because they cannot compete based on the brands that they carry, which also harms consumers who are deprived of their preferred Compatible Cup selections.

301.   Green Mountain's Office Coffee Services customers have expressed that they would prefer to purchase Competitive Cups from TreeHouse, but are precluded from doing so because Green Mountain has locked in all distributors and has substantially foreclosed access to Competitive Cups.

### 4.   Harm Specific To The TreeHouse Companies

302.   As a direct and proximate result of Green Mountain's anticompetitive conduct, TreeHouse has lost profits due to higher costs of doing business and the fact that it has been substantially foreclosed from competing with Green Mountain in the Compatible Cup Market.

303.   As a direct and proximate result of Green Mountain's scheme to foreclose Plaintiffs from the Compatible Cup Market, Bay Valley has been financially injured by a decreased ability to compete for Competitive Cup supply arrangements.

304.   As a direct and proximate result of Green Mountain's scheme to restrain competition for Compatible Cups, Sturm's ability to manufacture Compatible Cups has been substantially restrained and therefore Sturm has been financially injured.  In addition, Sturm's reputation was substantially harmed as a result of Green Mountain's baseless litigation regarding Sturm's Grove Square Compatible Cups.

### 5.   Threat Of Future Harm

305.   Green Mountain's interference with various distributors and retail outlets with respect to its plans for the Keurig 2.0 brewer launch has already harmed competition, as Green Mountain has induced those entities to stop doing business with Competitive Cup sellers.

Moreover, the introduction of Green Mountain's 2.0 K-Cup Brewer threatens to further harm competition in the future.   Green Mountain already controls approximately 86% of the Compatible Cup Market, but is threatening to substantially foreclose Competitive Cup makers from the balance of the market by locking Competitive Cups out of new brewers and replacing prior generations of K-Cup Brewers.

306.   The elimination of Competitive Cup competition for Green Mountain's K-Cup Brewers will harm consumers by raising average Compatible Cup prices and by eliminating consumer choice.   It will also harm retailers, distributors, and unlicensed suppliers of Competitive Cups that seek to win business based on the price and availability of alternative brands.

307.   The Competitive Cup business is critical to the economic health of TreeHouse and its subsidiaries.  Unless permanently enjoined, Defendants' continued promotion, marketing, and introduction of 2.0 K-Cup Brewers that will reportedly not function with Competitive Cups may destroy the valuable reputation Plaintiffs have built in the Compatible Cup Market, may make it impossible for TreeHouse to compete in any meaningful way with Green Mountain, and may cause TreeHouse to lose its substantial investment in the Competitive Cup business.

## CAUSES OF ACTION

## COUNT ONE
**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

308.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 307 as fully set forth herein.

309.    As detailed above, Green Mountain has monopoly power in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

310.    As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

311.    Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

a.    coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, unreasonably restrain competition, exclude competitors, limit output, and raise competitors' costs;

b.    conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

c.    coercing distributors and retailers to enter into anticompetitive agreements that restrain market entry, exclude competitors, unreasonably restrain competition, and limit output;

d.    filing an objectively and subjectively baseless litigation and appeal against TreeHouse subsidiary Sturm for the purpose of interfering with TreeHouse's ability to compete in the Compatible Cup market;

e.    interfering with TreeHouse's business relationships by attempting to dissuade retailers from working with TreeHouse on the basis that TreeHouse's Competitive Cups will not be compatible with 2.0 K-Cup Brewers;

f.    announcing an anticipated tie of the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitive Cup makers;

g.    threatening to unreasonably restrain competition through the implementation of an anticompetitive product redesign with lock-out technology that cannot be justified based on any legitimate, non-pretextual consumer benefit, which is coupled with the elimination of K-Cup Brewers that are compatible with Competitive Cups; and

h.    raising rivals' costs above those that would exist under competitive conditions by coercing Competitive Cup makers to enter purported "licenses" that restrict output and raise rivals' costs by requiring the payment of improper "royalty" payments.

312.    While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

313.    As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in amounts to be proven at trial, in at least the following ways: (1) TreeHouse's costs of doing business have been increased as a direct result of Green Mountain tying up the inputs and machinery necessary to make Competitive Cups; (2) TreeHouse has been substantially foreclosed from competing in the Portion Pack and

Compatible Cup Markets; (3) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (4) TreeHouse has lost business as a result of Green Mountain's interference with its relationships with retailers and its claims that Competitive Cups will be locked out of 2.0 K-Cup Brewers.

314.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and consumers in the Portion Pack and Compatible Cup Markets have been harmed by, among other things: (1) Green Mountain's ability to charge supracompetitive prices for K-Cups; and (2) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT TWO
### Exclusive Dealing
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2
### and Section 3 Of The Clayton Act, 15 U.S.C. § 14
### Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4)
### Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2)
### Donnelly Act, N.Y. Gen. Bus. Law § 340

315.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 314 as fully set forth herein.

316.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

317.   Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

318.   These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

319.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.    Thus, Green Mountain's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

320.    This conduct has substantially foreclosed competition in the Portion Pack and Compatible Cup Markets.

321.    This conduct has also substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

322.    Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and similar state laws.    These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws because these agreements constitute anticompetitive acts intended to maintain Green Mountain's monopolies in the Portion Pack and Compatible Cup Markets.

**COUNT THREE**
**Monopoly Leveraging**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

323.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 322 as fully set forth herein.

324.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

325.    Green Mountain has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Green Mountain's competitors in the Compatible Cup Market.

326.    Green Mountain further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology that cannot be justified on the basis of any legitimate consumer benefit.

327.    Green Mountain willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

### COUNT FOUR
### Sham Litigation
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)

328.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 327 as fully set forth herein.

329.    Just weeks after TreeHouse subsidiary Sturm entered the Compatible Cup Market, Keurig willfully and intentionally sued Sturm, alleging in bad faith, with no objective or subjective basis, that Sturm's Competitive Cups infringed Keurig's patents directed at brewers and methods of using brewers and that Sturm induced consumers to infringe these brewer patents by using Competitive Cups.   Keurig's non-patent claims were likewise objectively and subjectively baseless.

330.     In September 2012, the United States District Court for District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against Green Mountain.

331.     After Sturm incurred three years of litigation costs based on Keurig's frivolous argument that Sturm's Competitive Cups infringed Defendants' K-Cup Brewer patents, the Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

332.     The Federal Circuit expressly concluded that rather than pursuing any legitimate purpose, "Keurig [was] attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*

333.     No reasonable litigant could have realistically expected to succeed on the merits of Keurig's claims, and thus Keurig's litigation and appeal were objectively baseless.

334.     On information and belief, and as supported by the allegations in the *Keurig v. Sturm* complaint and the meritless legal claims, Keurig's litigation and appeal were also subjectively baseless.

335.     On information and belief, Keurig instituted this lawsuit and appeal in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation and interfere with its

business relations, and to deprive TreeHouse and consumers of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

336.   As a result of this sham litigation and appeal, Plaintiffs were forced to incur three years' worth of litigation fees and costs, rather than use those resources to compete against Green Mountain.  Competition in the market for Compatible Cups has thus been harmed.

## COUNT FIVE
### Patent Misuse

337.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 336 as fully set forth herein.

338.   The *Keurig v. Sturm* litigation alleged that Green Mountain's patents directed at brewers and methods of using brewers were infringed by Sturm and Green Mountain's consumers using Sturm's Competitive Cups in K-Cup Brewers.

339.   As noted above, the United States Court of Appeals for the Federal Circuit affirmed the district court's grant of summary judgment in Sturm's favor on Keurig's patent claims, holding that rather than seeking the proper enforcement of any patent rights, Keurig was rather trying to make an "end-run" around the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  This constituted patent misuse.

340.   Green Mountain has engaged in both types of unlawful patent misuse.  First, by having sought to "impermissibly restrict" purchasers of K-Cup Brewers from using Competitive Cups on the basis of its brewer and brewing method patents, (and similarly having sought to restrict suppliers of those Competitive Cups, like TreeHouse) Green Mountain has willfully, intentionally, and unlawfully broadened the scope of its patents and, moreover, has attempted to, and threatens to do so again in the future.  Second, by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups, Green Mountain engaged in, and

threatens to continue to engage in, an unlawful tying arrangement, constituting *per se* patent misuse.

341.    As a result of Green Mountain's patent misuse, competition has been harmed because, among other things, Green Mountain's patent misuse has substantially foreclosed its competitors from the Compatible Cup market, TreeHouse has been forced to pay attorneys' fees and costs that otherwise would have been spent bringing more Competitive Cups to the market, and consumers have had reduced access to Competitive Cups.

**COUNT SIX**
**Technological Tying**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**and Section 3 Of The Clayton Act, 15 U.S.C. § 14**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2)**

342.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 341 as fully set forth herein.

343.    With the introduction of the 2.0 K-Cup Brewers, which Green Mountain asserts will only be compatible with 2.0 K-Cups, Green Mountain threatens to tie 2.0 K-Cup purchases to the purchase of 2.0 K-Cup Brewers.  By willfully and intentionally imposing a technological tie between the 2.0 K-Cup Brewers and 2.0 K-Cups, Green Mountain will condition the use of the 2.0 K-Cup Brewers on a consumer's purchase of 2.0 K-Cups.  2.0 K-Cup Brewer consumers will be forced to forgo purchasing Competitive Cups, since those cups will purportedly be rendered incompatible with 2.0 K-Cup Brewers.

344.    Green Mountain's tying arrangement will affect a substantial volume of interstate commerce.

345.    Green Mountain's tying arrangement will have the effect of: (i) inhibiting or preventing the sale of Competitive Cups; (ii) decreasing research and investment by Competitive

Cup makers in the Portion Pack and Compatible Cup Markets; (iii) discouraging or preventing new entry into the Compatible Cup Market; (iv) maintaining supracompetitive K-Cup prices and increasing average prices of Compatible Cup prices overall to consumers; (v) exploiting purchasers of 2.0 K-Cup Brewers by blocking their use of Competitive Cups of their preference; (vi) allowing Green Mountain to coerce competitors and third parties to take licenses from, and pay royalties to, Green Mountain; and (vii) increasing Green Mountain's share and monopoly power over the Compatible Cup Market.

346.   The anticompetitive effects of Green Mountain's conduct outweigh any procompetitive benefits; indeed, there are little or no procompetitive benefits resulting from Green Mountain's threatened lock-out of Competitive Cups through means of a technological tie.

347.   Green Mountains' tying arrangement is intended to maintain and increase its monopoly power, or dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets.

348.   Green Mountains' tying arrangement threatens to cause TreeHouse substantial damages as a direct and proximate cause of this unlawful conduct, and indeed has already caused TreeHouse damages because Green Mountain has used this impending lock-out as a basis to interfere with TreeHouse's business relationships, thereby diverting sales from TreeHouse to Green Mountain.

349.   Additionally, TreeHouse has been, and will be, irreparably harmed by this tying arrangement, for which there is no adequate remedy at law, and TreeHouse is entitled to a permanent injunction to prevent further harm to TreeHouse resulting from this conduct.

## COUNT SEVEN
### Anticompetitive Product Redesign
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)

350.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 349 as fully set forth herein.

351.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

352.   As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

353.   Green Mountain has further threatened to willfully and intentionally exclude competition from the Portion Pack and Compatible Cup Markets through the use of anticompetitive and exclusionary interactive lock-out technology intended to render Competitive Cups incompatible with 2.0 K-Cup Brewers.

354.   Green Mountain has threatened to eliminate alternative brewers by replacing prior generations of K-Cup Brewers with 2.0 K-Cup Brewers, thereby locking in consumers and forcing them to use K-Cups exclusively.

355.   On information and belief, the "interactive technology" will not materially benefit consumers, and, in fact, will harm consumers by resulting in reduced availability of preferred brands.   Any purported consumer benefit asserted by Green Mountain for this lock-out technology is a pretextual sham, which, on information and belief, is intended to disguise Green

Mountain's anticompetitive intent to exclude competition and maintain and increase its monopoly over the Portion Pack and Compatible Cup Markets.

356.    Green Mountain seeks to force Competitive Cup makers to take a purported "license" from, and to pay illegitimate royalties to, Green Mountain in order to avoid the exclusionary effects of this "interactive technology."

357.    Green Mountain also seeks to leverage the threat of the exclusionary effects of "interactive technology" to cause entities to stop dealing with Green Mountain's competitors.

## COUNT EIGHT
### Attempted Monopolization In The Alternative
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)

358.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 357 as fully set forth herein.

359.    As detailed above, Green Mountain has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

360.    Green Mountain has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

361.    Green Mountain's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Pack and Compatible Cup Markets.  Green Mountain's anticompetitive conduct presents a dangerous probability that Green Mountain will succeed, to the extent it has not already, in its attempt to monopolize the Portion Pack and Compatible Cup Markets.

362.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in amounts to be proven at trial, in at least the following ways: (i) TreeHouse's costs of doing business have been increased as a direct result of Green Mountain tying up the inputs and machinery necessary to make Competitive Cups; (ii) TreeHouse has been substantially foreclosed from competing in the Portion Pack and Compatible Cup Markets; (iii) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (iv) TreeHouse has lost business as a result of Green Mountain's interference with its relationships with retailers and its claims that Competitive Cups will be locked out of 2.0 K-Cup Brewers.

363.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, competitors, suppliers, distributors, retailers, commercial customers, and consumers in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets have been harmed by, among other things: (i) Green Mountain's ability to restrain competition with Competitive Cup makers; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT NINE
### Conspiracy to Monopolize
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1)-(3)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2)
### Donnelly Act, N.Y. Gen. Bus. Law § 340

364.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 363 as fully set forth herein.

365.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack Market, and Compatible Cup Market, including the power to control prices and exclude competition.

366.   Green Mountain willfully and intentionally conspired with competitor roasters and coffee brands to monopolize the Portion Pack and Compatible Cup Markets.

367.   Green Mountain and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with Green Mountain's competitors.

368.   Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competitive Cup makers to enter into contracts with distributors or other resellers.

369.   These restrictions regarding where and how K-Cups can be sold also allow Green Mountain to maintain supracompetitive prices across licensed brands by controlling output, which reduces the competitor roaster or coffee brands' incentives to enter into deals with Competitive Cup makers and creates an economic incentive for these co-conspirators to restrain competition from Competitive Cup makers and to induce Competitive Cup makers to enter into "license" agreements with Green Mountain that would require the Competitive Cup maker to permit Green Mountain to allocate the markets for Competitive Cups and to raise rivals' costs through the payment of an illegitimate "royalty."

370.   Green Mountain and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from

Competitive Cup makers in order to restrain price competition in the Portion Pack and Compatible Cup Markets.

**COUNT TEN**
**Concerted Refusals to Deal & Group Boycott**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)**
**Donnelly Act, N.Y. Gen. Bus. Law § 340**

371.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 370 as fully set forth herein.

372.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

373.   Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified concerted refusal to deal agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

374.   Specifically, Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

a.   coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers;

b.   conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers; and

c.   coercing distributors and retailers to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers.

375.    These agreements constitute unlawful concerted refusals to deal because two or more unaffiliated companies have unreasonably agreed not to deal with Competitive Cup makers.  These agreements also constitute unlawful group boycotts because they are designed to induce Competitive Cup makers to become "licensed" or "authorized" by Green Mountain. Indeed, Green Mountain has repeatedly made public statements that its business objective is to "convert" unlicensed suppliers to licensed entities.

376.    This web of agreements refusing to deal with Competitive Cup makers cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.  Thus, Green Mountain's refusals to deal serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

377.    These concerted refusals to deal have unreasonably restrained trade and have permitted Green Mountain to maintain its monopoly power over the Portion Pack and Compatible Cup Markets.

### COUNT ELEVEN
**Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq*.**

378.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 377 as fully set forth herein.

379.    The violations of Sections 1 and 2 of the Sherman Act set forth above also constitute violations of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47.

## COUNT TWELVE
### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq.*

380.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 379 as fully set forth herein.

381.    Green Mountain's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

382.    The anticompetitive conduct alleged herein also constitutes a violation of the IUDTPA, 815 Ill Comp. Stat. 510/1, *et seq.*, which makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

383.    Green Mountain's anticompetitive conduct was willful and intentional and has resulted in substantial injury to consumers and competition that is not outweighed by any benefit to consumers, and which could not have been reasonably avoided by consumers.

## COUNT THIRTEEN
### Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.*

384.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 383 as fully set forth herein.

385.    Green Mountain's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

386.    The anticompetitive conduct alleged herein also constitutes a violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1), which makes it unlawful for a person to "make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person;" 740 Ill. Comp. Stat. § 10/3(2), which prohibits unreasonable restraints of trade or commerce "[b]y contract,

81

combination or conspiracy;" 740 Ill. Comp. Stat § 10/3(3), which makes it unlawful to "[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce;" and 740 Ill. Comp. Stat. § 10/3(4), which prohibits unlawful tying and exclusive dealing arrangements.

387.    Green Mountain has willfully and intentionally monopolized trade or commerce in Illinois by restraining competition with TreeHouse Foods and Bay Valley, which have their principal place of business in Illinois.

**COUNT FOURTEEN**
**Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01,** *et seq.*

388.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 387 as fully set forth herein.

389.    Green Mountain intentionally entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to Green Mountain's competitors, such as TreeHouse.

390.    The anticompetitive conduct alleged herein also constitutes a violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1) which prohibits "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade or commerce" as well as Wis. Stat. § 133.03(2), which makes unlawful monopolization, attempts to monopolize, and combinations or conspiracies to monopolize trade or commerce.

391.    A portion of the conduct alleged herein occurred within the state of Wisconsin. Furthermore, the conduct alleged herein as a whole substantially affects consumers in the state of Wisconsin and Bay Valley's subsidiary, Strum, located in Wisconsin, as well as interstate commerce.

## COUNT FIFTEEN
### Wisconsin Common Law Unfair Competition

392.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 391 as fully set forth herein.

393.    Green Mountain entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to Green Mountain's competitors, such as TreeHouse.

394.    The anticompetitive conduct alleged herein also constitutes a violation of the common law of Wisconsin, which prohibits unfair competition between competitors or would-be competitors.

## COUNT SIXTEEN
### Intentional Interference with Business Relations Under New York Law

395.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 394 as fully set forth herein.

396.    TreeHouse had, or has, a reasonable expectation of, economically advantageous business relations with its past, current, and prospective retail customers.

397.    A special relationship existed between Green Mountain and TreeHouse because Green Mountain intended to harm TreeHouse, such harm was foreseeable, TreeHouse's injury was directly linked to Green Mountain's conduct, and Green Mountain's conduct was morally blameworthy.

398.    Green Mountain knew of TreeHouse's business relations and was aware or should have been aware that if it did not act with due care, its actions would interfere with and cause injury, in whole or in part, to these relations.

399.    Green Mountain interfered with and continues to interfere with these relations by confronting TreeHouse's retail customers with its plan to lock out Competitive Cups through its

introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

400.   Green Mountain made and continues to make these statements intentionally, maliciously, without justification, and through the use of wrongful means as set forth above.

401.   But for Green Mountain's interference, TreeHouse would have received or would receive the expected economic advantage from its business relations with its retail customers.

402.   As a result of Green Mountain's interference, TreeHouse is likely to suffer, has suffered, and will continue to suffer damage to its relations with past, current, and/or prospective retail customers, as set forth above.

403.   By reason of the foregoing, Green Mountain has engaged in negligent and intentional interference with business relations in violation of New York law.

## COUNT SEVENTEEN
### Tortious Interference with Contract Under Wisconsin Law

404.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 403 as fully set forth herein.

405.   Green Mountain has interfered with TreeHouse's business relations by confronting retail customers with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

406.   Green Mountain, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these retail customers, intentionally interfered without justification or privilege with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

## COUNT EIGHTEEN
### Tortious Interference with Prospective Business Expectancy Under Illinois Law

407.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 406 as fully set forth herein.

408.   Green Mountain has interfered with TreeHouse's business relations by confronting retail customers with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

409.   Green Mountain, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these retail customers, intentionally interfered with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

410.   Green Mountain's conduct also constitutes common law unfair competition under Illinois law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:

A.   Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market and the Portion Pack Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

B.   Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has conspired with its licensees to monopolize the Compatible Cup Market and the Portion Pack Market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Illinois Antitrust Act,

740 Ill. Comp. Stat. § 10/3(1)-(3), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

C.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4), the Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

D.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully leveraged its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup Market and the Portion Pack Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

E.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has engaged in patent misuse and a declaration that Green Mountain's brewer and method patents are unenforceable as to Compatible Cups;

F.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully tied the sale of Keurig 2.0 Brewers to 2.0 K-Cups, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2);

G.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has engaged in concerted refusals to deal and group boycotts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

H.      Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Green Mountain's violations of the Sherman Act;

I.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation the Sherman Act;

J.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from implementing the announced 2.0 K-Cup Brewer lock-out technology that threatens to block Competitive Cups from working in 2.0 K-Cup Brewers;

K.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from tying the sale of 2.0 K-Cups to 2.0 K-Cup Brewers;

L.      Pursuant to N.Y. Gen. Bus. Law § 340(5), trebled damages resulting from Green Mountain's violations of the Donnelly Act and permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Donnelly Act;

M.      Pursuant to Wis. Stat. § 133.18, trebled damages resulting from Green Mountain's violations of the Wisconsin Antitrust Act;

N.      Pursuant to Wis. Stat. § 133.14, permanent injunctive relief voiding and preventing Green Mountain's unlawful contracts with its conspirators that violate the Wisconsin Antitrust Act;

O.      Pursuant to Ill. Comp. Stat. § 740 Ill. Comp. Stat. § 10/7(2), maximum compensatory and trebled damages resulting from Green Mountain's intentional and willful violations of the Illinois Antitrust Act and permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Illinois Antitrust Act;

P.      Pursuant to 815 Ill Comp. Stat. § 510/3, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Illinois Uniform Deceptive Trade Practices Act;

Q.      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

R.      Pre-judgment and post-judgment interest at the maximum legal rate;

S.      TreeHouse's costs, expenses, and reasonable attorneys' fees in bringing this action;

T.      An award of punitive damages; and

U.      Such other relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:   New York, New York          WINSTON & STRAWN LLP
         February 11, 2014            Attorneys for Plaintiffs


By: _Susannah P Torpey_
    Aldo A. Badini
    abadini@winston.com
    Susannah P. Torpey
    storpey@winston.com
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, New York 10166
    (212) 294-6700

    Dan K. Webb (*pro hac vice*
    application pending)
    dwebb@winston.com
    James F. Herbison (*pro hac vice*
    application pending)
    jherbison@winston.com
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-9703

(312)  558-5600

Diana L. Hughes (*pro hac vice*
application pending)
dhughes@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000

# EXHIBIT A

**Amended and Restated Purchase and License Agreement**
by and among
**Green Mountain Coffee Roasters, Inc.**
**Keurig, Incorporated and Caribou Coffee Company, Inc.**

This Amended and Restated Purchase and License Agreement (this "**Agreement**") is made as of the 20th day of December, 2011 to be effective as of the 1st day of January, 2012 (the "**Effective Date**") by and among Green Mountain Coffee Roasters, Inc., a Delaware corporation with it principal executive offices located at 33 Coffee Lane, Waterbury, Vermont 05676 ("**GMCR**"), Keurig, Incorporated, a Delaware corporation with its principal executive offices located at 55 Walkers Brook Drive, Reading, Massachusetts 01867 ("**Keurig**"), and Caribou Coffee Company, Inc., a Minnesota corporation with its principal executive offices located at 3900 Lakebreeze Avenue North, Minneapolis, Minnesota 55429 ("**Caribou**").

RECITALS

Keurig has designed, developed and patented a single-cup portion-pack hot beverage brewing system which consists primarily of using a Keurig Brewer (as defined below) in combination with a Keurig Portion Pack (as defined below).

GMCR and Keurig are interested in expanding the variety of premium branded coffee and other hot beverage products available to users of Keurig Brewers.

Caribou is recognized as a leading gourmet coffee company and is interested in expanding the distribution of Caribou branded coffee and other hot beverage products.

Keurig and Caribou have previously established an arrangement pursuant to which Caribou branded coffee and other hot beverage products can be packaged and sold in Keurig Portion Packs for use in Keurig Brewers and Caribou can purchase for resale to consumers Keurig Brewers and Caribou branded Keurig Portion Packs pursuant to a Purchase and License Agreement by and between Keurig and Caribou dated December 1, 2006 (the "**Original Agreement**"). The Parties now wish to amend and restate the Original Agreement in its entirety to reflect certain mutually agreed to changes to the terms thereof.

Now, for good consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Definitions**.

    1.1   Acceptable Keurig Portion Packs to Standard: Caribou Portion Packs that meet the manufacturing and quality standards set forth in Section 8 of this Agreement.

---

** Certain information in the publicly filed version of this document has been redacted pursuant to a confidential treatment request filed with the Securities and Exchange Commission. The redacted material has been filed separately with the Commission.

1.2     <u>Ancillary Products</u>: Those products, other than Keurig Brewers and Keurig Portion Packs, offered for sale by Keurig from time to time as part of its standard retail products menu offered to Persons focused on selling products to end use consumers for At Home use.

1.3     <u>At Home or AH</u>: The residence of a consumer,

1.4     <u>Agreement</u>: This Agreement together with all attached exhibits and schedules.

1.5     <u>Caribou Coffee</u>: Coffee purchased by or for Caribou and blended to Caribou specifications by or at the direction or request of Caribou.

1.6     <u>Caribou Portion Pack</u>: A Keurig Portion Pack that contains Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Product prepared and packaged by or for GMCR or an affiliate thereof and labeled "Caribou Coffee" or such other brand name as permitted by this Agreement.

1.7     <u>Caribou Marks</u>: The trade names, service marks, trademarks, and logos now or in the future owned by or licensed to Caribou which are authorized by Caribou for use in connection with Keurig Portion Packs and listed on <u>Exhibit A</u> attached hereto.

1.8     <u>Caribou Other Hot Beverage Product</u>: Any Other Hot Beverage Product produced, purchased or blended to Caribou specifications by or at the direction or request of Caribou.

1.9     <u>Caribou Tea</u>: Any Tea purchased by or for Caribou and blended to Caribou specifications by or at the direction or request of Caribou.

1.10     <u>Fiscal Year</u>: The 52 or 53 weeks ending on the last Saturday in September. Within each Fiscal Year, the term "Fiscal Period" shall mean each of the four or five week periods used by GMCR in its internal reporting to approximate monthly periods within such Fiscal Year.

1.11     <u>Keurig Authorized Distributor or KAD</u>: A Person that has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution for the purchase by such Person of non-bulk quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, KARDs, or Keurig for resale. Persons whose distribution agreements with Keurig have been terminated are not considered KADs, even if Keurig allows them to continue to purchase repair parts and Keurig Portion Packs to service their installed base of Keurig Brewers under their terminated agreement. For avoidance of doubt, no Person providing order fulfillment services for Keurig shall be deemed to be a KAD, regardless of whether title to Keurig Products or Keurig Portion Packs passes to such Person prior to ultimate shipment to a Keurig customer.

1.12    <u>Keurig AH Brewer</u>: Any Keurig Brewer that is (1) designed for At Home use, (2) if sought by Keurig, approved for household use only by an independent testing service, and (3) listed on <u>Schedule 1.12</u> attached hereto, as such Schedule may be amended from time to time by Keurig in its sole discretion.

1.13    <u>Keurig Authorized Re-Distributor or KARD</u>: A Person that has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution for the purchase by such Person of bulk quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters or Keurig for resale to other licensed distributors in accordance with the limitations set forth in their distribution agreements with Keurig. Persons whose distribution agreements with Keurig have been terminated are not considered KARDs.

1.14    <u>Keurig Brewer</u>: Any of the specialized brewing equipment designed, developed and marketed by Keurig, or a third party licensed by Keurig to use Keurig's intellectual property to produce such party's own brewing equipment, to be used in conjunction with a Keurig Portion Pack or other portion pack to brew coffee, Tea or Other Hot Beverage Products.

1.15    <u>Keurig Brewing System</u>: A single-cup portion-pack hot beverage brewing system using a Keurig Brewer to brew coffee, Tea or Other Hot Beverage Products contained in Keurig Portion Packs or Keurig's reusable filter assembly product, currently marketed under the name "My K-Cup", by using pressurized hot water that is injected into the Keurig Portion Pack or such filter assembly product.

1.16    <u>Keurig Marks</u>: The trade name, service marks, trademarks, and logos now or in the future owned by or licensed to Keurig.

1.17    <u>Keurig Portion Pack</u>: A sealed disposable cartridge (a) designed by Keurig and (b) containing a single serve portion of ground coffee, Tea or Other Hot Beverage Product. As of the date hereof, the term Keurig Portion Packs includes K-Cup® portion packs; Keurig may in its discretion give consideration to Caribou's inclusion in any new technology platforms of Keurig Portion Packs that are brand-appropriate.

1.18    <u>Licensed Roaster</u>: A coffee roaster, Tea packer or Other Hot Beverage Product company that Keurig licenses to manufacture, package, inventory and sell Keurig Portion Packs and related products to certain channels of distribution in a designated territory.

1.19    <u>Other Hot Beverage Product</u>: Any soluble hot beverage base other than coffee and Tea.

1.20    <u>Parties</u>: GMCR, Keurig and Caribou.

1.21    <u>Person</u>: Any individual, partnership, corporation, unincorporated organization or association, limited liability company, trust or other entity.

1.22   Tea: Tea, tea extracts and tisanes, collectively.

**2.   Grant of License for Caribou Portion Packs**. Caribou grants each of GMCR and Keurig a license to use the Caribou Marks in connection with the marketing and sale of Caribou Portion Packs and the Keurig Brewing System in the United States of America and Canada; provided, however, Keurig may not place any of the Caribou Marks on the body, as opposed to the packaging, of any Keurig Brewer or Ancillary Product. Neither GMCR nor Keurig shall have the right to sublicense the use of the Caribou Marks to any third party without the express written consent of Caribou which may be withheld for any reason or none.

**3.   Sale of Caribou Coffee, Tea and Other Hot Beverage Products to GMCR**. All sales of Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products by Caribou to GMCR shall be made pursuant to the terms set forth in this Agreement. In addition, the following terms and conditions shall apply to all such sales:

3.1   Pricing. All Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products sold by Caribou to GMCR hereunder shall be sold at **

3.2   Supply. Caribou shall sell to GMCR Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products for the purpose of the manufacture of Caribou Portion Packs by or for GMCR.

3.3   Varieties. Subject to Caribou's absolute and unconditional right to determine the taste profiles of all Caribou Portion Packs in accordance with the standards set forth in Section 8.1, GMCR and Keurig shall have the right but not the obligation to market and sell a variety of Caribou Portion Packs that matches the varieties of Caribou Coffee listed on Schedule 3.3 attached hereto, plus such other varieties of Caribou Coffee, Caribou Tea, and Caribou Other Hot Beverage Products as the Parties may mutually agree in the future. GMCR intends to market and offer for sale at least four (4) varieties of Caribou Portion Packs. Notwithstanding the foregoing, neither GMCR nor Keurig shall be obligated to produce, market or sell any particular quantity or variety of Caribou Portion Packs.

3.4   Forecasts.

3.4.1   By the fifteenth day of each calendar quarter during which this Agreement is in effect, GMCR shall make a commercially reasonable effort to deliver to Caribou GMCR's good faith estimate of the quantity and varieties of Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products that GMCR reasonably expects to order during the following twelve (12) months (or such shorter time if the remaining term of this Agreement is less than 12 months); provided, however, such estimate shall in no way bind GMCR to purchase the quantity or varieties of Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Products set forth therein.

Page 4

3.4.2    In support of the forecast delivered by GMCR pursuant to <u>Section 3.4.1</u>, Caribou agrees to purchase and have available for roasting green coffee sufficient to **

3.5    <u>Order Placement</u>. As and when GMCR wishes to purchase Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Products from Caribou hereunder, GMCR shall prepare and submit to Caribou purchase orders stating the quantity of the applicable product that GMCR desires to receive and the date(s) on which GMCR desires to receive such quantity. To the extent that any purchase order submitted by GMCR contains terms in conflict with, or in addition to, the terms and conditions of this Agreement, such conflicting and/or additional terms shall not be binding upon Caribou unless specifically agreed to by Caribou in its order acknowledgment.

3.6    <u>Order Modification or Cancellation</u>. GMCR shall have the right to make alterations or revisions to purchase orders issued hereunder upon written notice to Caribou. If GMCR makes such alterations or revisions and Caribou believes there is a material adverse effect on Caribou, the Parties agree to negotiate in good faith to reach a mutually acceptable resolution. If GMCR cancels a purchase order issued hereunder for a reason other than late delivery or anticipated late delivery advised by Caribou as provided in <u>Section 3.7</u>, GMCR shall reimburse Caribou for costs incurred and work performed before cancellation. The reimbursement shall be for the direct costs of materials, including on-hand or on-order inventory that cannot be canceled, services performed, services subcontracted and other normal charges incurred before the effective date of cancellation. Caribou shall make reasonable efforts to cancel all outstanding orders from its suppliers and otherwise minimize all of the above costs in the event of any such cancellation by GMCR.

3.7    <u>Order Acceptance</u>. Within ten (10) business days after receiving a purchase order from GMCR submitted in accordance with the terms hereof, Caribou shall accept such purchase order unless Caribou determines that it cannot reasonably ship the quantities called for in such purchase order. Caribou shall make a good faith effort to maintain available supply arrangements sufficient to reasonably satisfy GMCR orders based on forecasts provided by Caribou under <u>Section 3.4.1</u>. Caribou's acceptance shall constitute a binding commitment to ship to GMCR the quantity of the products stated in such purchase order, in accordance with the terms and conditions hereof. In all cases, Caribou shall provide GMCR with written notice within ten (10) business days of Caribou's receipt of such purchase order as to whether Caribou has accepted such purchase order and, if Caribou has not accepted such purchase order, the portion of such purchase order, if any, Caribou will accept. GMCR may in such event obtain from Caribou all or any portion of the quantity of the products ordered that is available. To the extent that any purchase order submitted by GMCR contains terms in conflict with, or in addition to, the terms and conditions of this Agreement, such conflicting and/or additional terms shall not be binding upon Caribou unless specifically agreed to by Caribou in its order acceptance.

Page 5

3.8   Order Fulfillment and Delivery.

    3.8.1   Delivery of products ordered by GMCR hereunder shall be FOB GMCR's or its contract manufacturer's designated facility, as applicable. Caribou shall deliver to the applicable FOB delivery point the full quantity of the products ordered under each purchase order issued and accepted hereunder (a) no sooner than five days prior to the date set forth by GMCR therefor in such purchase order and (b) no later than the date set forth by GMCR therefor in such purchase order. If delivery by Caribou is not anticipated by the delivery date set forth in a particular purchase order issued and accepted hereunder, Caribou shall so notify GMCR as soon as is practicable and GMCR may agree to accept later shipment or may cancel such order in whole or in part without obligation to Caribou. The Parties agree that products involving a blend of multiple green coffee varieties will be blended prior to delivery to GMCR hereunder.

    3.8.2   Except as described in Section 3.8.3, risk of loss, damage or destruction and responsibility in transit of the products sold hereunder shall pass from Caribou to GMCR when the ordered quantity of the products is delivered to the account of GMCR at any GMCR designated agent such as Continental.

    3.8.3   Notwithstanding the foregoing, GMCR or its designee may in its discretion elect to arrange for shipping by a carrier of its own choosing by delivering a notice (which, for the avoidance of doubt may include a notice by e-mail) to Caribou stating such election. In the event of such an election, (a) no cost for shipping shall be included in the pricing pursuant to Section 3.1 and (b) risk of loss, damage or destruction and responsibility in transit of the products sold hereunder and shipped pursuant to the election in this Section 3.8.2 shall pass from Caribou to GMCR when the ordered quantity of products is picked up for delivery by the carrier chosen by GMCR or its designee.

3.9   Labeling. All products sold to GMCR hereunder shall be clearly labeled with the facts necessary for GMCR to package and label Caribou Portion Packs in accordance with all applicable laws and regulations.

3.10   Inspection. GMCR agrees to receive, inspect, and accept shipments made pursuant to each purchase order accepted and delivered in accordance with the terms hereof. Any products delivered or offered for delivery in a damaged condition shall be rejected and Caribou shall credit GMCR for the full amount that would have been owed by GMCR if such quantity of the products had been delivered undamaged.

3.11   Invoicing and Payment Terms. After delivery of products by Caribou in accordance with the terms of a purchase order issued and accepted in accordance with the terms of this agreement, Caribou shall send an invoice to GMCR with

respect to such product. Each invoice shall identify the purchase order(s) covered by the invoice. GMCR shall pay each such invoice within 30 days after the date on which such invoice is sent to GMCR. In the event that GMCR is delinquent in its payments, Caribou may, in addition to any other remedies, suspend shipments of products to Keurig.

4. **Caribou Portion Pack Exclusivity**. Throughout the world Caribou shall not directly, or through any Person in which Caribou directly or indirectly owns an equity interest and, alone or with others, has control of such Person's operations, sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System. In addition, Caribou shall not license or permit to be licensed to any third party any Caribou Marks for use in connection with coffee products, Tea products or Other Hot Beverage Products, other than Caribou Portion Packs, intended for use with the Keurig Brewing System.

5. **No Participation in Competing Systems**. While this Agreement is in effect, Caribou shall not directly or indirectly: (a) install or solicit for installation, design or solicit for the design, develop or solicit the development of any manufacturing line or system to manufacture single-cup, portion-pack cartridges for use in conjunction with a pressurized hot water system other than the Keurig Brewing System; or (b) design, develop, or manufacture, or contribute in any way thereto, any single-cup, portion-pack products, including any brewer designed for use with single-cup, portion pack cartridges other than the Keurig Brewer, in the case of both clauses (a) and (b) that contemplate both of the following concepts:

- A brewing chamber designed to be pierced during the brewing process to allow hot water in and the brewed beverage out; and
- A pressurized brewing process that takes place at pressures less than 30 psi inside the brewing chamber.

Examples of the above systems that would be competitive include single-cup portion-pack coffee systems such as those manufactured by Flavia, Kenco and Braun (the Tassimo system). Examples of systems that would not be competitive are hopper-based single-cup coffee systems such as those manufactured by Filterfresh and Brio and espresso pod-based systems such as Illy pod espresso machines, Café Espresso and 123spresso systems.

6. [Reserved.]

7. **KAD Purchases of Caribou Portion Packs**. All KADs and KARDs shall be authorized by Keurig to purchase Caribou Portion Packs, and Caribou may create and administer, at its own expense, promotional programs to generate demand for Caribou Portion Packs from KADs. Keurig shall inform Caribou of all new KADs promptly after their acceptance. As and when Keurig is approached by KADs interested in purchasing Caribou Portion Packs, Keurig shall advise such KADs of all of the varieties of Caribou Portion Packs available for sale to KADs

Page 7

8.   **Acceptable Keurig Portion Packs to Standard**. GMCR shall only sell Caribou Portion Packs produced in conformity with the criteria set forth in this Section.

    8.1   Freshness and Quality of Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products.

        8.1.1   Caribou Coffee: GMCR, Caribou and GMCR's contract manufacturer will develop testing procedures to assure quality control over the production process. Among other tests, Caribou shall have its professional coffee taste testers compare the same type of Caribou Coffee brewed in Caribou Portion Packs and Keurig Brewers versus conventional drip brewing systems with the objective of providing similar taste quality levels via the Keurig Brewing System as judged by Caribou.

        8.1.2   Caribou Tea: GMCR, Caribou and GMCR's contract manufacturer will develop testing procedures to assure quality control over the production process. Among other tests, Caribou shall have its professional Tea taste testers compare the same type of Caribou Tea brewed in Caribou Portion Packs and Keurig Brewers versus conventional Tea brewing techniques with the objective of providing similar taste quality levels via the Keurig Brewing System as judged by Caribou.

        8.1.3   Caribou Other Hot Beverage Products: GMCR, Caribou and GMCR's contract manufacturer will develop testing procedures to assure quality control over the production process. Among other tests, Caribou shall have its professional taste testers compare the same type of Caribou Other Hot Beverage Products in Caribou Portion Packs and Keurig Brewers versus conventional beverage preparation techniques with the objective of providing similar taste quality levels via the Keurig Brewing System as judged by Caribou.

    8.2   Amount of Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Products Packaged in Caribou Portion Packs.

        8.2.1   Caribou Coffee: For each variety of Caribou Portion Pack filled with Caribou Coffee, such Keurig Portion Packs shall be filled with the standard amount of ground Caribou Coffee established for such variety, provided that the standard amount and grind shall be set, and on occasion adjusted, by Caribou subject to bean type, flavor and optimal roasting guidelines as determined by Caribou's professional coffee taste testers to provide optimal taste consistent with the requirements of Section 8.1.1. GMCR and Caribou shall mutually agree in good faith to an acceptable high/low range around the standard amount.

Page 8

8.2.2 <u>Caribou Tea</u>: For each variety of Caribou Portion Pack filled with Caribou Tea, such Keurig Portion Packs shall be filled with the standard amount of Caribou Tea established for such variety, provided that such standard amount shall be set, and on occasion adjusted, by Caribou subject to flavor guidelines as determined by Caribou's professional Tea taste testers to provide optimal taste consistent with the requirements of <u>Section 8.1.2</u>. GMCR and Caribou shall mutually agree in good faith to an acceptable high/low range around the standard amount. Notwithstanding the foregoing, for packaging Caribou Tea using what Keurig commonly designates as an M-Cup, the minimum fill weight shall be 2.7 grams. For packaging Caribou Tea using what Keurig commonly designates as a C-150 cup, the minimum fill weight shall be 4.0 grams.

8.2.3 <u>Caribou Other Hot Beverage Products</u>: For each variety of Caribou Portion Pack filled with Caribou Other Hot Beverage Products, such Keurig Portion Packs are filled with such quantity of Caribou Other Hot Beverage Product to provide a flavor profile consistent with the requirements of <u>Section 8.1.3</u>. GMCR and Caribou shall mutually agree in good faith to an acceptable high/low range around the standard amount.

8.3 <u>Dating, Shelf Life and Oxygen Impermeability for Coffee, Tea and Other Hot Beverage Products</u>.

8.3.1 All Caribou Portion Packs filled with Caribou Coffee will contain a consumer readable Best Used By Date ("**<u>BUBD</u>**") label that shall not be longer than ** during which the Caribou Portion Pack is manufactured, unless specific approval is granted by Caribou based on testing results provided by GMCR or Keurig, which approval will not be unreasonably withheld or delayed. Caribou Portion Packs filled with Caribou Coffee shall contain less than 3% oxygen.

8.3.2 All Caribou Portion Packs filled with Caribou Tea will contain a consumer readable BUBD label that shall not be longer than ** during which the Caribou Portion Pack is manufactured, unless specific approval is granted by Caribou based on testing results provided by GMCR or Keurig, which approval will not be unreasonably withheld or delayed. Caribou Portion Packs filled with Caribou Tea are not subject to an oxygen content limitation.

8.3.3 For all Caribou Portion Packs filled with Caribou Other Hot Beverage Products, GMCR in its sole discretion shall establish an appropriate BUBD and oxygen content specification that corresponds to at least a **

8.4 <u>Portion Pack Functionality</u>. GMCR shall be responsible for ensuring that final assembled Caribou Portion Packs properly brew and function when operated with all Keurig Brewers for which the applicable Caribou Portion Pack is intended to be used. Proper functionality of final assembled Caribou Portion Packs includes but is not limited to the puncturability applicable to such Caribou Portion Pack and, if a feature of a Keurig Brewer, proper portion pack ejection.

8.4.1    For each variety of Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products to be packaged in Caribou Portion Packs, proper functionality shall be defined as meeting the Quality Control System ("**QCS**") set forth in Section 8.4.4 during each production run.

8.4.2    In addition to the QCS set forth in Section 8.4.4, for each variety of Caribou Tea to be packaged in Caribou Portion Packs, proper functionality shall be defined to also include having failure rates below 1 per 200 for Caribou Portion Packs not ejecting from the portion pack holder in Keurig Brewers designed to automatically eject portion packs and 1 per 1,000 for Caribou Portion Packs sticking to the inlet needle of any Keurig Brewer after the brewing process is completed of any Keurig Brewer.

8.4.3    In addition to the QCS set forth in Section 8.4.4, for each variety of Caribou Other Hot Beverage Products to be packaged in Caribou Portion Packs, Keurig in its sole discretion will establish Caribou Portion Pack functionality criteria, by Keurig Brewer model, and packaging and testing procedures. GMCR's approval of Caribou Portion Packs packaged with Caribou Other Hot Beverage Products shall be based on satisfaction of such functionality criteria and packaging and testing procedures.

8.4.4    Quality Control System

    8.4.4.1    GMCR is responsible for implementing, or causing its contract manufacturer to implement, the QCS related to the production and sale of Caribou Portion Packs.

    8.4.4.2    A Certified Quality Control Inspector ("**CQCI**") will implement QCS during every production run of Caribou Portion Packs.

    8.4.4.3    CQCIs will perform the following QCS testing during the production run by removing sample test Caribou Portion Packs from each lane of the machinery used to produce such Caribou Portion Packs on a regular and systematic basis in compliance with the Keurig QCS requirements set forth below:

        8.4.4.3.1    Visual inspection of test Caribou Portion Packs for defects in BUBD legibility, lid seal integrity and any other obvious visual defect.

        8.4.4.3.2    Vacuum testing to ensure lid seal integrity.

Page 10

|  |  | 8.4.4.3.3 | Oxygen content testing, if applicable, to ensure residual oxygen content after packaging is in compliance with Section 8.3. |
|---|---|---|---|

8.4.4.3.3    Oxygen content testing, if applicable, to ensure residual oxygen content after packaging is in compliance with Section 8.3.

8.4.4.3.4    Brew testing to ensure Caribou Portion Pack puncturability applicable to such Caribou Portion Pack and internal filter weld integrity.

8.4.4.4    GMCR or Keurig shall develop and implement, or, if applicable, cause its contractor manufacturer to develop and implement, procedures that enable the CQCI to halt production and segregate and test inventory if Caribou Portion Packs do not meet QCS requirements as specified in this Section.

8.5    Notwithstanding the foregoing, GMCR may make changes to the Caribou Portion Pack and the manufacture thereof that are invisible to consumers based on mutually-agreed to validation tests.

## 9.   Royalties.

9.1    Calculation of Royalty. GMCR shall pay Caribou a royalty based on the number of Caribou Portion Packs sold by GMCR per Fiscal Period. The royalty payment due hereunder for each such Fiscal Period shall equal the result of multiplying (1) Caribou Portion Pack units sold during the Fiscal Period being measured, less the number of Caribou Portion Packs within BUBD returned by customers during such Fiscal Period, by (2) the Applicable Royalty Rate. As used in this Agreement, the "**Applicable Royalty Rate**" during any Fiscal Year shall be: ** For the avoidance of doubt, the first Fiscal Year hereunder shall commence on the Effective Date and end on the last Saturday in September of 2012.

9.2    Payments. GMCR shall pay all royalties due hereunder within thirty (30) days after the date of the end of the Fiscal Period for which royalties are due.

9.3    Review of GMCR's Books and Records. Upon reasonable request, Caribou may, at its expense, have an independent auditor audit such books and records of GMCR as are necessary or appropriate to verify the calculations prepared by GMCR relating to royalty payments due Caribou. Such independent auditor shall agree in writing to maintain the confidentiality of all of GMCR's records and shall be allowed only to certify to Caribou whether or not GMCR has complied with accurately calculated such royalty payments. Such review shall take place upon reasonable written notice at a mutually agreed time during regular business hours and in all cases within one year of the periods then being audited.

## 10.   Caribou Sale of Caribou Portion Packs and Keurig AH Brewers.

10.1    Caribou Portion Packs. Caribou may purchase Caribou Portion Packs for resale to and only to AH consumers at Caribou coffee shops and through Caribou's internet site, www.cariboucoffee.com ("**Caribou's Site**").

Page 11

10.2    <u>Keurig AH Brewers and Ancillary Products</u>. Caribou may purchase Keurig AH Brewers and Ancillary Products from Keurig for resale to and only to AH consumers at Caribou coffee shops and through Caribou's Site.

10.3    <u>Marketing Support for Keurig Brewing System</u>. As long as GMCR and Keurig continue to make available Caribou Portion Packs and one or more models of Keurig AH Brewers to Caribou for resale by Caribou, Caribou shall make commercially reasonable efforts to offer for sale at least one model of Keurig AH Brewer and Caribou Portion Packs in those Caribou coffee shops in the United States of America and Canada where there is the necessary space and no landlord or other third party restrictions which would prohibit such sale. This provision shall not require Caribou to impose any obligation on franchisees with regard to the sale of Caribou Portion Packs or Keurig AH Brewers. However, Caribou shall make Keurig AH Brewers and Caribou Portion Packs available for franchisees should they choose to sell them in their coffee shops. Whether Caribou is under a restriction prohibiting the sale of Keurig AH Brewers and Caribou Portion Packs in a particular location shall be determined by Caribou in its sole discretion.

10.4    <u>AH Use of Keurig Brewers</u>. Caribou shall not knowingly promote, market, sell, lease, loan or otherwise provide any Keurig AH Brewer to any Person for other than for **household use** by such Person. For purposes of this Agreement, knowledge of Caribou's officers and employees shall be imputed to Caribou. In addition, all of Caribou's direct and indirect promotional, marketing and sales materials used in connection with or in any way related to any Keurig AH Brewer, and regardless of the media in which such materials are produced or displayed, shall clearly and conspicuously state that such Keurig AH Brewer is intended for **household use only**. For avoidance of doubt, but without limitation, all Internet-based promotional, marketing and sales materials related to Keurig AH Brewers shall be covered by this <u>Section 10.4</u>.

10.5    <u>Additional Restrictions</u>. Caribou shall not knowingly sell Caribou Portion Packs, Keurig AH Brewers or Ancillary Products to customers for resale or for use outside of the United States of America, Canada, territories of the United States of America and military bases of the United States of America. If Caribou receives an order for any Caribou Portion Pack, Keurig AH Brewer or Ancillary Product from a prospective customer that Caribou is not authorized to sell to under this <u>Section 10</u>, Caribou shall not accept such order.

10.6    <u>Internet Limitations</u>. Generally, Caribou shall not sell, lease, loan or otherwise make Keurig AH Brewers, Caribou Portion Packs or Ancillary Products available through any Internet web site other than Caribou's Site. More specifically, but without limitation, Caribou shall not promote, market, sell, lease, loan or otherwise make Keurig AH Brewers, Caribou Portion Packs or Ancillary Products directly or indirectly available through any Internet mall web site such as Amazon.com (www.amazon.com). Notwithstanding the foregoing, Caribou shall not be deemed to have violated the foregoing prohibitions if Caribou (a) subscribes to Internet search engines or optimization services that will cause links

Page 12

to Caribou's Site to appear in response to a user's search request or (b) advertises Keurig AH Brewers, Caribou Portion Packs or Ancillary Products on Internet auction web sites such as eBay (www.ebay.com) with a direct link back to Caribou's Site to execute the sale, lease or loan of the applicable product through Caribou's Site.

11. **Product Terms of Sale**. All sales of Caribou Portion Packs, Keurig All Brewers and Ancillary Products by GMCR or Keurig, as applicable, to Caribou shall be made pursuant to the terms set forth in this Agreement at prices determined by GMCR or Keurig, as applicable. GMCR and Keurig will use commercially reasonable efforts to give thirty (30) days advance notice to Caribou of price and product changes. Further, neither GMCR nor Keurig shall not be obligated to produce any particular model Keurig Brewer or to produce or sell any particular Caribou Portion Pack or Ancillary Product. In addition to the foregoing, the following terms and conditions shall apply to all sales of Caribou Portion Packs, Keurig AH Brewers and Ancillary Products by GMCR or Keurig to Caribou hereunder:

   11.1   Taxes. Prices are subject to state, local and federal taxes if applicable.

   11.2   Order Approval Required. All orders are subject to approval by GMCR or Keurig at prices, terms and specifications prevailing at time of order placement.

   11.3   Order Fulfillment; Delivery. All orders for Caribou Portion Packs, Keurig AH Brewers and Ancillary Products placed by Caribou and accepted by GMCR or Keurig, as applicable, shall be filled as soon as practicable. During the term of this Agreement, subject in each instance to the other terms of this Agreement, product availability and order acceptance, GMCR and Keurig will supply Caribou Portion Packs, Keurig AH Brewers and Ancillary Products to Caribou in such quantities as Caribou may order from time to time. If delivery by GMCR or Keurig is not anticipated by the delivery date set forth in a particular purchase order issued and accepted hereunder, GMCR or Keurig shall so notify Caribou as soon as is practicable and Caribou may agree to accept later shipment or may cancel such order in whole or in part without obligation to GMCR or Keurig. Delivery of Caribou Portion Packs, Keurig AH Brewers and Ancillary Products shall be FOB GMCR's, Keurig's or either of its agent's facility, as applicable. In all cases, risk of loss, damage or destruction and responsibility in transit of Caribou Portion Packs, Keurig AH Brewers and Ancillary Products sold hereunder shall pass from GMCR or Keurig to Caribou when such Caribou Portion Packs, Keurig AH Brewers or Ancillary Products, as applicable, are delivered to Caribou or its agent at the applicable FOB delivery point, notwithstanding any terms to the contrary specified by Caribou. With respect to Keurig AH Brewers sold to Caribou for resale to consumers, Keurig shall upon order by Caribou ship the products directly to Caribou retail locations as specified in the orders. With respect to Caribou Portion Packs ordered by Caribou, GMCR will ship them initially to Caribou, but at the election of Caribou may also be requested to ship them directly to Caribou retail locations.

Page 13

11.4   Inspection. Caribou Portion Packs, Keurig AH Brewers and Ancillary Products, following receipt by Caribou from GMCR or Keurig, must be visually inspected to reveal damage or shortage. Any shortage or damage shall be reported to GMCR or Keurig and should be reported to the shipping company within 10 days of receipt.

11.5   Limited Returns. All Caribou Portion Packs, Keurig AH Brewers and Ancillary Products are sold without return privileges, except that Caribou may return, at Keurig's expense, any Caribou Portion Packs, Keurig AR Brewers and Ancillary Products (a) purchased from GMCR or Keurig that are returned to GMCR or Keurig in accordance with Section 12 below or (b) that Caribou did not order.

11.6   Pre-shipment Preparation. GMCR or Keurig shall prepare all Caribou Portion Packs, Keurig AH Brewers and Ancillary Products to be sold to Caribou hereunder, and all associated documentation, in accordance with the following specifications:

   11.6.1   "Pallets" must at a minimum, be of standard GMA #1 quality, 4 way entry (40" x 48"). Pallets must be stacked no higher than 6 feet 5 inches and must be stretch wrapped. Pallets must contain only one product or SKU per Pallet. Mixed Pallets will not be accepted. All Caribou Portion Pack, Keurig AH Brewer and Ancillary Product packaging shall include a bottom price, UPC and SKU sticker. In the event pallets do not meet these minimum standards, Caribou, at its sole option, may refuse delivery or require GMCR or Keurig to rework the pallets prior to delivery.

   11.6.2   GMCR or Keurig shall mark all invoices, bills of lading, and packing lists to show legibly the complete Caribou purchase order and Caribou item number(s) to which they relate.

   11.6.3   GMCR or Keurig shall place on all Caribou Portion Packs, Keurig AH Brewers and Ancillary Products sold to Caribou an accurate Caribou issued Universal Product Code ("UPC") that complies with the written Caribou Uniform Product Code Requirements, as amended from time to time. GMCR or Keurig will promptly supply Caribou with its manufacturer assigned Caribou UPC number. If requested by Caribou. Keurig shall place Caribou's assigned item number on all packaging for Caribou Portion Packs, Keurig AN Brewers and Ancillary Products supplied to Caribou.

11.7   Payment. Caribou shall pay all charges due hereunder within thirty (30) days after the date of GMCR's or Kettrig's applicable invoice.

11.8   Inconsistent Terms. To the extent that any purchase order submitted by Caribou contains terms in conflict with, or in addition to, the terms and conditions of this Agreement, such conflicting and/or additional terms shall not be binding upon GMCR or Keurig unless specifically agreed to by GMCR or Keurig in its order acceptance.

**12.    Warranties.**

12.1    <u>Caribou Warranty</u>.

12.1.1    <u>General</u>. Caribou warrants that at the time of tender of delivery of the Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products purchased by GMCR hereunder and, with respect to Caribou Coffee, after roasting, provided such roasting is performed in accordance with specifications provided by Caribou, such Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products shall be free and clear from liens and encumbrances, merchantable and fit for the purpose of human consumption. In addition, Caribou warrants that the Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products purchased by GMCR hereunder at the time of delivery to GMCR or GMCR's contract manufacturer, as applicable, shall not be:

12.1.1.1    adulterated or misbranded within the meaning of (a) the Federal Food, Drug and Cosmetic Act, as amended, and all rules and regulations promulgated thereunder, (b) the Federal Meat Inspection Act, as amended, and all rules and regulations promulgated thereunder, (c) the Poultry Products Inspection Act, as amended, and all rules and regulations promulgated thereunder, and (d) any similar state or local laws, and all rules and regulations promulgated thereunder;

12.1.1.2    adulterated, misbranded or packaged in misbranded packages, within the meaning of the terms of the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Hazardous Substances Labeling Act, and all rules and regulations promulgated thereunder, and similar state or local laws; and

12.1.1.3    misbranded within the meaning of any federal, state or local laws, ordinances, rules and regulations when bearing labels furnished by Caribou, its subsidiaries, affiliates, divisions or units, and affixed to such article of food, drug device or cosmetic on repackaging by Keurig in accordance with instructions furnished by Caribou, its subsidiaries, affiliates, divisions or units.

12.1.2    <u>No Child or Forced Prison Labor</u>. Caribou warrants that it and its subcontractors/suppliers will comply with all applicable labor and environmental laws and regulations of the respective countries where Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products are produced. Caribou further warrants that it and its

Page 15

subcontractors/suppliers do not use any form of compulsory prison or slave labor, or illegal child labor and do not physically abuse their workers.

EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 12, CARIBOU MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO SUCH CARIBOU COFFEE BEANS, CARIBOU TEA AND CARIBOU OTHER HOT BEVERAGE PRODUCTS. Subject to Section 16, Caribou's entire obligation under this warranty is limited to the replacement of any product sold to GMCR hereunder which proves to be not merchantable or not fit for the purpose of human consumption or to the issuance of a credit or refund of the purchase price paid by GMCR with respect thereto.

12.2    GMCR/Keurig Warranty. SUBJECT TO SECTION 16, THE WARRANTY PROVISIONS SET FORTH IN THIS SECTION 12 SET FORTH GMCR'S AND KEURIG'S SOLE LIABILITY FOR CLAIMS BASED UPON DEFECTS IN, OR FAILURE OF ANY CARIBOU PORTION PACKS, KEURIG AH BREWERS OR ANCILLARY PRODUCTS PROVIDED HEREUNDER. SUBJECT TO SECTION 16, THESE PROVISIONS ARE CARIBOU'S EXCLUSIVE REMEDIES FOR CLAIMS BASED UPON DEFECTS IN, OR FAILURE OF ANY CARIBOU PORTION PACKS, KEURIG AH BREWERS OR ANCILLARY PRODUCTS PROVIDED HEREUNDER. GMCR AND KEURIG HEREBY SPECIFICALLY DISCLAIM ALL OTHER WARRANTIES WITH RESPECT TO CARIBOU PORTION PACKS, KEURIG AH BREWERS AND ANCILLARY PRODUCTS SUPPLIED HEREUNDER BY GMCR OR KEURIG, INCLUDING ANY WARRANTY OF MERCHANTABILITY. GMCR and Keurig, as the manufacturer, either directly or indirectly, of Caribou Portion Packs and Keurig AH Brewers, respectively, shall provide original end-user purchasers thereof GMCR's or Keurig's standard original end-user purchaser warranty therefor. GMCR and Keurig acknowledge and agree that Caribou will not handle any product returns or warranty claims for Caribou Portion Packs or Keurig AH Brewers, except to advise customers who have such returns or make such claims that GMCR or Keurig, as applicable, is responsible therefor and to pass along to such customers GMCR's or Keurig's customer service contact information

12.2.1    Keurig AH Brewers. Keurig shall provide to original end-user purchasers a limited one-year warranty on each Keurig AH Brewer from the date of such end-user's purchase (the "**Keurig AH Warranty**"). Keurig warrants that Keurig AH Brewers will be approved by Underwriter's Laboratories, Inc. or similar rating agency selected by Keurig, labeled in accordance with applicable laws, free of design, material and workmanship defects and fit for their intended use. Keurig will repair or replace any defective Keurig AH Brewer for a period of one (1) year from date of the original end-user's purchase, subject to proof of purchase by such end-user and compliance with the other terms of Keurig's consumer warranty policy. If a Keurig AH Brewer is found to be defective within 30 days of such

Page 16

purchase, Keurig shall replace such Brewer with a new Brewer of the same model, subject to proof of purchase by such end-user and compliance with the other terms of Keurig's consumer warranty policy. Subject to the foregoing conditions, if a Keurig AH Brewer is found to be defective more than 30 days after such purchase, Keurig in its sole discretion shall repair such Brewer or replace such Brewer with a refurbished brewer of the same model in like-new condition.

12.2.2    Caribou Portion Packs. Subject to and in reliance on Caribou's performance of its obligations under Section 3.9 and its warranties under Section 12.1, GMCR warrants that Caribou Portion Packs purchased by Caribou hereunder at the time of delivery to Caribou shall not be:

12.2.2.1    adulterated or misbranded within the meaning of (a) the Federal Food, Drug and Cosmetic Act, as amended, and all rules and regulations promulgated thereunder, (b) the Federal Meat Inspection Act, as amended, and all rules and regulations promulgated thereunder, (c) the Poultry Products Inspection Act, as amended, and all rules and regulations promulgated thereunder, and (d) any similar state or local laws, and all rules and regulations promulgated thereunder; or

12.2.2.2    adulterated, misbranded or packaged in misbranded packages, within the meaning of the terms of the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Hazardous Substances Labeling Act, and all rules and regulations promulgated thereunder, and similar state or local laws.

12.2.3    Non-infringement. GMCR and Keurig warrant that all Caribou Portion Packs, Keurig AH Brewers and Ancillary Products sold to Caribou hereunder and their resale by Caribou as contemplated hereby will not infringe any patent, trademark, trade dress, trade name, copyright or other right of any third party.

12.2.4    No Child or Forced Prison Labor. GMCR and Keurig warrant that it and its subcontractors/suppliers will comply with all applicable labor and environmental laws and regulations of the country where Caribou Portion Packs, Keurig AH Brewers and Ancillary Products are produced. Keurig further represents and warrants that it and its subcontractors/suppliers do not use any form of compulsory prison or slave labor, or illegal child labor and do not physically abuse their workers.

12.2.5    Product Withdrawals and Recalls. In the event any Keurig AH Brewer or Caribou Portion Packs are subject of a withdrawal, recall or safety notice for a reason other than the Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Product packaged in Caribou Portion Packs (whether initiated by Caribou in good faith based on a reasonable belief that such

Keurig AH Brewer or Caribou Portion Packs pose a significant safety issue, Keurig, or an authorized government agency), Keurig and GMCR shall be responsible for all costs and expenses associated with such withdrawal, recall or notice. Keurig or GMCR shall promptly reimburse Caribou for all reasonable costs and expenses incurred by Caribou related to such withdrawal, recall or notice, including the reasonable costs of recalling, shipping and/or destroying the Keurig AH Brewers or Caribou Portion Packs covered by such withdrawal, recall or notice (and where applicable, any products with which such Keurig AH Brewers or Caribou Portion Packs have been packaged, consolidated or commingled by GMCR or Keurig), refunds to customers authorized by GMCR or Keurig and refund of the purchase price paid by Caribou with respect to unsold Keurig AH Brewers or Caribou Portion Packs covered by such withdrawal, recall or notice and in Caribou's inventory at the time of such withdrawal, recall or notice.

12.2.6 <u>EEO</u>. Each party agrees to be bound by and fully implement the requirements mandated by Executive Order 11246 [see 41 CFR 60-1.4(a)(7)]; Section 503 of the Rehabilitation Act of 1973 [see 41 CFR 60-741.5(d)]; the Vietnam Era Veterans Readjustment Assistance Act of 1974 [see 41 CFR 60-250.5(d) and 41 CFR 60-300.5(d)]; Federal Acquisition Regulations, FAR Case 2007-013.

## 13. <u>Trademark Ownership Acknowledgement and License</u>.

13.1 <u>Caribou Marks</u>. GMCR and Keurig acknowledge that Caribou is either the owner or exclusive licensee (with full power to enter this Agreement and convey the rights contemplated in this Agreement) of all rights, title and interest in and to all the trademarks set forth in <u>Exhibit A</u> (the "**Caribou Trademarks**"), and each of GMCR and Keurig agrees not to adopt or use any of the Caribou Trademarks in any manner whatsoever except as contemplated under <u>Section 2</u> and this <u>Section 13.1</u>. In addition to the license provided under <u>Section 2</u>, Caribou hereby grants GMCR and Keurig a license during the effectiveness of this Agreement to use the Caribou Trademarks, provided that (i) they are used solely in connection with the marketing and distribution of Keurig Brewers or the Keurig Brewing System and in accordance with Caribou's specifications as to style, color and typeface set forth in <u>Exhibit B</u>, (ii) such use shall be subject to prior written approval of Caribou, (iii) no other right to use any name or designation is granted by this Agreement. Caribou hereby approves the use of the Caribou Trademarks set forth on <u>Exhibit A</u> attached hereto as contemplated thereon, and (iv) neither GMCR nor Keurig shall directly or indirectly use or attempt to use "Caribou" or any word or phrase similar to any of the Caribou Marks in any Internet domain name registration filed directly or indirectly by or on behalf of Keurig or GMCR. Upon expiration or termination of this Agreement, GMCR and Keurig shall cease using any Caribou Marks; provided, however, upon any such termination or expiration, GMCR and Keurig shall be entitled to use its then current inventory of marketing materials and product packaging with Caribou Marks thereon until such

Page 18

inventories are exhausted in the ordinary course of GMCR's and Keurig's business. Notwithstanding the arbitration provisions of this Agreement, Caribou shall be entitled, without waiving any additional rights or remedies otherwise available to Caribou at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by GMCR or Keurig of any of the provisions of this <u>Section 13.1</u>.

13.2    <u>Keurig Marks</u>. Caribou acknowledges that all rights in and to the Keurig Marks set forth in <u>Exhibit C</u> (the "**Keurig Trademarks**"), including the goodwill derived there from, are the sole and exclusive properties of Keurig. All uses of Keurig Marks, other than in marketing materials provided by Keurig, are subject to the prior written consent of Keurig, which consent may be withheld in Keurig's sole discretion. Keurig hereby approves the use of the Keurig Trademarks set forth on <u>Exhibit C</u> attached hereto as contemplated thereon. Caribou shall not remove any Keurig Marks which are affixed to Keurig AH Brewers, Caribou Portion Packs of Ancillary Products, as applicable, at the time of Keurig's delivery thereof to Caribou or to Caribou's agent at the FOB delivery point therefor. In addition, Caribou shall not directly or indirectly use or attempt to use "Keurig", "K-Cup" or any similar word or phrase that could be confusingly similar to either "Keurig" or "K-Cup" in any Internet domain name registration filed directly or indirectly by or on behalf of Caribou. Upon expiration or termination of this Agreement, Caribou shall cease using any Keurig Marks; provided, however, upon any such termination or expiration, Caribou shall be entitled to use its then current inventory of marketing materials with Keurig Marks thereon until such inventories are exhausted in the ordinary course of Caribou's business. Notwithstanding the arbitration provisions of this Agreement, Keurig shall be entitled, without waiving any additional rights or remedies otherwise available to Keurig at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by Caribou of any of the provisions of this <u>Section 13.2</u>.

13.3    <u>Display of Marks</u>. The Parties agree that any of the Caribou Marks and Keurig Marks that have been pre-approved under <u>Section 13</u> and listed in <u>Exhibits A</u> and <u>C</u>, respectively, may be displayed in any media as part of a representation of the Keurig Brewing System for the purpose of sales literature without the further prior approval of the other Party.

**14.    Term and Termination of Agreement.**

14.1    <u>Term</u>. This Agreement shall have a term five (5) years (the "**Initial Term**"). Unless earlier terminated by the mutual agreement of the parties or pursuant to <u>Section 14.2</u>, this Agreement shall automatically be renewed for successive renewal terms of three (3) years each (each a "**Renewal Term**").

Page 19

14.2    Termination.

14.2.1    Notwithstanding the foregoing, any Party may terminate this Agreement. for Cause. "**Cause**" shall be understood as any of the following events: (a) material breach of this Agreement; (b) institution by or against a Party of bankruptcy, insolvency or receivership proceedings or an admission of a Party of its inability to pay its debts as they become due; or (c) commencement by a Party of any steps toward liquidation, dissolution or winding up of its affairs.

14.2.2    Prior to effecting termination under Section 14.2.1(a), any Party shall provide prior written notice of breach to the defaulting Party and if such breach is not cured within thirty (30) business days of notice, the Parties shall then attempt to resolve the matter in good faith through direct negotiations prior to calling on any remedies set forth in Section 17.11. If the Parties cannot resolve the matter within fifteen (15) days of their first meeting, the dispute shall be settled in accordance with Section 17.11 of this Agreement. If the judgment rendered as a result of the procedures required in Section 17.11 validates the terminating Party's assertion that it is entitled to terminate pursuant to Section 14.2.1(a), that Party may terminate this Agreement upon ninety (90) days' prior written notice to the defaulting Party. Any termination under Section 14.2.1(b) or (c) shall be effective immediately upon providing written notice to the defaulting Party.

14.2.3    If at the end of the 54th month of the Initial Term (the "**Initial Term Trigger Date**"), the volume of Caribou Portion Packs sold ** either Party may terminate this Agreement effective as of the end of the Initial Term by giving notice to the other Party within thirty (30) days of the Initial Term Trigger Date.

14.2.4    If at the end of the 30th month of any Renewal Term (a "**Renewal Term Trigger Date**"), the volume of Caribou Portion Packs sold ** either Party may terminate this Agreement effective as of the end of the Initial Term by giving notice to the other Party within thirty (30) days of the Initial Term Trigger Date.

14.2.5    If in any twelve month period during the term of the Agreement, the total volume of Caribou Portion Packs is less than ** the Parties agree to meet to discuss potential remedies or courses of action to increase sales. If the Parties are unable to come to a mutually agreed to course of action, Caribou may terminate the Agreement, such termination to be effective three months following the receipt of notice of such termination by Keurig.

14.2.6    Either Party may also terminate this Agreement immediately upon written notice to the other Party in the event of a Change of Control of such other Party provided within sixty (60) days of the consummation of such Change of Control, such termination to be effective one year from the

receipt of such notice. As used herein, "**Change of Control**" means with respect to each Party a transaction that results in (a) the sale of all or substantially all of such Party's assets, (b) the sale of all or substantially all of such Party's stock or (c) the merger of such Party with or into a an unaffiliated third party whereby such third party is the surviving entity. For the avoidance of doubt, a Change of Control of GMCR shall for purposes of this Section 14.2.6 be considered a Change of Control of Keurig.

14.3   Termination Effect. Notwithstanding the termination of this Agreement, each of GMCR and Keurig, at its own option, may continue to sell and deliver Caribou Portion packs remaining in its inventory in order to fulfill customer orders for a six (6) month period after the termination of this Agreement, and Caribou, at its own option, may continue to resell Caribou Portion Packs and Keurig AH Brewers remaining in its inventory for a six (6) month period after the termination of this Agreement. In the event either party gives notice to terminate this Agreement pursuant to Section 14.1 any restrictions in Section 5 prohibiting Caribou from discussing or soliciting alternative business partners in the future shall be of no further force and effect, however, Caribou shall not enter into any alternative agreement until such time as this Agreement shall actually terminate.

15.   **Confidentiality**. Each of the Parties acknowledges that, in the course of performing their respective obligations hereunder, a Party ("**Receiving Party**") may receive information which is proprietary and confidential to the other Party and its Affiliates ("**Disclosing Party**") and which the Disclosing Party wishes to protect from public disclosure ("**Confidential Information**"). Confidential Information includes nonpublic information that Disclosing Party designates as being confidential or which, under the circumstances surrounding disclosure, ought to be treated as confidential. Confidential Information includes, without limitation, all information disclosed at any time before, after or at the time of execution of this Agreement to the Receiving Party relating to the Disclosing Party's businesses, customers, products, manufacturing techniques, marketing and sales forecasts, financial status, product development plans, strategies and the like. Excluded from the definition of Confidential Information is information:

- Already in public domain (except as specifically provided above);

- Which passes into the public domain through no fault of the Receiving Party; or

- Released to third parties by the Disclosing Party without restriction; or

- Is independently developed by the Receiving Party without the use of the Disclosing Party's information.

The Receiving Party shall, during the term of this Agreement and for a period of three (3) years from the date of termination of this Agreement:

- Ensure that the Confidential Information of the Disclosing Party is not revealed to anyone, in whole or in part, except (1) to its employees and to third parties employed by it where it is essential that the Confidential Information be revealed in order to ensure the fulfillment of its obligations under this Agreement or (2)

Page 21

where the Receiving Party is ordered to release Confidential Information by a court or agency of competent jurisdiction. In such event, the Receiving Party shall notify the Disclosing Party immediately of the subpoena or court order. It will be the burden of Disclosing Party to move for a protection order or similar device upon notice, and to notify the Receiving Party within a seventy-two (72) hour period, or less if required by the subpoena, that it is doing so. Failure of a Disclosing Party to timely notify the Receiving Party will release the Receiving Party from its confidentiality obligations;

- Use the Confidential Information only to the extent where it is essential or desirable that it do so in order to ensure the fulfillment of its obligations under this Agreement;

- Take the necessary measures to inform each of its employees and third parties employed by it and to whom it discloses Confidential Information, of the nature of such information and its confidential character and to assure that each of its employees and such third parties respect all the obligations of the Receiving Party in accordance with this Agreement;

- Inform the Disclosing Party of any unauthorized disclosure or use of the Confidential Information of which it is aware; and

- Return to the Disclosing Party the Confidential Information, upon the Disclosing Party's request, or at the latest, at the time of the termination of this Agreement, without the requirement of notice, all the Confidential Information that the latter has revealed to it.

Notwithstanding the arbitration provisions of this Agreement, either Party shall be entitled to specific performance and injunctive relief to prevent a breach or threatened breach of its rights under this Section 15.

16. **Indemnification, Limitation of Damages and Insurance.**

16.1    Keurig and GMCR Indemnification of Caribou. GMCR and Keurig shall indemnify and hold harmless Caribou, its officers, directors, employees, and agents from and against any loss, damage, cost or expense (including reasonable attorneys' fees) arising out of (a) any third party trademark or copyright claim or action alleging infringement or violation of any other third party proprietary right as a result of Caribou's use of any Keurig trademark or other materials provided by Keurig for use by Caribou, except to the extent any such claim or action is based on or attributable to any use or alteration by Caribou or its agents of such trademark or other materials in a manner not authorized by Keurig hereunder; (b) any third party patent claim or action alleging infringement or violation of any other third party patent in connection with any Keurig AH Brewer, Caribou Portion Pack or the Keurig Brewing System; (c) any defect in the design of any Keurig AH Brewer, Caribou Portion Pack or Ancillary Product sold to Caribou hereunder; or (d) any manufacturing defect in any Keurig AH Brewer sold to Caribou hereunder, including, but not limited to, any actual or alleged damage, injury or death occurring to any Person as a result, directly or indirectly, of consumption of Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products via a Caribou Portion Pack and/or the Keurig Brewing System whether claimed by reason of breach of warranty, negligence, Keurig product defect or otherwise and regardless of the forum in which any such claim is made.

Page 22

16.2     Caribou's Indemnification of Keurig. Caribou shall indemnify and hold harmless GMCR, Keurig, and each of their officers, directors, employees, agents, shareholders, subsidiaries, and the officers, directors, employees, agents of such shareholders and subsidiaries, from and against any loss, damage, cost or expense (including reasonable attorneys' fees) arising out of: (a) any third party trademark or copyright claim or action alleging infringement or violation of any other third party proprietary right as a result of GMCR's or Keurig's use of any Caribou Mark, except to the extent any such claim or action is based on or attributable to any use or alteration by GMCR or Keurig or their agents of such Caribou Mark not authorized by Caribou hereunder; (b) any third party claim arising out of Caribou's failure to label products sold to GMCR hereunder in accordance with the requirements of this Agreement or any applicable law, regulation or governmental order; or (c) any third party claim of damage, injury, death or consequence related to the Caribou Coffee, Caribou Tea or Caribou Other Hot Beverage Products purchased from Caribou and used by Keurig, GMCR or its contract manufacturer in the manufacture of Caribou Portion Packs.

16.3     Limitation of Damages. Notwithstanding anything else contained in this Agreement to the contrary, neither Party shall in any event have obligations or liabilities to the other Party for loss of profits, loss of sales, loss of use or incidental, special or consequential damages, whether based on contract, tort (including negligence), strict liability, or any other theory or form of action, even if such Party has been advised of the possibility thereof, arising out of or in connection with the manufacture, sale, delivery, use, repair or performance of Caribou Portion Packs, Keurig Brewers or Ancillary Products, or any failure or delay in connection with any of the foregoing or for breach of any representation, warranty or covenant in this Agreement.

16.4     Insurance.

       16.4.1     Comprehensive General Liability. Each Party, with respect to the operations and services contemplated in this Agreement, will cause to be carried and maintained at its respective own cost and expense Comprehensive General Liability Insurance for an amount of not less than **combined single limit on an occurrence basis for bodily injury and property damage, including without limitation, products liability, completed operation and contractual liability and in such form as required by the other Party. The insurance shall name the other Party as an additional insured to the extent of the indemnity obligations hereunder and shall contain a standard cross-liability endorsement.

       16.4.2     Carriers; Force and Effect. Each of the Parties shall obtain the insurance required by this Agreement from a financially sound insurance company of recognized responsibility and shall furnish the other Party with a

certificate of insurance evidencing such coverage prior to commencing performance under this Agreement. All insurance policies shall be primary with respect to such parties' indemnification obligations hereunder, without contribution from any other insurance which is carried by the Parties. All insurance policies shall continue in full force and effect for at least 30 days after issuance of written notice of cancellation, termination or material alteration. Each Party shall provide evidence of such coverage to the other Party upon request.

## 17. General.

17.1    Scope of Agreement. The Parties agree that the scope of this Agreement is limited to the markets and products covered hereby. In no way do the terms of this Agreement affect the Parties' rights in other markets or with other products or create any obligations or rights pertaining thereto.

17.2    Force Majeure. Except in cases involving a failure to pay money owed under this Agreement, either Party shall be excused from delays in performing or from its failure to perform hereunder to the extent that such delays or failures result from a natural calamity, act of government or similar cause beyond the control of such Party, provided that, in order to be excused from delay or failure to perform, such Party must give written notice to the other containing reasonable particulars of such delay or failures in question and act diligently to remedy the cause of such delay or failure. Notwithstanding the foregoing or any other term or provision in this Agreement to the contrary, in the event any such delay or failure to perform extends for more than one hundred eighty (180) days after the date on which the stated cause of such delay or failure occurred, the Party that did not seek such excused delay or failure shall be entitled to terminate this Agreement upon providing written notice to the other Party at least fifteen (15) days prior to the effective date of such termination.

17.3    No Implied Waivers. Failure to insist upon strict compliance with any of the terms, condition, covenants, and agreements of this Agreement in any particular instance shall not be deemed a waiver of such terms, conditions, covenants or agreement in any other instance.

17.4    Entire Agreement. This Agreement, together with the Exhibits and Schedules attached hereto, is the complete and exclusive statement of the agreement between Caribou, GMCR and Keurig regarding the subject matter hereof and supersedes all agreements and any other communications, whether oral or written, between Caribou, GMCR and Keurig. This Agreement may be modified, changed or revised only by a written agreement between Caribou, GMCR and Keurig. The parties acknowledge and agree that they have read this Agreement, understand it, and agree to be bound by it.

17.5    Severability. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in

Page 24

any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and such invalid, illegal and unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

17.6    Relationship of the Parties. This Agreement does not imply any joint venture, partnership or other business arrangement between the Parties. Keurig and GMCR, on the one hand, and Caribou, on the other hand, are separate, independent business entities agreeing to work together in the manner set forth in this Agreement. Neither Keurig or GMCR, on the one hand, nor Caribou, on the other hand, shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect whatsoever, except that GMCR and Keurig shall have the right to sublicense the Caribou Marks as contemplated under Section 2. Neither Party, nor its agents or employees shall, under no circumstances, be deemed employees, agents or representatives of the other Party.

17.7    Waiver of Jury Trial. The Parties waive all rights to trial by jury.

17.8    Headings; Counterparts. Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.9    Assignment. This Agreement shall be binding upon the Parties and their respective permitted successors and assigns, provided that neither Party may assign nor transfer this agreement without the consent of the other Party.

17.10   Notices. All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered in hand or by confirmed facsimile, the following day when sent overnight by a reputable commercial courier or five (5) days from deposit in the U.S. Mail, postage prepaid and addressed to the appropriate Party at the address noted below, return receipt requested, unless by such notice a different address shall have been designated.

> **If to GMCR:**
> Green Mountain Coffee Roasters, Inc.
> 33 Coffee Lane
> Waterbury, Vermont 05676
> Attention: TJ Whalen, VP of Marketing
> Facsimile:
> With a copy to: General Counsel

**If to Keurig**:
Keurig, Incorporated
55 Walkers Brook Drive
Reading, MA 01867
Attention: Michelle Stacy, President
Facsimile: (781) 246-3499
With a copy to: General Counsel

**If to Caribou**:
Caribou Coffee Company, Inc.
3900 Lakebreeze Avenue North
Minneapolis, MN 55429
Attention: Mr. Hank Suerth, SVP Commercial Business
e-mail: hsuerth@cariboucoffee.com
Facsimile: (763) 592-2299

With a Copy to;
Caribou Coffee Company, Inc.
3900 Lakebreeze Avenue North
Minneapolis, MN 55429
Attention: Dan E. Lee, VP, General Counsel and Secretary
E mail  dlee@cariboucoffee com
Facsimile: (763) 529-2420

17.11    Arbitration. Except as otherwise specifically provided herein, in the event of any dispute between the Parties relating to or arising out of this Agreement, the Parties shall first attempt to resolve the matter in good faith through direct negotiation. If the Parties cannot resolve the matter within fifteen (15) days of the first meeting called for such purpose, the dispute shall be settled by arbitration in the city of the Party defending the claim before a neutral arbitrator in accordance with the rules and regulations of the American Arbitration Association. If the Parties cannot agree on a single arbitrator, each Party shall appoint an arbitrator, and the two arbitrators shall agree to a third, neutral arbitrator. The Parties shall share the fees and expenses of arbitration, provided however, that the arbitrator(s) shall be empowered to award costs of arbitration and attorneys' fees as part of any award subject to this Section 17.11. The arbitrator(s)' decision shall be final and legally binding on the Parties, and shall be rendered in a manner to permit enforcement of the award in any court of competent jurisdiction.

17.12    Governing Law; Jurisdiction. This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to any choice or conflict of law principles. The United Nations Convention on the International Sale of Goods is expressly excluded from this Agreement, including without limitation the construction, interpretation and governance of this Agreement.

17.13    Survival. The terms and provisions of Sections 12, 13, 15, 16 and 17 will survive the termination of this Agreement.

**Remainder of page left intentionally blank. Signature page follows.**

Page 26

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as a contract of the day and year first above written.

Green Mountain Coffee Roasters, Inc.

By:   /s/ Frances Rathke
Name: Frances Rathke
Title:  CFO

Keurig, Incorporated

By:   /s/ Frances Rathke
Name: Frances Rathke
Title:  CFO

Caribou Coffee Company, Inc.

By:   /s/ Tim Hennessy
Name: Tim Hennessy
Title:  CFO

LEGAL FORM – APPROVED AS TO /s/ DL

# EXHIBIT B

## NON-EXCLUSIVE DISTRIBUTORSHIP AGREEMENT
### "KAD AGREEMENT"

This Non-Exclusive Distributorship Agreement (this "**Agreement**"), is made as of the 16th day of November, 2013 by and between Green Mountain Coffee Roasters, Inc., a Delaware corporation with its principal executive offices located at 33 Coffee Lane, Waterbury, Vermont  05676 ("**GMCR**")▮

### Recitals

GMCR has designed, developed and patented several portion-pack beverage brewing systems which consists primarily of using a Keurig Brewer (as defined below) in combination with a Keurig Pack (as defined below).

GMCR seeks to enter into distribution agreements with distributors who demonstrate a commitment to focus their portion-pack beverage system selling efforts on Keurig Products (as defined below) and Keurig Packs within specified territories and who meet other criteria established by GMCR.

GMCR desires to appoint Distributor, and Distributor desires to accept appointment, as a non-exclusive distributor of Keurig Products and Keurig Packs upon the terms and conditions contained in this Agreement.

NOW THEREFORE, in consideration of the mutual agreements and promises set forth herein, the Parties agree as follows:

1. **Definitions.** Certain terms used in this Agreement have the meanings set forth in this Section 1 as follows:

    1.1. "**AFH Direct Brewer**" means any of the specialized brewing equipment that is (a) designed, developed and marketed by, for or under license from or to GMCR to be used in conjunction with a Keurig Pack to brew coffee or other non-coffee soluble beverages and (b) listed on Schedule 1.1 attached hereto, which Schedule may be amended from time to time by GMCR in its sole discretion.

    1.2. "**AFH Install Brewer**" means any of the specialized brewing equipment that is (a) designed, developed and marketed by, for or under license from or to GMCR to be used in conjunction with a Keurig Pack to brew coffee or other non-coffee soluble beverages and (b) listed on Schedule 1.2 attached hereto, which Schedule may be amended from time to time by GMCR in its sole discretion.

    1.3. "**Authorized Locations**" means those customer locations indicated on Exhibit B attached hereto, which Exhibit may be amended from time to time by GMCR in its sole discretion.

    1.4. "**Consumer**" means the ultimate consumer of the coffee and other beverages produced through the use of GMCR Brewers and Keurig Packs.

1.5. "**Keurig Authorized Distributor**" or "**KAD**" means a Person authorized by GMCR to purchase Keurig Products and Keurig Packs from GMCR, Licensed Partners or Keurig Authorized Re-Distributors and to sell, rent or lease such Keurig Products and Keurig Packs in a defined territory.

1.6. "**Keurig Authorized Re-Distributor**" or "**KARD**" means a Person authorized by GMCR to purchase Keurig Packs from Licensed Partners or Keurig Products from GMCR for the exclusive purpose of selling Keurig Products only to KADs.

1.7. "**Keurig Brewer**" means any AFH Direct Brewer or AFH Install Brewer.

1.8. "**Keurig Pack**" means a sealed disposable cartridge (a) designed by or for GMCR, (b) containing a specific portion of ground coffee or other non-coffee soluble beverage base packaged in such cartridge by GMCR, a Licensed Partner or a contract manufacturer approved by GMCR and (c) having outer dimensions consistent with those cartridges offered for sale by GMCR or its Licensed Partners to distributors, retailers and end consumers under its "Keurig" trademark or other Marks of GMCR including, without limitation, the trademarks "K-Cup®", "Vue®" or "Bolt™".

1.9. "**Keurig Products**" means Keurig Brewers and such other ancillary products, excluding Keurig Packs, offered for sale by GMCR under the Keurig® brand from time to time.

1.10. "**Licensed Partner**" means a Person licensed by GMCR to package, inventory and sell Keurig Packs and other Keurig Products to KADs and KARDs in the United States of America.

1.11. "**Marks**" mean the trade names, service marks, trademarks, logos and copyrighted designs and textual materials owned by or licensed to GMCR from time to time.

1.12. "**Other GMCR Products**" means any products other than Keurig Products and Keurig Packs made available for sale by GMCR hereunder including, without limitation, bagged coffee beans and accessories used for conventional coffee brewing and consumption.

1.13. "**Parties**" means GMCR and Distributor.

1.14. "**Person**" means an individual, partnership, corporation, unincorporated organization or association, limited liability company, trust or other entity.

1.15. "**Products**" means all Keurig Products, Keurig Packs and Other GMCR Products.

1.16. "**Territory**" means the geographic area set forth in Exhibit A attached hereto, unless otherwise designated (or revised) by GMCR.

2. **Appointment as KAD**.

2.1. Keurig Products and Keurig Packs. GMCR hereby appoints Distributor and Distributor hereby accepts appointment as a non-exclusive KAD to purchase and inventory Keurig Products and Keurig Packs for promotion and direct sale, lease, rent or loan to and only to Authorized Locations in the Territory for the exclusive use by such Authorized Locations and, with respect to Keurig Packs, only (a) for use and consumption by staff and visitor

Consumers at such Authorized Location, and (b) resale by such Authorized Locations to Consumers in single Keurig Pack quantities for brewing the coffee, tea or other soluble beverage base contained therein on the premises of such Authorized Locations. In connection with its activities as a KAD and in recognition of the limits of the appointment provided in this Section 2.1, except as provided in Section 2.3, Distributor shall not (a) list, display or broadcast pricing for any Keurig Product or Keurig Pack (1) through or at any store operated by or for Distributor or any affiliate, franchisee or subdistributor of Distributor, (2) via the Internet, (3) via any mass e-mails or fax blasts other than those directed solely at Distributor's customers currently purchasing Keurig Products from Distributor or (4) via any other mode of mass communication other than Distributor's product catalog, or (b) offer for sale, lease, rent or loan, or accept an order for, Keurig Products or Keurig Packs from existing or prospective customers (1) through or at any store operated by or for Distributor or any affiliate, franchisee or subdistributor of Distributor, (2) via the Internet or (3) via any other marketing program intended to generate sales, leases, rentals, loans or other placements of Keurig Products outside of the Territory. Notwithstanding the foregoing, (i) Distributor shall not sell any Keurig Products or Keurig Packs that are listed as restricted packs in Exhibit C to the customers listed as restricted on such Exhibit C (which Exhibit may be amended from time to time by GMCR in its sole discretion), (ii) Keurig Products or Keurig Packs purchased pursuant to this Agreement may not be sold in Canada and (iii) no Keurig Products or Keurig Packs purchased outside of this Agreement may be sold in the Territory.

2.2.   Other GMCR Products. In addition to the foregoing appointment, GMCR hereby appoints Distributor and Distributor hereby accepts appointment as a non-exclusive KAD to purchase and inventory Other GMCR Products for promotion and direct sale to and only to Authorized Locations in the Territory (a) for use and consumption by staff and visitor Consumers at such Authorized Locations, and (b) resale by such Authorized Locations to Consumers in single K-Cup quantities for brewing the coffee, tea or other soluble beverage base contained therein on the premises of such Office Locations and Food Service Locations. Notwithstanding the foregoing, (i) Other GMCR Products purchased pursuant to this Agreement may not be sold in Canada, and (ii) no Other GMCR Products purchased outside of this Agreement may be sold in the Territory.

2.3.   Limited Internet Promotion and Marketing of AFH Direct Brewers. Distributor may promote and market any Keurig Products or Keurig Packs through Distributor's own web site, which has a URL of **www.coffeeexpressltd.com** ("**Distributor's AFH Site**"); provided (a) Distributor shall not conduct any such promotional or marketing activities through any web site other than Distributor's AFH Site and (b) Distributor shall not (1) list or display any pricing for any Keurig Products or Keurig Packs, other than AFH Direct Brewers, on any page or area of Distributor's AFH Site that is available to the general public or (2) sell, lease, loan or otherwise make any Keurig Products available through Distributor's AFH Site or sell Keurig Packs through Distributor's AFH Site until GMCR determines in its sole discretion that Distributor's AFH Site complies with the banner requirements set forth in paragraphs (w) through (z) below and notifies Distributor of such determination in writing; provided that any prior determination of such compliance by GMCR prior to the date hereof shall continue to be valid as of the date hereof unless the site's functionality has been modified since such prior determination. After receipt of such

notification, Distributor shall only be entitled to conduct the activities provided for above in this Section 2.3 at times when Distributor's AFH Site complies in all respects with the requirements set forth in paragraphs (w) through (z) below. In addition, at all times during which Distributor is listing, referencing or displaying prices for Keurig Products or Keurig Packs on Distributor's AFH Site, offering Keurig Packs for sale through Distributor's AFH Site or making Keurig Products available through Distributor's AFH Site, Distributor must take the following steps to ensure that only Authorized Location customers in the Territory are gaining access to the portions of Distributor's AFH Site on or through which offers for sale or pricing for any Keurig Products, other than AFH Direct Brewers (each of which may have its resale price displayed on the pages of the Distributor's AFH Site available to the general public provided Distributor posts and maintains a clear and conspicuous banner message on each page of Distributor's AFH Site on which images of or references to such AFH Direct Brewer appears stating that Distributor is authorized to sell such AFH Direct Brewer only to Authorized Locations in the Territory), or Keurig Packs is listed, referenced or displayed or Keurig Products or Keurig Packs are offered for sale or otherwise made available (all such portions of Distributor's Site, collectively, the "**Keurig Areas**"):

      (w)     Distributor must only allow access to the Keurig Areas by existing or prospective customers who have been pre-screened by or for Distributor, by phone or in-person meetings, and qualified as Authorized Location customers in the Territory;

      (x)     Distributor must establish, maintain and utilize functionality on Distributor's AFH Site that requires all visitors to enter a customer specific and non-public password before gaining access to the Keurig Areas;

      (y)     Distributor must post and maintain a clear and conspicuous banner message on each page of Distributor's AFH Site on which images of or references to Keurig Packs and Keurig Products appear stating that Distributor is authorized to sell Keurig Packs and make available Keurig Products only to Authorized Locations in the Territory; and

      (z)     Distributor must establish, maintain and utilize functionality on Distributor's AFH Site that (A) requires as part of each checkout or sale consummation protocol that the applicable customer input the zip code of the location at which the Keurig Products or Keurig Packs, as applicable, are intended to be used and (B) refuses any such checkout or sale if the zip code input by the applicable customer is for a location outside of the Territory.

In addition, but without limitation, Distributor shall not promote, market, sell, lease, loan or otherwise make any Keurig Products or Keurig Packs directly or indirectly available through eBay (*www.ebay.com*), any other Internet auction web site or any Internet mall web site such as Amazon.com (*www.amazon.com*).

Notwithstanding the foregoing, Distributor shall not be deemed to have violated the foregoing promotional or marketing prohibitions in this Section 2.3 if Distributor's AFH Site appears organically in response to a user's Internet search engine inquiry, provided

the manner in which Distributor's AFH Site or a reference or link thereto so appears complies with the limitations of <u>Section 7</u> (Limited Right to Use Marks) of this Agreement."

2.4.  <u>Social Media</u>. In addition to the restrictions in <u>Sections 2.1</u> through <u>2.3</u>, Distributor agrees that it will not, directly or indirectly, (i) use or place any Marks in the design of any social media pages, sites or applications of Distributor or its affiliates, (ii) allow any social media advertisements (whether run by the Distributor or any other third party) that uses or places Marks in such advertisement, (iii) make any mention, suggestion or implication that Distributor is a KAD or an "official" or "authorized" (or any other similar term) distributor of Products on any GMCR social media pages, sites or applications run by or on behalf of GMCR or (iv) advertise, market, offer to sell or sell any Products on any GMCR social media pages, sites or applications run by or on behalf of GMCR. Unless notified in writing by GMCR otherwise, Distributor shall be permitted to use or place Marks (but not pricing) solely in the "wall" feature of Facebook but without violating any provision of this <u>Section 2.4</u>.

2.5.  <u>Non-Exclusivity</u>. Nothing in this Agreement will restrict GMCR from appointing other KADs or KARDs inside or outside of the Territory, nor shall anything in this Agreement obligate GMCR to impose any restriction upon the use or resale of Products by another purchaser. GMCR expressly reserves the right by itself and through third parties to sell and deliver Products to any Person inside or outside of the Territory.

3.  **General Obligations of Distributor**. As a precondition to Distributor's initial and continued appointment as a KAD hereunder, Distributor agrees to comply with the following obligations. Failure to achieve and maintain such compliance shall constitute a material breach of this Agreement.

3.1.  <u>Resale Limitation</u>. Except as allowed under <u>Section 2.2(b)</u>, Distributor shall not sell Products to any Person for the purposes of resale.

3.2.  <u>Keurig Loyalty</u>. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

3.3.  <u>Keurig Pack Purchasing</u>. Distributor shall order and purchase Keurig Packs directly from and only from GMCR, Licensed Partners or KARDs, unless otherwise agreed to in writing by GMCR. Nothing shall be construed within this Agreement, implied or not, to bind or require Licensed Partners or KARDs to sell Keurig Packs to Distributor.

3.4.  <u>Brewer Minimum Purchase Requirements</u>. Subject to the other terms of this Agreement, and in order to remain entitled to all of the benefits of this Agreement, Distributor shall purchase at least six (6) Model B3000 (or the GMCR designated equivalent, as set forth on <u>Schedules 1.1</u> and <u>1.2</u> attached hereto) Keurig Brewers in each six month period following the date of this Agreement, with measurement of such requirement to occur on the last day

of each March and September following the date of this Agreement. The minimum purchase requirements for Distributor set forth in this Section are hereinafter referred to as the "Minimum Purchase Requirements". Notwithstanding the foregoing, there shall not be any Minimum Purchase Requirements for Distributor prior to either the first April 1 or October 1 on which Distributor is a KAD.

3.5.   <u>Service Capability; Warranty Issues</u>. Distributor shall maintain at all times a maintenance and repair service capability for Keurig Products directly or through a GMCR approved third party agent and make such services available to the Distributor's customers using Keurig Brewers; provided that with GMCR's prior written consent (which shall be granted in GMCR's sole discretion) GMCR may agree to arrange and maintain such maintenance and repair service on behalf of Distributor. In addition to the foregoing, Distributor shall be the primary contact for end users with respect to all warranty claims related to Keurig Brewers sold by Distributor.

3.6.   <u>No Unauthorized Product Modification or Repackaging</u>. Distributor shall conduct all maintenance and repair of Keurig Products in accordance with procedures and using parts approved by GMCR. Distributor shall not alter or modify any GMCR Product or Keurig Pack or their packaging, including covering or removing any GMCR labeling, logo, LCD screen or printed user instructions without written permission from GMCR. Distributor will not repackage any Products from GMCR's original resale packaging, including without limitation selling Keurig Packs in boxes, assortments or quantities other than those in which they are manufactured by GMCR or a Licensed Partner.

3.7.   <u>Conduct of Business</u>. Distributor shall conduct its business in the purchase and, as applicable, resale, lease, rental, loan or other placement of Products as a principal for its own account and solely at its own risk and expense.

3.8.   <u>No Agency</u>. Distributor has no authority to act for, bind or make commitments on behalf of GMCR. Therefore, Distributor shall not act or represent itself directly or by implication as an agent for GMCR, and shall not attempt to create any obligation on behalf of or in the name of GMCR.

3.9.   <u>Personal Benefits</u>. The benefits and obligations of this Agreement are personal to Distributor. Distributor has no authority to appoint an associate distributor or sub-distributor of Products without the prior express written approval of GMCR. Any such attempted appointment without such approval shall be deemed never to have occurred and of no binding effect on GMCR. For purposes of this Agreement, a franchisee of Distributor shall be considered a sub-distributor. Therefore, if Distributor desires to have any such franchisee distribute Products, Distributor must first obtain GMCR's written approval to such proposed distribution. Notwithstanding the foregoing, Distributor may retain the services of agents for (a) the receipt or delivery of Products to Distributor's customers or (b) the servicing of Products sold, leased, rented, loaned to or otherwise placed with Distributor's customers, provided that ownership of such Products shall remain with the Distributor or the Distributor's customer, as applicable, and in no case be transferred to such an agent without prior express written approval of GMCR.

3.10. Information Requirements. The Distributor acknowledges and agrees that the sales data (and other similar records and data, collectively "**Sales Data**") relating to Distributor's sale of Products is relevant and important to GMCR's business and Distributor agrees (at no cost or expense to GMCR) to make a good faith effort to provide GMCR (or GMCR's specified data collection service provider) with such Sales Data within a reasonable time after GMCR's written request. In connection with the foregoing and whether or not requested by GMCR, Distributor agrees to maintain Sales Data on an ongoing basis for at least the prior twelve months. All such Sales Data received by GMCR will be subject to Section 14; provided that Distributor hereby consents to GMCR's disclosure of such Sales Data to GMCR's data collection provider or other similar third parties so long as GMCR notifies such third parties of the confidentiality of such Sales Data.

3.11. License Fees; Taxes. Distributor shall be responsible for and shall pay all license fees, sales, use, service use, and excise taxes or other fees, assessments or taxes that may be assessed or levied against Products sold to Distributor hereunder.

3.12. Business Standards. Distributor must apply the highest business standards in conducting its business. Distributor shall comply with all applicable laws and regulations and shall not deceive any customers. Further, Distributor shall not disparage GMCR or any GMCR officer, director, employee, shareholder or agent, or in any other way damage GMCR's reputation or goodwill.

3.13. Designated Contact. Distributor shall designate one person as the key contact for all information requests between Distributor and GMCR. Such person will be identified on Exhibit A attached hereto and be entirely familiar with all policies and procedures of GMCR and Distributor and will have the authority to make decisions on behalf of Distributor involving all sales, service and customer related issues.

3.14. No Alterations. Product, packaging or label modifications are not permitted. Neither Distributor nor its agents may repackage any Product or otherwise alter or modify any consumer packaging or labels.

4.   **Terms of Sale**.

4.1. Standard Terms. All sales by GMCR to Distributor shall be made pursuant to the terms set forth in this Agreement at prices determined by GMCR. Product prices applicable to Distributor shall be those prices set forth in GMCR's price list. All sales of Products by GMCR to Distributor shall also be subject to the terms of sale found in GMCR's standard terms and conditions attached hereto as Schedule B, which may be amended by GMCR from time to time in its discretion ("**GMCR Standard Terms**").

4.2. Conflict of Terms. Unless separately agreed to in writing by both parties hereto in a particular case, the terms and conditions of this Agreement (including the GMCR Standard Terms) shall supersede any terms and conditions which may be contained in any Distributor purchase order, proposal, request for quotation, confirmation, acknowledgment, website terms or other form or instrument that may be delivered to GMCR in connection with any of the transactions contemplated by this Agreement; and in the event any such Distributor purchase order or other document includes any term or condition not described in this Agreement, such term or condition shall not apply.

5.   **Payment**. Distributor shall pay all charges due hereunder pursuant to the GMCR Standard Terms.

6.   **Warranty**. SUBJECT TO GMCR'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 8, THE WARRANTY PROVISIONS SET FORTH IN THIS SECTION 6 SET FORTH GMCR'S SOLE LIABILITY FOR CLAIMS BASED UPON DEFECTS IN, OR FAILURE OF ANY PRODUCTS PROVIDED HEREUNDER. SUBJECT TO SECTION 8, THESE PROVISIONS ARE DISTRIBUTOR'S EXCLUSIVE REMEDIES FOR CLAIMS BASED UPON DEFECTS IN, OR FAILURE OF ANY PRODUCTS PROVIDED HEREUNDER. GMCR HEREBY SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES WITH RESPECT TO PRODUCTS SUPPLIED HEREUNDER BY GMCR, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

6.1   Keurig Products Warranty. GMCR warrants that Keurig Products purchased by Distributor from GMCR hereunder do not infringe, dilute or misappropriate the trademark, trade dress, patent, copyright or other intellectual property rights of any third party. In addition, GMCR warrants that (i) Keurig Products (other than Keurig Packs) purchased by Distributor from GMCR hereunder will be free of material and workmanship defects and perform under normal and proper operating conditions in accordance with GMCR's user manuals, directions and documentation for a period of one (1) year from date of shipment thereof (or such longer period as expressly provided for in writing by GMCR) to Distributor or its agent and (ii) all Keurig Packs will be free of defects in materials and workmanship as of the date of shipment provided GMCR is notified of any such defect by Distributor within 90 days of shipment. GMCR's sole responsibility under this warranty shall be (a) at GMCR's option, to repair or replace applicable Keurig Products for which GMCR (1) has received a claim therefor in writing within the applicable period set forth above and (2) if required by GMCR, has received the Keurig Products for which such claim was submitted within thirty (30) days of GMCR's receipt of such claim, and (b) to return such Keurig Products or replacements thereto to Distributor at GMCR's expense. All warranty repair service shall be performed at a facility designated by GMCR. Distributor shall be responsible for returning the applicable Keurig Product in accordance with the product return procedure set forth in Section 6.4 below. GMCR shall only be responsible for its own costs of materials and its own labor in connection with warranty claims. All defective Keurig Products, or defective components thereof, returned under this warranty shall become GMCR property. If GMCR determines in good faith that a Keurig Product returned under a warranty claim was not covered by the warranty set forth above, Distributor shall pay GMCR all costs of handling, transportation, and repairs associated with such Keurig Product at GMCR's then prevailing rates, the detail of which GMCR shall make available to Distributor at Distributor's reasonable request.

6.2   Keurig Products Warranty Conditions. The limited warranty set forth in Section 6.1 above shall not apply, and GMCR shall have no obligation under such warranty or otherwise, to Distributor or any third party with respect to applicable Keurig Products under the following circumstances:

6.2.1.   Distributor repairs the applicable Keurig Product with replacement parts that have not been purchased from or approved by GMCR or arranges for servicing by a third party not authorized by GMCR.

6.2.2.    Improper or negligent installation, repair, modification or operation of the applicable Keurig Product, including, but not limited to, (a) modifications in violation of Section 3.6 or (b) operation of a direct- plumbed Keurig Brewer without an Omnipure KQ8A or equivalent water filtration system.

6.2.3.    Abuse or neglect of the applicable Keurig Product, including, but not limited to, failure to clean or remove mineral deposit accumulations periodically from Keurig Brewers.

6.2.4.    Damage to the applicable Keurig Product in transit from Distributor to GMCR due to improper packaging.

6.2.5.    Damage to the applicable Keurig Product after delivery from GMCR to Distributor or Distributor's agent, as applicable.  As applicable, shipping damage claims should be submitted to the shipping company.

6.2.6.    Use of any cartridge, capsule, pod or other beverage base container, other than a Keurig Pack, in a Keurig Brewer directly or indirectly gave rise to the applicable warranty or other third party claim.

6.2.7.    Use of any accessories with a Keurig Brewer that (a) are not approved by GMCR and (b) are used in connection with the functionality of such Keurig Brewer, including without limitation any accessory which is intended to replace or allow the re-use of Keurig Packs, directly or indirectly gave rise to the applicable warranty or other third party claim.

6.2.8.    Repackaging any Product or otherwise altering or modifying any serial number, consumer packaging, or labels.

6.3   Other GMCR Products Warranty.  In addition, GMCR agrees to pass through to Distributor any warranties of any Licensed Partner that GMCR receives in connection with such Licensed Partner's Keurig Packs manufactured by such Licensed Partner and purchased from GMCR under this Agreement.

6.4   Products Return Procedure.  Any Products returned for exchange or repair must be returned in the manner indicated in the GMCR Standard Terms.

7.  **Limited Right to Use Marks**.  Distributor acknowledges that all rights in and to the Marks, including the goodwill derived therefrom, are the sole and exclusive properties of GMCR. All uses of the Marks, other than in marketing materials provided by GMCR, are subject to the prior written consent of GMCR, which consent may be withheld in GMCR's sole discretion. Distributor shall not remove any Marks which are affixed to Keurig Products or Keurig Packs, as applicable, at the time of GMCR's delivery thereof to Distributor or to Distributor's agent at the FOB delivery point therefor.  In addition, Distributor shall not directly or indirectly (a) (1) bid on or purchase Internet search keywords that include any of the Marks or (2) otherwise utilize any of the Marks in search term advertising or marketing through (A) Internet search services such as, but not limited to, Bing, Google, and Yahoo or (B) Internet shopping comparison services such as, but not limited to, shopping.com without GMCR's prior written consent, which consent may be withheld in GMCR's sole discretion, or (b) use or attempt to use "Bolt", "GMCR", "Keurig", "K-Cup", "Vue" or any other GMCR

Mark or any similar word or phrase that could be confusingly similar to either "Keurig", "K-Cup", "Vue" or any other GMCR Marks in any Internet domain name registration filed directly or indirectly by or on behalf of Distributor. GMCR shall be entitled, without waiving any additional rights or remedies otherwise available to GMCR at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by Distributor of any of the provisions of this Section 7.

8.   **Indemnification.**

8.1   Intellectual Property Indemnification by GMCR. GMCR shall indemnify and hold harmless Distributor, its officers, directors, employees, and agents from and against any claims, lawsuits, liabilities and damages (including reasonable attorneys' fees) in each case with respect to claims that the manufacture, sale and/or use of a Product infringes any intellectual property right of a third party, provided that Distributor gives GMCR prompt written notice of any such loss or claim, does not incur any cost or expense with respect to any such claim without the approval of GMCR and fully cooperates with GMCR in the investigation, defense and settlement of all such claims and losses.

8.2   Product Liability Indemnification by GMCR. GMCR shall indemnify and hold harmless Distributor, its officers, directors, employees, and agents from and against any claims, lawsuits, liabilities and damages (including reasonable attorneys' fees) asserted against such an indemnified party in each case with respect to damages to property or injuries to persons that have been sustained by any third party as a result of a defect in the manufacture of a Keurig Product sold by GMCR hereunder, provided that Distributor gives GMCR prompt written notice of any such loss or claim, does not incur any cost or expense with respect to any such claim without the approval of GMCR and fully cooperates with GMCR in the investigation, defense and settlement of all such claims and losses. For avoidance of doubt, any claims, lawsuits, liabilities and damages (including reasonable attorneys' fees) arising out of the use of (a) any cartridge, capsule, pod or other beverage base container, other than a Keurig Pack, in a Keurig Brewer or (b) use of any accessories with a Keurig Brewer that (1) are not approved by GMCR and (2) are used in connection with the functionality of such Keurig Brewer, including without limitation any accessory which is intended to replace or allow the re-use of Keurig Packs, shall not be deemed asserted as a result of a defect in the manufacture of a Keurig Product sold by GMCR hereunder and shall not be entitled to indemnification or other rights hereunder.

8.3   Indemnification by Distributor. Distributor shall indemnify and hold harmless GMCR, its officers, directors, employees, and agents from and against any claims, lawsuits, liabilities and damages (including reasonable attorneys' fees) arising out of malfeasance or negligence of Distributor, Distributor's agents, employees or representatives in the use, storage, sale, service, repair or distribution of Products or arising out of the breach of any representation or warranty or undertaking made by Distributor, its agents, employees or representatives, provided that GMCR gives Distributor prompt written notice of any such claim or loss, does not incur any cost or expense with respect to any such claim without the approval of Distributor and fully cooperates with Distributor in the investigation, defense and settlement of all such claims and losses.

8.4 <u>Limitation of Damages</u>. Notwithstanding anything else contained in this Agreement to the contrary, neither Party shall in any event have obligations or liabilities to the other Party for loss of profits, loss of sales, loss of use or incidental, special or consequential damages, whether based on contract, tort (including negligence), strict liability, or any other theory or form of action, even if such Party has been advised of the possibility thereof, arising out of or in connection with the manufacture, sale, delivery, use, repair or performance of Products, or any failure or delay in connection with any of the foregoing or for breach of any representation, warranty or covenant in this Agreement. Without limiting the generality of the preceding sentence, GMCR shall not be liable to Distributor for personal injury or property damage, except for bodily injury, death or tangible property damage caused by the negligence of GMCR or any of GMCR's employees or a defect in the manufacture of a Product.

9. **Relationship of the Parties**. Distributor, its agents and employees shall, under no circumstances, be deemed employees, agents, franchisees or representatives of GMCR. Neither Distributor nor GMCR shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect whatsoever, and neither Party shall act or make any representation to the contrary.

10. **Term**. Subject to Section 11, this Agreement shall remain in effect from the date first set forth on page 1 hereof until September 30, 2016.

11. **Termination**.

11.1 <u>By Distributor</u>. If GMCR fails to fulfill or perform any of its duties, obligations or responsibilities described in this Agreement, which failure is not cured within thirty (30) days of written notice from Distributor, Distributor may terminate this Agreement immediately provided written notice is given to GMCR.

11.2 <u>By GMCR</u>. Upon any of the following events GMCR may terminate this Agreement immediately upon written notice to the Distributor:

11.2.1. Conviction in a court of competent jurisdiction of Distributor, or manager or partner, principal officer or major stockholder of Distributor for any violation of law tending, in GMCR's good faith opinion, to affect adversely the operation or business of Distributor or the name, goodwill, or reputation of GMCR, products of GMCR, or Distributor;

11.2.2. Knowing and intentional submission by Distributor to GMCR of false or fraudulent reports or statements, including, without limitation, claims for any refund, credit, rebate, incentive, allowance, discount, reimbursement or any other payment by GMCR;

11.2.3. Failure by Distributor to meet Keurig Brewer Minimum Purchase Requirements, as set forth in <u>Section 3.4</u>, for the then current period of measurement;

11.2.4. Misappropriation or unauthorized disclosure or use by Distributor of any of GMCR's Proprietary and Confidential Information (as defined below);

11.2.5.  Failure by Distributor within thirty (30) days written notice from GMCR to cease direct or indirect promotion, sale, lease, rental, loan or placement by Distributor of any product that GMCR believes in good faith infringes any of GMCR's patents or other intellectual property;

11.2.6.  Distributor files a petition in bankruptcy, has such a petition filed against it (which petition is not discharged within ninety (90) days after such filing), makes an assignment for the benefit of creditors, has a receiver, trustee, custodian or similar agent appointed or take possession of Distributor's assets, or generally ceases doing business in the ordinary course; or

11.2.7.  Breach by Distributor of any of the other duties, obligations or responsibilities of Distributor described in this Agreement, which breach is not cured within thirty (30) days following written notice from GMCR.

12. **Obligations on Termination**.  The Terminated Distributor Terms, attached hereto as Schedule A, shall survive the termination of this Agreement and shall govern any rights and obligations of a terminated Distributor upon termination of this Agreement.

13. **Incentive Programs**.  From time to time GMCR may set up and maintain incentive programs for qualified KADs. Distributor's right to participate in any such incentive plans, if at all, and the rules and requirements governing participation may be established by GMCR in its sole discretion. If Distributor is late in its payments owed GMCR or has any other outstanding breaches under this Agreement, GMCR will have the absolute right to suspend Distributor's participation in any such incentive programs, as well as Distributor's right to receive any payments thereunder, until Distributor remedies such breaches. Further, if this Agreement is terminated by GMCR under Section 11.2, GMCR's obligations under any incentive program will cease as of the date of termination without any further liability to Distributor.

14. **Proprietary and Confidential Information**.  All Proprietary and Confidential Information disclosed by either Party to the other in connection with this Agreement and the relationship of the Parties, shall be used solely as needed to perform the Parties' respective obligations under this Agreement and to allow GMCR to satisfy its financial and other reporting requirements to its corporate parent, Green Mountain Coffee Roasters, Inc., and shall be otherwise protected by the recipient from disclosure to others with the same degree of care as that which is accorded to its own Proprietary and Confidential Information. "**Proprietary and Confidential Information**" includes, without limitation, all information disclosed at any time before, after or at the time of execution of this Agreement to the receiving Party designated as confidential by the disclosing Party or relating to the disclosing Party's businesses, customers, products, manufacturing techniques, marketing and sales forecasts, financial status, product development plans, strategies and the like, including without limitation the content of this Agreement, purchasing volumes and history and product marketing results. Information will not be Proprietary and Confidential Information if such information (a) is or becomes generally available to the public other than as a result of a disclosure directly or indirectly by recipient or its Representatives, (b) was within the possession of the recipient prior to it being furnished by or on behalf of the disclosing Party pursuant hereto, provided that the source of such information was not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the disclosing Party or any third party with respect to

such information or (c) becomes available to the recipient on a non-confidential basis from a source other than the disclosing Party or any of its Representatives, provided that such source is not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the disclosing Party or any third party with respect to such information. For the purpose of this Agreement, the term "**Representatives**" shall mean the directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) of the respective Party or such Party's corporate parent or subsidiaries. Either Party shall be entitled, without waiving any additional rights or remedies otherwise available to such Party at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by the other Party of any of the provisions of this Section 14.

15. **Inspection Right.** GMCR may from time to time, upon reasonable notice to Distributor, at GMCR's expense and during Distributor's normal business hours, inspect such books and records of Distributor as are necessary or appropriate to verify Distributor's compliance with Sections 2, 3 and 7 of this Agreement.

16. **Entire Agreement.** This Agreement, together with the Exhibits and Schedules attached hereto, is the complete and exclusive statement of the agreement between Distributor and GMCR regarding the subject matter hereof and supersedes all prior agreements and any other communications, whether oral or written, between Distributor and GMCR and its subsidiaries including, without limitation, Keurig, Incorporated. This Agreement may be modified, changed or revised only by a written agreement between Distributor and GMCR. The parties acknowledge and agree that they have read this Agreement, understand it, and agree to be bound by it.

17. **Assignment.** Neither this Agreement nor any interest in this Agreement may be assigned nor transferred by Distributor nor may Distributor delegate any duties or responsibilities of Distributor under this Agreement without the prior express written approval of GMCR, which may be withheld by GMCR at GMCR's absolute discretion. This Agreement shall be binding on the assigns and successors of GMCR and permitted assigns and successors of Distributor. Whereas the distribution and other rights of Distributor set forth herein are personal to Distributor, a change in ownership of Distributor shall be deemed an assignment for purposes of this Section. For the purpose of this Agreement, a change of ownership of Distributor occurs when a third party or related group not listed on Exhibit A acquires more than 50% of the ownership or voting control of Distributor.

18. **No Implied Waivers.** Except as expressly provided in this Agreement, waiver by either Party, or failure by either Party to claim a breach, of any provision of this Agreement shall not be a waiver of any other breach or subsequent breach.

19. **Notices.** Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate Party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services and shall be deemed effective immediately upon delivery if delivered by personal delivery or three (3) days after deposit in the mails if sent by certified mail or the next day if deposited with a recognized overnight delivery service:

If to GMCR:
Green Mountain Coffee Roasters, Inc.
55 Walkers Brook Drive
Reading, MA 01867
Attn: Vice President, Associate General Counsel - Operations

If to Distributor:
To the address set forth on Exhibit A.

20. **Governing Law**. The validity, interpretation, construction and performance of this Agreement shall be governed and construed by the laws of the State of Delaware (other than its conflicts-of-laws provisions). The United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. Distributor irrevocably agrees that any suit, action or other proceeding regarding the interpretation, breach or enforcement of this Agreement shall be exclusively filed in and heard by the state or federal courts with jurisdiction to hear such disputes in Massachusetts (the "**Courts**"), and Distributor irrevocably agrees to submit to the personal jurisdiction of such Courts.

21. **Severability**. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and such invalid, illegal and unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

22. **Survival**. The terms and provisions of Sections 1, 4-8, 11-23, Exhibits A through C, Schedule 1.1, Schedule 1.2 and Schedules A and B will survive the termination of this Agreement.

23. **Headings; Counterparts**. Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent. This Agreement may be executed by facsimile or electronically and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

24. **Not Binding on GMCR until Signed by GMCR**. Notwithstanding any prior course of dealing or reliance on any actions or communications by GMCR or between the Parties, this document shall not be an effective agreement unless and until executed by a duly authorized officer of GMCR. In the event that GMCR provides an unsigned copy of this document to a Distributor, it is provided for information purposes only. Should the Distributor execute this document and deliver it to GMCR, it shall be deemed an offer by that Distributor, which may or may not be accepted by GMCR in its sole discretion, and not an acceptance of an offer by GMCR.

[Signatures follow]

Exhibit B
to
Non-Exclusive Distributorship Agreement

Authorized Locations

Authorized Locations are indicated with a "**Yes**" or "**No**" below:

**[No]**   "**Convenience Store**" means a small store (often franchised) that is open long hours and carries a limited selection of high-convenience items and food basics that people commonly use and need quickly, such as toilet paper, soft drinks, and microwavable and prepared foods, and at which brewed beverages are generally offered for sale to and for immediate consumption by Consumers thereof. Convenience Stores will not have a check out aisle nor will they offer their customers shopping carts.

**[No]**   "**Food Service Location**" means an establishment, such as a restaurant, supermarket (on premise brewing), hospital, hotel, motel, sandwich shop, delicatessen, bar, bakery shop, micro-market, or other similar retail outlet (but excluding convenience stores), that is involved in on-premise brewing and the sale of brewed beverages to Consumers.

**[Yes]**   "**Hospitality**" means (i) in hotel rooms, in motel rooms or in other similar accommodations, in each case to be offered to the guests thereof for in-room consumption and (ii) at hotels, motels or other similar accommodations at locations for on-premises consumption only by the guests, workers and employees thereof.

**[Yes]**   "**Workplace Location**" means a micro-market, business or organization, other than a Food Service Location, where business, professional, manufacturing, clerical or other commercial activities are conducted and at which brewed beverages are generally offered for immediate consumption by employees of such business or organization or, for hospitality purposes (clients) by others in connection with the activities of such business or organization and not for the primary business objective of making a profit.

<u>Exhibit C</u>

Restricted Products

The following restrictions apply:

- Distributor shall not sell any Keurig Packs in pack sizes other than in 22/24 counts.
- Distributor shall not sell the following Keurig Packs in the below listed locations:

<u>All Authorized Locations</u>: all varieties of Timothy's®.
<u>Convenience Store</u>: all varieties of International Coffee & Tea, LLC (CBTL); all varieties of Cinnabon®; all varieties of Emeril's®; all varieties of Folgers®; all varieties of Kahlua®; all varieties of Lipton®; all varieties of Millstone®; all varieties of Starbucks®; all varieties of Tazo®; and all varieties of Wolfgang Puck®.

- Distributor shall not sell any Keurig Packs with the Vue® trademark to any Food Service Location, Convenience Store, on any website not password protected or any AH website.

<u>Schedule 1.1</u>
to
Non-Exclusive Distributorship Agreement

<u>GMCR AFH Direct Brewers</u>

OfficePro/B145 Model (Model B3000 series equivalent: ¼)

Model K155 (Model B3000 series equivalent: ½)

Model V1255 (Model B3000 series equivalent: 1/3)

Page 19

Schedule 1.2
to
Non-Exclusive Distributorship Agreement

GMCR AFH Install Brewers

Model B3000 Series (Model B3000 series equivalent: 1)

Model B130 (Model B3000 series equivalent: 1/16)

Model B140 (Model B3000 series equivalent: ¼)

Model K150 (Model B3000 series equivalent: ½)

Model K150P (Model B3000 series equivalent: ½)

Model B200 (Model B3000 series equivalent: ½)

Model V1200 (Model B3000 series equivalent: 1/3)

Schedule A
to
Non-Exclusive Distributorship Agreement

Terminated Distributor Terms

Upon expiration under <u>Section 10</u> of this Agreement or, as applicable, earlier termination of this Agreement in accordance with <u>Section 11</u> above, Distributor shall cease to have any rights under this Agreement, except as provided (a) in those sections of this Agreement that are deemed to survive expiration or termination under <u>Section 22</u> of this Agreement and (b) below:

1.    (a)    Subject to the other terms and conditions of this Schedule A, Distributor may continue to purchase (1) Keurig Packs and other Keurig Products (including spare parts for Keurig Brewers but not Keurig Brewers), from GMCR or KARDs at GMCR's highest price level on GMCR's then current price list for KADs; provided that GMCR in its discretion may require that such purchases only be through GMCR and not through a KARD, and (2) at GMCR's sole discretion and further subject to Distributor entering into a separate arrangement with one or more Licensed Partner, Keurig Packs from such Licensed Partner(s), in all cases for the sole purpose of supplying the requirements of Keurig Brewers owned by Distributor at the time of the expiration or earlier termination of this Agreement ("**Installed Brewers**").

(b)    Distributor's rights to purchase Keurig Packs and Keurig Products (including spare parts for Keurig Brewers but not Keurig Brewers) from GMCR or Keurig Packs from a Licensed Partner pursuant to Paragraph 1(a) shall continue for a period of one (1) year from any termination of this Agreement pursuant to <u>Section 11</u> of this Agreement or three (3) years from any termination of this Agreement due to the expiration of the Term described in <u>Section 10</u>, in each case unless earlier terminated pursuant to the provisions of this Paragraph 1.

(c)    GMCR reserves the right to establish separate credit terms or no credit terms for the Distributor, in GMCR's sole discretion. In addition, GMCR may require, as a condition to GMCR's obligations under this Paragraph 1 and notwithstanding any previously established terms of sale, that Distributor pay in full all amounts owed by Distributor to GMCR and to all other subsidiaries, unincorporated divisions or business units of Green Mountain Coffee Roasters, Inc. prior to the expiration or earlier termination of this Agreement and cure all Distributor breaches of this Agreement. If GMCR so requires, Distributor's rights under this Paragraph 1 shall be suspended until all such amounts have been paid in full and such breaches cured to GMCR's satisfaction, in its sole discretion.

(d)    In addition, if at any time after GMCR's obligations under this Paragraph 1 become effective an event occurs that would have entitled GMCR to terminate this Agreement under <u>Section 11.2</u>, GMCR may, in its sole discretion, suspend Distributor's rights under this Paragraph 1 until the breach accruing as a result of the applicable event is cured to GMCR's satisfaction, in its sole discretion, or terminate such rights under this Paragraph 1 if such breach is not so cured within thirty (30) days following the occurrence of such event. Any termination of this Agreement shall not affect any other rights then accrued.

(e)     In addition to the other limitations set forth above concerning GMCR's obligations to continue to supply Keurig Packs and Keurig Products (including spare parts for Keurig Brewers but not Keurig Brewers) hereunder, such obligations shall continue only so long as Keurig continues to provide such Keurig Products or Keurig Packs in the ordinary course of its business within the Territory.

2.      Distributor shall only sell or use Keurig Packs or Keurig Products supplied by GMCR or KARDs or Keurig Packs supplied by Licensed Partners under Paragraph 1 for Installed Brewers.  GMCR shall be entitled, without waiving any additional rights or remedies otherwise available to GMCR at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by Distributor of any of the provisions of this Paragraph 2.

3.      With the specific exception of the Keurig Pack trademark, Distributor shall limit its use of Marks to inventories of stationery, advertising matter and other printed matter in Distributor's possession or under Distributor's control at the time of expiration or earlier termination of this Agreement.  Distributor shall immediately take all commercially reasonable steps to remove and cancel its listings in telephone books, and other directories, and public records, or elsewhere that contain Marks.  GMCR shall be entitled, without waiving any additional rights or remedies otherwise available to GMCR at law or in equity or by statute and without any requirement to post bond, to injunctive and other equitable relief, including specific performance, in the event of a direct or indirect breach or intended or threatened breach by Distributor of any of the provisions of this Paragraph 3.

4.      All unshipped orders for Keurig Brewers shall be cancelled without liability of either Party to the other.

5.      Neither Party shall be liable to the other because of such termination for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales, or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of GMCR or Distributor. It is understood that GMCR's obligation to make or accrue payments to Distributor under any marketing program in effect prior to termination of this Agreement shall cease upon such termination if GMCR so terminated this Agreement under Section 11.2.  Except as provided in the immediately preceding sentence, nothing in this Paragraph 5 or a termination of this Agreement by either Party under Section 11 of this Agreement shall be deemed to relieve the other Party of any liability arising out of a breach of its obligations under this Agreement.

6.      In addition to the applicable termination provisions of Paragraph 1, Distributor's rights to continue to purchase Keurig Packs and Keurig Products from GMCR, a KARD or a Licensed Partner under Paragraph 1 shall terminate immediately and irrevocably upon notice in the event of Distributor's breach of any provision of this Schedule A (**which for avoidance of doubt includes breaches of the terms of this Agreement**), or upon Distributor's failure to pay any amount owed when due, which failure is not cured within ten (10) days following written notice from GMCR.  It is expressly understood and agreed that GMCR's rights in the event of such breach or failure shall include the right to cause its

Licensed Partners to cease supplying Keurig Packs and Keurig Products to Distributor pursuant to GMCR's contractual arrangements with its Licensed Partners.

7.    Distributor may not hold itself out to the public or otherwise represent itself as a KAD upon termination of this Agreement.

8.    Distributor may terminate its rights under this Schedule A at any time upon providing written notice of such termination to GMCR.

Schedule B
to
Non-Exclusive Distributorship Agreement

Terms and Conditions

The following Terms and Conditions will apply to all orders received and all sales made by GMCR and, along with any Terms and Conditions printed on the face of GMCR's order confirmation and the terms and conditions of the Agreement, constitute the sole and entire agreement between Distributor and GMCR. No waiver, alteration or modification of these Terms and Conditions will be binding on GMCR unless in writing and signed by GMCR. Any conflicting statements or terms listed in any purchase orders, invoice, confirmations or other documents generated by Distributor are hereby objected to by GMCR and are null and void.

- GMCR prices are subject to change without notice. Orders are billed at the prices (in US dollars) in effect at the time of order. GMCR does not offer floor stock protection.

- Distributor's failure to advise GMCR within 180 days from invoice date of any dispute regarding GMCR's invoice waives Distributor's right to dispute said invoice at any time in the future.

- Invoices must be paid in full within 30 days of the date of invoice. Late charges of one and one-half percent (1 1/2 %) per month on outstanding balances may be charged. All amounts are due and payable in U.S. dollars.

- Minimum Order Quantities (MOQ) accepted for 22-ct/24-ct K-Cup® packs and 12-ct, 16-ct, 24-ct and 32-ct Vue® packs will be evaluated and communicated on a regular basis. Select Keurig Packs will have a MOQ of 5 cases per single Product ID/SKU and additional quantities of said Keurig Packs must be ordered in 5 case increments. All other Keurig Packs will have a MOQ of 15 cases per single Product ID/SKU and additional quantities of said Keurig Packs must be ordered in 15 case increments. The MOQ for each Keurig Packs ID/SKU will be noted on the Away From Home price list.

- Standard Lead Time is 5 business days from date order is received to date of shipment or pick up.

- Delivery is F.O.B. Destination – Freight Prepaid. Title, risk of loss, damage and insurance responsibilities for the Products pass from GMCR to Distributor upon accepted delivery of the Products from the GMCR's contracted carrier. GMCR will not be liable for any loss or expense (incidental, indirect, economic, consequential or otherwise) that Distributor incurs as a result of any delay in delivery or partial shipment for any reason. GMCR reserves the right to make partial deliveries.

- If for any reason GMCR's supply of Products ordered is caused to be limited, GMCR reserves the right to allocate its supply of Products in any manner that it determines in its sole discretion. Distributor agrees to adjustments in order quantities, if needed, for shipping or ordering purposes.

- Distributor must inspect Products promptly and make notation of any shortages or damages upon receipt. Acceptance shall constitute acknowledgement of full performance by GMCR of all its obligations hereunder. GMCR will not issue credits for outdated Product or accept returns of outdated Product. No Products delivered and accepted are subject to return without prior written authorization from GMCR. All returns require a Return Authorization Number. If the return is authorized, GMCR will arrange transportation at GMCR's expense. To arrange for a return, Distributor must call GMCR at 800-432-4627.

COMPLEX-CSMGMT, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-00905-VSB

Treehouse Foods, Inc. et al v. Green Mountain Coffee Roasters, Inc. et al

Assigned to: Judge Vernon S. Broderick

Related Cases: 1:14-cv-01716-VSB
              1:14-cv-01671-VSB
              1:14-cv-01609-VSB

Cause: 15:1 Antitrust Litigation

Date Filed: 02/11/2014
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

Plaintiff

Treehouse Foods, Inc.          represented by  Aldo A Badini
      Winston & Strawn LLP (NY)
      200 Park Avenue
      New York, NY 10166
      (212) 294-4601
      Fax: (212) 294-4700
      Email: abadini@winston.com
      ATTORNEY TO BE NOTICED

      Dan K. Webb
      Winston & Strawn LLP (IL)
      35 West Wacker Drive
      Chicago, IL 60601
      (312) 558-5856
      Fax: (312) 558-5700
      Email: dwebb@winston.com
      ATTORNEY TO BE NOTICED

      Diana Lee Hughes
      Winston & Strawn LLP
      101 California Street, Suite 3900
      San Francisco, CA 94111
      (415)-591-1000
      Fax: (415)-591-1400
      Email: dhughes@winston.com
      PRO HAC VICE
      ATTORNEY TO BE NOTICED

James Franklin Herbison
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
Fax: (312) 558-5700
Email: jherbison@winston.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Susannah Providence Torpey
Winston & Strawn LLP (NY)
200 Park Avenue
New York, NY 10166
212-294-6700
Fax: 212-294-4700
Email: storpey@winston.com
ATTORNEY TO BE NOTICED

**Plaintiff**

Bay Valley Foods, LLC                    represented by    Aldo A Badini
                                                           (See above for address)
                                                           ATTORNEY TO BE NOTICED

                                                           Dan K. Webb
                                                           (See above for address)
                                                           ATTORNEY TO BE NOTICED

                                                           Diana Lee Hughes
                                                           (See above for address)
                                                           PRO HAC VICE
                                                           ATTORNEY TO BE NOTICED

                                                           James Franklin Herbison
                                                           (See above for address)
                                                           PRO HAC VICE
                                                           ATTORNEY TO BE NOTICED

                                                           Susannah Providence Torpey
                                                           (See above for address)
                                                           ATTORNEY TO BE NOTICED

**Plaintiff**

Sturm Foods, Inc.                        represented by    Aldo A Badini
                                                           (See above for address)

ATTORNEY TO BE NOTICED

Dan K. Webb
(See above for address)
ATTORNEY TO BE NOTICED

Diana Lee Hughes
(See above for address)
PRO HAC VICE
ATTORNEY TO BE NOTICED

James Franklin Herbison
(See above for address)
PRO HAC VICE
ATTORNEY TO BE NOTICED

Susannah Providence Torpey
(See above for address)
ATTORNEY TO BE NOTICED

V.

Defendant

Green Mountain Coffee Roasters, Inc.

Defendant

Keurig, Incorporated

Defendant

Keurig Green Mountain, Inc., f/k/a          represented by  Wendelynne J. Newton
Green Mountain Coffee Roasters, Inc.,                       Buchanan Ingersoll & Rooney PC
and as successor to Keurig,                                301 Grant Street, 20th Floor
Incorporated                                               Pittsburgh, PA 15219
                                                           (412)-562-8932
                                                           Fax: (412)-562-1041
                                                           Email: wendelynne.newton@bipc.com
                                                           LEAD ATTORNEY
                                                           PRO HAC VICE
                                                           ATTORNEY TO BE NOTICED

                                                           George S Cary
                                                           Cleary Gottlieb Steen & Hamilton LLP
                                                           2000 Pennsylvania Avenue, NW
                                                           Washington, DC 20006
                                                           (202)-974-1920

Fax: (202) 974-1999
Email: gcary@cgsh.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Landon Y. Jones
Buchanan Ingersoll & Ingersoll PC
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
(215)-665-3929
Fax: (215)-665-8760
Email: landon.jones@bipc.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Leah Brannon
Cleary Gottlieb Steen & Hamilton LLP
(DC)
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1508
Fax: (202) 974-1999
Email: lbrannon@cgsh.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Lev Louis Dassin
Cleary Gottlieb
One Liberty Plaza
New York, NY 10006
(212) 225-2790
Fax: (212) 225-3999
Email: ldassin@cgsh.com
ATTORNEY TO BE NOTICED

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2014 | 1 | CIVIL COVER SHEET filed. (jom) (Entered: 02/19/2014) |
| 02/11/2014 | 2 | COMPLAINT against Green Mountain Coffee Roasters, Inc., Keurig, Incorporated. (Filing Fee $ 350.00, Receipt Number 465401087580)Document filed by Treehouse Foods, Inc., Bay Valley Foods, LLC, Sturm Foods, Inc. (Attachments: # 1 Part 2, # 2 Exhibit A, # 3 Exhibit B)(jom) (Entered: 02/19/2014) |
| 02/11/2014 | | SUMMONS ISSUED as to Green Mountain Coffee Roasters, Inc., Keurig, |

| | | |
|---|---|---|
| | | Incorporated. (jom) (Entered: 02/19/2014) |
| 02/11/2014 | | Magistrate Judge Henry B. Pitman is so designated. (jom) (Entered: 02/19/2014) |
| 02/11/2014 | | Case Designated ECF. (jom) (Entered: 02/19/2014) |
| 02/11/2014 | 3 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2011) (jom) (Entered: 02/19/2014) |
| 02/24/2014 | 4 | ORDER AND NOTICE OF INITIAL CONFERENCE: Initial Conference set for 5/8/2014 at 10:00 AM in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007 before Judge Vernon S. Broderick. (Signed by Judge Vernon S. Broderick on 2/24/2014) (mro) (Entered: 02/24/2014) |
| 02/25/2014 | 5 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Green Mountain Coffee Roasters, Inc. served on 2/19/2014, answer due 3/12/2014. Service was accepted by Alma Andino, Client Service Associate (c/o United Corporate Services, Inc.). Document filed by Treehouse Foods, Inc.; Bay Valley Foods, LLC; Sturm Foods, Inc.. (Attachments: # 1 Summons)(Torpey, Susannah) (Entered: 02/25/2014) |
| 02/25/2014 | 6 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Keurig, Incorporated served on 2/19/2014, answer due 3/12/2014. Service was accepted by Elena Bou, Process Specialist (c/o National Registered Agents, Inc.). Document filed by Treehouse Foods, Inc.; Bay Valley Foods, LLC; Sturm Foods, Inc.. (Attachments: # 1 Summons)(Torpey, Susannah) (Entered: 02/25/2014) |
| 02/25/2014 | 7 | CERTIFICATE OF SERVICE of Order and Notice of Initial Conference served on Defendants on 2/24/2014. Service was accepted by Wendelynne J. Newton (Buchanan Ingersoll & Rooney PC). Service was made by Email on consent. Document filed by Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc.. (Torpey, Susannah) (Entered: 02/25/2014) |
| 02/26/2014 | 8 | MOTION for Dan K. Webb to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395108. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc.. (Attachments: # 1 Certificate of Good Standing - IL, # 2 Text of Proposed |

| | | Order)(Webb, Dan) (Entered: 02/26/2014) |
|---|---|---|
| 02/26/2014 | 9 | MOTION for James F. Herbison to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395157. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc.. (Attachments: # 1 Certificate of Good Standing - IL, # 2 Certificate of Good Standing - FL, # 3 Text of Proposed Order)(Herbison, James) (Entered: 02/26/2014) |
| 02/26/2014 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 9 MOTION for James F. Herbison to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395157. Motion and supporting papers to be reviewed by Clerk's Office staff., 8 MOTION for Dan K. Webb to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395108. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 02/26/2014) |
| 02/26/2014 | 10 | MOTION for Diana L. Hughes to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395250. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc.. (Attachments: # 1 Certificate of Good Standing - CA, # 2 Text of Proposed Order)(Hughes, Diana) (Entered: 02/26/2014) |
| 02/26/2014 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 10 MOTION for Diana L. Hughes to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9395250. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 02/26/2014) |
| 02/27/2014 | 11 | ORDER granting 8 Motion for Dan K. Webb to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 02/27/2014) |
| 02/27/2014 | 12 | ORDER granting 9 Motion for James F. Herbison to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 02/27/2014) |
| 02/27/2014 | 13 | ORDER granting 10 Motion for Diana L. Hughes to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 02/27/2014) |
| 03/10/2014 | 14 | NOTICE OF APPEARANCE by Lev Louis Dassin on behalf of Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. (Dassin, Lev) (Entered: 03/10/2014) |
| 03/10/2014 | 15 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate The Coca-Cola Company for Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as |

| | | successor to Keurig, Incorporated.(Dassin, Lev) (Entered: 03/10/2014) |
|---|---|---|
| 03/10/2014 | 16 | LETTER addressed to Judge Vernon S. Broderick from Lev Dassin dated March 10, 2014 re: Requesting a pre-motion conference, etc.. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated.(Dassin, Lev) (Entered: 03/10/2014) |
| 03/10/2014 | 17 | MOTION to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Certificate of Good Standing - Pennsylvania)(Newton, Wendelynne) Modified on 3/10/2014 (sdi). Modified on 3/12/2014 (bcu). (Entered: 03/10/2014) |
| 03/10/2014 | 18 | MOTION for George S. Cary to Appear Pro Hac Vice , dated March 10, 2014. Filing fee $ 200.00, receipt number 0208-9437774. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Cary, George) (Entered: 03/10/2014) |
| 03/10/2014 | 19 | MOTION for Leah Brannon to Appear Pro Hac Vice , dated March 10, 2014. Filing fee $ 200.00, receipt number 0208-9437882. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Brannon, Leah) (Entered: 03/10/2014) |
| 03/10/2014 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 18 MOTION for George S. Cary to Appear Pro Hac Vice , dated March 10, 2014. Filing fee $ 200.00, receipt number 0208-9437774. Motion and supporting papers to be reviewed by Clerk's Office staff., 19 MOTION for Leah Brannon to Appear Pro Hac Vice , dated March 10, 2014. Filing fee $ 200.00, receipt number 0208-9437882. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sdi) (Entered: 03/10/2014) |
| 03/10/2014 | | Pro Hac Vice Fee Payment: for 17 MOTION to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff.. Filing fee $ 200.00, receipt number 0208-9437945.(Newton, Wendelynne) (Entered: 03/10/2014) |
| 03/11/2014 | 20 | ORDER granting 18 Motion for George S. Cary to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 03/11/2014) |
| 03/11/2014 | 21 | ORDER granting 19 Motion for Leah Brannon to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 03/11/2014) |

| | | |
|---|---|---|
| 03/11/2014 | 22 | MEMO ENDORSEMENT on re: 16 Letter, filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. ENDORSEMENT: Application Granted. A premotion conference will be held on March 20, 2014 at 11:00 a.m. Counsel for Plaintiff should respond by letter, not to exceed three (3) pages, by March 13, 2014. (Pre-Motion Conference set for 3/20/2014 at 11:00 AM before Judge Vernon S. Broderick.) (Signed by Judge Vernon S. Broderick on 3/11/2014) (tn) (Entered: 03/11/2014) |
| 03/13/2014 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 17 MOTION to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 03/13/2014) |
| 03/13/2014 | 23 | ORDER granting 17 Motion to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 03/13/2014) |
| 03/13/2014 | 24 | LETTER addressed to Judge Vernon S. Broderick from Dan K. Webb dated 3/13/2014 re: Plaintiffs' response to pre-motion letter (docket no. 16). Document filed by Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc..(Webb, Dan) (Entered: 03/13/2014) |
| 03/14/2014 | 25 | LETTER MOTION to Adjourn Conference scheduled for March 20, 2014 addressed to Judge Vernon S. Broderick from Lev Dassin dated March 14, 2014. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated.(Dassin, Lev) (Entered: 03/14/2014) |
| 03/17/2014 | 26 | MOTION to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9459719. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A - PA Certificate of Good Standing, # 3 Exhibit B - NJ Certificate of Good Standing)(Jones, Landon) (Entered: 03/17/2014) |
| 03/17/2014 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 26 MOTION to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9459719. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 03/17/2014) |
| 03/17/2014 | 27 | ORDER granting 25 Letter Motion to Adjourn Conference. The Pre-Motion Conference is adjourned to May 1, 2014 at 11:30 a.m. in Courtroom 518, 40 Centre Street, New York, NY 10007 before Judge Vernon S. Broderick. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 03/17/2014) |
| 03/18/2014 | 28 | ORDER granting 26 Motion for Landon Y. Jones to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Vernon S. Broderick)(Text Only Order) (Broderick, Vernon) (Entered: 03/18/2014) |

| 03/20/2014 | 29 | LETTER MOTION to Adjourn Conference addressed to Judge Vernon S. Broderick from Lev Dassin dated March 20, 2014. Document filed by Keurig Green Mountain, Inc., f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Incorporated.(Dassin, Lev) (Entered: 03/20/2014) |
|---|---|---|

## PACER Service Center

### Transaction Receipt

| 03/20/2014 12:10:27 | | | |
|---|---|---|---|
| PACER Login: | rk3333 | Client Code: | 110176-0000 |
| Description: | Docket Report | Search Criteria: | 1:14-cv-00905-VSB |
| Billable Pages: | 7 | Cost: | 0.70 |