UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDY HOYER, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>GREEN MOUNTAIN COFFEE ROASTERS, INC. and KEURIG, INCORPORATED,<br><br>    Defendants. | Civil Action No. CV   14   1609<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff, Judy Hoyer, individually and on behalf of a class of direct purchasers, brings this class action complaint to recover damages and permanent injunctive relief against Defendant, Green Mountain Coffee Roasters, Inc. ("GMCR"), and Defendant, Keurig, Incorporated ("Keurig"), GMCR's wholly-owned subsidiary (collectively, "Green Mountain" or "Defendants"). Plaintiff alleges, upon knowledge as to herself and her own acts, and upon information and belief as to all other matters, against Defendants as follows:

**NATURE OF THE ACTION**

1.      This is an antitrust class action for damages and permanent injunctive relief against Defendants for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4, 16.

2.      Defendants have monopolized the market for the sale of single-serve brewers, as well as the market for the sale of single servings of coffee, tea, hot chocolate, cider, or other beverages that are used in those brewers ("Portion Packs"). Green Mountain previously owned certain patents that allowed it to exclude competition for the sale of the most popular format of

those "portion packs" – the "K-Cup" format – but those patents expired in September 2012.  In order to perpetuate its monopoly, Defendants coerced businesses to enter into anticompetitive agreements intended to unlawfully maintain Defendants' monopoly power in the markets in which K-Cups are sold.

### A.   The "Lock-Out" Technology To Prevent Competition and Control the Market

3.      In order to stymie competition, Defendants devised an anticompetitive plan to maintain their monopoly by redesigning their single-serve brewers ("K-Cup Brewers") to "lock-out" competitors' products. Defendants have announced that Keurig will stop selling existing K-Cup brewers and will replace them with a new K-Cup brewer called the Keurig 2.0 ("2.0 K-Cup Brewer") containing "interactive technology."  The new 2.0 K-Cup Brewers will be able to identify whether an inserted cup is either a new generation Green Mountain-supplied or licensed K-Cup ("2.0 K-Cups") or competitive portion packs that would be compatible with K-Cup Brewers, but that would be engineered, manufactured, and sold by unaffiliated competitors seeking to introduce new products to consumers at lower prices   ("Competitive Cups," collectively with K-Cups, "Compatible Cups"), in order to prevent the brewer from working with Competitive Cups. Defendants' technology is, therefore, intended to block Competitive Cups from working with 2.0 K-Cup Brewers, even though the shape of the Competitive Cups generally be the same as the 2.0 K-Cups and Defendants do not currently have any patent protection extending to 2.0 K-Cups.  This "lock-out" technology provides no cognizable consumer benefit – while forcing consumers to pay at least 15% to 25% more for K-Cups - blocking consumers from their preferred beverages, and restraining competition.

4.      Green Mountain has failed to articulate any material and demonstrable consumer benefit that will be achieved by locking Competitive Cups out from 2.0 K-Cup Brewers, nor

could it, as many consumers prefer the price, taste, and/or quality of Competitive Cups to K-Cups. Green Mountain's anticompetitive product redesign is thus not legitimately intended to benefit consumers, but is rather its latest of many anticompetitive acts designed to maintain its monopoly over the markets for the sale of Portion Packs and Compatible Cups by excluding competition and the lower-priced Competitive Cups. Indeed, Green Mountain President and Chief Executive Officer, Brian P. Kelley ("Mr. Kelley"), has admitted that the proposed "lock-out" technology could be programmed by Green Mountain to be switched on or off after a certain number of uses, thus demonstrating that this technology cannot plausibly be considered integral or key to any consumer benefit offered by the new product. *See* Dan D'Ambrosio, "With K-Cup patent expired, others try to cash in," USA Today (Oct. 29, 2013), http://www.usatoday.com/story/money/business/2013/10/29/life-after-the-k-cup-patent/3307187/ ("Kelley declined to say what the fate of unlicensed pods will be in the new system, but it could range from not brewing them at all to brewing them a few times before they no longer work. 'It's fair to say we're still deciding on exactly how we will handle the unlicensed pod,' Kelley said.").

5.      End user businesses, institutions, and consumers should be free to decide whether this pretextual and purported product "improvement" is worth the substantially higher price of K-Cups over Competitive Cups, but Green Mountain is threatening to eliminate the freedom of consumer choice and the free and fair interplay of the market. End users of K-Cup Brewers should not be forced by Green Mountain to buy only 2.0 K-Cups when they would prefer to buy Competitive Cups, but this is precisely the goal and result of this anticompetitive and exclusionary scheme.

6.    As alleged in a related litigation by Green Mountain competitors TreeHouse Foods, Inc., Bay Valley Foods, LLC and Sturm Foods, Inc. (collectively, "TreeHouse"), that Defendants control approximately 89% of the market for the sale of single-serve brewers and approximately 73% of the market for the sale of portion packs used in single-serve brewers. *See TreeHouse Foods, Inc. v. Green Mountain Coffee Roasters, Inc.*, No. 14-cv-0905 (S.D.N.Y.) (the "Treehouse litigation"). In addition, Mr. Kelley admitted during an investor call on February 5, 2014, that Defendants controlled approximately 86% of the Compatible Cup market. Mr. Kelley acknowledged, that for many years, Defendants controlled 100% of the market for the sale of these cups.[1]

7.    Although competitors have entered the market, Defendants continue to sell K-Cups at supra-competitive prices for use with K-Cup Brewers.

**B.    Defendants' Restraints of Trade**

8.    GMCR first partnered with Keurig in the late 1990s to manufacture and sell K-Cups, which, at that time, were covered by patents relating to the coffee filters in those cups ("K-Cup Filter Patents"). However, as GMCR has admitted, the K-Cup Filter Patents expired in September 2012. *See* GMCR SEC Form 10-K/A for the fiscal year ended September 28, 2013, http://www.sec.gov/Archives/edgar/data/909954/000104746913010715/a2217486z10-ka.htm.

9.    Threatened by the inevitable expiration of the K-Cup Filter Patents in September, 2012, GMCR embarked on an aggressive plan to unlawfully eliminate and restrain competition from Competitive Cups.

---

[1] *See* Green Mountain FQ1 2014 Earnings Call Tr. ("We had 100% of the system . . . and all of a sudden we have 86%. . . .") at http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq.

10.     After GMCR acquired Keurig and its patents in 2006, Defendants aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte), by the end of 2010.

11.     Upon information and belief, to foreclose potential competition, Green Mountain tied up vertical distribution channels for Competitive Cups by entering into unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system – from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers that sell and market Compatible Cups to end user consumers, businesses, and institutions.   The terms and number of these anticompetitive agreements cannot be justified by any purportedly pro-competitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

12.     Upon information and belief, these exclusionary agreements between Green Mountain and coffee brands contain restrictions dictating where and how licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supra-competitive prices across licensed brands by controlling output.   This creates a further incentive for licensed coffee brands to conspire to exclude Competitive Cup makers from the market unless those competitors agree to take a license or become "authorized" by Green Mountain, thereby likewise subjecting the Competitive Cup makers to Green Mountain's territorial control and allocation.

13.     Upon information and belief, Green Mountain distributors, which according to Green Mountain exceed 700 in number, are also prohibited from dealing with Competitive Cup

makers under the express terms of Green Mountain's Keurig Authorized Distributor, or "KAD," Agreement. *See* https://www.gmcrwholesale.com/ordering/working-with-distributors.

14.     Defendants having grown their business into a billion dollar publicly traded company by restraining competition, they were poised to exercise monopoly power without fear that market entrants could constrain its prices. Defendants did just this by raising K-Cup prices 10% to 15% in the fourth quarter of 2010. *See* Green Mountain Coffee Roasters, Inc. Announces Price Increase (Sept. 7, 2010) http://investor.gmcr.com/releasedetail.cfm?releaseid=505288.

15.     The web of exclusive dealing agreements Green Mountain has created has allowed it to leverage its monopoly over K-Cup Brewers in order to maintain its monopoly over the Portion Pack market, and indeed, this was the intended result of Green Mountain's business model – the profitability of which depends upon Green Mountain's ability to maintain supracompetitive K-Cup prices and to restrain competition from lower-priced Competitive Cups.

16.     Green Mountain sells K-Cup Brewers at cost or at a loss for use by consumers, and provides K-Cup Brewers to businesses for free, so long as those businesses agree to purchase K-Cups exclusively from Green Mountain.

17.     While Green Mountain sacrifices brewer profits to drive K-Cup sales, it recoups profits by charging a 50% margin on K-Cups. Green Mountain admits, for instance, that it "sell[s] []at home ("AH") brewers at attractive price points which are . . . sometimes at a loss . . . in order to drive the sales of profitable packs."[2]

18.     Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain such a

---

[2] Green Mountain Coffee Roasters, Inc., Form 10-Q, "For the thirteen weeks ended December 28, 2013," http://www.sec.gov/Archives/edgar/data/909954/000110465914006821/a13-26524_110q.htm.

substantial K-Cup profit margin for as long as it has following the entry of Competitive Cup makers.

### C.    The Sham Litigations

19.    Defendants filed a patent infringement lawsuit against a competitor, Sturm Foods, Inc., in the District of Delaware in an attempt to prevent or delay the competitor from entering or remaining in the market.  On September 13, 2012, the District of Delaware granted summary judgment in favor of Keurig's competitor. *Keurig, Inc. v. Sturm Foods, Inc.*, No. 10-841, 2012 WL 4049799 (D. Del. 2012).  Defendants appealed the decision to the Federal Circuit.

20.    The United States Court of Appeals for the Federal Circuit affirmed the district court's ruling, holding on appeal that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  The Federal Circuit held that "use of Keurig's brewers with a non-Keurig cartridge cannot constitute infringement because Keurig's authorized sale of those brewers, which are covered by the asserted patents, exhausted Keurig's rights." *Id.* at 1372-73. The lawsuit against Sturm was not filed for any valid purpose of protecting patent rights, but was an objectively and subjectively baseless sham intended to squelch competition from Competitive Cups.

21.    Defendants also filed a lawsuit against another potential competitor – JBR, Inc. d/b/a Rogers Family Company ("Rogers Family Co.") – making similar claims.  In Keurig's litigation against Rogers Family Co., the District of Massachusetts likewise held on summary judgment that the Competitive Cups at issue could not infringe Keurig's brewer patents under the doctrine of patent exhaustion. *Keurig, Inc. v. JBR, Inc. d/b/a/ Rogers Family Company*, No. 11-11941, 2013 WL 2304171 (D. Mass. 2013).

22.     While the litigation over Sturm's Competitive Cups was pending, Green Mountain's K-Cup Filter Patents expired. Competitors began selling Competitive Cups in competition with Green Mountain. Although competitors were able to enter the market, their ability to increase capacity and to bring Competitive Cups to consumers and businesses has been restrained by Green Mountain's anticompetitive exclusive dealing agreements that have restricted access to: (i) cup-making machinery; (ii) cup components; (iii) coffee brands; and (iv) virtually entire categories of potential customers. These exclusive dealing agreements are anticompetitive because, *inter alia*, they have facilitated Green Mountain's exercise of market power by impairing rivals' abilities to achieve the scale necessary to become competitively efficient and by depriving competitors of efficient access to both upstream and downstream markets.

23.     In sum, Green Mountain has committed numerous anticompetitive acts to unlawfully maintain its monopoly over the portion pack and Compatible Cup markets, including:

- Coercing machine manufacturers and component suppliers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to equipment and materials needed to make Compatible Cups;

- Conspiring with competitor roasters and coffee brands to allocate markets, reduce output, and to restrain competition from substantially lower-priced Competitive Cups, thereby maintaining supracompetitive prices and inducing would-be competitors to enter into an agreement with Green Mountain despite the expiration of its K-Cup Filter Patents;

- Coercing distributors and retailers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to retail customers and distribution channels;

- Filing sham litigation and continuing on appeal to pursue a "tactic" that had previously been "expressly admonished" by the Supreme Court in order to "impermissibly restrict" consumers from using Competitive Cups;

- Misusing its brewer patents by attempting to make an "end-run" around the patent laws, by attempting to impermissibly broaden the scope of the brewer patents to

cover Competitive Cups, and by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups and engaging in an unlawful tying arrangement; and

- Threatening to eliminate competitive access to 2.0 K-Cup Brewers, as well as retail customer and consumer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups, even though K-Cup Brewers and Compatible Cups are distinct products that consumers demand to purchase separately and that have been purchased separately for years.

24.     Because these anticompetitive acts were performed to unlawfully maintain Green Mountain's monopoly over portion packs and Compatible Cups by employing anticompetitive agreements with unaffiliated entities to unreasonably restrain trade, without adequate justification or procompetitive benefits, Green Mountain's conduct violates Sections 1 and 2 of the Sherman Act, Massachusetts and Vermont's consumer protection statutes, as well as the common law of unjust enrichment in the fifty states.

25.     These efforts, individually and collectively, were intended to, and have had the effect of, substantially foreclosing competition, restricting entry, constraining output, maintaining supracompetitive prices, restraining the free and fair interplay of the market, and curtailing consumer choices.  As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business and property.

## THE PARTIES

26.     Plaintiff Judy Hoyer is a resident of the state of Florida.  Plaintiff directly purchased K-Cups on-line through a Defendant's Keurig.com website.  *See* http://www.keurig.com/shop/k-cups/k-cup-tea.  As a direct and proximate result of Defendants' anticompetitive conduct alleged herein, Plaintiff paid supracompetitive prices for K-Cups, was injured as a result thereof and will continue to sustain injury when purchasing K-Cups unless

Defendants are enjoined from continuing such unlawful conduct. Plaintiff owns a K-Cup brewing system and intends to continue purchasing K-Cups in the future.

27.     Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Waterbury, Vermont.

28.     Defendant Keurig, Incorporated is a corporation organized under the laws of the State of Delaware, with its principal place of business in Reading, Massachusetts. Keurig is a wholly-owned subsidiary of GMCR.

## AGENTS AND CO-CONSPIRATORS

29.     Various persons that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to monopolize the markets for the sale of portion packs and Compatible Cups and the anticompetitive and unduly restrictive exclusive dealing agreements addressed in this lawsuit. Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

30.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restraints of trade.

## JURISDICTION AND VENUE

31.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiff and the Class for their damages. This Court has jurisdiction over the federal antitrust law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331,

1337.  This Court also has jurisdiction under 28 U.S.C. § 1332(d) as the amount in controversy for the Class exceeds $5,000,000 and the members of the Class are citizens of a state different than Defendants.

## CLASS ALLEGATIONS

32.    Plaintiff brings this class action on behalf of herself and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages, equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities that directly purchased Keurig single serve brewers/K-Cup Brewers and K-Cups/portion packs beginning as early as September 7, 2010 and continuing to the present. Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

33.    Plaintiff believes that there are thousands of members of the Class, as described above, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

34.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether Defendants entered into a contract, combination or conspiracy to fix, raise, maintain, or stabilize Keurig K-Cup and/or other Keurig product prices or otherwise restrain trade in the United States in violation of Section 1 of the Sherman Act;

b.    Whether Defendants conspired to monopolize the Keurig K-Cup product markets and the single serve brewer market in the United States in violation of Section 2 of the Sherman Act;

c.      Whether Defendants monopolized or attempted to monopolize the Keurig K-Cup product markets and the single serve brewer market in the United States in violation of Section 2 of the Sherman Act;

d.      The identity of the participants in the conspiracy;

e.      The duration of the conspiracy;

f.      The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

g.      Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

h.      The appropriate injunctive and equitable relief for the Class; and

i.      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

35.    Plaintiff purchased Keurig K-Cups and other Keurig products at supracompetitive prices set by and through Defendants' anticompetitive conduct.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

36.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

12

37.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as the ones asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## RELEVANT MARKETS

### A.     Relevant Product Markets

39.     There are at least three relevant product markets in which to evaluate Defendants' anticompetitive conduct: (i) the market for the design manufacture, and sale of single-serve brewers ("Single-Serve Brewer Market"); (ii) the market for the design, manufacture, and sale of "portion packs" or single-serve containers of coffee, tea, or other beverages that are used in single-serve brewers ("Portion Pack Market"); and (iii) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"), which is a sub-market of the Portion Pack Market. Green Mountain tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

13

### 1.    Single-Serve Brewer Market

40.    The Single-Serve Brewer Market encompasses the design, manufacture, and sale of single-serve brewers.  The single-serve brewer is a quick, convenient, and simple way for consumers to brew a single cup of coffee, cocoa, cappuccino, cider, or other beverages.  Single-serve brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

41.    In part, because of the unique convenience offered by single-serve brewers, the price of traditional drip coffee makers typically does not fully constrain prices for single-serve brewers.

42.    Consumers pay a premium for single-serve brewers over the price of traditional drip coffee makers.  While traditional drip coffee makers are frequently sold around a price point of around $30 to $35, single-serve brewers typically cost anywhere from $80 to several hundred dollars.

### a.    Keurig Single-Serve Brewers

43.    Green Mountain designs, manufactures, markets and sells a variety of single-serve brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers, each of which uses a different type of Portion Pack that is incompatible with the other types of brewers.

44.    Keurig offers a variety of Single-Serve K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector (e.g., hotels).

45.    K-Cup Brewers are sold for a range of prices.  For example, the Mr. Coffee KG2 brewer for home use has been priced at $89.95, while the Breville brewer for home use has been priced at $249.95.  Keurig's website lists the prices of only two of its commercial brewers, which are either $129.95 or $249.95.

14

46.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

47.     Many of Keurig's commercial K-Cup Brewers do not even have their price listed anywhere on the Keurig website.  An interested consumer must specifically "request pricing" from a distributor.

48.     Businesses can request a "free trial" of a Keurig single-serve brewer on the Keurig website, without being shown the price of the commercial K-Cup Brewers for which they are requesting a free trial.

49.     Green Mountain restricts the ability of distributors to advertise or display the prices of K-Cups that are used in office K-Cup Brewers.  For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack . . . through or at any store operated by or for Distributor." Exhibit B at § 2.1 (attaching KAD Agreement).

50.     In addition to the single-serve brewers manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

51.     Keurig also sells Vue Brewers, which, like K-Cup Brewers, are marketed for home or office use.  Vue Brewers, however, use a different type of Portion Pack, known as "Vue Packs," which are shaped differently than K-Cups.  The Vue Brewer is not compatible with K-Cups, and Vue Packs cannot be used in K-Cup Brewers or Rivo Brewers.

52.     Keurig also offers the Rivo cappuccino and latte brewer, which is marketed for home use.  This brewer "exclusively uses Rivo Packs," which, again, are shaped differently than

K-Cups and are not compatible with K-Cup Brewers. K-Cups, therefore, cannot be used in Rivo brewers. *See* http://www.keurig.com/rivosystem.

53.     More than half of the Keurig K-Cup Brewers, in both the home and commercial sectors, already offer consumers more than one brew size and a digital display.

### b.     Single-Serve Brewers Manufactured By Other Companies

54.     Additional single-serve brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavi," Bosch's "Tassimo," Philips Electronics N.V's "Senseo," Nestle's "Nespresso," and Starbucks' "Verismo."

55.     Prices across these single-serve brewers can vary by as much as several hundred dollars.

56.     These single-serve brewers are fragmented and collectively represent a small share of the Single-Serve Brewer Market.

### c.     Green Mountain Has Monopoly Power In The Single-Serve Brewer Market

57.     Green Mountain controls the dominant share of the Single-Serve Brewer Market. As alleged in the TreeHouse litigation, brokerage and investment firm Stifel has noted that Green Mountain's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share." As also alleged in the TreeHouse litigation, a 2011 Morgan Stanley consumer survey report similarly observed, "Green Mountain and its Keurig system dominates [the single-serve brewer market]." It would be extremely difficult for any new entrant to gain a meaningful share of this market.

58.     On a March 6, 2014 Shareholders Conference Call, Green Mountain's Brian Kelley reported that Green Mountain has "now sold more than 20 billion portion packs [and] more than 35 billion brewers." Green Mountain Coffee Roasters' CEO Hosts Annual Meeting of

Shareholders (Transcript) (Mar. 6, 2014), http://seekingalpha.com/article/2073423-green-mountain-coffee-roasters-ceo-hosts-annual-meeting-of-shareholders-transcript.   In its 2013 Annual Report, Green Mountain reported that its Keurig Single-Serve Brewers are used in at least approximately 16 million U.S. households. *See* Green Mountain 2013 Annual Report at 2, http://files.shareholder.com/downloads/GMCR/2984019180x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_Report.pdf.   Green Mountain also reported in November 2013 that in fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers. *See* Green Mountain Press Release (Nov. 20, 2013), "Green Mountain Coffee Roasters Reports Full Fiscal Year and Fourth Quarter Fiscal 2013 Results," http://investor.gmcr.com/releasedetail.cfm?ReleaseID=808735.

59.    As of September 2013, Keurig Single-Serve Brewers represented the top four best-selling coffeemakers in the United States by dollar volume.[3]

60.    As alleged in the TreeHouse litigation, from July 2012 to July 2013, Green Mountain sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value during that time period.  As also alleged in the TreeHouse litigation, Green Mountain controls at least 88% of the Single-Serve Brewer Market of brewers used in the home, and on information and belief, Green Mountain controls nearly 100% of the share of K-Cup Brewers supplied to offices.

61.    In the first quarter of 2014, Green Mountain has already sold a record 5.1 million Keurig Single-Serve Brewers. *See* Green Mountain Press Release (Feb. 5, 2014), http://investor.gmcr.com/releasedetail.cfm?releaseid=823624.

---

[3]  *See* Green Mountain Form 10-K/A for the fiscal year ended September 28, 2013, http://www.sec.gov/Archives/edgar/data/909954/000104746913010715/a2217486z10-ka.htm.

62.     Green Mountain has the power to exclude competition in the Single-Serve Brewer Market.  Green Mountain has exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig single-serve brewers be sold or used by these entities.

63.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market.   Green Mountain still holds patents that cover its K-Cup Brewers. Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.  Moreover, retailers are reluctant to stock brewers unless the Portion Packs they sell are readily and widely available. Portion Packs that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular. In light of the foregoing, potential market entrants face a substantial competitive disadvantage vis-a-vis established brewer suppliers.

### 2.     The Portion Pack Market

64.     The   second   relevant   product   market   in   which   to   evaluate   Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Portion Packs that are used in single-serve brewers.

65.     Compatible Cups (both K-Cups and Competitive Cups) are Portion Packs that are generally only used in single-serve brewers that are K-Cup Brewers.

66.     Some single-serve brewers besides K-Cup Brewers use Portion Packs that are packaged as "pods," which look like flat cookies, or "T-Discs," which are a type of sealed pod.

67.     Manufacturers of single-serve brewers that use "pod" Portion Packs include Hamilton Beach, Gevalia, and Philips Electronics N.V.'s "Senseo."

68.     Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.

69.     The ability to increase Portion Pack prices above their competitive levels has not been reasonably constrained by the price of ground coffee, with the price-per-pound of Portion Pack coffee nearly five times greater than that of ground coffee. Consumers who utilize Single-Serve Brewers and compatible Portion Packs generally find such packs to be substantially more convenient and desirable in their quality as compared with the brewed coffee from multiple-serve formats. Thus, were single-serve Portion Packs competitively priced, consumers who own a single-serve brewer would generally not switch to multi-serve format brewers in response to a small but significant rise in the price for the corresponding single Portion Packs.

70.     Although there are different types of Portion Packs, such as K-Cups, T-Discs and pods, each of these Portion Packs is generally only compatible with a corresponding type of single-serve brewer. For example, Compatible Cups generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of single-serve brewers.

71.     Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Portion Packs, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers. Indeed, these other Portion Packs are generally incompatible with K-Cup Brewers.

72.     Green Mountain possesses and exercises monopoly power over the Portion Pack market. As alleged in the TreeHouse litigation, Green Mountain controls approximately 73% of the Portion Pack Market. Green Mountain touts its K-Cups as the "#1 single cup brand" in North America. *See* http://www.keurig.co.uk/our-story.

73.     Barriers to entry are high and challenging for potential entrants into the Portion Pack Market. Potential manufacturers must either develop and manufacture their own brewers to be compatible with their own Portion Packs, or alternatively make Portion Packs that are

compatible with Green Mountain's K-Cup Brewers or another existing single-serve brewer (e.g., pods or T-Discs).

74.    In the first instance, potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Portion Packs because Green Mountain has a number of patents covering brewer technology.  Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

75.    In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Portion Pack that is compatible with a particular single-serve brewer format.

76.    Potential entrants are further restrained from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the machinery and components used to make Portion Packs.  These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete with Green Mountain in the Portion Pack Market.

77.    Green Mountain intends to further increase its monopoly power by launching the 2.0 K-Cup Brewer, which will reportedly contain "interactive technology" preventing 2.0 K-Cup Brewers from functioning with Competitive Cups, and by replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

### 3.    The Compatible Cup Market

78.    The third relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups that are either:  (i) compatible with K-Cup Brewers; or (ii) would be compatible with K-Cup Brewers, but for the proposed "interactive technology" designed to prevent Competitive Cups

from working in 2.0 K-Cup Brewers. The Compatible Cup Market is a sub-market of the Portion Pack Market.

79.     Green Mountain has acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market, inasmuch as Portion Packs that are incompatible with the K-Cup format do not offer much significant competition to compatible ones.

80.     Indeed, the Compatible Cup Market, as opposed to the Portion Pack Market, is the market in which Green Mountain tracks market shares of K-Cups for competitive purposes. As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high. The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, works out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs." http://www.nytimes.com/2012/02/08/dining/ single-serve-coffee-brewers-make-convenience-costly.html?_r=0.

81.     Competitive Cup companies, exercising their right to produce Competitive Cups, offer prices that are substantially lower than Keurig-branded K-Cups; and, hence, appeal to large numbers of price-conscious consumers.

82.     Competitive Cups, are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Green Mountain. *See, e.g.*, Green Mountain FQl 2014 Earnings Call Tr. (Green Mountain admitting that Competitive Cups "came in . . . at mostly 15 to 25% lower prices") at http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq.

83.    Green Mountain owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee Inc., and LNH Holdings, Inc. (Van Houtte).

84.    Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry,' such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. Green Mountain either owns or licenses some forty-nine brands.

85.    In total, Green Mountain controls approximately 86% of the Compatible Cup Market, as Mr. Kelley recently admitted during a conference call with financial analysts on February 5, 2014. *See* Green Mountain FQ1 2014 Earnings Call Tr. ("We had 100% of the system . . . and all of a sudden we have 86%. . . .").[4] The remaining 14% of the Compatible Cup Market is composed of sellers of unlicensed and private label Competitive Cups that are compatible with K-Cup Brewers.  In fiscal year 2012, Green Mountain's net sales were $3.9 billion, with 90% of these consolidated net sales resulting from the combined sales of K-Cup Brewers (which comprised 22%, or $760 million) and K-Cups (which comprised 78%, or $2.7 billion).  *See* Green Mountain 2012 Annual Report at 2.[5] This is consistent with Green Mountain's strategy of selling its K-Cup Brewers at cost or at a loss.

---

[4]  http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq

[5] http://files.shareholder.com/downloads/GMCR/2984019180x0x630863/FDBC5F63-78E8-493C-9BB9-8F33000C0465/GMCR_2012_ANNUAL_REPORT.pdf.

86. In fiscal year 2013, Green Mountain's net sales were $4.4 billion, 92% of which was attributed to the combined sales of K-Cups (which comprised approximately $3.187 billion) and K-Cup Brewers (which comprised approximately $828 million. *See* Green Mountain 2013 Annual Report, 10-K-A at 9, 38.[6]

87. In fiscal year 2013, Green Mountain's net sales included approximately $3.187 billion for K-Cups and approximately $828 million for K-Cup Brewers.

88. As discussed above, Compatible Cups designed for use in K-Cup Brewers are not reasonably interchangeable with other Portion Pack formats, such as T-Discs, pods, or capsules, and consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups.

89. Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Green Mountain locks consumers in to use the Compatible Cup format by selling its K-Cup Brewers at cost or at a loss and is able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups. *See* Green Mountain 2013 Investor Day Presentation, p. 164 (September 10, 2013), http://files.shareholder.com/downloads/GMCR/2971051915x0x689991/2571face-a834-4ba2-9cab-c4aa52b82c27/MASTER_INVESTOR_DAY_ALL_FINAL_For_Web.pdf.

90. Indeed, Green Mountain has been able to exercise its monopoly power by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share or increasing demand for Portion Packs other than Compatible Cups or Single-Serve Brewers other than K-Cup Brewers.

---

[6] http://files.shareholder.com/downloads/GMCR/2984019180x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_Report.pdf, 10-K/A at 9, 38.

91.     Green Mountain has also exercised, sustained, and magnified its monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

92.     For example, Green Mountain has succeeded in substantially foreclosing access to the market for the sale of Compatible Cups to offices, and has substantially restrained competition for Compatible Cup sales to consumers for home use.

93.     Barriers to entry for the Compatible Cup Market are high and difficult to surmount for the same reasons discussed above with respect to the Portion Pack Market.

94.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer.  The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute to Portion Packs that are incompatible.  The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups.

### a.     The At-Home Market Segment

95.     The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment"), and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

96.     The At-Home Market Segment is a billion dollar market.

97.     At least approximately 16 million U.S. households have a K-Cup Brewer for use at home.

98.     Green Mountain controls approximately 92% of the At-Home Market Segment for Compatible Cups.  Competitive Cup manufacturers hold the remaining 8% of that market segment.  *See* Green Mountain Investor 2013 Day Presentation, pp. 98-99 (September 10, 2013) http://files.shareholder.com/downloads/GMCR/2971051915x0x689991/2571face-a834-4ba2-9cab-c4aa52b82c27/MASTER_INVESTOR_DAY_ALL_FINAL_For_Web.pdf.

### b.     The Away-From-Home And Office Coffee Services Market Segments

99.     K-Cups are also consumed outside of consumers' homes at, among other places, food service, workplace, higher education, and hospitality locations.

100.    As alleged in the TreeHouse litigation, the Away-From-Home Market Segment is a $600 million to billion dollar market.

101.    Since at least 2009, Green Mountain has been the Portion Pack leader in the Away-From-Home Market Segment.

102.    On information and belief, Green Mountain currently provides all or nearly all of the office K-Cup Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

103.    As alleged in the TreeHouse litigation, the Office Coffee Services Market Segment for Green Mountain is estimated to account for $175 million to $250 million worth of Green Mountain's sales.

104.    Green Mountain's distributors are prohibited from selling Competitive Cups to the Office Coffee Services Market Segment because doing so would violate the Keurig Authorized Distributor KAD Agreement.

105.    Green Mountain has substantially foreclosed competitors from selling to the Office Coffee Services Market Segment through the use of anticompetitive conduct including Green Mountain's extensive web of agreements, such as the KAD Agreements.

106.    Upon information and belief, Green Mountain also enters into exclusionary agreements with office specialty stores, such as Staples. Competitors of Defendants sought to supply Compatible Cups to Staples, but Staples had an agreement with Green Mountain and was thus unable to enter into a supply arrangement with a competitor of the Defendants.

107.    As alleged in the TreeHouse litigation, Green Mountain has admitted that it has more than 500 Keurig Authorized Distributors (KADs), which are contractually obligated to buy directly from Green Mountain and to only sell products that are "authorized" by Green Mountain.

108.    Green Mountain maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segments by leveraging its monopoly over the Single-Serve Brewer Market to exclude competition from Competitive Cups. Specifically, Green Mountain and its distributors agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competitive Cup suppliers from this market segment by purchasing Compatible Cups exclusively from Green Mountain.

**B.      Geographic Market**

109.    The relevant geographic market is the United States. To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

## ANTICOMPETITIVE CONDUCT

110.    Green Mountain's monopoly leveraging strategy has created an enormous installed base of consumers for Green Mountain, which currently supplies at least 88% of the single-serve brewers purchased by consumers for use at home, and on information and belief, 100% or close to 100% of K-Cup Brewers supplied to offices.

111.    Green Mountain also controls at least 86% of the Compatible Cup Market, based on Green Mountain estimates. *See* Green Mountain FQ1 2014 Earnings Call Tr. ("We had 100% of the system . . . and all of a sudden we have 86%. . . .").[7]

112.    About 2.5 million cups are brewed in K-Cup Brewers every day in offices and homes in North America, and billions of cups have been brewed with K-Cup Brewers since K-Cups were created in 1998.[8]

113.    Green Mountain has protected its monopoly K-Cup profits, and has exercised its power to exclude competition, by coercing companies that would like to do business with other Compatible Cup makers, but whose business depends upon access to K-Cup Brewers, to sign anticompetitive agreements that prevent them from doing so.

114.    Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain its substantial K-Cup profit margins.

---

[7] http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq.

[8] http://www.keurig.com/in-the-news/2010/~/media/files/news%20and%20media%20pdfs/keurig_coprofile.ashx.

**A.    Green Mountain Eliminates Competition And Exercises Its Monopoly Power By Raising Prices 10% To 15%**

115.    Keurig developed K-Cup Brewers and K-Cups in the late 1990s, obtaining patents on those brewers as well as on the filters in K-Cups.  For years thereafter, Keurig licensed various coffee company competitors, including GMCR, to manufacture and sell filtered K-Cups.

116.    GMCR first partnered with Keurig in the late 1990s to manufacture and sell Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

117.    Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, GMCR embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of Competitive Cups.

118.    After acquiring Keurig and its patents in June 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and LNH Holdings, Inc. (Van Houtte) (in 2010).

119.    According to one analyst's presentation, at the 2011 Value Investing Congress, "GMCR eliminated the licensees by buying them . . . GMCR paid high prices to avoid having to compete with the licensees post patent expiration."  "GAAP-uccino," David Einhorn, Greenlight Capital, Value Investing Congress, October 17, 2011.[9]

120.    By August 2010, Green Mountain was ranked number two on Fortune's List of Global 100 Fastest-Growing Companies.  In an August 19, 2010 press release, Green Mountain touted that for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and . . . earnings per share growth of 89% over the same

---

[9] http://online.wsj.com/public/resources/documents/EinhornGMCRpresentation_Oct2011_VIC.pd

period for fiscal year 2009." "Green Mountain Coffee Roasters, Inc. Ranks #2 on Fortune's List of Global 100 Fastest-Growing Companies," GMCR press release (Waterbury, VT, August 9, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=500603.

121.   Having grown into a billion dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that.  On September 7, 2010, Green Mountain announced "a price increase" of "approximately 10 to 15 percent" on "all K-Cup portion packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."  "Green Mountain Coffee Roasters, Inc. Announces Price Increase," GMCR press release (Waterbury, VT, September 7, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=505288.

### B.   Competitors Enter The Compatible Cup Market

122.   As the expiration date of Green Mountain's K-Cup Filter Patents approached, retailers and distributors were eager to offer consumers additional lower-priced alternatives to the filtered K-Cup.  Competition among Compatible Cup vendors allows such resellers to reduce prices, increase sales, and win business from competitors with higher prices.

123.   Kroger Co., whose network of stores includes Ralphs, King Soopers, and Fred Meyer, announced plans on June 8, 2012 to offer store-branded, filtered Competitive Cups for use with Keurig brewers. *See* http://bizmology.hoovers.com/2012/06/11/kroger-fights-for-stake-in-single-cup-coffee-market/. Likewise, Safeway, Inc., announced on June 15, 2012 that it would introduce its own branded, filtered Competitive Cups for use in K-Cup brewers, but at prices below Green Mountain's K-Cups. *See* http://investorplace.com/2012/06/safeway-to-introduce-its-own-k-cup-coffees/#.UxpGm_ldWEd.

124.   Green Mountain's K-Cup Filter Patents expired in September 2012.

125.   In response, in part, to requests from grocery retailers and food service distributors, one competitor launched its first filtered Competitive Cups in the Fall of 2012 in order to supply a lower-priced alternative to Green Mountain's filtered K-Cup's.

126.   Since competitors have entered the Compatible Cup Market, demand and sales have been growing for Competitive Cups.

### C.   Green Mountain Restrains Competition With Anticompetitive Exclusive Agreements, Cuts Rivals Off From Inputs Needed To Compete, And Raises Rivals' Costs

127.   Green Mountain has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at every level of the Compatible Cup distribution system from sellers of machinery used to make K-Cups, to sellers of K-Cup components, to coffee roasters and coffee brands whose coffee and/or trademarks are used in K-Cups, all the way down to the distributors and retailers that sell K-Cups to end-user consumers, businesses, and institutions.

128.   This web of anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  As parties to these agreements have admitted, Green Mountain does not restrict the ability to sell these same products for other purposes – *so long as those products are not sold to a Green Mountain competitor who intends to use them to make Competitive Cups for use in K-Cup Brewers.*  Thus, these exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Green Mountain.

129.   Indeed, the web of exclusive dealing agreements Green Mountain created allowed it to leverage its monopoly over the Single-Serve Brewer Market in order to maintain its monopoly over the Portion Pack and Compatible Cup markets.

1.     **Green Mountain Unreasonably Restrains Access To Machines Needed To Make Compatible Cups In Competition With Green Mountain·**

a.     **Direct Evidence Confirms That Green Mountain Exercises, Sustains, And Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competition**

130.    It has been alleged in the TreeHouse litigation that TreeHouse sought to increase its capacity to produce a higher output of non-filtered Compatible Cups by purchasing a Spee-Dee Holmatic machine from R.A Jones & Co. ("R.A Jones").

131.    It has been alleged in the TreeHouse litigation that Treehouse requested a price quote for a new machine from R.A Jones, but on December 19, 2013, a Sales Manager from R.A Jones responded in an email, stating:  "I am quite embarrassed to be writing this email, but it needs to be done.  R.A Jones is declining to quote the new machine for soluble, non-filtered product."

132.    It has been alleged in the TreeHouse litigation that under "the rules," as described by the R.A Jones Sales Manager, "if the cup goes into a Keurig brewer, [R.A Jones] cannot quote it."  However, R.A Jones can still "build equipment for all types of packages, just not k-cups or anything that goes into a Keurig brewer."

133.    It has been alleged in the TreeHouse litigation the R.A Jones Sales Manager expressed hope that the Green Mountain "agreement will be re-written to allow [R.A Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.

134.    It has been alleged in the TreeHouse litigation that a December 19, 2013 R.A Jones email, explaining that the "agreement" with Green Mountain prohibits R.A Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that Green Mountain coerces suppliers into entering exclusionary agreements intended to restrain competition between Competitive Cup makers and Green

31

Mountain. Because R.A Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Competitive Cups cannot be justified on the basis that it ensures a reliable supply when Green Mountain needs equipment. Instead, it is merely intended to cut off Competitive Cup makers' access to machinery that is necessary to compete with Green Mountain on a level playing field. This agreement, in and of itself, constitutes an unlawful conspiracy in restraint of trade and provides direct evidence that Green Mountain has exercised its monopoly power by excluding competitors from resources needed to compete with Green Mountain.

> **b.    Green Mountain Has Substantially Foreclosed Access To Machinery Used To Make Compatible Cups**

135.    It has been alleged in the Treehouse litigation that in the December 19, 2013 R.A Jones email that in another related competitor initiated litigation the Sales Manager allegedly further noted that "[f]rom my own personal perspective, it's very frustrating because I feel that I'm alienating a great customer in Sturm Foods." He sympathized further, stating: "I can imagine this causes problems for Sturm, because you now have to start over with another OEM. I can only offer my sincere apology."

136.    Indeed, as alleged in the TreeHouse litigation, R.A. Jones's alleged refusal did cause problems for TreeHouse. TreeHouse purportedly searched for, but was unable to find, a single supplier in the United States that was willing to sell it machinery used to make non-filtered Compatible Cups.

137.    Thus, on information and belief, by coercing R.A. Jones to enter into this anticompetitive and exclusionary agreement, Green Mountain substantially foreclosed competitors from the United States market for machinery used to make Compatible Cups.

**2.      Green Mountain Unreasonably Restrains Access To Inputs Necessary To Make Compatible Cups In Competition With Green Mountain**

138.    Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter.  There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K Cup Brewers and, therefore, cannot be purchased from suppliers "off the shelf."

139.    Upon information and belief, Green Mountain entered into exclusive dealing agreements with suppliers of each K-Cup component to prevent competitors from purchasing these necessary inputs.   Such agreements have restrained competitors' ability to purchase Compatible Cup components and to compete with Green Mountain.

140.    As alleged in the TreeHouse litigation, before competitors entered the Compatible Cup market, the three main domestic suppliers of the plastic cups used in K-Cups, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups, were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood.   Upon information and belief, at least one competitor approached all three of these companies to find a supplier for components to make Competitive Cups.  All three companies refused to supply the components.

141.    TreeHouse alleges in its litigation that it contacted many suppliers of filter components for K-Cups.  Several filter suppliers declined to supply TreeHouse because they were already supplying Green Mountain with the same product.  Upon information and belief, these companies refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.

3.      **Green Mountain Unreasonably Restrains Access To Roasters And Coffee Brands And Conspires To Allocate Markets, Exclude Competition, And Induce Competitive Cup Makers To Take An Anticompetitive License**

   a.     **Green Mountain Enlists Competitor Co-Conspirators To Restrain Price Competition By Excluding Competitive Cup Makers**

142.    Over the years, Green Mountain has obtained trademark license and manufacturing agreements from numerous third-parties to use their brand names on K-Cups. These companies include: Starbucks, Dunkin' Donuts, Caribou Coffee, Wolfgang Puck, and Newman's Own. As alleged in the TreeHouse litigation, Green Mountain currently owns or licenses some forty-nine coffee brands.

143.    Upon information and belief, many, if not all, of these agreements have multi-year terms and are exclusive, which prevents these brands from also licensing trademarks or entering into manufacturing agreements with Green Mountain's competitors in the Compatible Cup Market.

144.    As alleged in the Treehouse litigation, Starbucks, Wolfgang Puck, and other coffee brands discussed entering into potential business relationships with TreeHouse, but declined to do so after entering into contracts with Green Mountain.

145.    Upon information and belief, Green Mountain's agreements with coffee brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output. This creates a further incentive for licensed coffee brands to renew their agreements with Green Mountain and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Green Mountain, as demanded by Green Mountain as a precondition for selling Compatible Cups.

146.    Upon information and belief, Green Mountain has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee brands as part of its expansive campaign to maintain its monopoly position in the Compatible Cup Market by excluding competitors who refuse to allow Green Mountain to dictate the geographical territory, market segments, and/or channels of distribution in which Compatible Cups may be sold.

147.    This expansive system of exclusionary agreements is orchestrated by Green Mountain, and coffee brands that enter into a license or manufacturing agreement with Green Mountain do so with the express knowledge of Green Mountain's anticompetitive exclusionary distribution agreements.    This is demonstrated, for example, by the Amended and Restated Purchase and License Agreement entered into between Green Mountain and Caribou Coffee Company, Inc. ("Caribou"), on December 20, 2011.  *See* Exhibit A at 2 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc. (December 20, 2011)).  The Caribou agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase . . . of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale."

148.    As agreed to between Green Mountain and coffee brands, such as Caribou, Keurig Authorized Distributor KAD Agreements contain a corresponding restriction prohibiting distributors from selling K-Cups outside of the "Authorized Location" determined by Green Mountain.  *See* Exhibit B at 2.1 (attaching KAD Agreement).

149.   On information and belief, Keurig Authorized Re-Distributor or "KARD" Agreements similarly prohibit bulk wholesalers from selling K-Cups outside of locations or stores specified by Green Mountain.

150.   Coffee brands further agree:  (1) "not to sell coffee, tea or other hot beverage products to any third-party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (2) not to license any trademarks for use by third-parties in connection with products "intended for use with the Keurig.  Brewing System." *See* Exhibit A at 7 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou).

151.   This conspiracy has the anticompetitive effect of allowing Green Mountain to allocate markets, restrain output, restrain price competition, and to exclude competitors.  Indeed, the coffee brands' agreements not to deal with Competitive Cup makers that could otherwise increase their product output and sales revenue do not make economic sense, but for a conspiracy to sustain supracompetitive K-Cup prices by restraining price competition with Competitive Cup makers.

152.   Moreover, as Green Mountain's K-Cup Filter Patents have expired, there is no legitimate justification for this division of markets across competitors, or the restraints placed on dealing with Competitive Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for Green Mountain to demand that Competitive Cup makers take a purported "license" or become "authorized" to sell Competitive Cups.  Green Mountain's lawful right to exclude Competitive Cup makers from the Compatible Cup Market has expired and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.

b.      **Green Mountain Has Substantially Foreclosed Competition Through A Series Of Agreements Allocating The Compatible Cup Market Across Coffee Brands**

153.    According to one analyst report, the "only meaningful coffee brands that [Green Mountain] does not have in its portfolio are Maxwell House (i.e., Kraft) and Peet's." "GAAP-uccino," David Einhorn, Greenlight Capital, Value Investing Congress, October 17, 2011. http://online.wsj.com/public/resources/documents/EinhornGMCRpresentation_Oct2011_VIC.pd

154.    In December 2006, Green Mountain entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups. The parties renewed and amended their agreement in December 2011. Under this five-year agreement, Caribou sells Green Mountain coffee, which Green Mountain packages into K-Cups, and grants Green Mountain a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. The contract provides that Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only.

155.    In February 2010, Green Mountain entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Green Mountain is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands. Under the agreement, Smucker sells the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website. *See* http://investor.gmcr.com/releasedetail.cfm?releaseid=471019.

156.    In February 2011, Green Mountain entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Green Mountain became the exclusive manufacturer of Dunkin' Donuts Compatible Cups. Green Mountain and Dunkin' Donuts agreed that Dunkin' Donuts K-Cups would be sold exclusively at Dunkin' Donuts restaurants not at grocery stores, where Dunkin' Donuts sells its

bagged coffee and that some Dunkin' Donuts restaurants would also sell Keurig Brewers. *See* http://investor.gmcr.com/common/mobile/iphone/releasedetail.cfm?ReleaseID=551547&Compa nyID=GMCR&mobileid=.

157.   In March 2011, Green Mountain entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a minimum five-year agreement, under which Starbucks is the exclusive licensed super premium coffee brand on the Keurig platform and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, Green Mountain began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Green Mountain sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.[10]

158.   In May 2013, Green Mountain entered into a multi-year agreement with The Coffee Bean & Tea Leaf ("Coffee Bean"), the largest privately held specialty coffee and tea retailer in the United States, under which Coffee Bean K-Cups will be sold in a variety of channels beginning in the spring of 2014.[11]

159.   In July 2013, Green Mountain entered into a multi-year agreement with Cinnabon, Inc. ("Cinnabon") under which Green Mountain will manufacture Cinnabon K-Cups.

---

[10] *See* http://investor.starbucks.com/phoenix.zhtml?c=99518&p=irol-newsArticle&ID=1817231&highlight=.

[11] *See* http://investor.gmcr.com/releasedetail.cfm?releaseid=767731.

Under the terms of this agreement, Cinnabon K-Cups will be sold in the retail and Away-From-Home Market Segment, as well as in Cinnabon restaurants.[12]

160.    Green Mountain has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies, such as Bigelow, Twinings, Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola. *See* http://www.businesswire.com/news/home/20130725005075/en/Keurig-Brewing-Sweeter-Green-Mountain-Coffee-Roasters#.UxpLDPldWEc.

**c.      Green Mountain Enters Into Contracts With Coffee Roasters That Unduly Restrict Competition From Competitive Cup Makers**

161.    Green Mountain also enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the co`ffee and tea that Green Mountain purchases from coffee brands.

162.    In at least one such contract, Green Mountain subjected the roaster's ability to contract separately with Competitive Cup makers to Green Mountain's veto rights.  The contract allegedly provides that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement.  Keurig shall review and either approve or disapprove such contracts. . . .".[13]

---

[12]    *See*  http://www.businesswire.com/news/home/20130725005075/en/Keurig-Brewing-Sweeter-Green-Mountain-Coffee-Roasters#.UxpLDPldWEc.

[13]    *See* License and Distribution Agreement between Keurig, Incorporated and Diedrich Coffee, Inc. at §14.3,http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.htm.

163.    Upon information and belief, Green Mountain has entered into additional, anticompetitive agreements similarly restricting the ability to contract separately with Competitive Cup makers and impermissibly subjecting any such proposed contract to Green Mountain's veto rights.

### d.    Green Mountain Ties Up Distributors And Retailers With Unduly Restrictive And Anticompetitive Exclusive Agreements

164.    As alleged in the TreeHouse litigation, Green Mountain distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors (KADs), including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality service providers, and food-service management companies, such as Vistar and Aramark.

165.    Green Mountain requires distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing any Competitive Cups, thereby substantially foreclosing access to the Office Coffee Services Market Segment. Specifically, Green Mountain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty.   Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

*See* Exhibit B (attaching KAD Agreement).

166.    These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

167.    Although at least one competitor has sought to supply Competitive Cups to the Office Coffee Services Market Segment, it has allegedly been repeatedly turned away on the

basis that distributors, such as Vistar, Aramark, and United Stationers, have several years left on their KAD Agreements with Green Mountain. On information and belief, Vistar, Aramark, and United Stationers collectively supply the majority share of K-Cups to the Office Coffee Services Market Segment. Without competition for distribution services from multiple Compatible Cup suppliers, many distributors have experienced margin erosion under the KAD distribution system and have expressed a preference to do business with multiple Compatible Cup manufacturers, but are prohibited from doing so.

168.    Despite widespread distributor displeasure with the KAD distribution system, it persists because Green Mountain has leveraged its monopoly over the Single-Serve Brewer Market to coerce distributors into unfavorable and exclusionary agreements, which protect Green Mountain's monopoly profits in the Compatible Cup Market.

169.    Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers, that might otherwise switch if they were made better aware of Green Mountain's supracompetitive K-Cup prices, because KAD Agreements restrict distributors' ability to display prices for K-Cups, further insulating Green Mountain from competitive pricing. *See* Exhibit B at 2.1, 2.3 (attaching KAD Agreement).

170.    Upon information and belief, Green Mountain also enters into anticompetitive, unjustified, and exclusionary agreements with distributors and retailers of K-Cups and Single-Serve Brewers that ultimately are purchased by consumers in the At-Home Market.

**D.      Green Mountain Plans To Eliminate Competition By Technologically Tying K-Cup Purchases To K-Cup Brewer Purchases To "Lock-Out" Competitive Cups**

171.    Faced with the expiration of its K-Cup Filter Patents, its brewer patents lawsuit rejected as overreaching, retailers seeking low-priced alternatives to the Green Mountain K-Cup, and other market entrants overcoming the substantial hurdles to produce those alternatives,

41

Green Mountain now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers that use a K-Cup Brewer from using Competitive Cups and to coerce retailers into replacing low-priced Competitive Cups with K-Cups.

172.    In November 2013, in the wake of increased competition from TreeHouse and other Competitive Cups following the expiration of Green Mountain's K-Cup Filter Patents, Green Mountain announced that it would launch a new lineup of 2.0 K-Cup Brewers over the next twelve months with an anticipated release date in Fall 2014. Green Mountain Q4 2013 Earnings Call Tr., November 20, 2013, http://www.morningstar.com/earnings/60483466-green-mountain-coffee-roasters-inc-q4-2013.aspx ("Q4 2013 Earnings Call Tr.")

173.    The 2.0 K-Cup Brewer will reportedly work with a special technology built into the lid of Green Mountain-owned or licensed 2.0 K-Cups, which will be read by "interactive technology" in the 2.0 K-Cup Brewer  to identify whether the user has inserted a 2.0 K-Cup that is owned or licensed by Green Mountain or a Competitive Cup.

174.    As Mr. Kelley stated during a conference call with financial analysts on November 20, 2013, 2.0 K-Cup Brewers "will not brew unlicensed [Competitive Cup] packs." Green    Mountain    Q4    2013    Earnings    Call    Tr.    (Nov.    20,    2013)    at http://www.morningstar.com/earnings/60483466-green-mountain-coffee-roasters-inc-q4-2013.aspx.

175.    2.0 K-Cup Brewers will reportedly only work if a Green Mountain-owned or licensed 2.0 K-Cup is inserted and will prevent consumers from using Competitive Cups they wish to brew.

176.    As alleged in the TreeHouse litigation, as one analyst explained, "GMCR has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs."

177.   As alleged in the TreeHouse litigation, brokerage and investment firm Stifel agrees that Green Mountain's "re-closing the system is driven in part by meaningful share gains from unlicensed brands in the approximately one year since patent expiration and that threats to do so are more a scare tactic to bring unaffiliated brands and retailers to the negotiating table," rather than an interest in benefitting consumers.   Mark S. Astrachan and Edward McPike, "Investor Meeting Takeaways," Stifel, September 11, 2013, at p. 2.[14]

178.   As industry news editor, Keith Nunes, explains, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share." Keith Nunes, "G.M.C.R. playing hardball with Keurig 2.0," Food Business News, November 21, 2013, http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing _hardball_with_Keu.aspx?ID={58DC5419-F51B-486C-8328-64CD811AFC81}&cck=1.

179.   Accordingly, Mr. Kelley "expect[s the] unlicensed [Competitive Cup] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations· of K-Cup.  Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.  http://www.morningstar.com/earnings/PrintTranscript.aspx?id=60483466.

180.   Thus, rather than a true technological innovation, Green Mountain's announced "new" technology threatens to eliminate competitive access to 2.0 K-Cup Brewers, as well as consumer and retail customer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups. By tying 2.0 K-Cup purchases to the purchases of the 2.0 K-Cup Brewers, Green Mountain

---

[14] ftp://115.113.198.66/DOWNLOAD/2013/DECEMBER/20131219/GMCR/20130911_GMCR_BW_1.PDF.

intends to again leverage its monopoly over the Single-Serve Brewer Market in order to exclude competition in the Compatible Cup Market.

> **1.** **Green Mountain's "Lock-Out" Strategy Is Intended To Coerce Competitive Cup Makers To Enter Agreements Restricting Competition**

181.    Green Mountain's Brian Kelley stated during the November 20, 2013 investor call that Green Mountain "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [Green Mountain's ] goal" is to "convert . . . as many [Competitive Cup makers] as [it] can." Q4 2013 Earnings Call Tr.

182.    In order to become an "authorized" or "licensed" "Keurig system partner," however, on information and belief, Green Mountain demands that its purported "licensees" cede their independent decision-making authority to Green Mountain as to where and how many Competitive Cups can be sold by the "licensee." Such agreements have the effect of allocating markets, restraining output, and allowing Green Mountain to maintain supracompetitive prices.

183.    On information and belief, Green Mountain additionally demands a royalty payment or other consideration under the purported "license," despite the fact that its K-Cup Filter Patents expired over a year ago. Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

> **2.** **The 2.0 K-Cup Brewer's "Lock-Out" Feature Has No Legitimate Consumer Benefit and Actually Harms Consumers**

184.    To date, Green Mountain has failed plausibly to substantiate its claim that locking Competitive Cups out of 2.0 K-Cup Brewers would benefit consumers. Not only is there no consumer benefit to be gained by locking Competitive Cups out of the market, but the "lock-out" would actually harm consumers.

185.    Green Mountain asserts in its 2013 Investor Day slides that its "interactive technology," recognizing only "licensed portion packs," will allow 2.0 K-Cup Brewers to "deliver the perfect beverage."  Green Mountain also asserts that the interactive technology function will provide "game-changing performance," allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed portion packs."[15]

186.    However, these vague claims lack any real substance, are without merit, and are pretextual sham justifications for Green Mountain's anticompetitive and exclusionary conduct. As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup . . . very much of the technology we're using [with the 2.0 K-Cup Brewer] is technology we're very, very familiar with."  http://www.morningstar.com/earnings/PrintTranscript.aspx?id=60483466.

187.    Stifel analyst Mark Astrachan recently noted, the  announced Keurig 2.0 features are "underwhelming," adding Green Mountain launched the new product primarily because unlicensed    coffee    brands    were    gaining    market    share    at    its    expense. http://seekingalpha.com/article/1711532-green-mountain-roasters-investor-day-recap.

188.    As alleged in the TreeHouse litigation, the so-called "breakthrough innovation" is in fact old news.  For example, Bosch has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."  Despite this "interactive technology," consumers remained unconvinced and,

---

[15]    Green    Mountain    2013    Investor    Day    Presentation    at    p.    143    (September    10,    2013) http://files.shareholder.com/downloads/GMCR/2971051915x0x689991/
2571face-a834-4ba2-9cab-c4aa52b82c27/MASTER_INVESTOR_DAY_ALL_FINAL_For_Web.pdf.

as of January 2014, Tassimo had only captured a 2.9% share of the market of consumers who own a brewer at home (as opposed to 88% for Keurig).

189.   As alleged in the TreeHouse litigation, Green Mountain's claim that its "lock-out" technology benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied by Green Mountain's own experience with its Vue Brewer, which also touted the same feature, but was largely rejected by consumers.

190.   As the Vue V1200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage." See http://www.keurig.com/VueCommercialSystem. Just as Green Mountain now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue portion packs was touted by Green Mountain as promising the "perfect brew."

191.   Nonetheless, Vue's "lock-out" technology was recognized as a failure.  One analyst notes the "Vue platform was a poorly planned, researched and designed platform." http://seekingalpha.com/article/1711532-green-mountain-roasters-investor-day-recap.

192.   Even Mr. Kelley has acknowledged that the Vue Brewer "lock-out" technology was poorly received by consumers, noting in a May 2013 call with investors that Vue portion packs offer only about 25% of the variety of K-Cups.  Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice.  They want to have all of the brands available to them.  And a lot of consumers who have [the] Keurig today, they don't want to give up the K-Cup.  They love the K-Cup. . . . And the most important thing they tell us about Vue is, give us more choice."[16]

---

[16] http://www.morningstar.com/earnings/PrintTranscript.aspx?id=51941350.

193.  Mr. Kelley further stated in a November 2013 investor call that Green Mountain "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0." http://www.morningstar.com/earnings/60483466-green-mountain-coffee-roasters-inc-q4-2013.aspx.

194.  Green Mountain says it "learned" from its prior Vue introduction, and indeed it did learn that consumers wanted more choice across Compatible Cup brands.  But instead of responding to consumer demand, Green Mountain has decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively, and has decided "to replace" all existing K-Cup Brewers that can be used with Competitive Cups to ensure that Green Mountain can fully realize its monopoly power by excluding competitors and maintaining supracompetitive prices.  Thus, the purported consumer benefit of a "perfect brew" delivered by interactive technology is a pretextual sham intended to conceal Green Mountain's true intention of excluding competition that threatens its ability to extract monopoly profits from the Compatible Cup Market.

195.  Even if Green Mountain were able to articulate a consumer benefit for the lock-out strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects.  Consumers often prefer the price, taste, and/or quality of Competitive Cups to K-Cups.

196.  However, as one research analyst noted, "if you buy Keurig 2.0, you're actually limiting the amount of coffee that you can make."  As the analyst asked, "[d]ue to the fact that the original K-Cup is still growing, who is going to be eager to 'upgrade' their coffee maker and simply chuck the one they have now, that makes all brands accessible?"  But ultimately consumers will be forced to make the switch as prior generations of K-Cup Brewers need to be

replaced. http://seekingalpha.com/article/1987501-should-you-bet-on-green-mountain-coffee-2_0 ("Should You Bet On Green Mountain Coffee 2.0?," February 3, 2014).

197. Green Mountain's anticompetitive product redesign is not legitimately intended to benefit consumers; it is just Green Mountain's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower-priced Competitive Cups that consumers demand.

### 3. Green Mountain Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That They Create A "System"

198. Green Mountain deceptively claims that its 2.0 K-Cup Brewer and 2.0 K-Cups together create one purportedly unified "system," but this is false. Indeed, Green Mountain has admitted that it could turn on or off this "lock-out" technology after a certain number of uses, such that any purported claim that the K-Cup Brewers and the K-Cups necessarily constitute a system is pretextual.

199. As of October 2013, Mr. Kelley, admitted it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times before they no longer work," as reported by USA Today. http://www.usatoday.com/story/money/business/2013/10/29/life-after-the-k-cup-patent/3307187/ (Dan D'Ambrosio, *With K-Cup Patent Expired, Others Try To Cash In*, USA Today, October 29, 2013). Green Mountain, therefore, cannot plausibly assert that this "lock-out" technology, which could be programmed to be switched on or off or to work only a limited number of times, is in any way integral to any purported consumer benefit or a necessary aspect of any unified "system."

E.    **Green Mountain Has Harmed Competition, Competitive Cup Makers, Suppliers, Retailers, Distributors, Commercial Customers, And Consumers**

200.    Green Mountain's anticompetitive acts, including requiring its K-Cup machinery and component suppliers, coffee brands and roasters, and K-Cup distributors and retailers to enter into exclusive agreements, have had serious anticompetitive effects on competitors and on competition in the Compatible Cup Market overall, including on other Competitive Cup manufacturers, potential market entrants, distributors, retailers, commercial customers, and consumers.

1.    **Restraints On Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, And Distributors**

201.    With little to no competition, depending on the line of business, Green Mountain and its owned or licensed coffee brands have been able to charge supracompetitive prices for K-Cups. As a result, consumers and commercial customers in both the Away-From-Home and At-Home Market Segments have been forced to pay at least 15% to 25% more for Green Mountain-owned and licensed K-Cups than they would have for Competitive Cups. Indeed, a consumer or commercial customer pays on average $0.60 for a Green Mountain K-Cup, as opposed to $0.45 for a Competitive Cup. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28, http://www.vending.org/education/coffeeshow/presentations/NAMA_2013-In_Pod_We_Trust.pdf.

202.    The average K-Cup Brewer owner, moreover, uses more than 1,000 K-Cups per year, according to estimates. At an estimated 60 cents per K-Cup, that translates into an expense of over $600 per year for the average K-Cup user.

203.    Competitive Cups are substantially less expensive, which can save consumers over $150 a year (assuming the same 1,000-cup per year consumption rate).

204.   By restraining price competition and the availability of Competitive Cups, Green Mountain has also harmed competition and injured purchasers in the stream of commerce.

### 2.   Restraints On Competition Have Reduced Output And Availability Of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, And Consumers

205.   Green Mountain's conduct has also limited the number and variety of Compatible Cup beverages available to consumers and commercial customers. By foreclosing access to equipment, markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of Competitive Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by Competitive Cup manufacturers.

206.   Consumer choice has been further limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Competitive Cups.

207.   Green Mountain has further constrained Competitive Cup output and diversity by foreclosing access to lucrative licensing and manufacturing arrangements with most well-known coffee brands, such as Starbucks and Dunkin' Donuts.

### 3.   Green Mountain Has Substantially Foreclosed Access To The Office Coffee Services Market Segment

208.   Because Green Mountain is currently, on information and belief, the only provider of K-Cup Brewers in the Office Coffee Services Market Segment and has prohibited distributors from selling Competitive Cups, competition in this market has been substantially foreclosed. Competitive Cup manufacturers and other potential entrants have been substantially foreclosed from competing for this business.

209.    Distributors serving the Office Coffee Services Market Segment have also been deprived of competition for their services and the opportunity to bargain for their preferred sales terms, despite their expressed interest in doing business with multiple Compatible Cup manufacturers.

210.    Instead, distributors have been forced to do business with Green Mountain alone on a take-it-or-leave-it basis, and distributors and commercial customers have had to accept Green Mountain's unfavorable delivery and packaging terms.

211.    By eliminating the freedom to do business with Competitive Cup manufacturers, distributors have also been harmed because they cannot compete based on the brands that they carry, which also harms consumers who are deprived of their preferred Compatible Cup selections.

### 4.    Threat Of Future Harm

212.    Green Mountain's interference with various distributors and retail outlets with respect to its plans for the Keurig 2.0 brewer launch has already harmed competition, as Green Mountain has induced those entities to stop doing business with Competitive Cup sellers. Moreover, the introduction of Green Mountain's 2.0 K-Cup Brewer threatens to further harm competition in the future.   Green Mountain already controls approximately 86% of the Compatible Cup Market, but is threatening to substantially foreclose Competitive Cup makers from the balance of the market by locking Competitive Cups out of new brewers and replacing prior generations of K-Cup Brewers.

213.    The elimination of Competitive Cup competition for Green Mountain's K-Cup Brewers will harm consumers by raising average Compatible Cup prices and by eliminating consumer choice.

F.     **Interstate Commerce**

214.    Defendants manufactured and/or sold single-serve brewers, Portion Packs, and/or Compatible Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

215.    Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

216.    Green Mountain had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013. This number includes $3.187 billion in Portion Pack net sales and $827.6 million in Keurig single-serve brewer and accessories net sales. Green Mountain had the top four best-selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.

## CAUSES OF ACTION

### COUNT ONE
Declaratory and Injunctive Relief

217.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 216 as fully set forth herein.

218.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

219.    Plaintiff's allegations described herein constitute violations of §§ 1 and 2 of the Sherman Act.

220.    Defendants effectuated a scheme to restrain trade and monopolize a market.

221.    There is and was no legitimate, non-pretextual, procompetitive business justification for their conduct that outweighs its harmful effect.

222.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

223.    The goal, purpose and/or effect of the scheme was to prevent and/or delay competition in order to continue charging supracompetitive prices for K-Cups without a substantial loss of sales.

224.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of paying higher prices for K-Cups than they would have paid in the absence of those violations. These injuries will continue unless halted.

225.    Each Defendant committed at least one overt act in furtherance of the conspiracy.

226.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class were harmed.

227.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of §§ 1 and 2 of the Sherman Act.

228.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

### COUNT TWO
Monopolization
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

229.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 228 as fully set forth herein.

230.    Green Mountain, as alleged herein, has monopoly power in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

231.    Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

232.    Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

      a.    coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, unreasonably restrain competition, exclude competitors, limit output, and raise competitors' costs;

      b.    conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

      c.    coercing distributors and retailers to enter into anticompetitive agreements that restrain market entry, exclude competitors, unreasonably restrain competition, and limit output;

      d.    filing baseless litigation against competitors for the purpose of interfering with their ability to compete in the Compatible Cup market;

      e.    misusing its brewer patents by attempting to make an "end-run" around the patent laws, by attempting to impermissibly broaden the scope of the brewer patents to cover Competitive Cups, and by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups and engaging in an unlawful tying arrangement;

f.     announcing an anticipated tie of the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitive Cup makers;

g.     threatening to unreasonably restrain competition through the implementation of an anticompetitive product redesign with "lock-out" technology that cannot be justified based on any legitimate, non-pretextual consumer benefit, which is coupled with the elimination of K-Cup Brewers that are compatible with Competitive Cups; and

h.     raising rivals' costs above those that would exist under competitive conditions by coercing Competitive Cup makers to enter purported "licenses" that restrict output and raise rivals' costs by requiring the payment of improper "royalty" payments.

233.    While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

234.    As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT THREE**
Exclusive Dealing
(Violation of Sections 1& 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)

235.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 234 as fully set forth herein.

236.   As detailed above, Green Mountain has monopoly power in the single-serve brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

237.   Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

238.   These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

239.   This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.  Thus, Green Mountain's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

240.   This conduct has substantially foreclosed competition in the Portion Pack and Compatible Cup Markets.

241.   This conduct has also substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

242.   Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these

agreements constitute anticompetitive acts intended to maintain Green Mountain's monopolies in the Portion Pack and Compatible Cup Markets.

243.   As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT FOUR**
Monopoly Leveraging
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

244.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 243 as fully set forth herein.

245.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

246.   Green Mountain has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Green Mountain's competitors in the Compatible Cup Market.

247.   Green Mountain further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, "lock-out" technology that cannot be justified on the basis of any legitimate consumer benefit.

248.    Green Mountain willfully acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency or legitimate innovation.

249.    As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

### COUNT FIVE
Technological Tying
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

250.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 249 as fully set forth herein.

251.    With the introduction of the 2.0 K-Cup Brewers, which Green Mountain asserts will only be compatible with 2.0 K-Cups, Green Mountain threatens to tie 2.0 K-Cup purchases to the purchase of 2.0 K-Cup Brewers.  By willfully and intentionally imposing a technological tie between the 2.0 K-Cup Brewers and 2.0 K-Cups, Green Mountain will condition the use of the 2.0 K-Cup Brewers on a consumer's purchase of 2.0 K-Cups.  2.0 K-Cup Brewer consumers will be forced to forgo purchasing Competitive Cups, since those cups will purportedly be rendered incompatible with 2.0 K-Cup Brewers.

252.    Green Mountain's tying arrangement will affect a substantial volume of interstate commerce.

253.    Green Mountain's tying arrangement will have the effect of:  (i) inhibiting or preventing the sale of Competitive Cups; (ii) decreasing research and investment by Competitive Cup makers in the Portion Pack and Compatible Cup Markets; (iii) discouraging or preventing new entry into the Compatible Cup Market; (iv) maintaining supracompetitive K-Cup prices and

increasing average prices of Compatible Cup prices overall to consumers; (v) exploiting purchasers of 2.0 K-Cup Brewers by blocking their use of Competitive Cups of their preference; (vi) allowing Green Mountain to coerce competitors and third parties to take licenses from, and pay royalties to, Green Mountain; and (vii) increasing Green Mountain's share and monopoly power over the Compatible Cup Market.

254.   The anticompetitive effects of Green Mountain's conduct outweigh any procompetitive benefits; indeed, there are little or no procompetitive benefits resulting from Green Mountain's threatened "lock-out" of Competitive Cups through means of a technological tie.

255.   Green Mountains' tying arrangement is intended to maintain and increase its monopoly power, or dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets.

256.   Green Mountains' tying arrangement threatens to cause Plaintiff and the Class damages as a direct and proximate cause of this unlawful conduct. Additionally, Plaintiff and the Class will be irreparably harmed by this tying arrangement, for which there is no adequate remedy at law, and Plaintiff and the Class are entitled to a permanent injunction to prevent further harm resulting from this conduct.

257.   As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT SIX
Anticompetitive Product Redesign
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

258.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 257 as fully set forth herein.

259.    As detailed above, Green Mountain has monopoly power in the single-serve brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

260.    As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

261.    Green Mountain has further threatened to willfully and intentionally exclude competition from the Portion Pack and Compatible Cup Markets through the use of anticompetitive and exclusionary interactive "lock-out" technology intended to render Competitive Cups incompatible with 2.0 K-Cup Brewers.

262.    Green Mountain has threatened to eliminate alternative brewers by replacing prior generations of K-Cup Brewers with 2.0 K-Cup Brewers, thereby locking in consumers and forcing them to use K-Cups exclusively.

263.    On information and belief, the "interactive technology" will not materially benefit consumers, and, in fact, will harm consumers by resulting in reduced availability of preferred brands.   Any purported consumer benefit asserted by Green Mountain for this "lock-out" technology is a pretextual sham, which, on information and belief, is intended to disguise Green Mountain's anticompetitive intent to exclude competition and maintain and increase its monopoly over the Portion Pack and Compatible Cup Markets.

264.   Green Mountain seeks to force Competitive Cup makers to take a purported "license" from, and to pay illegitimate royalties to, Green Mountain in order to avoid the exclusionary effects of this "interactive technology."

265.   Green Mountain also seeks to leverage the threat of the exclusionary effects of "interactive technology" to cause entities to stop dealing with Green Mountain's competitors.

266.   As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

### COUNT SEVEN
Attempted Monopolization In The Alternative
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

267.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 266 as fully set forth herein.

268.   As detailed above, Green Mountain has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

269.   Green Mountain has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

270.   Green Mountain's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Pack and Compatible Cup Markets.  Green Mountain's anticompetitive conduct presents a dangerous probability that Green Mountain will succeed, to the extent it has not already, in its attempt to monopolize the Portion Pack and Compatible Cup Markets.

271.    As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT EIGHT
### Conspiracy to Monopolize
(Violation of Sections 1& 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)

272.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 271 as fully set forth herein.

273.    As detailed above, Green Mountain has monopoly power in the single-serve brewer, Portion Pack Market, and Compatible Cup Market, including the power to control prices and exclude competition:

274.    Green Mountain willfully and intentionally conspired with pod product manufacturers and/or roasters and coffee brands to monopolize the Portion Pack and Compatible Cup Markets.

275.    Green Mountain and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with Green Mountain's competitors.

276.    Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competitive Cup makers to enter into contracts with distributors or other resellers.

277.    These restrictions regarding where and how K-Cups can be sold also allow Green Mountain to maintain supracompetitive prices across licensed brands by controlling output,

which reduces the competitor roaster or coffee brands' incentives to enter into deals with Competitive Cup makers and creates an economic incentive for these co-conspirators to restrain competition from Competitive Cup makers and to induce Competitive Cup makers to enter into "license" agreements with Green Mountain that would require the Competitive Cup maker to permit Green Mountain to allocate the markets for Competitive Cups and to raise rivals' costs through the payment of an illegitimate "royalty."

278.   Green Mountain and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from Competitive Cup makers in order to restrain price competition in the Portion Pack and Compatible Cup Markets.

279.   As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) Green Mountain' s ability to charge supracompetitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT NINE**
Vermont Consumer Protection Violation

280.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 279 as fully set forth herein.

281.   Defendants have engaged in unfair trade practices which emanated from Vermont in violation of Vermont Statute Annotated Title 9, 2451, *et seq.*

282.   There was a gross disparity between the price that Plaintiff and the Class members paid for the Keurig products and the value received, given that a less expensive competitor's product could and should have been more widely available.

283.    As a direct and proximate result of Defendants' unfair trade practices in violation of Vermont law, Plaintiff and members of the class were deprived of the opportunity to purchase less expensive K-Cups and forced to purchase higher price K-Cups from Defendants.

284.    Plaintiffs have been injured in their business and property by reason of Defendants' unfair trade practices alleged herein. Their injury consists of paying higher prices for K-Cups than they would have paid in the absence of such violations. This injury is of the type of the Vermont consumer protection statute was designed to prevent and directly results from Defendants' unlawful conduct.

### COUNT TEN
Massachusetts Consumer Protection Violation

285.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 284 as fully set forth herein.

286.    Defendants have engaged in unfair trade practices which emanated from Massachusetts in violation of Mass. Gen. Laws ch. 93A, *et seq*.

287.    There was a gross disparity between the price that Plaintiff and the Class members paid for the Keurig products and the value received, given that a less expensive competitor's product could and should have been more widely available.

288.    As a direct and proximate result of Defendants' unfair trade practices in violation of Massachusetts law, Plaintiff and members of the class were deprived of the opportunity to purchase less expensive K-Cups and forced to purchase higher price K-Cups from Defendants.

289.    Plaintiffs have been injured in their business and property by reason of Defendants' unfair trade practices alleged herein. Their injury consists of paying higher prices for K-Cups than they would have paid in the absence of such violations. This injury is of the

type of the Massachusetts consumer protection statute was designed to prevent and directly results from Defendants' unlawful conduct.

<h3 style="text-align:center">COUNT ELEVEN</h3>
Massachusetts Unfair Sales Act Violation

290.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 289 as fully set forth herein.

291.    Defendants have engaged in unfair trade practices which emanated from Massachusetts in violation of Mass. Gen. Laws ch. 93, §14A.

292.    By selling single-serve brewers below cost, Defendants have violated Mass. Gen. Laws ch. 93, §14A.

293.    As alleged herein, Defendants have sold K-Cup Brewers below cost in order to leverage a monopoly position in the Compatible Cup market. Pursuant to Section 14H of the Massachusetts Unfair Sales Act. Defendants should be restrained and enjoined from engaging in any sale of single-serve brewers below cost.

<h3 style="text-align:center">COUNT TWELVE</h3>
Unjust Enrichment

294.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 293 as fully set forth herein.

295.    Defendants have benefited from the monopoly profits on the sale of K-Cups resulting from the unlawful and inequitable acts alleged in this Complaint.

296.    Defendants' financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for K-Cups by Plaintiff and members of the Class.

297.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

65

298.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for K-Cups is a direct and proximate result of Defendants' unlawful practices.

299.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

300.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Defendants to be permitted to retain any of the overcharges for K-Cups derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this complaint.

301.    Defendants are aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

302.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

303.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

304.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a trial by jury and hereby respectfully request:

A.      Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market and the Portion Pack Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.      Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has conspired with its pod manufacturers and/or licensees to monopolize the Compatible Cup Market and the Portion Pack Market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,

C.      Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14;

D.      Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully misused its patents, filed sham litigation and used its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup Market and the Portion Pack Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

E.      Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully tied the sale of Keurig 2.0 Brewers to 2.0 K-Cups, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14;

F.      Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Green Mountain's violations of the Sherman Act;

G.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation the Sherman Act;

H.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from implementing the announced 2.0 K-Cup Brewer "lock-out" technology that threatens to block Competitive Cups from working in 2.0 K-Cup Brewers;

I.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from tying the sale of 2.0 K-Cups to 2.0 K-Cup Brewers;

J.      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

K.      Plaintiff's and the Class's costs, expenses, and reasonable attorneys' fees in bringing this action; and

L.      Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff and the Class hereby demand a trial by jury on all issues triable by jury.

Dated: March 10, 2014
       New York, New York

**MOTLEY RICE LLC**

By: _____

William H. Narwold
Donald A. Migliori
Michael M. Buchman
John A. Ioannou
Alex R. Straus
600 Third Avenue, 21st Floor
New York, New York  10016
Telephone:  (212) 577-0040
Facsimile:   (212) 577-0054

Lew T. LeClair (*pro hace vice* to be filed)
**McKOOL SMITH P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas  75201
Telephone:  (214) 978-4000
Facsimile:   (214)978-4044

John F. Garvish, II (*pro hace vice* to be filed)
**McKOOL SMITH, P.C.**
300 W. 6th St., Suite 1700
Austin, Texas  78701
Telephone:  (512) 692-8731
Facsimile:   (512) 692-8744

Lauren Fornarotto
**McKOOL SMITH P.C.**
One Bryant Park, 47th Floor
New York, New York  10036
Telephone:  (212) 402-9426
Facsimile:   (212) 402-9444

COMPLEX-CSMGMT, ECF, RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-01609-VSB

Hoyer v. Green Mountain Coffee Roasters, Inc. et al

Assigned to: Judge Vernon S. Broderick

Related Case: 1:14-cv-00905-VSB

Cause: 15:1 Antitrust Litigation

Date Filed: 03/10/2014

Jury Demand: Plaintiff

Nature of Suit: 410 Anti-Trust

Jurisdiction: Federal Question

Plaintiff

Judy Hoyer

represented by Donald Alan Migliori
Motley Rice LLC
321 South Main Street
Providence, RI 02903
(401)-457-7700
Fax: (401)-457-7708
Email: dmigliori@motleyrice.com
ATTORNEY TO BE NOTICED

John Franklin Garvish , II
McKool Smith(Austin)
300 W. 6th Street
Suite 700
Austin, TX 7870`
(512) 692-8731
Fax: (512) 692-8744
Email: jgarvish@mckoolsmith.com
ATTORNEY TO BE NOTICED

Lauren Lee Fornarotto
McKool Smith
One Bryant Park
47th Flr
New York, NY 10036
(212)-402-9400
Fax: (212)-402-9444
Email: lfornarotto@mckoolsmith.com
ATTORNEY TO BE NOTICED

Michael Morris Buchman
Pomerantz LLP
600 Third Avenue, 20th Floor

New York, NY 10016
212-661-1100
Fax: 212-661-8665
Email: mbuchman@motleyrice.com
ATTORNEY TO BE NOTICED

William H. Narwold
Motley Rice LLC (CT)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
860-882-1676
Fax: 860-882-1682
Email: bnarwold@motleyrice.com
ATTORNEY TO BE NOTICED

V.

Defendant

Green Mountain Coffee Roasters, Inc.

Defendant

Keurig, Incorporated

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2014 | 1 | CIVIL COVER SHEET filed. (laq) (mqu). (Entered: 03/11/2014) |
| 03/10/2014 | 2 | COMPLAINT against Green Mountain Coffee Roasters, Inc., Keurig, Incorporated. (Filing Fee $ 350.00, Receipt Number 1089587)Document filed by Judy Hoyer.(laq) (Additional attachment(s) added on 3/12/2014: # 1 cmp part 2) (mqu). (Entered: 03/11/2014) |
| 03/10/2014 |  | SUMMONS ISSUED as to Green Mountain Coffee Roasters, Inc., Keurig, Incorporated. (laq) (Entered: 03/11/2014) |
| 03/10/2014 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 14-cv-0905. Document filed by Judy Hoyer.(laq) (mqu). (Main Document 3 replaced on 3/14/2014) (mqu). (Entered: 03/11/2014) |
| 03/10/2014 |  | CASE REFERRED TO Judge Vernon S. Broderick as possibly related to 14-cv-0905. (laq) (Entered: 03/11/2014) |
| 03/10/2014 |  | Case Designated ECF. (laq) (Entered: 03/11/2014) |
| 03/10/2014 | 4 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE |

| | | |
|---|---|---|
| | | SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2011) (laq) (Entered: 03/14/2014) |
| 03/18/2014 | | CASE ACCEPTED AS RELATED. Create association to 1:14-cv-00905-VSB. Notice of Assignment to follow. (pgu) (Entered: 03/18/2014) |
| 03/18/2014 | | NOTICE OF CASE ASSIGNMENT to Judge Vernon S. Broderick. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 03/18/2014) |
| 03/18/2014 | | Magistrate Judge Henry B. Pitman is so designated. (pgu) (Entered: 03/18/2014) |
| 03/18/2014 | 5 | WAIVER OF SERVICE RETURNED EXECUTED. Green Mountain Coffee Roasters, Inc. waiver sent on 3/10/2014, answer due 5/9/2014. Document filed by Judy Hoyer. (Buchman, Michael) (Entered: 03/18/2014) |
| 03/18/2014 | 6 | WAIVER OF SERVICE RETURNED EXECUTED. Document filed by Judy Hoyer. (Buchman, Michael) (Entered: 03/18/2014) |
| 03/18/2014 | 7 | FILING ERROR - DEFICIENT DOCKET ENTRY - MOTION for John F. Garvish, II to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9467592. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Judy Hoyer.(Garvish, John) Modified on 3/18/2014 (sdi). (Entered: 03/18/2014) |
| 03/18/2014 | | >>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice regarding Document No. 7 MOTION for John F. Garvish, II to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9467592. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): Missing Certificate of Good Standing. Certificates of Good Standing is missing from the Supreme Court of Texas with the Clerk of Court's signature. Re-file the document as a Corrected Motion to Appear Pro Hac Vice and attach a valid Certificate of Good Standing, issued within the past 30 days. (sdi) (Entered: 03/18/2014) |

| PACER Login: | rk3333 | Client Code: | 110176-0000 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:14-cv-01609-VSB |
| Billable Pages: | 3 | Cost: | 0.30 |