**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

14 CV 1671

RECEIVED
MAR 11 2014
U.S.D.C. S.D.N.Y.
CASHIERS

| | |
|---|---|
| NEY SILVERMAN INSURANCE ASSOCIATES, LLC, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>    -against-<br><br>KEURIG GREEN MOUNTAIN, INC., GREEN MOUNTAIN COFFEE ROASTERS, INC. and KEURIG, INCORPORATED,<br><br>                  Defendants. | Docket No.<br><br>ECF Case<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES ................................................................................................................... 5

JURISDICTION AND VENUE ......................................................................................... 5

INTERSTATE COMMERCE ............................................................................................ 6

RELEVANT MARKETS ................................................................................................... 7

    A.    The United States Markets For Single-Serve Brewers, Portion Packs And
Compatible Cups And Green Mountain's Monopoly Power In Those Markets ............... 7

        (i)    Relevant Product Markets ........................................................................ 7

            (a)    The Single-Serve Brewer Market And Green Mountain's
Monopoly Power In The Single-Serve Brewer Market .......................... 7

            (b)    The Portion Pack Market And Green Mountain's Monopoly
Power In The Portion Pack Market ....................................................... 12

            (c)    The Compatible Cup Market And Green Mountain's Monopoly
Power In The Compatible Cup Market ................................................... 15

        (ii)    The Relevant Geographic Market ........................................................... 19

FACTUAL ALLEGATIONS ........................................................................................... 19

    A.    Green Mountain's Unlawful Monopolization Of The Relevant Markets ..................... 19

        (i)    Green Mountain Aggressively Eliminated Potential Competitors Through
Successive Acquisitions And Licensing Agreements With Competitors .......... 19

        (ii)    Green Mountain Coerced Machine Manufacturers And Component
Suppliers To Enter Into Long-Term, Exclusive Contracts Denying
Competitors Access To Equipment And Materials ............................................ 25

        (iii)    Green Mountain Coerced Distributors And Retailers To Enter Into Long-
Term, Exclusive Contracts Denying Competitors Access To Retail
Customers And Distribution Channels .............................................................. 31

        (iv)    Green Mountain Sold Its K-Cup Brewers At Or Below Cost To
Consumers And Provided K-Cup Brewers To Businesses For Free As
Long As Businesses Agreed To Purchase K-Cups Exclusively From
Green Mountain .................................................................................................. 32

        (v)    Green Mountain Pursued Sham Litigation To Restrain Competition ................ 34

        (vi)    Green Mountain Has Designed A Soon-To-Be Released Single-Serve
Brewer With "Lock-Out" Technology That Will Prevent The Brewers
From Working With Cups Not Manufactured By Green Mountain .................... 36

THE ANTICOMPETITIVE EFFECTS OF GREEN MOUNTAIN'S UNLAWFUL
MONOPOLIZATION OF THE RELEVANT MARKETS ............................................ 44

CLASS ACTION ALLEGATIONS ............................................................................... 46

**TABLE OF CONTENTS**
(continued)

**Page**

**CLAIMS FOR RELIEF** ........................................................................... **49**

**FIRST CLAIM FOR RELIEF**
**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2** ...................... **49**

**SECOND CLAIM FOR RELIEF**
**Exclusive Dealing in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and
Section 3 of the Clayton Act, 15 U.S.C. § 14** .................................................................. **50**

**THIRD CLAIM FOR RELIEF**
**Monopoly Leveraging in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2** ............ **52**

**FOURTH CLAIM FOR RELIEF**
**In the Alternative, Attempted Monopolization in Violation of Section 2 of the
Sherman Act, 15 U.S.C. § 2** ............................................................................................. **53**

**PRAYER FOR RELIEF** ..................................................................................................... **54**

**JURY TRIAL DEMANDED** .............................................................................................. **54**

Plaintiff Ney Silverman Insurance Associates, LLC, on behalf of itself and all others similarly situated, brings this action against Defendants Keurig Green Mountain, Inc., Green Mountain Coffee Roasters, Inc. ("GMCR"), and Keurig, Incorporated ("Keurig"), GMCR's wholly owned subsidiary (collectively, "Green Mountain" or "Defendants"), and alleges as follows, based on information and belief and its counsel's investigation:

## NATURE OF THE ACTION

1.      This lawsuit is brought as a class action against Green Mountain for, among other violations, unlawfully monopolizing the U.S. market for the sale of single servings or "portion packs" of coffees or other beverages ("Portion Packs") that are used in single-serve brewers ("Single-Serve Brewers") through a multifaceted anticompetitive scheme designed to exclude competitors and restrain competition in those markets.

2.      Green Mountain manufactures k-cups ("K-Cups"), which are Portion Packs specifically designed for use in K-Cup Single-Serve Brewers ("K-Cup Brewers").  Green Mountain has unlawfully monopolized both the Portion Pack market and the submarket of cups compatible with K-Cup Brewers ("Compatible Cups").  Compatible Cups include both K-Cups and other cups designed by Keurig's competitors for use in K-Cup Brewers.

3.      As a result of its unlawful and anticompetitive conduct, Green Mountain now controls approximately 75% of the market for the sale of Single-Serve Brewers, approximately 88% of the market for the sale of all Portion Packs and approximately 86% of the market for the sale of all Compatible Cups.

4.      Green Mountain has acquired its unlawful monopoly power through a multifaceted anticompetitive scheme that began with aggressively eliminating potential competitors through successive acquisitions.  Before the end of 2010, Green Mountain acquired

1

Keurig, Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte). As one analyst explained, Green Mountain "eliminated" its competitors "by buying them" and paying "high prices to avoid having to compete." David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation.

5.      Next, Green Mountain proceeded to systematically tie-up vertical distribution channels for Compatible Cups by entering into multi-year, unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system.  These exclusive dealing agreements were intended to and did foreclose competition by tying up sellers of machinery used to make Compatible Cups, sellers of Compatible Cup components, competitor coffee roasters and brands whose coffee is used in Compatible Cups, as well as the distributors and retailers that sell and market Compatible Cups.

6.      For example, Green Mountain does not allow its suppliers to sell their products to Green Mountain competitors who intend to use them to make Compatible Cups.  Thus, these unduly restrictive and unreasonably lengthy exclusive dealing agreements serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.  As Suzanne Delong, Keurig's director of investor relations, explained, there are only two companies in the world making K-Cup packaging equipment, and they are both under contract with Keurig.  Daniel McGinn, *The Buzz Machine*, BOSTON.COM (Aug. 7, 2011), http://www.boston.com/business/articles/2011/08/07/the_inside_story_of_keurigs_rise_to_a_billion_dollar_coffee_empire/.

7.      Green Mountain has an extensive network of distributors, exceeding 500 in

number and including known retailers such as Safeway, Target and Bed, Bath & Beyond.  Under the terms of many of Green Mountain's Keurig Authorized Distributor ("KAD") agreements, distributors are prohibited from offering for sale Compatible Cups made by Green Mountain's competitors.  One industry report explained that "[v]endors' contracts with Green Mountain prohibit them from selling any private-label K-Cups for the Keurig branded brewers." Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountain sKCups.pdf.

8.    Green Mountain also unlawfully maintains and enhances its monopoly power by selling its K-Cup Brewers at or below cost to consumers, and by giving K-Cup Brewers to businesses for free, as long as the businesses agree to purchase K-Cups exclusively from Green Mountain.  While Green Mountain sacrifices brewer profits to drive K-Cup sales, it recoups profits by charging a 50% margin on K-Cups.

9.    Green Mountain also sought to maintain its unlawful monopoly by filing sham patent litigation against a competitor, Sturm Foods, Inc. ("Sturm"), alleging that Sturm's sale of Compatible Cups infringed and induced infringement of Keurig's brewer method patents.  Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement. In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit.  The United States Court of Appeals for the Federal Circuit affirmed the district court's ruling, holding on appeal that Keurig was, in filing the lawsuit, trying to make an "end-run" around the patent laws with a "tactic that the Supreme Court has

3

explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013). The lawsuit was not filed for any legitimate purpose of protecting patent rights, but was a baseless sham intended to squelch competition. The Federal Circuit explicitly admonished Defendants' anticompetitive tactics when it held:

> **Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law.**

*Id.* (emphasis added).

10.     Finally, in its latest unlawful effort to further its monopoly, Green Mountain has announced that Keurig will stop selling existing K-Cup Brewers and replace them with a new K-Cup Brewer called the Keurig 2.0 ("2.0 K-Cup Brewer") containing lock-out technology to prevent the brewer from working with competitor manufacturers' Compatible Cups.   The new design serves no legitimate or procompetitive purpose.   In fact, Green Mountain's President and Chief Executive Officer, Brian Kelley, has admitted the proposed lock-out technology could be programmed by Green Mountain to be switched on or off after a certain number of uses.   Thus, Green Mountain cannot plausibly argue that the lock-out technology is integral or key to any consumer benefit offered by the new design.   While the 2.0 K-Cup Brewer has not yet been launched, Green Mountain has preemptively used its anticipated launch as a calculated ploy to steal market share from competitor Compatible Cup manufacturers.

11.     By foreclosing access to markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of competitors' Compatible Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers.

4

12.     These anticompetitive and exclusionary acts, individually and collectively, were intended to, and had the effect of, substantially foreclosing competition, and artificially inflating prices, in the U.S. market for the sale of Single-Serve Brewers, as well as the U.S. market for the sale of Portion Packs, and the submarket for the sale of Compatible Cups.

## THE PARTIES

13.     Plaintiff Ney Silverman Insurance Associates, LLC is a Maryland company that purchased K-Cups directly from Green Mountain during the Class Period (as defined below).

14.     Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business in Waterbury, Vermont.

15.     Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Waterbury, Vermont.

16.     Defendant Keurig, Incorporated is a corporation organized under the laws of the State of Delaware with its principal place of business in Reading, Massachusetts.   Keurig is a wholly-owned subsidiary of GMCR.

## JURISDICTION AND VENUE

17.     This action arises under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  Plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).   Plaintiff and the Class (defined below) also seek attorneys' fees, costs, and other litigation expenses permitted under federal law.

18.     This Court has jurisdiction pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and pursuant to 28 U.S.C. §§ 1331, 1337.

19.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the

Clayton Act, 15 U.S.C. § 22.

20.     This Court also has personal jurisdiction over Green Mountain because it regularly does and solicits substantial business in this District, either directly or through intermediaries, is continuously and systematically present in this District, and has established minimum contacts with this District, in particular by registering to do business in the state of New York, maintaining a registered agent for service of process in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in this District.  Furthermore, Green Mountain, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in this District; (b) directly or indirectly sold or marketed substantial quantities of K-Cup Brewers and K-Cups in this District; (c) had substantial aggregate contacts in this District; or (d) was engaged in an illegal, anticompetitive scheme to monopolize the U.S. market for the sale of Single-Serve Brewers, as well as the U.S. market for the sale of Portion Packs and Compatible Cup submarket, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

21.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because Green Mountain can be found in and transacts business within this District, and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

## INTERSTATE COMMERCE

22.     Throughout the Class Period (defined below), Green Mountain manufactured, produced, sold and/or shipped substantial quantities of K-Cup Brewers and K-Cups in a

continuous and uninterrupted flow of transactions in interstate commerce throughout the U.S., including within this District.  Green Mountain's unlawful activities that are the subject of this complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## RELEVANT MARKETS

### A.      The United States Markets For Single-Serve Brewers, Portion Packs And Compatible Cups And Green Mountain's Monopoly Power In Those Markets

#### (i)      Relevant Product Markets

23.      There are at least three relevant product markets in which to evaluate Defendants' anticompetitive conduct: (1) the market for the design, manufacture, and sale of Single-Serve Brewers ("Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of Portion Packs that are used in Single-Serve Brewers ("Portion Pack Market"); and (3) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"), which is a submarket of the Portion Pack Market. Green Mountain tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

#### (a)      The Single-Serve Brewer Market and Green Mountain's Monopoly Power In The Single-Serve Brewer Market

24.      The Single-Serve Brewer is a quick, convenient, and simple way for consumers to brew a single cup of coffee, cocoa, cappuccino, cider, or other beverages.  Single-Serve Brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

25.      Keurig offers a variety of K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector (*e.g.*, hotels).

26.      Green Mountain designs, manufactures, and sells a variety of Single-Serve

Brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo

Brewers, each of which uses a different type of Portion Pack that is incompatible with the other

types of brewers.

27.     Keurig's Single-Serve Brewers are pictured below.  From left to right, the models

include the Keurig K45 Elite Brewing System ($119.99), the Keurig K75 Platinum Brewing

System ($179.99), the Keurig K10 MINI Plus Brewing System ($99.99), the Cuisinart Brewing

System ($199.95) and the Mr. Coffee Brewing System – KG2 ($89.95)



28.     Among other qualities, the unique convenience offered by Single-Serve Brewers

means that traditional percolators and drip coffee makers are not reasonable substitutes for

Single-Serve Brewers, and there is no cross-elasticity of demand between Single-Serve Brewers

and drip coffee makers.  Thus, the price of traditional drip coffee makers typically does not fully

constrain prices for Single-Serve Brewers.

29.     Consumers pay a premium for Single-Serve Brewers over the price of traditional

drip coffee makers. While traditional percolaters and drip coffee makers are frequently sold

around a price point of $20 to $30, Single-Serve Brewers typically cost anywhere from $80 to

several hundred dollars.

30.     While K-Cups and K-Cup Brewers are sold as separate products in many stores

and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

31.     As a 2012 New York Times article explained, "it's hard to tell how much coffee costs, even if you know what you spent [,] ... [which is] the case with many of the single-serve brewing machines."  Oliver Strand, *With Coffee, the Price of Individualism Can Be High*, N.Y. TIMES (Feb. 7, 2012), http://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly.html.

32.     Many of Keurig's commercial K-Cup Brewers do not even have their price listed anywhere on the Keurig website.  An interested customer must specifically "[c]onnect with a distributor" to "[r]equest pricing."  *See Keurig B200 Commercial Brewing System*, KEURIG.COM, http://www.keurig.com/brewers/b200 (last visited Feb. 25, 2014).

33.     Businesses can request a "free trial" at the click of a button on the Keurig website, without being shown the price of the commercial K-Cup Brewers for which they are requesting a free trial. *See id.*

34.     Green Mountain restricts the ability of distributors to advertise or display the prices of K-Cups that are used in office K-Cup Brewers. For example, Green Mountain's contracts with distributors provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack [ ] through or at any store operated by or for Distributor."  KAD Agreement § 2.1., attached hereto as Exhibit A.

35.     In addition to the Single-Serve Brewers manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee and Cuisinart.

36.     Keurig also sells Vue Brewers, which, like K-Cup Brewers, are marketed for home or office use. Vue Brewers, however, use a different type of Portion Pack, known as "Vue

Cups," which are shaped differently than K-Cups.  The Vue Brewer is not compatible with K-Cups, and Vue Cups cannot be used in K-Cup Brewers or Rivo Brewers.

37.     Keurig also offers the Rivo cappuccino and latte brewer.  This brewer "exclusively uses Rivo Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers.  K-Cups thus cannot be used in Rivo brewers.

38.     Additional Single-Serve Brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavia," Bosch's "Tassimo," Philips Electronics N.Y.'s "Senseo," Nestlé's "Nespresso" and Starbucks' "Verismo."

39.     Prices across these Single-Serve Brewers can vary by as much as several hundred dollars.

40.     In fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers.  And in the first quarter of 2014, Green Mountain sold a record 5.1 million Keurig Single-Serve Brewers.

41.     Green Mountain controls the dominant share of the Single-Serve Brewer Market. It is estimated that Green Mountain controls approximately 75% of the Single-Serve Brewer Market overall.  *See* Tony Daltorio, *The Brewing Coffee War*, THE MOTLEY FOOL (Mar. 23, 2012), http://beta.fool.com/tdalmoe/2012/03/23/brewing-coffee-war/3079/.



42.     Green Mountain has the power to exclude competition in the Single-Serve Brewer Market. Green Mountain has exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retailers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

43.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market. For example, Green Mountain still holds patents that cover its K-Cup Brewers. Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment. Moreover, potential new market entrants face a typical chicken/egg problem:  retailers only stock Single-Serve Brewers with a wide assortment of compatible Portion Packs, and Portion Packs are only commercially successful if they are compatible with a widely available Single-Serve Brewer.

      (b)     **The Portion Pack Market and Green Mountain's Monopoly Power In The Portion Pack Market**

44.     The second relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for Portion Packs that are used in Single-Serve Brewers.

45.     K-Cups manufactured, licensed and/or sold by Green Mountain are shown below.

    

46.     Some Single-Serve Brewers use Portion Packs that are packaged as "pods," which look like flat cookies, or "T-Discs," which are a type of sealed pod.

47.     Manufacturers of Single-Serve Brewers that use "pod" Portion Packs include Hamilton Beach, Gevalia, and Philips Electronics N.Y.'s "Senseo."

48.     Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.  Various brands' T-Discs are shown below.



49.     Ground coffee is not a reasonable substitute for, or interchangeable with, Portion Packs.  This is demonstrated by the fact that the ability to increase Portion Pack prices above

their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers. The price-per-pound of Portion Pack coffee is nearly five times greater than that of ground coffee.  Additionally, ground coffee is not a reasonable substitute for Portion Packs because consumers generally find coffee brewed from such packs to be substantially more convenient and desirable in its quality as compared with brewed coffee from multiple-serve coffee makers.

50.     There is no cross-elasticity of demand between Portion Packs and ground coffee. Were Portion Packs priced competitively with ground coffee, consumers who chose to brew their coffee from Single-Serve Brewers using Portion Packs would generally not switch to coffee brewed from a multiple-serve coffee maker in reaction to a small but significant and nontransitory rise in the price of Portion Packs.

51.     Although there are different types of Portion Packs, such as K-Cups, T-Discs, and pods, each of these Portion Packs is generally only compatible with a corresponding type of Single-Serve Brewer. For example, K-Cups (and Compatible Cups) generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of Single-Serve Brewers.

52.     Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Portion Packs, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers. Indeed, these other Portion Packs are generally incompatible with K-Cup Brewers.

53.     Green Mountain possesses and exercises monopoly power over the Portion Pack market. In 2013, Green Mountain controlled approximately 88% of the Portion Pack Market.

13



54.     Barriers to entry are high and challenging for potential entrants into the Portion

Pack Market.  To enter the market, Portion Pack manufacturers must either develop and

manufacture their own compatible brewers, or design and manufacture Portion Packs that are

compatible with Green Mountain's K-Cup Brewers or another existing Single-Serve Brewer

(*e.g.*, pods or T-Discs).

55.     In the first instance, potential market entrants cannot easily manufacture their own

brewers to accommodate their own Portion Packs because Green Mountain has a number of

patents covering brewer technology. Such a manufacturing effort would require successful

research and development efforts, large commitments of sunk costs, and significant capital

expenditures.

56.     In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Portion Pack that is compatible with a particular Single-Serve Brewer format.

57.     Potential entrants are further restrained from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the machinery and components used to make Portion Packs. These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete on a level playing field with Green Mountain in the Portion Pack Market.

58.     Green Mountain intends to further increase its unlawful monopoly power by launching the 2.0 K-Cup Brewer, which will reportedly contain "interactive technology" preventing 2.0 K-Cup Brewers from functioning with competitors' Compatible Cups, and by replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

### (c)     The Compatible Cup Market and Green Mountain's Monopoly Power In The Compatible Cup Market

59.     The third relevant product market in which to evaluate Green Mountain's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups.

60.     Indeed, the Compatible Cup Market, as opposed to the Portion Pack Market, is the market in which Green Mountain tracks market shares of K-Cups for competitive purposes. *See* Green Mountain FQ1 2014 Earnings Call Tr., SEEKING ALPHA, http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript.

61.     As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high. The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the

15

priciest coffees sold by artisanal roasters, the stuff of coffee snobs." Oliver Strand, *With Coffee, the Price of Individualism Can Be High*, N.Y. TIMES (Feb. 7, 2012), *available at* http://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly.html.

62.     Yet, as Time Magazine pointed out, "[t]he [cup] numbers are highly variable based on where one shops, what kind of coffee you're buying, and whether you purchase in small packages or enormous quantities." Brad Tuttle, *Beans vs. Single-Serve Cup: Just How Much More Does K-Cup Coffee Cost?*, TIME (Feb. 9, 2012), http://business.time.com/2012/02/09/beans-vs-single-serve-cup-just-how-much-more-does-k-cup-coffee-cost/.

63.     Green Mountain owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte).

64.     Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups bearing the trademarks of various major players in the coffee industry such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. Green Mountain either owns or licenses some forty-nine brands.

65.     According to Green Mountain's President and Chief Executive Officer, Brian Kelley, in total, Green Mountain controls approximately 86% of the Compatible Cup Market. *See* Green Mountain FQI 2014 Earnings Call Tr., SEEKING ALPHA, http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript ("We had 100% of the system . . . and all of a sudden we have 86% . . . .").

16



66.     The remaining 14% of the Compatible Cup Market is composed of sellers of

unlicensed and private label Compatible Cups. *See id.* (Green Mountain "estimate[s] that

unlicensed packs represented a 14% share of the Keurig system as of the end of [their] first

quarter" of 2014.).

67.     In fiscal year 2012, Green Mountain's net sales were $3.9 billion. 90% of these

consolidated net sales resulted from the combined sales of K-Cup Brewers (which comprised

22%, or $760 million) and K-Cups (which comprised 78%, or $2.7 billion). This is consistent

with Green Mountain's strategy of selling its K-Cup Brewers at or below cost.

68.     In fiscal year 2013, Green Mountain's net sales included approximately $3.187

billion for K-Cups and approximately $828 million for K-Cup Brewers.

69.     As discussed above, Compatible Cups are not reasonably interchangeable with

other Portion Pack formats, such as T-Discs, pods, or capsules, and consumers who purchase K-

Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups.

70.     Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Green Mountain locks consumers in to the Compatible Cup format by selling its K-Cup Brewers at or below cost.  Green Mountain is then able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% profit margin (or more) on its K-Cups. *See* Green Mountain Investor Day Presentation at 164, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm.

71.     Indeed, Green Mountain has been able to exercise its unlawful monopoly power by profitably pricing K-Cups at least 10% to 15% above competitive levels without losing significant market share or increasing demand for Portion Packs other than Compatible Cups.

72.     As discussed more fully herein, Green Mountain has also exercised, sustained, and magnified its unlawful monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

73.     Barriers to entry for the Compatible Cup Market are high and difficult to surmount for the same reasons discussed above with respect to the Portion Pack Market.

74.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer.  This is so because most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute Portion Packs that are incompatible. The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the

18

price of Compatible Cups.

    **(ii)**      **The Relevant Geographic Market**

75.     The relevant geographic market is the United States. To compete effectively within the United States, Single-Serve Brewer, Portion Pack and Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Single-Serve Brewer, Portion Pack and Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Single-Serve Brewer, Portion Pack and Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

## FACTUAL ALLEGATIONS

**A.**    <u>Green Mountain's Unlawful Monopolization of the Relevant Markets</u>

    **(i)**      **Green Mountain Aggressively Eliminated Potential Competitors Through Successive Acquisitions And Licensing Agreements With Competitors**

76.     Keurig developed K-Cup Brewers and K-Cups in the late 1990s and obtained patents on those brewers as well as on the filters in K-Cups. For years thereafter, Keurig licensed various coffee company competitors, including GMCR, to manufacture and sell filtered K-Cups.

77.     GMCR first partnered with Keurig in the late 1990s to manufacture and sell Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

78.     Keurig introduced its Single-Serve Brewers to home users in 2002.  During that same year, GMCR acquired 42% of Keurig for $15 million.

79.     GMCR acquired the remainder of Keurig in June 2006 for $104 million.

80.     After acquiring Keurig and its patents in June 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and

19

LNH Holdings, Inc. (Van Houtte) (in 2010).

81.     According to one analyst's presentation, "GMCR eliminated the licensees by buying them. . . . GMCR paid high prices to avoid having to compete with the licensees post patent expiration."  In effect, GMCR "overpa[id] to buy [its] licensees back via acquisitions" and then partnered with other coffee brands that could still pose a competitive threat.  The analyst thus concluded that aside from eliminating potential competitors from the market, at least one of the acquisitions had very little value since "[t]he very high allocations to Goodwill raise suspicion about subsequent earnings quality."  David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation.

82.     In addition to foreclosing competition through acquisitions, Green Mountain has also eliminated competitors by entering into anticompetitive license and manufacturing agreements with numerous competitors. For example, after expressing concern in its 2010 annual report over its then "primary competitors," Dunkin' Donuts, Peet's and Starbucks, Green Mountain locked up exclusive licensing deals with the two biggest brands, Dunkin' Donuts and Starbucks.   Green Mountain currently owns or licenses some forty-nine coffee brands including well-known brands such as: Caribou Coffee, Wolfgang Puck, and Newman's Own.  Some of these brands are shown below.

     

    

    

     

       

     



83.     Green Mountain's anticompetitive and unduly restrictive exclusionary agreements with these competitors have further enabled it to wield its unlawful monopoly power in the Compatible Cup Market.  For example, the Amended and Restated Purchase and License Agreement entered into between Green Mountain and Caribou Coffee Company, Inc. ("Caribou"), dated December 20, 2011, expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase . . . of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale." *See* Exhibit B at 2, 3 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc. (Dec. 20, 2011)).

84.     Competitor coffee brands further agree not to: (1) "sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion

Packs or any other product intended for use in the Keurig Brewing System;" and (2) license any trademarks for use by third parties in connection with products "intended for use with the Keurig Brewing System." *See* Exhibit B at 7 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou).

85.     Such agreements with competitor coffee brands, like Caribou, have the effect of allowing Green Mountain to allocate markets, restrain output, restrain price competition, and to exclude competitors.  This is particularly true given that, according to one analyst report, the "only meaningful coffee brands that [Green Mountain] does not have in its portfolio are Maxwell House (*i.e.*, Kraft) and Peet's." David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation.

86.     In fact, Green Mountain has entered into numerous long-term, exclusionary licensing agreements with competitor coffee brands, some of which are highlighted below:

(a)     In December 2006, Green Mountain entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups. The parties renewed and amended their agreement in December 2011. Under this agreement, Caribou sells Green Mountain its coffee, which Green Mountain packages into K-Cups, and grants Green Mountain a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. Under the agreement, Caribou may only sell the K-Cups at Caribou coffee stores and on Caribou's website for "At Home" use.

(b)     In February 2010, Green Mountain entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Green Mountain is the exclusive manufacturer of Compatible Cups under Smucker's

Folgers and Millstone coffee brands. Under the agreement, Smucker may only sell the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

(c)     In February 2011, Green Mountain entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Green Mountain became the exclusive manufacturer of Dunkin' Donuts K-Cups. Under the agreement, Dunkin' Donuts may only sell its K-Cups at Dunkin' Donuts restaurants. Additionally, Dunkin' Donuts is prohibited from selling K-Cups in grocery stores, where it traditionally sells its bagged coffee.

(d)     In March 2011, Green Mountain entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks is the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee."  Under this agreement, Green Mountain began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Green Mountain sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.  *See* Starbucks Press Release, *Starbucks and Green Mountain Coffee Roasters Enter Into Expanded, Long-Term Strategic Partnership* (May 7, 2013), http://news.starbucks.com/news/starbucks-and-green-mountain-coffee-roasters-enter-into-expanded-long-term-.

(e)     In May 2013, Green Mountain entered into a multi-year agreement with

The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea retailer in the United States." Under the agreement, Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014. *See* GMCR Press Release, *Green Mountain Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family* (May 29, 2013), http://investor.gmcr.com/releasedetail.cfm?releaseid=767731.

(f)     In July 2013, Green Mountain entered into a multi-year agreement with Cinnabon. Under the agreement, Green Mountain will manufacture Cinnabon K-Cups which will be sold in the retail and commercial channels, as well as in Cinnabon restaurants.

87.     Green Mountain has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies such as Bigelow, Twinings, Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola.

88.     As a result of the above-described anticompetitive agreements, Green Mountain was able to foreclose competition from would-be competitors both before and after the patents protecting its K-Cup technology expired.

89.     Similarly, Green Mountain also enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the coffee and tea that Green Mountain purchases from coffee brands.

90.     In at least one such contract, Green Mountain is permitted to veto the roaster's ability to contract with competitor Compatible Cup makers. Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement. Keurig shall review and either approve or disapprove

24

such contracts . . . ."  *See* License and Distribution Agreement between Keurig, Incorporated and

Diedrich Coffee, Inc. (July 29, 2003),

http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.ht

m.

91.     As a result of Green Mountain's scheme to acquire competitors and licensing

partners, by August 2010, Green Mountain was ranked number 2 on Fortune's List of Global 100

Fastest-Growing Companies. When reporting the ranking, Green Mountain touted on August 19,

2010, that for "the first nine months of fiscal 2010, the company [had] produced net sales growth

of 70% over the prior year and . . . earnings per share growth of 89% over the same period for

fiscal year 2009."  GMCR Press Release, *Green Mountain Coffee Roasters, Inc. Ranks #2 on*

*Fortune's List of Global 100 Fastest –Growing Companies* (Aug. 19, 2010),

http://investor.gmcr.com/releasedetail.cfm?ReleaseID=500603.

92.     Having grown into a billion-dollar publicly traded company by eliminating and

restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power

without fear that market entrants could constrain its prices, and indeed, it did just that. On

September 7, 2010, Green Mountain announced a "price increase" of "approximately 10 to 15

percent" on "all K-Cup Portion Packs for its Keurig Single Cup brewing system sold in North

America" that would "occur across all sales channels."  GMCR Press Release, Green Mountain

Coffee Roasters, Inc. Announces Price Increase (Sept. 7, 2010),

http://investor.gmcr.com/releasedetail.cfm?ReleaseID=505288. And on June 11, 2011, Green

Mountain announced another price increase of approximately 9 to 13 percent on all K-Cups.

**(ii)     Green Mountain Coerced Machine Manufacturers And Component**
**Suppliers To Enter Into Long-Term, Exclusive Contracts Denying**
**Competitors Access to Equipment And Materials**

93.    Green Mountain has entered into unduly restrictive, anticompetitive, and exclusionary agreements with sellers of the machinery and components used to make K-Cups and sellers of K-Cup components. For example, under one such agreement, Green Mountain restricts the ability of the machinery manufacturer to sell the machinery to a Green Mountain competitor who intends to use it to make Compatible Cups.  However, the machinery manufacturer can sell the same machinery for other purposes.

94.    As such, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

95.    In fact, Suzanne Delong, Keurig's director of investor relations, has stated that there are only two companies in the world making K-Cup packaging equipment, and both are under contract with Keurig.

96.    Green Mountain's web of exclusive dealing agreements has further enabled it to wield an unlawful monopoly in the Portion Pack and Compatible Cup Markets.

97.    For example, these agreements were used as a shield to insulate Green Mountain from competition by competitor TreeHouse Foods, Inc. ("TreeHouse").  TreeHouse attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Compatible Cups.  In response to TreeHouse's request, a Sales Manager from R.A. Jones responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product." Complaint at ¶ 179, *Treehouse Foods, Inc. v. Green Mountain Coffee Roasters, Inc.*, No. 14-cv-00905, (S.D.N.Y. Feb. 11, 2014).

98.    Under "the rules," as described by the representative: "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."  However, R.A. Jones can still "build equipment

26

for all types of packages, just not K-Cups or anything that goes into a Keurig brewer." *Id.* at ¶ 180.

99.     According to TreeHouse, the Sales Manager expressed hope that the Green Mountain "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse. *Id.* at ¶ 181.

100.     The December 19, 2013 R.A. Jones email, explaining that the "agreement" with Green Mountain prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that Green Mountain coerces suppliers into entering exclusionary agreements intended to restrain competition between competitor Compatible Cup makers and Green Mountain. Because R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Compatible Cups cannot be justified on the basis that it ensures a reliable supply of equipment for Green Mountain. Instead, it is merely intended to cut off competitor Compatible Cup makers' access to machinery that is necessary to manufacture Compatible Cups.  This agreement, in and of itself, provides direct evidence that Green Mountain has exercised its unlawful monopoly power by excluding competitors from resources needed to compete with Green Mountain.

101.     Green Mountain also unreasonably restrains competitors' access to the inputs necessary to make Compatible Cups.

102.     Indeed, TreeHouse was unable to find a single other supplier in the United States willing to sell it machinery used to make non-filtered Compatible Cups.  *See id.* at ¶ 184.

103.     Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter. There are few suppliers for each of these components because Compatible

Cup components must generally be custom engineered for use in K-Cup Brewers. TreeHouse alleges that Green Mountain has entered into exclusive dealing agreements with suppliers of each K-Cup component, which have resulted in TreeHouse being forced to work with less experienced suppliers at higher cost to TreeHouse. *See id.* at ¶ 187.

104. In 2010, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups. *See id.* at ¶ 188.

105. Green Mountain competitor TreeHouse approached all three of these companies to find a supplier for components to make Compatible Cups. *See id.* at ¶ 189.

106. At that time, Winpak was already supplying TreeHouse subsidiary Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers. TreeHouse contacted Winpak to see if Winpak could also supply cups and lids to make Compatible Cups. After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply the components to TreeHouse. Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers. *See id.* at ¶ 190.

107. TreeHouse also met with Phoenix Cups to see if Phoenix could supply the cup component to make Compatible Cups. Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements. However, shortly thereafter, Phoenix Cups informed TreeHouse that it could not supply TreeHouse with cups for use in K-Cup Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Green Mountain. *See id.* at ¶ 193.

28

108.    Because Phoenix Cups was free to supply cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix Cups from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Green Mountain.

109.    TreeHouse then contacted Curwood, the only remaining domestic supplier of cup components used to make Compatible Cups known at that time. Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with cups for use in K-Cup Brewers, Curwood informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations." *See id.* at ¶ 196.

110.    As a direct result of these suppliers' refusal to supply TreeHouse with the materials necessary to make Compatible Cups, TreeHouse was forced to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components.  Developing a new cup component was a more costly and lengthy process as compared to purchasing cup components from a company that already produced such components.  TreeHouse incurred additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers.  As a result, TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase cups from an experienced cup manufacturer.  *See id.* at ¶ 198-99.

111.    TreeHouse also approached domestic suppliers of foil lids used to make Compatible Cups, Winpak and LMI Packaging Solutions ("LMI") to find a supplier for its Compatible Cups' foil lids.  *See id.* at ¶ 200.

112.    As detailed above, Winpak refused to supply TreeHouse with lids after learning

that TreeHouse intended to use the lids in Compatible Cups.

113.    LMI, then a supplier to Sturm of other cups and lids, also refused to supply TreeHouse with foil lids to make Compatible Cups, citing other business commitments.  It would seem that these "other business commitments" were to Green Mountain.  After its initial refusal, LMI later informed TreeHouse that it no longer had a relationship with Green Mountain, and was therefore now free to do business with TreeHouse.  *See id.* at ¶ 202-03.

114.    Once again, because TreeHouse was unable to contract with experienced domestic lid suppliers, it had to incur additional unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. As a result, its start-up costs were substantially higher than they would have been if TreeHouse had been able to purchase lids from an experienced lid manufacturer.  *See id.* at ¶ 204.

115.    Similarly, several filter suppliers declined to supply TreeHouse because they were already supplying Green Mountain with the same product.  Thus, TreeHouse was forced to find a new supplier of filter supplies and adapt TreeHouse's production process to use the new products.  Similarly, TreeHouse had to incur additional costs because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.  *See id.* at ¶ 206.

116.    As demonstrated by TreeHouse's experience, these multi-year, exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Green Mountain.

117.    Moreover, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  As parties to these agreements have admitted, Green Mountain does not restrict the ability

to sell these same products for other purposes just so long as those products are not sold to a

Green Mountain competitor who intends to use them to make Compatible Cups for use in K-Cup

Brewers.

> **(iii)     Green Mountain Coerced Distributors And Retailers To Enter Into Long-Term, Exclusive Contracts Denying Competitors Access to Retail Customers and Distribution Channels**

118.    Green Mountain distributes commercial K-Cup Brewers and accompanying K-

Cups through over 500 Keurig Authorized Distributors ("KAD"s), including Office Coffee

Service operators, office suppliers such as WB Mason and United Stationers, hospitality service

providers, and food-service management companies, such as Vistar and Aramark.

119.    Green Mountain requires some distributors to enter into a multi-year KAD

Agreement, which prevents them from purchasing Compatible Cups from Green Mountain

competitors, thereby substantially foreclosing access to the Office Coffee Services Market

Segment. Specifically, certain Green Mountain KAD Agreements contain a "Keurig Loyalty"

requirement that provides:

> 3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an
> affiliate promote, market, sell or otherwise make available (a) any
> beverage base or portion pack product, other than Keurig Packs, that can
> be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer
> that is intended for use or usable with Keurig Packs, or (c) any accessories
> to Keurig Brewers that are not approved by GMCR and are related to the
> functionality of any Keurig Brewer, including without limitation any
> accessory that is intended to replace or allow the re-use of Keurig Packs.
> *See* Exhibit B (attaching KAD Agreement).

120.    As one national coffee supplier for offices, food service and retail explained

"[o]ur agreements [with Green Mountain] state that we cannot sell other brands of K-Cups to be

used in Keurig brewers."  And a president of an office coffee distribution company explained

that "Private label K-Cups prices are probably 10% to 15% less than Green Mountain's K-Cups,

31

but I am not offering anything private label.  I am not permitted by contract with them."

Similarly, the owner of a major North American Keurig-contracted online retailer said "We've

abided by our contracts, so we haven't taken on any of the new K-Cups.  We've stuck with

Green Mountain."  Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-*

*Cups*, BLUESHIFT REPORT (July 3, 2013),

http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.p

df.

121.    These KAD Agreements are unduly restrictive not only because they substantially

exclude competition, but also because they do so for a multi-year period.

122.    Notably, the standard KAD Agreement also has the effect of locking in office and

commercial customers that might otherwise switch to new suppliers if they were made better

aware of Green Mountain's supracompetitive K-Cup prices.  Additionally, these KAD

Agreements restrict distributors' ability to display prices for K-Cups, further insulating Green

Mountain from competitive pricing. *See* Exhibit B at 2.1, 2.3 (attaching KAD Agreement).

**(iv)    Green Mountain Sold Its K-Cup Brewers At Or Below Cost To Consumers And Provided K-Cup Brewers To Businesses For Free As Long As Businesses Agreed To Purchase K-Cups Exclusively From Green Mountain**

123.    Green Mountain's business model depends upon its ability to leverage its Single-

Serve Brewer monopoly to restrain competition and extract monopoly profits from the K-Cups it

sells in the Portion Pack and Compatible Cup Markets. Specifically, this model relies on Green

Mountain's ability to: (1) drive sales of Green Mountain's highly profitable K-Cups by

excluding competition for sales of Single-Serve Brewers; (2) restrain price competition for

Compatible Cups; and (3) maintain supracompetitive K-Cup prices for extended periods of time.

124.    As it admits in its own statements to the public and investors, Green Mountain

sells K-Cup Brewers at cost or even at a loss to saturate the market with brewers that are only compatible with the K-Cup format, thereby locking consumers in to using the K-Cup format instead of other types of Portion Packs.

125.    K-Cups account for the bulk of Green Mountain's profit margin, and Green Mountain's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

126.    While Green Mountain sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging a 50% margin on K-Cups.

127.    The chart below demonstrates how GMCR's operating margin increased dramatically from 2008- 2011.



Source: YCharts Pro Investor Service

128.     Green Mountain's monopoly leveraging strategy has created an enormous installed base of consumers for Green Mountain's K-Cups, which currently controls at least 86% of the Compatible Cup Market, based on Green Mountain estimates.

**(v)     Green Mountain Pursued Sham Litigation To Restrain Competition**

129.     For many years, Green Mountain's monopoly in the Compatible Cup market was protected by the patents covering the technology necessary to make filtered K-Cups.  However, the two principal patents associated with Green Mountain's filtered K-Cups expired in September 2012.

130.     Despite Green Mountain's patent protection, some competitors were able to enter the market prior to September 2012 by creating Compatible Cups that did not infringe on Green Mountain's K-Cup Patents.  One such competitor, TreeHouse, decided to enter the Compatible Cup Market in or about 2010.

131.     Before beginning to sell Compatible Cups, TreeHouse hired counsel to analyze whether there would be any potential intellectual property issues that might arise from the manufacture and sale of its Compatible Cups.  Because Green Mountain owned K-Cup Filter Patents covering the use of filters in Compatible Cups that had not yet expired as of 2010, TreeHouse decided to manufacture and sell Compatible Cups that did not contain filters.

132.     Thus, in August 2010, TreeHouse subsidiary Sturm Foods, Inc. ("Sturm") introduced the first Compatible Cups for use in K-Cup Brewers that were not sold by Green Mountain or under a Green Mountain license.

133.     As discussed above, prior to September 2012, Green Mountain enjoyed patent protection on certain aspects of its K-Cups. Green Mountain claimed that these patents, for

34

example, prevented competitors from offering Compatible Cups with filters.  The Compatible Cups introduced by TreeHouse in 2010 did not infringe any Green Mountain patents because these cups did not contain any filters.

134.    But that did not stop Green Mountain from filing a baseless lawsuit (asserting various infringement, trademark, and false advertising claims) and appeal harming competition.

135.    Within just a matter of weeks after TreeHouse's Compatible Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, alleging in bad faith that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers – not even asserting any patents covering K-Cups themselves. Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup Brewers by using Sturm's unlicensed Compatible Cups, and that Sturm was thus also liable for "inducing" infringement by these consumers.

136.    No reasonable litigant could have realistically expected to succeed on the merits of such claims, and thus Keurig's complaint was objectively baseless.

137.    Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

138.    In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit.  The Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

139.     The court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'"  *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008)).

140.     Keurig also sued another early Compatible Cup Market entrant, Rogers Family Co., making similar claims. In Keurig's litigation against Rogers Family Co., a different federal district court likewise held on summary judgment that the Compatible Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

141.     As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law." *Id.*

142.     As the Federal Circuit implicitly recognized, Keurig's lawsuit was objectively baseless and had no realistic expectation for success on the merits.  To be sure, Keurig's lawsuit was merely a baseless attempt to interfere directly with the business relationships of TreeHouse.

    **(vi)**     **Green Mountain Has Designed A Soon-To-Be Released Single-Serve Brewer With "Lock-Out" Technology That Will Prevent The Brewers From Working With Cups Not Manufactured By Green Mountain**

143.     In its latest effort to preserve and enhance its unlawful monopoly, Green Mountain now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers that use a K-Cup Brewer from using competitors' Compatible Cups and to coerce retailers into replacing low-priced Compatible Cups with K-Cups.

144.     In November 2013, in the wake of increased competition from TreeHouse and other Compatible Cup manufacturers, Green Mountain announced that it would "launch a new

lineup" of 2.0 K-Cup Brewers over the next twelve months with an anticipated release date in Fall 2014.

145.    The 2.0 K-Cup Brewer will reportedly work with a special taggant ink built into the lid of Green Mountain-owned or licensed 2.0 K-Cups.  The 2.0 K-Cup Brewer will then use "interactive technology" to identify whether the user has inserted a 2.0 K-Cup that is owned or licensed by Green Mountain or a competitors' Compatible Cup.

146.    2.0 K-Cup Brewers will reportedly only work with Green Mountain-owned or licensed 2.0 K-Cups.

147.    As Brian Kelley stated during a conference call with financial analysts on November 20, 2013, 2.0 K-Cup Brewers "will not brew unlicensed [Compatible Cup] packs" because of a new "interactive technology" intended to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew."  Brian Kelley, Green Mountain Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

148.    Thus, as one industry report explained, "GMCR has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs." William B. Chappell & Sarah Miller, *Running on Faith: Strong 4Q but Weak Guidance; Maintain Neutral*, SunTrust Robinson Humphrey (Nov. 20, 2013), http://webcache.googleusercontent.com/search?q=cache:n9AiCUh9Z1wJ:ftp://115.113.198.66/D OWNLOAD/2013/DECEMBER/20131219/GMCR/20131121_GMCR_EQ_1.PDF+&cd=1&hl= en&ct=clnk&gl=us.

149.    Rather than a true technological innovation, Green Mountain's announced "new" technology threatens to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer

and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Compatible Cups. By tying 2.0 K-Cup purchases to the purchases of the 2.0 K-Cup Brewers, Green Mountain intends to leverage its monopoly over the Single-Serve Brewer Market to exclude competition in the Compatible Cup Market.

150.    And in fact, during the November 2013 financial analyst call, Mr. Kelley stated that Green Mountain "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015."  Brian Kelley, Green Mountain Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

151.    Mr. Kelley reiterated Green Mountain's plan to eliminate alternative K-Cup Brewers during the investor call on February 5, 2014. When asked if the 2.0 K-Cup Brewers would "have a more narrow retail footprint," as "retailers [ ] might not carry it [2.0 K-Cup Brewers], because it might not support their private label brand," Mr. Kelley responded in part that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's replacing the current Keurig system that's out there. And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry." Brian Kelley, Green Mountain Q1 2014 Earnings Conference Call, SEEKING ALPHA (Feb. 5, 2014), http://seekingalpha.com/article/1995291-q1-2014-green-mtn-coffee-roasters-earnings-conference-call-webcast.

152.    By eliminating the K-Cup Brewers that work with competitors' Compatible Cups and replacing them with brewers that lock out competitors' Compatible Cups, Green Mountain seeks to exercise its monopoly power to exclude competition and to maintain supracompetitive K-Cup prices.

153.    As industry news editor, Keith Nunes, explained, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."  Keith Nunes, *GMCR playing hardball with Keurig 2.0*, Food Business News (Nov. 21, 2013), http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing _hardball_with_Keu.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

154.    Accordingly, Mr. Kelley "expect[s] [the] unlicensed [competitor Compatible Cup] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer. Brian Kelley, Green Mountain Q4 2013 Earnings Call Transcript, Morningstar (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

155.    Mr. Kelley stated during the November 20, 2013 investor call that Green Mountain "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert ... as many [competitor Compatible Cup makers] as [it] can." *Id.*

156.    Green Mountain has been further using the upcoming 2.0 K-Cup Brewer launch to coerce Compatible Cup makers to enter into exclusive licensing agreements with Green Mountain by enlisting the help of their retail customers. Specifically, Green Mountain has been contacting retailers to inform them that the Compatible Cups they have been purchasing from Green Mountain competitors will not work in 2.0 K-Cup Brewers.  Green Mountain then encourages those retailers to pressure their suppliers into becoming "authorized" or "licensed" partners.

157.    To date, Green Mountain has failed to plausibly substantiate its claim that locking

Compatible Cups out of 2.0 K-Cup Brewers would benefit consumers. Not only is there no

consumer benefit to be gained by locking Compatible Cups out of the market, but the lock-out

would actually harm consumers.

158.     Green Mountain asserts in its 2013 Investor Day slides that its "interactive

technology" recognizing only "licensed Portion Packs" will allow 2.0 K-Cup Brewers to "deliver

the perfect beverage." Green Mountain Investor Day Presentation, GMCR (Sept. 10, 2013),

http://investor.gmcr.com/investorday.cfm. Mr. Kelley claims that this function will provide

"game-changing performance," allowing the brewers to "provide consumers with the perfect

brew settings for each beverage by recognizing the 'recipes' of licensed Portion Packs." Brian

Kelley, Green Mountain Q4 2013 Earnings Call, MORNINGSTAR (Nov. 20, 2013),

http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR; GMCR

Innovation Pipeline for Web, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm.

159.     However, these vague claims lack any real substance, are without merit, and are

pretextual sham justifications for Green Mountain's anticompetitive and exclusionary conduct.

As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." As Green

Mountain has openly acknowledged, "very much of the [2.0 K-Cup Brewer] technology . . . is

technology [it is] very familiar with." Keith Nunes, *GMCR playing hardball with Keurig 2.0*,

FOOD BUSINESS NEWS (Nov. 21, 2013),

http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing

_hardball_with_Keu.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

160.     The so-called "breakthrough innovation" is in fact old news.  For example, Bosch

has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that

is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup

size, and brewing time in order to purportedly make the "perfect cup."

161.    Green Mountain's claim that its lock-out technology benefits consumers by

providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied

by Green Mountain's own experience with its Vue Brewer, which also touted the same feature,

but was largely rejected by consumers.

162.    As the Vue Vl200 product brochure states, "[e]ach commercial Vue pack contains

an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your

beverage." Just as Green Mountain now claims with respect to 2.0 K-Cup Brewers, this

identification tag on Vue Portion Packs was touted by Green Mountain as promising the "perfect

brew."

163.    Nonetheless, Vue's lock-out technology was recognized as a failure. One analyst

notes the "Vue platform was a poorly planned, researched and designed platform." Seth Golden,

*Green Mountain Roasters Investor Day Recap*, SEEKING ALPHA (Sept. 24, 2013),

http://seekingalpha.com/article/1711532-green-mountain-roasters-investor-day-recap.

164.    Even Mr. Kelley has acknowledged that the Vue Brewer lock-out technology was

poorly received by consumers, noting in a May 2013 call with investors that Vue Portion Packs

offer only about 25% of the variety of K-Cups. Referring to the Vue Brewer's limited success,

Mr. Kelley admitted that consumers "want the ability to have more choice. They want to have all

of the brands available to them. And a lot of consumers who have [the] Keurig today, they don't

want to give up the K-Cup. They love the K-Cup . . . . And the most important thing they tell us

about Vue is, give us more choice."  Green Mountain Coffee Roasters' CEO Discusses F2Q

2013 Results – Earnings Transcript, SEEKING ALPHA (May 8, 2013),

http://seekingalpha.com/article/1416741-green-mountain-coffee-roasters-ceo-discusses-f2q-

2013-results-earnings-call-transcript.

165.    Mr. Kelley further stated in a November 2013 investor call that Green Mountain "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0." Brian Kelley, Green Mountain Q4 2013 Earnings Call, Morningstar (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

166.    Green Mountain says it "learned" from its prior Vue introduction, and indeed it did learn that consumers wanted more choice across Compatible Cup brands.  But instead of responding to consumer demand, Green Mountain has decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively.  Thus, Keurig decided "to replace" all existing K-Cup Brewers that can be used with competitors' Compatible Cups to ensure that Green Mountain can fully realize its unlawful monopoly power by excluding competitors and maintaining supracompetitive prices.  The purported consumer benefit of a "perfect brew" delivered by interactive technology is a pretextual sham intended to conceal Green Mountain's true intention of excluding competition that threatens its ability to extract monopoly profits from the Compatible Cup Market.

167.    Even if Green Mountain were able to articulate a consumer benefit for the lock-out strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects. Consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.

168.    Green Mountain deceptively claims that its K-Cup Brewers and K-Cups together create one purportedly unified "system," but this is false. Indeed, Green Mountain has admitted that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the 2.0 K-Cup Brewer and K-Cups constitute a unified system is pretextual.

169.     As reported by USA Today, Mr. Kelley admitted as recently as October 2013 that it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times before they no longer work."  Dan D'Ambrosio, *With K-Cup patent expired, others try to cash in*, USA TODAY (Oct. 29, 2013), http://www.usatoday.com/story/money/business/2013/10/29/life-after-the-k-cup-patent/3307187/.  Green Mountain therefore cannot plausibly assert that this lock-out technology, which could be programmed to be switched on or off (or to work only a limited number of times) is in any way integral to any purported consumer benefit or a necessary aspect of a unified "system."

170.     Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demanded to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

171.     While Keurig may choose to bundle K-Cups with K-Cup Brewers at the time the brewer is sold, the vast majority of K-Cups are sold without a K-Cup Brewer.

172.     Consumers frequently buy a mix of both Compatible Cups and K-Cups from a wide variety of sources at a wide variety of price points, such as high-end stores like Starbucks, bulk warehouses like BJs, budget mass retailers like Wal-Mart, or online meccas like Amazon.com – all typically at separate times from the time at which they purchase a K-Cup Brewer.

173.     Some retailers only sell K-Cups or Compatible Cups but not the corresponding K-Cup Brewers.

174. Further, Green Mountain has successfully raised K-Cup prices without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.

175. Indeed, Green Mountain's sales of K-Cup Brewers have experienced a high rate of growth, year after year, every year since Green Mountain increased its prices in 2010.

176. Green Mountain's anticompetitive product redesign is not legitimately intended to benefit consumers; it is just Green Mountain's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower-priced Compatible Cups that consumers demand.

177. As one financial analyst recently observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know, a monopoly is good, but marketplace/consumer confusion isn't." Herb Greenberg, *Cramer vs. Greenberg: The Battle of Green Mountain*, THE STREET (Nov. 21, 2013), http://www.thestreet.com/story/12119516/1/cramer-vs-greenberg-the-battle-of-green-mountain.html.

### THE ANTICOMPETITIVE EFFECTS OF GREEN MOUNTAIN'S UNLAWFUL MONOPOLIZATION OF THE RELEVANT MARKETS

178. Green Mountain's above-described anticompetitive acts have had serious anticompetitive effects on competition in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets overall and have resulted in Plaintiff and members of the Class paying supracompetitive prices for K-Cups.

179. With little to no competition, depending on the line of business, Green Mountain

and its owned or licensed coffee brands have been able to charge supracompetitive prices for K-Cups. As a result, consumers have been forced to pay at least 10% to 15% more for Green Mountain owned and licensed K-Cups than they would have in the absence of Defendants' unlawful anticompetitive conduct.

180.    At least twice in the past four years, Green Mountain has raised K-Cup prices approximately 12%.  While Green Mountain claimed such price increases were caused by rising input costs, industry sources state that commodity prices are insignificant to K-Cup pricing.  As one Compatible Cup manufacturer stated, "[o]nly a small amount of coffee is in each cup.  The price of the coffee is an insignificant factor in the cost of our production."  A sales executive for a global private-label food manufacturer also explained that single-cup products are relatively shielded from even a sudden upturn in raw coffee pricing.  Similarly, a marketing director for a private-label coffee producer said "[c]ommodity costs are pretty irrelevant on the single-cup buyer side.  This is not a product type that goes up when coffee costs rise and down when they fall." Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.

181.    Green Mountain's conduct has also limited the number and variety of competitive Compatible Cup beverages available to consumers and commercial customers. By foreclosing access to markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of competitors' Compatible Cups.  As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers.

182.    Restricted access to competitors' Compatible Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of such Cups over Green Mountain-owned or licensed K-Cups.

183.    Consumer choice has been further limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Compatible Cups.

184.    Moreover, the introduction of Green Mountain's 2.0 K-Cup Brewer threatens to further harm competition and consumers in the future. Green Mountain already controls approximately 86% of the Compatible Cup Market, but is threatening to substantially foreclose competitor Compatible Cup makers from the balance of the market by locking competitors' Compatible Cups out of the market for new brewers and the replacement of prior generations of K-Cup Brewers.

185.    In fact, Green Mountain's plans for the Keurig 2.0 Brewer launch have already harmed competition.  For example, Green Mountain has used the anticipated Keurig 2.0 Brewer launch to induce retailers and distributors to cease doing business with competitor Compatible Cup manufacturers and sellers.

186.    The unlawful elimination of Compatible Cup competition for Green Mountain's K-Cup Brewers will continue to harm consumers like Plaintiff and the members of the Class by maintaining or raising Compatible Cup prices at supracompetitive levels and by eliminating consumer choice.

## CLASS ACTION ALLEGATIONS

187.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure

46

23(a) and 23(b)(2) and (b)(3), on its own behalf and as a representative of the following class of persons and entities (the "Class"):

> All persons and entities that purchased at least one K-Cup directly from Green Mountain, or any other entity it owns or controls, at any time between March 11, 2010 and the present (the "Class Period").  Excluded from the Class is Green Mountain and its subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

188.    The Class is individually so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in the Class and that their identities can be identified from records in Green Mountain's possession, custody or control.

189.    Class members are geographically dispersed throughout the U.S.

190.    Plaintiff's claims are typical of the claims of the other members of the Class.

191.    Plaintiff and the members of the Class have all sustained damages in that, during the Class Period, they purchased K-Cup(s) directly from Green Mountain at artificially maintained, supracompetitive prices, resulting from Green Mountain's actions in connection with the anticompetitive behavior alleged herein.  Green Mountain's anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

192.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members.

193.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.

194.     The questions of law and fact common to the Class include, but are not limited to:

(a)      whether the U.S. market for Single-Serve Brewers constitutes a Relevant

Market;

(b)      whether the U.S. market for Portion Packs constitutes a Relevant Market;

(c)      whether the U.S. market for Compatible Cups constitutes a Relevant

Submarket;

(d)      whether Green Mountain possesses monopoly power in these three

Relevant Markets;

(e)      whether, through the unlawful conduct alleged herein, Green Mountain

willfully acquired, maintained, or enhanced its monopoly power in the three Relevant Markets;

(f)      whether Green Mountain monopolized the three Relevant Markets by

engaging in unlawful exclusionary conduct to acquire, maintain, or enhance its monopoly power

in the three Relevant Markets;

(g)      whether, and to what extent, Green Mountain's conduct caused Plaintiff

and the members of the Class to pay supracompetitive prices for K-Cups, and thereby, suffer

antitrust injuries; and

(h)      whether Plaintiff and Class members are entitled to damages and, if so, the

appropriate measure of damages.

195.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because joinder of all members of the Class is impracticable.

196.     The prosecution of separate actions by individual members of the Class would

impose heavy burdens upon the courts and the parties, and would create a risk of inconsistent or

varying adjudications of the questions of law and fact common to the Class.  A class action

would achieve substantial economies of time, effort, and expense, and would assure uniformity

of decision as to persons similarly situated without sacrificing procedural fairness.  There will be

no material difficulty in the management of this action as a class action on behalf of the Class.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

197.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

199.    As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

200.    Green Mountain has effectively restrained, and further threatens to restrain, competition in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets by:

(a)    aggressively eliminating potential competitors through successive competitor acquisitions;

(b)    coercing machine manufacturers and component suppliers to enter into long-term, exclusive contracts denying competitors access to equipment and materials;

(c)    coercing distributors and retailers to enter into long-term, exclusive contracts denying competitors access to retail customers and distribution channels;

(d)    coercing coffee brands and roasters to enter into long-term, exclusive contracts allowing Green Mountain to allocate markets and restrain output;

(e)    selling its K-Cup Brewers at or below cost to consumers and providing K-Cup Brewers to businesses for free as long as businesses agreed to purchase K-Cups exclusively from Green Mountain;

(f)    pursuing sham litigation to restrain competition; and

(g)    designing a soon-to-be released Single-Serve Brewer with "lock-out" technology that will prevent the brewers from working with cups not manufactured by Green Mountain.

201.    While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

202.    Green Mountain has effectively excluded competition from the Relevant Markets, unlawfully acquired and expanded its monopoly power in the Relevant Markets, and profited from its anticompetitive conduct by maintaining K-Cup prices at artificially high levels and by otherwise reaping the benefits of its illegally obtained and maintained monopoly power.

203.    There is no legitimate business justification for Green Mountain's anticompetitive actions and the conduct through which it acquired and maintained its monopoly power in the three Relevant Markets.  The anticompetitive effects of Green Mountain's conduct far outweigh any conceivable procompetitive benefit or justification.  Even if such justification had existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

204.    As a direct and proximate result of Green Mountain's anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property by Green Mountain's unlawful monopolization of the three Relevant Markets.  Plaintiff and the other members of the Class have been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have paid absent Green Mountain's unlawful monopolization of the three Relevant Markets.

### SECOND CLAIM FOR RELIEF
**Exclusive Dealing in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14**

205.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and

exclude competition.

207.    Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors and retailers.

208.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

209.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers. Thus, Green Mountain's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

210.    This conduct has substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

211.    This conduct has substantially foreclosed access to machinery used to manufacture Compatible Cups and competition for sales of Compatible Cups.

212.    These exclusionary agreements violate Section 2 of the Sherman Act, 15 U.S.C. § 2 because these agreements constitute anticompetitive acts intended to maintain Green Mountain's monopolies in the Portion Pack and Compatible Cup Markets.

213.    As a direct and proximate result of Green Mountain's anticompetitive conduct, Plaintiff and members of the class have been injured in their business or property by Green Mountain's exclusive dealing agreements.  Plaintiff and the other members of the Class have

51

been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Green Mountain's exclusive dealing agreements.

## THIRD CLAIM FOR RELIEF
**Monopoly Leveraging in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

214.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

216.    Green Mountain has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Green Mountain's competitors in the Compatible Cup Market.

217.    Green Mountain further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology that cannot be justified on the basis of any legitimate consumer benefit.

218.    Green Mountain willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

219.    As a direct and proximate result of Green Mountain's anticompetitive conduct, Plaintiff and members of the class have been injured in their business or property by Green Mountain's monopoly leveraging.  Plaintiff and the other members of the Class have been forced

to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Green Mountain's monopoly leveraging.

## FOURTH CLAIM FOR RELIEF
### In the Alternative, Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

220.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

221.    As detailed above, Green Mountain has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

222.    Green Mountain has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Single-Serve Brewer, Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

223.    Green Mountain's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets. Green Mountain's anticompetitive conduct presents a dangerous probability that Green Mountain will succeed, to the extent it has not already, in its attempt to monopolize the Single-Serve Brewer, Portion Pack and Compatible Cup Markets.

224.    As a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiff and members of the Class have been injured in their business or property.  Plaintiff and the other members of the Class have been forced to pay artificially high, supracompetitive prices for K-Cups, prices higher than they would have been absent Green Mountain's anticompetitive and monopolistic conduct.

**PRAYER FOR RELIEF**

225.    Accordingly, Plaintiff, on behalf of itself and the Class members, seeks judgment as follows:

(a)    An order certifying this action as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative and its counsel of record as Class Counsel;

(b)    a declaration that Green Mountain's conduct is in violation of Section 2, of the Sherman Act, 15 U.S.C. § 2;

(c)    a declaration that Green Mountain's conduct is in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

(d)    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Sherman Act;

(e)    Treble damages under the antitrust laws, as well as actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes cited herein;

(f)    Pre-judgment and post-judgment on monetary relief awarded;

(g)    The costs of bringing this suit, including reasonable attorneys' fees; and

(h)    All other relief to which Plaintiff and members of the Class may be entitled which the Court deems proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues triable by jury.

Dated: New York, New York
      March 11, 2013

**ROBINS, KAPLAN, MILLER
& CIRESI L.L.P.**

By

Kellie Lerner
Hollis Salzman
Bernard Persky
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile: (212) 980-7499
klerner@rkmc.com
hsalzman@rkmc.com
bpersky@rkmc.com

K. Craig Wildfang
Thomas J. Undlin
Stephen P. Safranski
**ROBINS, KAPLAN, MILLER
& CIRESI L.L.P.**
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402-2015
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
kcwildfang@rkmc.com
tjundlin@rkmc.com
spsafranski@rkmc.com

John Zaremba
**ZAREMBA BROWNELL & BROWN
PLLC**
The Trump Building
40 Wall Street 27th Floor
New York, NY 10005
Telephone:  (212) 380-6700
jzaremba@zbblaw.com

*Counsel for Plaintiff and the Proposed
Class*

COMPLEX-CSMGMT, ECF, RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-01671-VSB

Ney Silverman Insurance Associates, L.L.C. v. Keurig Green Mountain, Inc. et al
Assigned to: Judge Vernon S. Broderick
Related Case: 1:14-cv-00905-VSB
Cause: 15:2 Antitrust Litigation

Date Filed: 03/11/2014
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

<u>Plaintiff</u>

Ney Silverman Insurance Associates, L.L.C.
on behalf of itself and all others similarly situated

represented by  Bernard Persky
Robins, Kaplan, Miller & Ciresi, LLP (NYC)
601 Lexington Avenue, Suite 3400
New York, NY 10022
(212) 980-7400
Fax: (212) 980-7499
Email: bpersky@rkmc.com
ATTORNEY TO BE NOTICED

Hollis L. Salzman
Robins, Kaplan, Miller & Ciresi, LLP (NYC)
601 Lexington Avenue, Suite 3400
New York, NY 10022
212-980-7400
Fax: 212-980-7499
Email: hsalzman@rkmc.com
ATTORNEY TO BE NOTICED

John Domenick Zaremba
Zaremba Brownell & Brown, PLLC
40 Wall Street, 28th Floor
New York, NY 10005
(212) 400-7223
Fax: (212) 400-7224
Email: jzaremba@zbblaw.com
ATTORNEY TO BE NOTICED

K. Craig Wildfang
Robins, Kaplan, Miller & Ciresi L.L.P.

800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
(612) 349-8554
Fax: (612) 339-4181
Email: kcwildfang@rkmc.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Kellie Lerner
Robins, Kaplan, Miller & Ciresi, LLP
(NYC)
601 Lexington Avenue, Suite 3400
New York, NY 10022
(212) 980-7400
Fax: (212) 980-7499
Email: klerner@rkmc.com
ATTORNEY TO BE NOTICED

Thomas J. Undlin
Robins Kaplan Miller & Ciresi(MN)
800 La Salle Avenue, Ste. 2500
Minneapolis, MN 55402
(612) 349-8706
Fax: (612) 339-4181
Email: tjundlin@rkmc.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

V.

Defendant

Keurig Green Mountain, Inc.

Defendant

Green Mountain Coffee Roasters, Inc.

Defendant

Keurig, Incorporated

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2014 | 1 | CIVIL COVER SHEET filed. (laq) (mqu). (Entered: 03/12/2014) |
| 03/11/2014 | 2 | COMPLAINT against Green Mountain Coffee Roasters, Inc., Keurig Green Mountain, Inc., Keurig, Incorporated. (Filing Fee $ 350.00, Receipt Number 1089700)Document |

| | | filed by Ney Silverman Insurance Associates, L.L.C..(laq) (Additional attachment(s) added on 3/12/2014: # 1 Exhibit A, # 2 Exhibit B) (mqu). (Entered: 03/12/2014) |
|---|---|---|
| 03/11/2014 | | SUMMONS ISSUED as to Green Mountain Coffee Roasters, Inc., Keurig Green Mountain, Inc., Keurig, Incorporated. (laq) (Entered: 03/12/2014) |
| 03/11/2014 | | CASE REFERRED TO Judge Vernon S. Broderick as possibly related to 14-cv-0905. (laq) (Entered: 03/12/2014) |
| 03/11/2014 | | Case Designated ECF. (laq) (Entered: 03/12/2014) |
| 03/11/2014 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 14cv0905. Document filed by Ney Silverman Insurance Associates, L.L.C..(laq) (mqu). (Entered: 03/12/2014) |
| 03/11/2014 | 4 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2011) (laq) (Entered: 03/12/2014) |
| 03/17/2014 | 5 | AFFIDAVIT OF SERVICE. Keurig Green Mountain, Inc. served on 3/14/2014, answer due 4/4/2014. Service was accepted by Jane Dixon, acting as registered agent (c/o United Corporate Services, Inc.). Document filed by Ney Silverman Insurance Associates, L.L.C.. (Lerner, Kellie) (Entered: 03/17/2014) |
| 03/17/2014 | 6 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Ney Silverman Insurance Associates, L.L.C..(Lerner, Kellie) (Entered: 03/17/2014) |
| 03/18/2014 | | CASE ACCEPTED AS RELATED. Create association to 1:14-cv-00905-VSB. Notice of Assignment to follow. (pgu) (Entered: 03/18/2014) |
| 03/18/2014 | | NOTICE OF CASE ASSIGNMENT to Judge Vernon S. Broderick. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 03/18/2014) |
| 03/18/2014 | | Magistrate Judge Henry B. Pitman is so designated. (pgu) (Entered: 03/18/2014) |
| 03/19/2014 | 7 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Green Mountain Coffee Roasters, Inc. served on 3/14/2014, answer due 4/4/2014. Service was accepted by Kim Mason, Admin. Assistant. Document filed by Ney Silverman Insurance Associates, |

| | | L.L.C.. (Lerner, Kellie) (Entered: 03/19/2014) |
|---|---|---|
| 03/19/2014 | 8 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Keurig, Incorporated served on 3/14/2014, answer due 4/4/2014. Service was accepted by Daryl Brown. Document filed by Ney Silverman Insurance Associates, L.L.C.. (Lerner, Kellie) (Entered: 03/19/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/20/2014 11:33:31 | | | |
| PACER Login: | rk3333 | Client Code: | 110176-0000 |
| Description: | Docket Report | Search Criteria: | 1:14-cv-01671-VSB |
| Billable Pages: | 3 | Cost: | 0.30 |