## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**14 CV 1836**

| | |
|---|---|
| RICHARD CONSTANTINO,<br><br>                    Plaintiff,<br><br>    -against-<br><br>KEURIG GREEN MOUNTAIN, INC.,<br>GREEN MOUNTAIN COFFEE ROASTERS,<br>INC., AND KURIG, INC.,<br><br>                    Defendants. | Docket No. _____<br><br>ECF Case<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

FILED
U.S. DISTRICT COURT
2014 MAR 17 PM 4: 21
S.D. OF N.Y.

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ........................................................................................ 1

THE PARTIES............................................................................................................... 4

JURISDICTION AND VENUE ................................................................................... 5

INTERSTATE COMMERCE ...................................................................................... 6

RELEVANT MARKETS ............................................................................................. 6

    A.    Green Mountain's Monopolies In The U.S. Product Markets For Single-Serve Brewers, Portion Packs, And Compatible Cups ..................................................... 6

        (i)    Relevant Product Markets........................................................................... 6

                (a)    Green Mountain's Monopoly In The Single-Serve Brewer Market ........................................................................................ 7

                (b)    Green Mountain's Monopoly In The Portion Pack Market .......... 10

                (c)    Green Mountain's Monopoly In The Compatible Cup Market ...................................................................................... 12

        (ii)    The Relevant Geographic Market .............................................................. 15

FACTUAL ALLEGATIONS ...................................................................................... 16

    B.    Green Mountain's Illegal Monopolization of The Relevant Markets................... 16

        (i)    Green Mountain Aggressively Eliminated Potential Competitors Through Acquisitions and Exclusive Dealings Agreements .................... 16

        (ii)    Green Mountain Coerced Equipment And Component Suppliers To Enter Into Exclusive Dealings Agreements That Restricted Competitors' Access To Equipment And Materials Required To Compete ........................................................................................... 21

        (iii)    Green Mountain Coerced Distributors And Retailers To Enter Into Exclusive Dealings Agreements That Restricted Competitors Access To Retail And Distribution Channels ........................................... 26

        (iv)    Green Mountain Offered Its K-Cup Brewers At Or Below Cost To Consumers And Provided K-Cup Brewers To Businesses For Free On The Condition That They Agreed To Purchase K-Cups Exclusively From Green Mountain........................................................... 27

        (v)    Green Mountain Initiated Sham Litigation To Remove Competition ...... 28

i

(vi)     Green Mountain Designed A Single-Serve Brewer With "Lock-Out" Technology Preventing Brewers From Operating With Cups Not Manufactured By Green Mountain ........................................................... 31

GREEN MOUNTAIN'S MONOPOLIZATION HAS SUBSTANTIAL ANTICOMPETITIVE EFFECTS ON THE RELEVANT MARKETS ........................................................... 38

CLASS ACTION ALLEGATIONS ........................................................... 40

CLAIMS FOR RELIEF ........................................................... 42

FIRST CLAIM FOR RELIEF
Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ................. 42

SECOND CLAIM FOR RELIEF
Exclusive Dealing in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14 ........................................................... 44

THIRD CLAIM FOR RELIEF
Monopoly Leveraging in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ...... 45

FOURTH CLAIM FOR RELIEF
Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ........................................................... 46

PRAYER FOR RELIEF ........................................................... 46

Plaintiff, Richard Constantino, on behalf of himself and all others similarly situated, brings this action against Defendants Keurig Green Mountain, Inc., Keurig, Inc. ("Keurig")—a wholly owned subsidiary of Keurig Green Mountain, Inc.—and Green Mountain Coffee Roasters, Inc. ("GMCR") (collectively, "Defendants" or "Green Mountain"). Based on information and belief and its counsel's investigation, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against Green Mountain for monopolizing the U.S. market for the sale of single serve and portion pack coffee, tea, cocoa, and other beverages ("Portion Packs") used in single-serve brewing systems ("Single-Serve Brewers") through an anticompetitive and unlawful scheme that has restrained, and continues to restrain, competition in the single serve beverage marketplace, among other violations.

2.     Green Mountain manufactures and sells K-Cups, or Portion Packs designed for use in K-Cup Single-Serve Brewers ("K-Cup Brewers"). Green Mountain monopolized both the market for Portion Packs as well as the submarket for K-Cups and cups designed by competitors for compatibility with K-Cup Brewers ("Compatible Cups").

3.      Green Mountain controls about 75 percent of the market for Single-Serve Brewers, 88 percent of the market for Portion Packs, and 86 percent of the market for Compatible Cups as a result of its anticompetitive and unlawful conduct.

4.     Green Mountain acquired and maintains monopoly power through a multi-front scheme spanning multiple years. First, it eliminated new and aggressive competitors by acquiring them. Green Mountain "eliminated" its competitors "by buying them" and paying "high prices to avoid having to compete" per one analyst's presentation. *See* David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation. By the end of 2010, Green Mountain had acquired Keurig, Incorporated (FY2006),

1

Tully's Coffee Corporation (FY2009), Timothy's Coffees of the World, Inc. (FY2010), Diedrich Coffee, Inc. (FY2010), and LJVH Holdings, Inc. (FY2011).

5.     Next, Green Mountain seized control of the vertical distribution chain of Compatible Cups by signing exclusive, multi-year contracts with companies at various distribution levels and in various distribution channels for Compatible Cups.  Green Mountain had agreements in place with various entities in the vertical distribution system: competitor coffee roasters whose coffees were used in Compatible Cups, sellers of Compatible Cups equipment, sellers of Compatible Cup components, and distributors and retailers of Compatible Cups.

6.     As the agreements were unduly restrictive and unreasonably lengthy, they cut off resources to Green Mountain's competitors—the very resources that its competitors needed to compete with Green Mountain.  These contracts consequently foreclosed competition by other manufacturers of Compatible Cups.

7.     According to Suzanne Delong, Keurig's Director of Investor Relations, there are only two companies in the world making K-Cup packaging equipment, and they are both under contract with Keurig.  Daniel McGinn, *The Buzz Machine*, BOSTON.COM (Aug. 7, 2011), http://www.boston.com/business/articles/2011/08/07/the_inside_story_of_keurigs_rise_to_a_bill ion_dollar_coffee_empire/.  In other words, Green Mountain barred suppliers from selling their products to its competitors who would use them to manufacture Compatible Cups.

8.     Green Mountain has an extensive network of over 500 distributors, including household names like Target, Safeway, and Bed, Bath & Beyond.  Many agreements between Green Mountain and Keurig Authorized Distributors ("KAD") prohibit distributors from selling Compatible Cups made by Green Mountain's competitors.  Per one industry report, "Vendors' contracts with Green Mountain prohibit them from selling any private-label K-Cups for the Keurig branded brewers."  Reverdy Johnson, *Private-Label Threat Brewing for Green*

*Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013),

http://blueshiftideas.com/content/private-label-threat-brewing-for-green-mountains-k-cups/.

9.     After achieving a monopoly in the Compatibility Cup market, Green Mountain augmented its monopoly power by offering K-Cup Brewers at or below cost to consumers, and by providing K-Cup Brewers to businesses for free given that the businesses agree to buy K-Cups exclusively from Green Mountain.  Green Mountain may have forfeited profits from K-Cup Brewers but recouped them through increased sales of K-Cups, which have a profit margin of 50 percent.

10.     Green Mountain sought to preserve its monopoly by filing sham patent lawsuits against its competitor, Sturm Foods, Inc. ("Sturm"), for selling Compatible Cups, which allegedly infringed and induced infringement of Keurig's brewing system patents.  Sturm asserted the affirmative defense of patent exhaustion, moving for summary judgment grounded upon non-infringement.  The U.S. District Court for the District of Delaware granted Sturm's motion in September 2012.  Keurig then appealed that decision to the U.S. Court of Appeals for the Federal Circuit, which affirmed the district court's ruling, holding that Keurig was attempting to "end-run" around the patent laws with a "tactic that the Supreme Court has explicitly admonished" in filing this suit.  *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  Keurig's lawsuit was filed to restrain, not to protect, patent rights.  The Federal Circuit's holding explicitly admonished Defendants' anticompetitive conduct: By invoking patent law, Keurig was attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups].  *Id.*

11.     Finally, Green Mountain recently announced that Keurig will stop selling existing K-Cup Brewers and start selling the Keurig 2.0 ("2.0 K-Cup Brewer"), a new version of K-Cup Brewer.  The Keurig 2.0 was designed with lock-out technology to prevent the brewers from working if non-Green Mountain Compatible Cups are used.  The new design merely serves anticompetitive purposes and no legitimate purpose.

12.     Brian Kelley, Green Mountain's President and Chief Executive Officer, acknowledged that the Green Mountain can program the lock-out technology to be switched on or off after a certain number of uses.  This suggests that the lock-out technology is neither beneficial to consumers nor integral to the new design.  While the 2.0 K-Cup Brewer has not yet been launched, Green Mountain has strategically marketed its launch to suppress competition and usurp market share from competitor Compatible Cups manufacturers.

13.     By blocking access to raw material suppliers, component manufacturers, manufacturing equipment, distributors, and retailers, Green Mountain has effectively and unlawfully limited the supply and availability of Compatible Cups that are manufactured by its competitors.  Consumers and commercial customers have therefore been greatly hindered, if not wholly precluded, from access to competitor Compatible Cup manufacturers.

14.     Green Mountain's anticompetitive and exclusionary acts, individually and collectively, were intended to, and had the effect of, unreasonably restraining competition, and artificially inflating prices in the U.S. markets for Single-Serve Brewers and Portion Packs and the U.S. submarket for Compatible Cups.

## THE PARTIES

13.     Plaintiff Richard Constantino is an individual that purchased K-Cups directly from Green Mountain, or indirectly from a distributor or retailer, during the Class Period (as defined below).

14.     Defendant Keurig Green Mountain, Inc. is a Delaware corporation with its principal place of business in Waterbury, Vermont.

15.     Defendant Keurig, Inc. is a Delaware corporation with its principal place of business in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

4

16.     Defendant Keurig Green Mountain, Inc. was formerly known as Green Mountain Coffee Roasters, Inc. and is a Vermont corporation with its principal place of business in Waterbury, Vermont.

## JURISDICTION AND VENUE

17.     Plaintiff brings this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure damages as well as equitable and injunctive relief against Defendants. Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

18.     Plaintiff seeks treble damages according to Section 4 of the Clayton Act, 15 U.S.C. § 15(a). Plaintiff and the Class (defined below) also seek attorneys' fees, costs, and other litigation expenses permitted under federal law.

19.     This Court has subject matter jurisdiction under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 as well as under 28 U.S.C. §§ 1331, 1337.

20.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court also has personal jurisdiction over Defendants because they have established minimum contacts with this District. Specifically, Defendants are registered to do business in the State of New York, maintain a registered agent for service of process in New York, maintain a distribution facility in New York, and conduct banking with financial institutions in this District. They also solicit substantial business in this District in the ordinary course of business—either directly or indirectly—and are continuously and systematically present in this District.

21.     Additionally, Green Mountain—directly or through the ownership and/or control of its subsidiaries—*inter alia*: (a) was engaged in an anticompetitive and unlawful scheme to monopolize the U.S. market for Single-Serve Brewers and U.S. submarkets for Portion Packs and Compatible Cup submarket; (b) directly or indirectly sold or marketed substantial quantities

5

of K-Cup Brewers and K-Cups in this District; (c) has business transactions in this District; and (d) had substantial contacts in this District, or, contact that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

22.     Venue is proper in this District per Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b-d) because Green Mountain is found in and transacts business within this District, and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

## INTERSTATE COMMERCE

22.     Green Mountain manufactured, produced, distributed, and/or sold significant quantities of K-Cup Brewers and K-Cups that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the U.S., including within this District, during the Class Period (defined below). Green Mountain's activities were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the U.S.

## RELEVANT MARKETS

A.     **Green Mountain's Monopolies In The U.S. Product Markets For Single-Serve Brewers, Portion Packs, And Compatible Cups**

   (i)     **Relevant Product Markets**

23.     Defendants' anticompetitive conduct occurred in least three relevant product markets: (1) the market for the design, manufacture, and sale of Single-Serve Brewers ("Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of Portion Packs that are used in Single-Serve Brewers ("Portion Pack Market"); and (3) the market for the design, manufacture, and sale of Compatible Cups ("Compatible Cup Market"). The latter market is a submarket of the Portion Pack Market. Green Mountain tracks its Compatible Cup Market shares to analyze its K-Cup market shares.

6

### (a)    Green Mountain's Monopoly In The Single-Serve Brewer Market

24.    The Single-Serve Brewer is a fast and easy method for consumers to brew a single serving of coffee, tea, cocoa, and other hot beverages. Single-Serve Brewers brew hot beverages in less than a minute. The convenience is clear: Consumers do not have to grind beans, measure coffee, use filters, or clean up afterward.

25.    Keurig manufactures and sells a variety of K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector (*e.g.*, hotels).

26.    Green Mountain designs, manufactures, and sells a variety of Single-Serve Brewers under the name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers. Each of these brewers uses a different type of Portion Pack that is incompatible with other brewers.

27.    Keurig manufactures and sells five different Single-Serve Brewers, including the Mr. Coffee Brewing System – KG2 ($89.95), the Keurig K10 MINI Plus Brewing System ($99.99), the Keurig K45 Elite Brewing System ($119.99), the Keurig K75 Platinum Brewing System ($179.99), and the Cuisinart Brewing System ($199.95).

28.    Traditional percolators and drip coffeemakers are not reasonable substitutes for Single-Serve Brewers due to the latter's high convenience factor. As such, there is no demand cross-elasticity between Single-Serve Brewers and traditional coffeemakers, and the price of traditional coffeemakers typically does not fully impact prices for Single-Serve Brewers.

29.    While traditional coffee makers are frequently sold around a price point of $20 to $30, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars. Consumers pay a premium for Single-Serve Brewers over the price of traditional coffeemakers for the convenience factor.

30.    While K-Cup Brewers and K-Cups are sold as separate products online and in stores, Keurig typically sells K-Cup Brewers bundled with K-Cups, which renders it difficult for consumers to separate and determine the price of the K-Cups when they purchase K-Cup

7

Brewers. A 2012 New York Times captures this issue: "[I]t's hard to tell how much coffee costs, even if you know what you spent [,] ... [which is] the case with many of the single-serve brewing machines." Oliver Strand, *With Coffee, the Price of Individualism Can Be High*, N.Y. TIMES (Feb. 7, 2012), http://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly.html.

31.     An interested customer must specifically "[c]onnect with a distributor" to "[r]equest pricing" for many of Keurig's K-Cup Brewers, which lack price stickers on the Keurig website. *See Keurig B200 Commercial Brewing System*, KEURIG.COM, http://www.keurig.com/brewers/b200 (last visited Mar. 14, 2014). Businesses may sign up for a "free trial" of a K-Cup Brewer on its website without being shown the price of the brewer for which they are requesting a free trial. *See id.*

32.     Green Mountain's contracts with distributors provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack [ ] through or at any store operated by or for Distributor." KAD Agreement § 2.1., attached hereto as Exhibit A. Green Mountain therefore restricts its distributors' ability to advertise or even display the prices of K-Cups that are used in K-Cup Brewers.

33.     Green Mountain also licenses K-Cup Brewer technology to brands such as Mr. Coffee and Cuisinart in addition to the Single-Serve Brewers manufactured by Green Mountain.

34.     Keurig also manufactures and sells Vue Brewers, which are marketed for home or office use like K-Cup Brewers. Vue Brewers use a different type of Portion Pack that is shaped differently than K-Cups known as "Vue Cups." The Vue Brewer is not compatible with K-Cups, and Vue Cups cannot be used in K-Cup Brewers or Rivo Brewers (described below).

35.     Keurig also manufactures and sells the Rivo cappuccino and latte brewer. This brewer "exclusively uses Rivo Packs," which are shaped differently than K-Cups and are not compatible with K-Cup Brewers. K-Cups thus cannot be used in Rivo brewers.

8

36.     Besides Green Mountain's Keurig brewers, other Single-Serve Brewers include Bosch's "Tassimo," Mars, Inc.'s "Flavia," Nestlé's "Nespresso," Philips Electronics N.Y.'s "Senseo," and Starbucks' "Verismo." These Single-Serve Brewers vary in price by as much as several hundred dollars.

37.     Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers in FY2013. Green Mountain sold a record 5.1 million Keurig Single-Serve Brewers in the first quarter of 2014.

41.     Green Mountain dominates the Single-Serve Brewer Market with its approximately 75 percent share overall. *See* Tony Daltorio, *The Brewing Coffee War*, THE MOTLEY FOOL (Mar. 23, 2012), http://beta.fool.com/tdalmoe/2012/03/23/brewing-coffee-war/3079/.



42.     Green Mountain has the monopoly power to exclude competition in the Single-Serve Brewer Market and has used it. For example, it has coerced distributors and retailers to enter into exclusive agreements requiring only Keurig Single-Serve Brewers to be sold or used by these entities.

9

43.    Potential entrants into the Single-Serve Brewer Market face high barriers to entry. Green Mountain continues to hold patents that cover K-Cup Brewers. Successful entry into the Single-Serve Brewer Market requires advanced technology, research and design skills, and significant investment. Moreover, potential entrants face the chicken-and-egg problem: retailers only stock commercially successful Single Serve Brewers with an assortment of compatible Portion Packs, and Portion Packs are only commercially successful if they are compatible with a widely available Single-Serve Brewer.

**(b)    Green Mountain's Monopoly In The Portion Pack Market**

44.    The second relevant product market is the U.S. market for Portion Packs used in Single-Serve Brewers. Green Mountain manufactures, licenses, and/or sells a variety of Portion Packs.

45.    Some Single-Serve Brewers use Portion Packs packaged as "pods," which look like flat cookies, or "T-Discs," which are sealed pods. Manufacturers of Single-Serve Brewers that use pod-style Portion Packs include Gevalia, Hamilton Beach, and Philips Electronics N.Y.'s "Senseo." Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.

46.    Ground coffee is neither interchangeable with, nor a reasonable substitute for, Portion Packs. Portion Pack prices consequently may be increased above their competitive levels without being reasonably constrained by ground coffee prices. The price-per-pound of Portion Pack coffee is almost five times more than that of ground coffee.

47.    Ground coffee is also not a reasonable substitute for Portion Packs because consumers generally find Portion Pack-brewed coffee to be significantly more convenient and desirable in quality compared to traditionally-brewed coffee.

48.    There is no demand cross-elasticity between Portion Packs and ground coffee. If Portion Packs and ground coffee were competitively priced, consumers who brew their coffee from Single-Serve Brewers using Portion Packs would generally not switch to traditional coffeemakers given a small but significant and nontransitory rise in Portion Pack prices.

10

49.     Portion Packs are generally only compatible with a corresponding type of Single-Serve Brewer. For example, K-Cups (and Compatible Cups) generally only work in K-Cup Brewers, and T-Discs generally only work in the Tassimo Brewers.  Once a consumer purchases a K-Cup Brewer, that consumer cannot use non-K-Cup Portion Packs.  Consumers therefore do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers.

50.     Green Mountain has a monopoly in the Portion Pack Market. Green Mountain controlled approximately 88 percent of the Portion Pack Market in 2013.



51.     Potential entrants face high barriers to the Portion Pack Market.  To successfully enter this market, Portion Pack manufacturers must either design and manufacture their own compatible brewers, or design and manufacture Portion Packs that are compatible with Green Mountain's K-Cup Brewers or another existing Single-Serve Brewer (*e.g.*, pods or T-Discs).

55.     In the first scenario, potential market entrants cannot simply design and manufacture their own brewers to accommodate their own Portion Packs because Green Mountain has numerous patents covering its brewing systems.  Manufacturing would require

substantial research and development efforts, investments of sunk costs, and capital expenditures.

56.     In the second scenario, substantial technological know-how, research and design, and capital investment are required to design, manufacture, and sell a Portion Pack that is compatible with a particular Single-Serve Brewer system.

57.     Potential entrants are also discouraged from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the equipment and components required to manufacture Portion Packs.  These agreements restrict the competitors' ability to purchase equipment and inputs required to compete on a level playing field with Green Mountain in the Portion Pack Market.

58.     Green Mountain will further increase its unlawful monopoly by (1) launching the 2.0 K-Cup Brewer, which contains "interactive technology" preventing 2.0 K-Cup Brewers from operating with competitors' Compatible Cups, and (2) replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

(c)     **Green Mountain's Monopoly In The Compatible Cup Market**

59.     The third relevant product market is the market for the design, manufacture, and sale of Compatible Cups.

60.     It is the Compatible Cup Market—not the Portion Pack Market—that Green Mountain employs to tracks market shares of K-Cups for competitive purposes. *See* Green Mountain FQI 2014 Earnings Call Tr., SEEKING ALPHA, http://seekingalpha.com/article/ 1997961-green-mountain-coffee-roasters-ceo-discusses-f1q2014-results-earnings-call-transcript.

61.     The price of coffee delivered by K-Cups is extremely high per various articles. The New York Times has reported that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."  Oliver Strand, *With Coffee, the Price of Individualism Can Be High*, N.Y. TIMES (Feb. 7, 2012), *available at*

http://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-conveniencecostly.html.

62.     Time Magazine reveals, "The [cup] numbers are highly variable based on where one shops, what kind of coffee you're buying, and whether you purchase in small packages or enormous quantities." Brad Tuttle, *Beans vs. Single-Serve Cup: Just How Much More Does K-Cup Coffee Cost?*, TIME (Feb. 9, 2012), http://business.time.com/2012/02/09/beans-vs-single-serve-cup-just-how-much-more-does-kcup-coffee-cost/.

63.     Green Mountain acquired many companies that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc.

64.     Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups with the trademark of household names in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf. Green Mountain either owns or licenses some forty-nine brands.

65.     According to Green Mountain's President and Chief Executive Officer, Brian Kelley, Green Mountain controls approximately 86 percent of the Compatible Cup Market. *See* Green Mountain FQI 2014 Earnings Call Tr., SEEKING ALPHA, http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q2014-results-earnings-call-transcript ("We had 100% of the system . . . and all of a sudden we have 86% . . . .").



66.     Green Mountain "estimate[s] that unlicensed packs represented a 14% share of the Keurig system as of the end of [their] first quarter" of 2014. *See id.* The other 14 percent of the Compatible Cup Market is comprised of sellers of unlicensed and private label Compatible Cups.

67.     Green Mountain's net sales were $3.9 billion in FY2012. The combined sales of K-Cup Brewers (which comprised 22 percent, or $760 million) and K-Cups (which comprised 78 percent, or $2.7 billion) together represented 90 percent of Green Mountain's net sales. This is consistent with Green Mountain's strategy of selling its K-Cup Brewers at or below cost.

68.     Green Mountain's net sales included approximately $3.187 billion for K-Cups and approximately $828 million for K-Cup Brewers in FY2013.

69.     Compatible Cups are not reasonably interchangeable with other Portion Pack formats, such as T-Discs, pods, or capsules. Consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups.

70.     Green Mountain is able to lock consumers in to the Compatible Cup format by selling its K-Cup Brewers at or below cost because Compatible Cups are not reasonably interchangeable with other Portion Packs. Green Mountain recoups and significantly exceeds losses on its sales of K-Cup Brewers by obtaining a 50 percent profit margin (or more) on its K-

14

Cups. *See* Green Mountain Investor Day Presentation at 164, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm.

71.     Green Mountain has been able to exercise its unlawful monopoly by profitably pricing K-Cups at least 10 to 15 percent above competitive levels without losing significant market share or increasing demand for Portion Packs other than Compatible Cups.

72.     As discussed more fully herein, Green Mountain has also exercised, maintained, and grown its unlawful monopoly over the Compatible Cup Market by excluding competitors from access to equipment, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

73.     Barriers to entry for the Compatible Cup Market are high, imposing, and hard to overcome for the same reasons discussed above with respect to the Portion Pack Market.

74.     Most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer and are sufficiently locked-in to its use to find it impractical to substitute Portion Packs that are incompatible. As a result, small but significant non-transitory increases in the price of Compatible Cups (1) do not substantially raise demand for T-Discs, pods, or other types of Portion Packs that are incompatible with a K-Cup Brewer; and (2) do not reasonably constrain the price of Compatible Cups.

### (ii)     The Relevant Geographic Market

75.     The relevant geographic market is the U.S.  To compete effectively within the U.S., Single-Serve Brewer, Portion Pack and Compatible Cup manufacturers and sellers need distribution assets and relationships within the U.S. Single-Serve Brewer, Portion Pack and Compatible Cup manufacturers and sellers located outside of the U.S.  Competitors that lack such assets and relationships cannot successfully constrain the prices of Single Serve Brewers, Portion Packs, and Compatible Cups.

# FACTUAL ALLEGATIONS

A.    **Green Mountain's Illegal Monopolization of The Relevant Markets**

   (i)    **Green Mountain Aggressively Eliminated Potential Competitors Through
          Acquisitions And Exclusive Dealing Agreements**

76.    Keurig developed K-Cup Brewers and K-Cups in the late 1990s and received
patents on those brewers as well as on the filters in K-Cups. Keurig then licensed competitor
coffee companies, including GMCR, to manufacture and sell filtered K-Cups.

77.    GMCR first partnered with Keurig in the late 1990s to manufacture and sell
Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

78.    Keurig introduced its Single-Serve Brewers to household consumers in 2002.
GMCR acquired 42 percent of Keurig for $15 million that same year.

79.    GMCR acquired the rest of Keurig in June 2006 for $104 million. After securing
Keurig's patents in June 2006, Green Mountain aggressively eliminated potential competitors
through acquisition of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc.
(2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (2010).

80.    "GMCR eliminated the licensees by buying them. . . . GMCR paid high prices to
avoid having to compete with the licensees post patent expiration." In effect, GMCR "overpa[id]
to buy [its] licensees back via acquisitions" and then partnered with other coffee companies that
could still pose a competitive threat per one analyst's presentation. The analyst found that aside
from eliminating potential competitors from the market, at least one of the acquisitions had very
little value since "[t]he very high allocations to Goodwill raise suspicion about subsequent
earnings quality." David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress
(Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-davideinhorns-full-short-green-
mountain-coffee-presentation.

81.    In addition to foreclosing competition through acquisitions, Green Mountain has
also eliminated competitors by entering into anticompetitive license and manufacturing

16

agreements with numerous competitors. For example, after expressing concern in its 2010 annual report over its then "primary competitors," Dunkin' Donuts, Peet's and Starbucks, Green Mountain locked up exclusive licensing deals with the two biggest brands, Dunkin' Donuts and Starbucks. Green Mountain currently owns or licenses some forty-nine coffee companies including well-known brands such as: Caribou Coffee, Wolfgang Puck, and Newman's Own.

82.     Green Mountain's exclusionary and restrictive agreements with these competitors have allowed it to exercise monopoly power in the Compatible Cup Market. For example, the Amended and Restated Purchase and License Agreement entered into between Green Mountain and Caribou Coffee Company, Inc. ("Caribou") on December 20, 2011 expressly states that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" entered into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase . . . of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale." *See* Exhibit B at 2 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc. (Dec. 20, 2011)).

84.     Competitor coffee companies also consented to not: (1) "sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (2) license any trademarks for use by third parties in connection with products "intended for use with the Keurig Brewing System." *See* Exhibit B at 7 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou).

85.     Green Mountain's agreements with competitor coffee companies, like Caribou, enabled Green Mountain to allocate markets, restrain supply, undermine, and to exclude competitors. One analyst has reported that the "only meaningful coffee companies that [Green Mountain] does not have in its portfolio are Maxwell House (*i.e.*, Kraft) and Peet's." David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011),

http://www.zerohedge.com/news/gaap-uccino-davideinhorns-full-short-green-mountain-coffee-presentation.

86.     In fact, Green Mountain entered into numerous long-term, exclusionary licensing agreements with competitor coffee companies, some of which are highlighted below:

(a)     Green Mountain entered into a multi-year agreement in December 2006 with Caribou which provided that Caribou coffee would be packaged and sold in K-Cups. The parties renewed and amended their agreement in December 2011. Under the subsequent agreement, Caribou sells Green Mountain its coffee, which Green Mountain packages into K-Cups, and grants Green Mountain a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. Furthermore, Caribou may only sell the K-Cups at Caribou coffee stores and on Caribou's website for "At Home" use.

(b)     Green Mountain entered into a multi-year agreement with J.M. Smucker Company ("Smucker") in February 2010, a leader in the domestic retail coffee market, under which Green Mountain exclusively manufactures Compatible Cups under Smucker's Folgers and Millstone coffee companies. Under the agreement, Smucker may only sell the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

(c)     Green Mountain entered into an agreement with Dunkin' Donuts in February 2011, a market leader in the traditional and iced coffee markets in the U.S., under which Green Mountain exclusively manufactures Dunkin' Donuts K-Cups. Under the agreement, Dunkin' Donuts may only sell its K-Cups at Dunkin' Donuts restaurants. Moreover, Dunkin' Donuts is prohibited from selling K-Cups in grocery stores, where it sells its bagged coffee traditionally.

(d)     Green Mountain entered into a multi-year agreement in March 2011 with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell

18

Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks is the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this subsequent agreement, Green Mountain began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Green Mountain sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website. *See* Starbucks Press Release, *Starbucks and Green Mountain Coffee Roasters Enter Into Expanded, Long-Term Strategic Partnership* (May 7, 2013), http://news.starbucks.com/news/starbucks-and-green-mountain-coffee-roasters-enter-intoexpanded-long-term-.

(e)     Green Mountain entered into a multi-year agreement with The Coffee Bean & Tea Leaf in May 2013, "the largest privately held specialty coffee and tea retailer in the United States." Under the agreement, Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014. *See* GMCR Press Release, *Green Mountain Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family* (May 29, 2013), http://investor.gmcr.com/releasedetail.cfm?releaseid=767731.

(f)     Green Mountain entered into a multi-year agreement with Cinnabon in July 2013. Under the agreement, Green Mountain will manufacture Cinnabon K-Cups to be sold in retail and commercial channels as well as Cinnabon restaurants.

87.     Further, Green Mountain entered into similar agreements with Gloria Jean's Coffee, Newman's Own Organics Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies such as Bigelow, Campbell's.

19

Celestial Seasonings, Snapple, Swiss Miss, and Twinings. Most recently, it reached an agreement with Coca-Cola.

88.     Green Mountain was able to foreclose competition from would-be competitors both before and after the patents protecting its K-Cup technology expired as a result of the above-described anticompetitive agreements.

89.     Green Mountain similarly enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the coffee and tea that Green Mountain purchases from coffee companies.

90.     In at least one such contract, Green Mountain has veto power over the roaster's ability to contract with competitor Compatible Cup makers. Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement. Keurig shall review and either approve or disapprove such contracts . . . ." *See* License and Distribution Agreement between Keurig, Incorporated and Diedrich Coffee, Inc. (July 29, 2003), http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.htm.

91.     Green Mountain was ranked number two on Fortune's List of Global 100 Fastest-Growing Companies as a result of Green Mountain's scheme to acquire competitors and licensing partners, by August 2010. When reporting the ranking, Green Mountain touted on August 19, 2010, that for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and . . . earnings per share growth of 89% over the same period for fiscal year 2009." GMCR Press Release, *Green Mountain Coffee Roasters, Inc. Ranks #2 on Fortune's List of Global 100 Fastest –Growing Companies* (Aug. 19, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=500603.

20

92.    Having grown into a billion-dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices and did just that. On September 7, 2010, Green Mountain announced a "price increase" of "approximately 10 to 15 percent" on "all K-Cup Portion Packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels." GMCR Press Release, Green Mountain Coffee Roasters, Inc. Announces Price Increase (Sept. 7, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=505288. And on June 11, 2011, Green Mountain announced another price increase of approximately 9 to 13 percent on all K-Cups.

(ii)    **Green Mountain Coerced Equipment And Component Suppliers To Enter Into Exclusive Dealings Agreements That Restricted Competitors' Access To Equipment And Materials Required To Compete**

93.    Green Mountain has entered into exclusionary and restrictive agreements with sellers of the equipment and components used to make K-Cups. For example, under one such agreement, Green Mountain stripped the ability of the equipment manufacturer to sell equipment to a Green Mountain competitor who intend to use it to make Compatible Cups. The equipment manufacturer, however, can sell the same equipment for other purposes.

94.    These anticompetitive agreements cannot be justified by any purportedly procompetitive objective, such as to ensure a reliable supply of materials used in K-Cups. Suzanne Delong, Keurig's Director of Investor Relations, has stated that there are only two companies in the world making K-Cup packaging equipment, and both are under contract with Keurig.

95.    Green Mountain's exclusive dealing agreements have also enabled it to wield an unlawful monopoly in the Portion Pack and Compatible Cup Markets. For example, these agreements were used as a shield to insulate Green Mountain from competition by competitor TreeHouse Foods, Inc. ("TreeHouse"). TreeHouse attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Compatible Cups.

21

In response to TreeHouse's request, a Sales Manager from R.A. Jones responded in an e-mail, stating: "I am quite embarrassed to be writing this e-mail, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product." Complaint at ¶ 179, *Treehouse Foods, Inc. v. Green Mountain Coffee Roasters, Inc.*, No. 14-cv-00905, (S.D.N.Y. Feb. 11, 2014).

96.     As described by the representative, under the "rules," "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it." R.A. Jones can still, however, "build equipment for all types of packages, just not K-Cups or anything that goes into a Keurig brewer." *Id.* at ¶ 180.

97.     TreeHouse alleged that the R.A. Jones Sales Manager expressed hope that the Green Mountain "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup equipment] business" with TreeHouse. *Id.* at ¶ 181.

98.     The December 19, 2013 R.A. Jones e-mail—describing that the "agreement" with Green Mountain prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer"—provides direct evidence that Green Mountain coerces suppliers into entering exclusionary agreements intended to restrain competition between competitor Compatible Cup makers and Green Mountain.

99.     TreeHouse was unable to find a single other supplier in the U.S. willing to sell it equipment used to make non-filtered Compatible Cups. *See id.* at ¶ 184.

100.    As R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying equipment used to make Compatible Cups cannot be justified on the basis that it ensures a reliable supply of equipment for Green Mountain. Rather, it is merely intended to block competitor access of Compatible Cup manufacturers to equipment necessary to produce Compatible Cups. This agreement provides direct evidence that Green Mountain has exercised its unlawful monopoly power by excluding competitors from resources needed to compete with Green Mountain.

101.    Green Mountain also unreasonably restrains competitors' access to the components necessary to make Compatible Cups.

102.    Compatible Cups are made from various components, including a plastic cup, a foil lid, and a filter.  There are a few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers. TreeHouse alleges that Green Mountain has entered into exclusive dealing agreements with suppliers of each K-Cup component, which have resulted in TreeHouse being forced to work with less experienced suppliers at higher cost to TreeHouse.  *See id.* at ¶ 187.

103.    The three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood in 2010, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce KCups. *See id.* at ¶ 188.

104.    Green Mountain competitor TreeHouse approached all three of these companies to find a supplier for components to make Compatible Cups. *See id.* at ¶ 189.

105.    Winpak was already supplying TreeHouse subsidiary Sturm with different types of cups and lids to make products not used in K-Cup Brewers at the time.  TreeHouse contacted Winpak to inquire if Winpak could also produce cups and lids to make Compatible Cups.  After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply the components to TreeHouse.  Winpak continued, however, to supply Sturm with lids for products that are not used in K-Cup Brewers. *See id.* at ¶ 190.

106.    TreeHouse also reached out to Phoenix Cups to supply the cup component to make Compatible Cups. Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements.  Shortly thereafter, however, Phoenix Cups informed TreeHouse that it could not supply TreeHouse with cups for use in K-Cup Brewers due

23

to the fact that TreeHouse was not an "authorized manufacturer" for Green Mountain. *See id.* at ¶ 193.

107. Any restriction prohibiting Phoenix Cups from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Green Mountain because Phoenix Cups was free to supply cups for use in products not intended for K-Cup Brewers.

108. TreeHouse finally contacted Curwood, the only remaining domestic supplier of cup components used to make Compatible Cups known at that time. Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with cups for use in K-Cup Brewers, Curwood conveyed to TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations." *See id.* at ¶ 196.

109. TreeHouse was forced to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components as a direct result of these suppliers' refusal to supply TreeHouse with the materials necessary to make Compatible Cups. Developing a new cup component was a more costly and lengthy process compared to purchasing cup components from a company that already produced such components. TreeHouse incurred additional, unnecessary costs by dealing with a company that lacked the knowledge and skill required to manufacture cups for use in K-Cup Brewers. TreeHouse's start-up costs were therefore substantially higher than they would have been if TreeHouse had been free to purchase cups from cup manufacturer that already had the know-how. *See id.* at ¶ 198-99.

110. TreeHouse similarly approached domestic suppliers of foil lids used to make Compatible Cups, Winpak and LMI Packaging Solutions ("LMI") to find a supplier for its Compatible Cups' foil lids. *See id.* at ¶ 200.

111. As detailed above, Winpak again refused to supply TreeHouse with lids after learning that TreeHouse intended to use the lids in Compatible Cups.

24

112.    LMI, then a supplier to Sturm of other cups and lids, also declined to supply TreeHouse with foil lids to make Compatible Cups, citing other business commitments. It would seem that these "other business commitments" were to Green Mountain. After its initial refusal, LMI later expressed to TreeHouse that it no longer had a relationship with Green Mountain and was therefore now free to do business with TreeHouse. *See id.* at ¶ 202-03.

113.    Once again, because TreeHouse was unable to contract with skilled domestic lid suppliers, it had to incur additional unnecessary costs by dealing with a company that lacked the knowledge and skills required to manufacture lids for use in K-Cup Brewers. Its start-up costs were therefore substantially higher than they would have been if TreeHouse had been able to purchase lids from a lid manufacturer that already had the know-how. *See id.* at ¶ 204.

114.    Likewise, several filter suppliers declined to supply TreeHouse because they were supplying Green Mountain with the same product. TreeHouse was therefore forced to find a new supplier of filter supplies and modify TreeHouse's production process to use the new products. TreeHouse had to incur additional, unnecessary costs because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups. *See id.* at ¶ 206.

115.    TreeHouse's experience illustrates that these multi-year, exclusive dealing agreements are not only unduly restrictive and unreasonable but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to successfully compete with Green Mountain.

116.    Moreover, no purportedly procompetitive purpose can justify these anticompetitive agreements. Ensuring a reliable supply of materials used in K-Cups is certainly not a justifiable purpose. As parties to these agreements have admitted, Green Mountain does not restrict the ability to sell these same products for other purposes as long as those products are not sold to a Green Mountain competitor who intends to use them to make Compatible Cups for use in K-Cup Brewers.

25

(iii)   **Green Mountain Coerced Distributors And Retailers To Enter Into Exclusive Dealings Agreements That Restricted Competitors' Access To Retail And Distribution Channels**

118.   Green Mountain distributes commercial K-Cup Brewers and K-Cups through over 500 Keurig Authorized Distributors ("KAD"s), including Office Coffee Service operators, office suppliers (*e.g.*, WB Mason and United Stationers), hospitality service providers, and food-service management companies (*e.g.*, Vistar and Aramark).

119.   Green Mountain dictates that some distributors enter into a multi-year KAD Agreement to prevent them from purchasing Compatible Cups from Green Mountain competitors, thereby substantially foreclosing access to the Office Coffee Services Market. For example, certain Green Mountain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs. *See* Exhibit B (attaching KAD Agreement).

120.   These KAD Agreements often unduly restrict competition for multi-year periods. As one national coffee supplier for offices, food service and retail explained "[o]ur agreements [with Green Mountain] state that we cannot sell other brands of K-Cups to be used in Keurig brewers." A president of an office coffee distribution company explained that "Private label K-Cups prices are probably 10% to 15% less than Green Mountain's K-Cups, but I am not offering anything private label. I am not permitted by contract with them." Similarly, the owner of a major North American Keurig-contracted online retailer said, "We've abided by our contracts, so we haven't taken on any of the new K-Cups. We've stuck with Green Mountain." Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013),

26

http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.p
df.

121.    The standard KAD Agreement locks in office and commercial customers that may

otherwise switch to new suppliers if they were made aware of Green Mountain's supra-

competitive K-Cup prices. Additionally, these KAD Agreements restrict distributors' ability to

display prices for K-Cups, further insulating Green Mountain from competitive pricing. *See*

Exhibit B at 2.1, 2.3 (attaching KAD Agreement).

> **(iv)    Green Mountain Offered Its K-Cup Brewers At Or Below Cost To
> Consumers And Provided K-Cup Brewers To Businesses For Free On The
> Condition That They Agreed To Purchase K-Cups Exclusively From Green
> Mountain**

122.    Green Mountain's business model depends upon its ability to leverage its

SingleServe Brewer monopoly to restrain competition. Specifically, Green Mountain must

extract monopoly profits from the K-Cups it sells in the Portion Pack and Compatible Cup

Markets. This model relies on Green Mountain's ability to: (1) drive sales of Green Mountain's

highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (2)

restrain price competition for Compatible Cups; and (3) maintain supra-competitive K-Cup

prices for extended periods of time.

123.    Green Mountain admits in its own statements to the public and investors that it

sells K-Cup Brewers at cost or even at a loss to saturate the market with brewers that are only

compatible with the K-Cup, thereby locking consumers in to using the K-Cup instead of other

types of Portion Packs.

124.    K-Cups comprise the majority of Green Mountain's profit margin, and Green

Mountain's earnings come primarily from its direct or licensed sales of K-Cups, not from its

sales of Single-Serve Brewers.

125.    Although Green Mountain forfeits some of its brewer profits to drive K-Cup

sales, it recoups and exceeds its losses on brewer sales by charging a 50 percent margin on K-

Cups. GMCR's operating margin increased dramatically from 2008-2011, from under eight percent in 2008 to over 15 percent in 2011.



Source: Michael McHugh, *Math on Green Mountain's Razor/Razor Blade Model: Dull Edges after Patent Expires*, Forbes.com (March 22, 2012),
http://www.forbes.com/sites/ycharts/2012/03/22/math-on-green-mountains-razorrazor-blade-model-dull-edges-after-patent-expires/.

126.    Green Mountain's monopoly strategy has created an enormous base of consumers for Green Mountain's K-Cups, which currently control at least 86 percent of the Compatible Cup Market, based on Green Mountain estimates.

**(v)    Green Mountain Initiated Sham Litigation To Remove Competition**

127.    Green Mountain's monopoly in the Compatible Cup market was protected by the patents covering the brewing technology required to make filtered K-Cups for many years. The two principal patents associated with Green Mountain's filtered K-Cups, however, expired in September 2012.

28

128.    Despite Green Mountain's patent protection, some competitors were able to enter the market prior to September 2012 by creating Compatible Cups that did not infringe on Green Mountain's K-Cup patents. TreeHouse, for example, decided to enter the Compatible Cup Market in or about 2010.

129.    Before it began selling Compatible Cups, TreeHouse hired counsel to analyze whether there would be any potential intellectual property problems that might arise from the manufacture and sale of its Compatible Cups. Because Green Mountain owned K-Cup Filter Patents covering the use of filters in Compatible Cups that had not yet expired as of 2010, TreeHouse decided to manufacture and sell Compatible Cups that did not contain filters.

130.    TreeHouse subsidiary Sturm Foods, Inc. ("Sturm") introduced the first Compatible Cups for use in K-Cup Brewers that were not sold by Green Mountain or under a Green Mountain license in August 2010.

131.    As discussed above, Green Mountain enjoyed patent protection on certain aspects of its K-Cups prior to September 2012. Green Mountain claimed that these patents prevented competitors from offering Compatible Cups with filters. The Compatible Cups introduced by TreeHouse in 2010 did not infringe any Green Mountain patents because these cups did not contain any filters.

132.    But that did not stop Green Mountain from filing a baseless lawsuit (asserting various infringement, trademark, and false advertising claims) and appeal harming competition.

133.    Within a matter of weeks after TreeHouse's Compatible Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, alleging in bad faith that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers – not even asserting any patents covering K-Cups themselves. Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup Brewers by using Sturm's unlicensed Compatible Cups, and that Sturm was thus also liable for "inducing" infringement by these consumers.

29

134.    No reasonable litigant could have realistically expected to succeed on the merits of such claims. Keurig's complaint was objectively baseless as a result.

135.    Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

136.    In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit. The Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

139.    The court noted that the relief sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'" *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008)).

140.    Keurig also filed suit against Rogers Family Co., another early Compatible Cup Market entrant, making similar claims. In that case, a different federal district court similarly held on summary judgment that the Compatible Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

141.    As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law." *Id.*

142.    The Federal Circuit implicitly recognized that Keurig's lawsuit was objectively baseless and had no realistic expectation for success on the merits. To be sure, Keurig's lawsuit

30

was merely a baseless attempt to interfere directly with the business relationships of its
competitors.

      **(vi)**    **Green Mountain Designed A Single-Serve Brewer With "Lock-Out"
Technology Preventing Brewers From Operating With Cups Not
Manufactured By Green Mountain**

      143.    In its latest effort to preserve its monopoly, Green Mountain now seeks to impose
an exclusionary, "lock-out" technological barrier (1) to prevent consumers and commercial
customers that use a K-Cup Brewer from using competitors' Compatible Cups and (2) to coerce
retailers into replacing low-priced Compatible Cups with K-Cups.

      144.    In the wake of increased competition from TreeHouse and other Compatible Cup
manufacturers in November 2013, Green Mountain announced that it would "launch a new
lineup" of 2.0 K-Cup Brewers over the next year with an anticipated release date in Fall 2014.

      145.    The 2.0 K-Cup Brewer will reportedly operate with a special taggant ink built into
the lid of Green Mountain-owned or licensed 2.0 K-Cups.  The 2.0 K-Cup Brewer will then use
"interactive technology" to identify whether the user has inserted a 2.0 K-Cup that is owned or
licensed by Green Mountain or a competitors' Compatible Cup.  2.0 K-Cup Brewers will
reportedly only function with Green Mountain-owned or licensed 2.0 K-Cups.

      146.    As Brian Kelley stated during a conference call with financial analysts on
November 20, 2013, 2.0 K-Cup Brewers "will not brew unlicensed [Compatible Cup] packs"
because of a new "interactive technology" intended to "ensure the system delivers on the
promise of excellent quality beverages, produced simply and consistently every brew." Brian
Kelley, Green Mountain Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013),
http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

      147.    One industry report concluded, "GMCR has decided to 'close' the system with its
new reader technology, meaning that the new brewers will not brew unlicensed packs."  William
B. Chappell & Sarah Miller, *Running on Faith: Strong 4Q but Weak Guidance; Maintain
Neutral*, SunTrust Robinson Humphrey (Nov. 20, 2013),

http://webcache.googleusercontent.com/search?q=cache:n9AiCUh9Z1wJ:ftp://115.113.198.66/D
OWNLOAD/2013/DECEMBER/20131219/GMCR/20131121_GMCR_EQ_1.PDF+&cd=1&hl=
en&ct=clnk&gl=us.

148.    Despite being packaged as a true technological innovation, Green Mountain's
announced "new" technology's underlying objective is (1) to eliminate competitive access to 2.0
K-Cup Brewers, (2) limit consumer and retail customer choice, and (3) tie the purchase of K-
Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out non-
Keurig Compatible Cups. Green Mountain intends to leverage its monopoly over the Single-
Serve Brewer Market to exclude competition in the Compatible Cup Market by tying 2.0 KCup
purchases to the purchases of the 2.0 K-Cup Brewers.

149.    During the November 2013 financial analyst call, Mr. Kelley reported that Green
Mountain "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup
Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early
2015." Brian Kelley, Green Mountain Q4 2013 Earnings Call Transcript, MORNINGSTAR
(Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

150.    Mr. Kelley restated Green Mountain's plan to eliminate alternative K-Cup
Brewers during the investor call on February 5, 2014. When asked if the 2.0 K-Cup Brewers
would "have a more narrow retail footprint," as "retailers [ ] might not carry it [2.0 K-Cup
Brewers], because it might not support their private label brand," Mr. Kelley responded in part
that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's replacing the current
Keurig system that's out there. And so this [2.0 K-Cup Brewer] is the Keurig system that all
retailers would carry." Brian Kelley, Green Mountain Q1 2014 Earnings Conference Call,
SEEKING ALPHA (Feb. 5, 2014), http://seekingalpha.com/article/1995291-q1-2014-green-
mtncoffee-roasters-earnings-conference-call-webcast.

151.    Green Mountain seeks to exercise its monopoly power to exclude competition and
to maintain supra-competitive K-Cup prices by eliminating the K-Cup Brewers that work with

competitors' Compatible Cups and replacing them with brewers that lock out competitors'
Compatible Cups. As industry news editor, Keith Nunes, explained, "Keurig 2.0 is the
company's answer" to the question of "how would it protect its market share." Keith Nunes,
*GMCR playing hardball with Keurig 2.0*, FOOD BUSINESS NEWS (Nov. 21, 2013),
http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing
_hardball_with_Keu.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

152.    Mr. Kelley "expect[s] [the] unlicensed [competitor Compatible Cup] share of the
system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as older
generations of K-Cup Brewers are replaced, which coincides with the introduction of the 2.0 K-
Cup Brewer. Brian Kelley, Green Mountain Q4 2013 Earnings Call Transcript,
MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-
calltranscript.aspx?t=GMCR.

153.    Mr. Kelley stated during the November 20, 2013 investor call that Green
Mountain "will continue to convert current unlicensed players into licensed Keurig system
partners," noting that "obviously [its] goal" is to "convert ... as many [competitor Compatible
Cup makers] as [it] can." *Id.*

154.    Green Mountain is further employing the upcoming 2.0 K-Cup Brewer launch to
coerce Compatible Cup manufacturer to enter into exclusive licensing agreements with Green
Mountain by enlisting the help of their retail customers. Specifically, Green Mountain has been
contacting retailers to inform them that the Compatible Cups they have been purchasing from
Green Mountain competitors will not work in 2.0 K-Cup Brewers. Green Mountain then
encourages those retailers to pressure their suppliers into becoming "authorized" or "licensed"
partners.

155.    Green Mountain has failed to plausibly substantiate its claim that locking
Compatible Cups out of 2.0 K-Cup Brewers would benefit consumers. There is no consumer

33

benefit to be gained by locking Compatible Cups out of the market. In fact, the lock-out would actually harm consumers by limiting their options.

156.    Green Mountain asserts in its 2013 Investor Day slides that its "interactive technology" recognizing only "licensed Portion Packs" will allow 2.0 K-Cup Brewers to "deliver the perfect beverage." Green Mountain Investor Day Presentation, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm. Mr. Kelley claims that this function will provide "game-changing performance," allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed Portion Packs." Brian Kelley, Green Mountain Q4 2013 Earnings Call, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR; GMCR Innovation Pipeline for Web, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm.

157.    Mr. Kelley's vague claims lack any real substance, are without merit, and are pretextual sham justifications for Green Mountain's anticompetitive and exclusionary conduct. As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." As Green Mountain has openly acknowledged, "very much of the [2.0 K-Cup Brewer] technology . . . is technology [it is] very familiar with." Keith Nunes, *GMCR playing hardball with Keurig 2.0*, FOOD BUSINESS NEWS (Nov. 21, 2013), http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing _hardball_with_Keu.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

158.    The so-called "breakthrough innovation" is, in fact, not a breakthrough at all. Bosch, for instance, has been selling its Tassimo brewer with "Intellibrew™" barcode technology that allows the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."

159.    Green Mountain's claim that its lock-out technology benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also

contradicted by Green Mountain's own experience with its Vue Brewer, which also touted the same feature but was largely rejected by consumers.

160.    As the Vue Vl200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage." Just as Green Mountain now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue Portion Packs was touted by Green Mountain as promising the "perfect brew."

161.    Vue's lock-out technology was recognized as a failure. One analyst notes the "Vue platform was a poorly planned, researched and designed platform." Seth Golden, *Green Mountain Roasters Investor Day Recap*, SEEKING ALPHA (Sept. 24, 2013), http://seekingalpha.com/article/1711532-green-mountain-roasters-investor-day-recap.

162.    In May 2013, Mr. Kelley even acknowledged that the Vue Brewer lock-out technology was poorly received by consumers, noting in a call with investors that Vue Portion Packs offer only about 25 percent of the variety of K-Cups. Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice. They want to have all of the brands available to them.  And a lot of consumers who have [the] Keurig today, they don't want to give up the K-Cup.  They love the K-Cup . . . . And the most important thing they tell us about Vue is, give us more choice."  Green Mountain Coffee Roasters' CEO Discusses F2Q 2013 Results – Earnings Transcript, SEEKING ALPHA (May 8, 2013), http://seekingalpha.com/article/1416741-green-mountain-coffee-roasters-ceo-discusses-f2q2013-results-earnings-call-transcript.

165.    Mr. Kelley further stated in a November 2013 investor call that Green Mountain "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0." Brian Kelley, Green Mountain Q4 2013 Earnings Call, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

35

166.   Besides realizing that consumers wanted more choice across Compatible Cup brands, it is hard to believe that Green Mountain "learned" from its prior Vue introduction because Green Mountain has failed to respond to consumer demand. Instead, Green Mountain has decided it simply did not go far enough to force consumers and commercial customers to use K-Cups exclusively. Keurig therefore decided "to replace" all existing K-Cup Brewers that can be used with competitors' Compatible Cups to ensure that Green Mountain can fully realize its monopoly power by excluding competitors and maintaining supra-competitive prices. The purported consumer benefit of a "perfect brew" delivered by interactive technology is a pre-textual sham intended to conceal Green Mountain's true intention of excluding competition—competition that threatens its ability to extract monopoly profits from the Compatible Cup Market.

167.   Even if Green Mountain were able to articulate a consumer benefit for the lockout strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects. Consumers generally prefer, and benefit from, having the ability to choose from a greater variety of Compatible Cups.

168.   Green Mountain deceptively claims that its K-Cup Brewers and K-Cups together create one purportedly unified "system." This is false. Green Mountain has already acknowledged that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the 2.0 K-Cup Brewer and K-Cups constitute a unified system is pretextual.

169.   Green Mountain cannot plausibly assert that the lock-out technology, which could be programmed to be switched on or off (or to work only a limited number of times) is in any way integral to any purported consumer benefit or a necessary aspect of a unified "system."

170.   As reported by USA Today, Mr. Kelley admitted as recently as October 2013 that it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times

before they no longer work." Dan D'Ambrosio, *With K-Cup patent expired, others try to cash in*, USA TODAY (Oct. 29, 2013), http://www.usatoday.com/story/money/business/2013/10/29/life-after-the-k-cuppatent/3307187/.

171.    K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demanded to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

170.    Consumers frequently buy a mix of both Compatible Cups and K-Cups from a wide variety of sources at a wide variety of price points, such as high-end stores like Starbucks, bulk warehouses like BJs, budget mass retailers like Wal-Mart, or online meccas like Amazon.com – all typically at separate times from the time at which they purchase a K-Cup Brewer.

171.    While Keurig may choose to bundle K-Cups with K-Cup Brewers at the time the brewer is sold, the vast majority of K-Cups are sold without a K-Cup Brewer.

172.    Some retailers only sell K-Cups or Compatible Cups but not the corresponding K-Cup Brewers.

173.    Green Mountain has effectively raised K-Cup prices without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.

174.    Green Mountain's sales of K-Cup Brewers have seen a high rate of growth, year after year, every year since Green Mountain increased its prices in 2010.

175.    Green Mountain's anticompetitive product redesign is not legitimately intended to benefit consumers. It is Green Mountain's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower priced Compatible Cups that consumers want.

37

176.    One financial analyst reported, "[T]he introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know, a monopoly is good, but marketplace/consumer confusion isn't." Herb Greenberg, *Cramer vs. Greenberg: The Battle of Green Mountain*, THE STREET (Nov. 21, 2013), http://www.thestreet.com/story/12119516/1/cramer-vs-greenberg-the-battle-of-greenmountain.html.

## GREEN MOUNTAIN'S MONOPOLIZATION HAS SUBSTANTIAL ANTICOMPETITIVE EFFECTS ON THE RELEVANT MARKETS

178.    Green Mountain's above-described anticompetitive conduct has essentially squelched competition in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets. Plaintiff and Class members have therefore been forced to pay supra-competitive prices for K-Cups.

179.    Green Mountain and its owned or licensed coffee companies have been able to charge supra-competitive prices for K-Cups with little or no competition. Plaintiff and Class members have therefore been forced to pay at least 10 to 15 percent more for Green Mountain owned and licensed K-Cups than they would have in the absence of Defendants' anticompetitive conduct.

180.    Green Mountain has increased K-Cup prices by approximately 12 percent at least twice in the past four years. Green Mountain claimed such price increases were caused by rising input costs. Industry sources, however, argue that commodity prices are insignificant vis-à-vis K-Cup prices. As one Compatible Cup manufacturer stated, "[o]nly a small amount of coffee is in each cup. The price of the coffee is an insignificant factor in the cost of our production." A marketing director for a private-label coffee producer similarly stated that "[c]ommodity costs are pretty irrelevant on the single-cup buyer side. This is not a product type that goes up when

coffee costs rise and down when they fall." Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf. A sales executive for a global private label food manufacturer likewise revealed that single-cup products are relatively protected from even a sudden upturn in raw coffee pricing.

181.    Green Mountain's anticompetitive conduct has limited the amount and variety of competitive Compatible Cups available to consumers and commercial customers. Green Mountain has restricted the supply, distribution, and availability of competitors' Compatible Cups by foreclosing their access to equipment and component suppliers, inputs, distributors, and retailers. Consumers and commercial customers have therefore been partially if not entirely restricted from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers.

182.    Limited access to competitors' Compatible Cups has had detrimental effects on consumers who prefer the taste, flavor, and/or quality of such Cups over Green Mountain-owned or -licensed K-Cups.

183.    Consumer choice has been further limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research, development, and technology required establish and improve Compatible Cups.

184.    Green Mountain already controls approximately 86 percent of the Compatible Cup Market. Further, it is foreclosing, or threatening to foreclose, competitor Compatible Cup manufacturers from the balance of the free market by locking competitors' Compatible Cups out of the market for new brewers and replacing older generations of K-Cup Brewers. The introduction of Green Mountain's 2.0 K-Cup Brewer will harm competition and consumers in the future. Only Green Mountain stands to gain from this technology.

185.    Green Mountain's plans for the Keurig 2.0 Brewer launch have already harmed competition despite the fact that it has not been released yet. For example, Green Mountain has

39

used the anticipated Keurig 2.0 Brewer launch to induce retailers and distributors to cease or refuse business with competitor Compatible Cup manufacturers and sellers.

186.   The aggressive elimination of Compatible Cup competition for Green Mountain's K-Cup Brewers will continue to harm consumers like Plaintiff and Class members by limiting consumer choice and by maintaining or raising Compatible Cup prices at supra-competitive levels.

## CLASS ACTION ALLEGATIONS

187.   Plaintiff, on behalf of himself and as a representative of the following class of persons and entities ("Class"), brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3):

> All persons and entities that purchased at least one K-Cup directly from Green Mountain, or any other entity it owns or controls, at any time between March 11, 2010 and the present (the "Class Period"). Excluded from the Class is Green Mountain and its subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

188.   The number of members in the Class is so numerous that joinder of all members is impracticable.  Plaintiff does not know the exact number of Class members at this time but reasonably believes that there are at least thousands of Class members based on the nature of the trade and commerce involved.  Their identities can be identified from records in Green Mountain's possession, custody, or control.

189.   Class members are dispersed throughout the U.S. geographically.

190.   Plaintiff's claims are typical of other Class members' claims.

191.   Plaintiff and Class members have all sustained damages in that, during the Class Period, they purchased K-Cup(s) directly from Green Mountain at artificially maintained, supra-competitive prices, which resulted from Green Mountain's anticompetitive conduct.  The effects of such violations and the relief sought are all issues or questions that are common to Plaintiff and Class members.

40

192.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiffs have ensured this by retaining counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of Class members.

193.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual Class members.

194.    The questions of law and fact common to the Class include, but are not limited to:

    (a)    whether the U.S. market for Single-Serve Brewers is a Relevant Market;

    (b)    whether the U.S. market for Portion Packs is a Relevant Market;

    (c)    whether the U.S. market for Compatible Cups is a Relevant Submarket;

    (d)    whether Green Mountain possesses monopolies in these three Relevant Markets;

    (e)    whether Green Mountain intentionally and willfully acquired, maintained, or enhanced its monopolies in the three Relevant Markets;

    (f)    whether Green Mountain monopolized the three Relevant Markets by engaging in exclusionary and restrictive conduct to acquire, maintain, or enhance its monopolies in the three Relevant Markets;

    (g)    whether Green Mountain's conduct caused Plaintiff and the Class members to pay supra-competitive prices for K-Cups, and thereby, suffer antitrust injuries, and to what extent; and

    (h)    whether Plaintiff and Class members are entitled to damages and, if so, the appropriate measure of damages.

195.    Joinder of all Class members is impracticable. A class action is therefore superior to other available methods for the fair and efficient adjudication of this controversy.

196.    Prosecuting separate actions by individual Class members imposes substantial burdens upon the courts and the parties. It also creates a risk of inconsistent or varying

41

adjudications of the questions of law and fact common to the Class. A class action achieves substantial economies of time, resources, and effort. It further assures uniformity of decision as to persons similarly situated without sacrificing procedural fairness. Plaintiff believes there will be no material difficulty in the management of this action as a class action on behalf of the Class.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF

### Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

197.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.    Green Mountain has monopolies in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets, which includes the power to control prices and exclude competition.

199.    Green Mountain has intentionally and willfully engaged in anticompetitive and unlawful conduct to maintain its monopolies in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

200.    Green Mountain has effectively restrained, and threatens to restrain, competition in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets by:

(a)    aggressively eliminating potential competitors by acquisition;

(b)    coercing equipment manufacturers and component suppliers to enter into exclusive dealings agreements that restrict competitors' access to equipment and materials;

(c)    coercing distributors and retailers to enter into exclusive dealings agreements that restrict competitors' access to retail and distribution channels;

(d)    coercing coffee companies and roasters to enter into exclusive dealings agreements that enable Green Mountain to allocate markets and control supply;

(e)   selling K-Cup Brewers at or below cost to consumers and providing K-Cup Brewers to businesses for free on the condition that businesses agree to purchase K-Cups exclusively from Green Mountain;

(f)   attempting to oust competition by pursuing sham litigation; and

(g)   designing a Single-Serve Brewer with "lock-out" technology that prevents brewers from operating with Compatible Cups not manufactured by Green Mountain.

201.   These anticompetitive acts constitute individual antitrust violations alone and support a broader monopolization claim collectively.

202.   Green Mountain has intentionally and willfully excluded competition from the Relevant Markets, acquired and enhanced its monopolies in the Relevant Markets, and greatly profited from its anticompetitive scheme.  Furthermore, it has effectively maintained K-Cup prices at artificially high levels and enjoyed the benefits of its illegally obtained and maintained monopoly in the Compatible Cups market.

203.   Green Mountain cannot legitimately justify its anticompetitive scheme through which it achieved, maintained, and enhanced its monopolies in the three Relevant Markets.  The anticompetitive effects of Green Mountain's conduct far outweigh any conceivable procompetitive benefit or justification.  Any possible procompetitive benefits could have been obtained by less restrictive alternatives.

204.   Plaintiff and Class members have been injured in their business or property by Green Mountain's unlawful monopolization of the three Relevant Markets as a direct and proximate result of Green Mountain's anticompetitive conduct.  Plaintiff and Class members have been forced to pay artificially high, supra-competitive prices for K-Cups—prices that they would not have paid in the absence of Green Mountain's unlawful monopolization of the three Relevant Markets.

43

## SECOND CLAIM FOR RELIEF

### Exclusive Dealing in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14

205.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.   Green Mountain has monopolies in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to exclude competition and dictate prices.

207.   Green Mountain has intentionally and willfully entered into exclusionary and restrictive agreements with equipment manufacturers, component suppliers, competitor roasters, competitor coffee companies, distributors, and retailers.

208.   These agreements are unreasonably long and unduly restrictive in terms of breadth, duration, and market coverage.

209.   These agreements are unjustifiable by any purportedly procompetitive purpose that exists, including guaranteeing Green Mountain a reliable supply of materials used in K-Cups.  Green Mountain only restricts the ability to sell the same products for use in K-Cup Brewers—not for other uses.  Green Mountain's exclusive dealing agreements are therefore not only exclusionary and restrictive but serve the anticompetitive objective of cutting competitors off from resources required to compete with Green Mountain.

210.   Green Mountain's anticompetitive conduct has widely foreclosed other manufacturers' (1) access to equipment and components required to manufacture non-filtered Compatible Cups and (2) competition for sales of Compatible Cups.

211.   These exclusionary agreements violate Section 2 of the Sherman Act, 15 U.S.C. § 2 as they constitute anticompetitive conduct intended to maintain Green Mountain's monopolies in various U.S. markets.

212.   Plaintiff and Class members have been injured in their business or property by Green Mountain's exclusive dealing agreements as a direct and proximate result of Green

44

Mountain's anticompetitive conduct. Plaintiff and Class members have been forced to pay artificially high, supra-competitive prices for K-Cups—higher prices than they would have paid absent Green Mountain's exclusive dealing agreements.

### THIRD CLAIM FOR RELIEF

### Monopoly Leveraging in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

214.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.    Green Mountain has a monopoly in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

216.    Green Mountain has intentionally and willfully employed its monopolies in the Single-Serve Brewer Market to gain, or attempt to gain or maintain, a monopoly in the Portion Pack and Compatible Cup Markets. Specifically, Green Mountain sells K-Cup Brewers at or below cost to lock consumers into the K-Cup system, then coerces companies, whose business depends on access to K-Cup Brewers, to sign exclusive dealing agreements that prohibit them from doing business with Green Mountain's competitors in the Compatible Cup Market.

217.    Green Mountain threatens to continue to leverage its monopoly in the Single-Serve Brewer Market to gain, or attempt to gain or maintain, its monopolies in the Portion Pack and Compatible Cup Markets. This is illustrated by its intention to tie 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology lacking any legitimate consumer benefit.

218.    Green Mountain intentionally and willfully acquired its monopolies by the exclusionary conduct detailed above, rather than through efficiency or innovation.

219.    Plaintiff and Class members have been injured in their business or property by Green Mountain's monopoly leveraging as a direct and proximate result of Green Mountain's anticompetitive conduct. Plaintiff and Class members have been forced to pay artificially high,

45

supra-competitive prices for K-Cups—higher prices than they would have paid in the absence of Green Mountain's monopoly leveraging.

## FOURTH CLAIM FOR RELIEF

### Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

220.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

221.     Green Mountain has monopolies, or at least, a dangerous probability of acquiring monopolies, in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

222.     Green Mountain has knowingly, willfully, and with specific intent attempted to monopolize the Single-Serve Brewer, Portion Pack and Compatible Cup Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

223.     Green Mountain's anticompetitive conduct was intended to achieve the unlawful objective of controlling prices and/or excluding competition in the Single-Serve Brewer, Portion Pack and Compatible Cup Markets.  Green Mountain's anticompetitive conduct suggests a dangerous probability that Green Mountain will succeed—to the extent it has not already—in its attempt to monopolize the Single-Serve Brewer, Portion Pack and Compatible Cup Markets.

224.     Plaintiff and Class members have been injured in their business or property as a direct and proximate result of Green Mountain's anticompetitive and monopolistic conduct. Plaintiff and Class members have been forced to pay artificially high, supra-competitive prices for K-Cups—higher prices than they would have paid absent Green Mountain's anticompetitive conduct.

## PRAYER FOR RELIEF

225.     Plaintiff, on behalf of himself and all others similarly situated, prays that the Court:

(a)     Find that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3);

(b)     Appoint Plaintiff as Class Representative and its counsel of record, Class Counsel;

(c)     Declare Green Mountain's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14;

(d)     Grant damages, including actual, injunctive, punitive, statutory, treble, and such other relief as provided by the statutes cited herein;

(e)     Grant pre-judgment and post-judgment interest; lawsuit costs, including reasonable attorneys' fees; and other relief as is just and proper under the circumstances.

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of himself and all others similarly situated hereby request a jury trial

pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on any and all claims so triable.

Dated:  March 17, 2014

*Steve Williams*

Joseph W. Cotchett
Steven N. Williams
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
etran@cpmlegal.com

COMPLEX-CSMGMT, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-01836-UA

Constantino v. Keurig Green Mountain Inc. et al             Date Filed: 03/17/2014
Assigned to: Judge Unassigned                                Jury Demand: Plaintiff
Cause: 15:25 Clayton Act                                     Nature of Suit: 410 Anti-Trust
                                                             Jurisdiction: Federal Question

Plaintiff

Richard Constantino                    represented by   Joseph W. Cotchett
                                                        Cotchett, Pitre & Simon
                                                        San Francisco Airport Office Center
                                                        840 Malcolm Rd.
                                                        Burlingame, CA 94010
                                                        (650) 697-6000
                                                        ATTORNEY TO BE NOTICED

V.

Defendant

Keurig Green Mountain Inc.

Defendant

Green Mountain Coffee Roasters Inc.

Defendant

Kurig Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2014 | 1 | CIVIL COVER SHEET filed. (js) (Entered: 03/20/2014) |
| 03/17/2014 | 2 | COMPLAINT against Green Mountain Coffee Roasters Inc., Keurig Green Mountain Inc., Kurig Inc.. (Filing Fee $ 350.00, Receipt Number 465401090226)Document filed by Richard Constantino.(js) (Entered: 03/20/2014) |
| 03/17/2014 | | SUMMONS ISSUED as to Green Mountain Coffee Roasters Inc., Keurig Green Mountain Inc., Kurig Inc. (js) (Entered: 03/20/2014) |
| 03/17/2014 | | Case Designated ECF. (js) (Entered: 03/20/2014) |

| 03/17/2014 | 3 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2011) (js) (Entered: 03/20/2014) |
| 03/17/2014 | 4 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 14-cv-905. Document filed by Richard Constantino.(js) (Entered: 03/20/2014) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/20/2014 13:27:54 | | |
| PACER Login: | rk3333 | Client Code: | 110176-0000 |
| Description: | Docket Report | Search Criteria: | 1:14-cv-01836-UA |
| Billable Pages: | 2 | Cost: | 0.20 |