1  MORGAN, LEWIS & BOCKIUS LLP
   DANIEL JOHNSON, JR., State Bar No. 57409
2  KENT M. ROGER, State Bar No. 95987
   One Market, Spear Street Tower
3  San Francisco, CA  94105-1126
   Tel:  415.442.1000
4  Fax:  415.442.1001
   djjohnson@morganlewis.com
5  kroger@morganlewis.com

6  Attorneys for Plaintiff
   JBR, Inc. (d/b/a Rogers Family Company)
7

8

9                  UNITED STATES DISTRICT COURT

10               EASTERN DISTRICT OF CALIFORNIA

11                    (SACRAMENTO DIVISION)

12

13  | | |
14  JBR, INC. (D/B/A ROGERS FAMILY COMPANY),

15                            Plaintiff,        **Civil Action No. _____**

16           vs.                               **COMPLAINT**

17  KEURIG GREEN MOUNTAIN, INC.
    (F/K/A GREEN MOUNTAIN COFFEE
18  ROASTERS, INC. AND AS SUCCESSOR          **DEMAND FOR JURY TRIAL**
    TO KEURIG, INCORPORATED)

19                           Defendant.

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

DB2/ 24817747.4

Plaintiff JBR, Inc. (d/b/a Rogers Family Company) ("Rogers" or "Plaintiff"), brings this action for damages and permanent injunctive relief against Defendant Keurig Green Mountain, Inc. ("Keurig" or "Defendant"), f/k/a Green Mountain Coffee Roasters, Inc. ("GMCR") and as successor to Keurig, Incorporated.  Plaintiff alleges as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has subject-matter jurisdiction over the First through Ninth Claims for Relief, which seek relief pursuant to Section 3 of the Clayton Act (15 U.S.C. § 14), Section 2 of the Sherman Act (15 U.S.C. § 2), and Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.  This Court has jurisdiction over the remaining Claims for Relief pursuant to the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because the remaining Claims for Relief all arise from the same transactions and from a common nucleus of operative facts.

2.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

3.      This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.  This Court also has personal jurisdiction over Defendant because it regularly conducts and solicits substantial business in California and has established minimum contacts with California sufficient to satisfy the requirements of due process.  In particular, GMCR has been registered to do business in the state of California since at least 1999, maintains a registered agent for service of process in California, does substantial business with third parties in California, and maintains a production facility in Castroville, California.  Similarly, Keurig, Inc. has been registered to do business in the state of California since at least 1999, maintains a registered agent for service of process in California, and does substantial business with third parties in California.  Furthermore, Defendant's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiff, a company headquartered in this District. The effects of the unlawful conduct alleged below impacted Plaintiff, as well as consumers, in this District.

4.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act,

1   15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to

2   Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and

3   commerce discussed below has been carried out in this District, and Defendant is licensed to do

4   business in, have agents in, are transacting business in, and/or may be found in this District.

5                                          **THE PARTIES**

6          5.      Plaintiff JBR, Inc. (doing business as Rogers Family Company) is a California

7   corporation with its principal place of business in Lincoln, California.  Rogers is a privately held,

8   100% family owned roaster, packager, and seller of coffee products, including individual portion

9   packs for single serve coffee brewers.  Rogers has been selling premium, sustainably grown

10  coffees and teas for over 32 years.

11         6.      Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws

12  of the State of Delaware with a principal place of business in Waterbury, Vermont.  Until March

13  6, 2014, Keurig Green Mountain, Inc. was known as Green Mountain Coffee Roasters, Inc.

14  Keurig Green Mountain, Inc. is the successor to Keurig, Inc., which prior to its merger with and

15  into Green Mountain Coffee Roasters, Inc. on December 31, 2013, was a wholly-owned

16  subsidiary of Green Mountain Coffee Roasters, Inc. organized under the laws of the State of

17  Delaware with a principal place of business in Reading, Massachusetts.

18         7.      On information and belief, additional persons and/or entities that are not currently

19  named as Defendants and are currently unknown to Plaintiff, participated as co-conspirators in

20  the violations alleged herein and have performed acts and made statements in furtherance thereof.

21  Plaintiff reserves the right to name some or all of these entities as Defendants at a later date.

22                                          **INTRODUCTION**

23         8.      Keurig has monopolized the market for single-serve brewers, as well as the market

24  for the single-serving "portion packs" of coffees used in those brewers since the inception of

25  single-serve brewers in or around 1998.  Although Keurig initially held certain patents that

26  allowed it to exclude competition from manufacturing or selling its proprietary format of portion

27  pack (the "K-Cup" format) used in its proprietary single-cup brewers, Keurig was not satisfied

28  with the dominant market position afforded it through its patents and engaged in anticompetitive

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                    3

1    conduct aimed at excluding competition from other formats of portion packs that did not infringe

2    its patents.  Since Keurig's patents on the "K-Cup" format expired in 2012, Keurig has increased

3    its efforts to maintain its monopoly and exclude competitors not through fair market competition

4    but by abusing its market power.  For example, Keurig has used its market power to require its

5    distribution partners to enter into exclusive anticompetitive agreements.

6         9.    Keurig's monopoly power in the single-serve brewer and portion pack coffee

7    markets is beyond dispute.  Currently, Keurig controls approximately 90% of the market for the

8    sale of single-serve brewers.  Keurig controls approximately 85% of the market for portion packs

9    compatible with single-serve brewers that are compatible with its proprietary K-Cup portion

10   packs, which is the market Keurig itself analyzes when evaluating its competition. Even if one

11   looks at the market for portion packs for any type of single-serve brewer, Keurig controls

12   approximately 73% of that market.

13        10.    In spite of Keurig's anticompetitive conduct, Rogers, in addition to a few other

14   companies, have managed – through hard work and a superior, competitively priced product – to

15   enter the portion packs market and win a small portion of Keurig's market share.  Keurig has

16   responded by undertaking additional anticompetitive action, including, but not limited to, making

17   false and disparaging allegations about Rogers and Rogers' products to Rogers' customers and

18   potential customers.

19        11.    In a further attempt to maintain its monopoly through anticompetitive conduct,

20   Keurig recently announced plans to change the technology utilized in its single-serve brewers to

21   lock out competitors' portion pack products.  As explained in more detail in paragraphs 84-112

22   and 163-179 herein, it is clear that the proposed lock-out technology, referred to as Keurig 2.0, is

23   not intended to offer the consumer a better product, but rather is intended to protect Keurig's

24   monopoly by freezing out competition.  Indeed, industry experts have described the 2.0

25   technology as an "underwhelming innovation" and have indicated that the main goal of the new

26   technology is to "protect [Keurig's] market share (and profits) from the incursion of unlicensed

27   portion pack competitors."  Keurig itself has acknowledged that the lock-out feature of the new

28   technology is not necessary to its functioning and that Keurig may set up its forthcoming 2.0

1   brewers to allow competing portion packs to work in the machines "a few times before they no

2   longer work."  It thus is clear that the new technology design is intended only to protect Keurig's

3   K-Cup products from having to compete on the merits and thereby will deprive consumers of the

4   quality and pricing benefits that competition has just started to produce in the portion packs

5   market.  Keurig has already attempted to capitalize on the anticompetitive product redesign by

6   encouraging its customers and potential customers to refrain from purchasing competing portion

7   packs because they allegedly will not work in the forthcoming 2.0 brewers.  Thus, unless Keurig

8   is enjoined from making such representations and implementing the lockout feature of the Keurig

9   2.0 technology, Rogers will suffer irreparable harm through the resulting loss of a significant

10  portion of its business and goodwill.  Given the nature of the irreparable harm to Rogers in form

11  of lost business and goodwill, this harm is difficult to quantify.

## RELEVANT MARKETS

### A.      Relevant Product Markets

12      12.      There are at least three relevant product markets in which to evaluate Defendant's

14  anticompetitive conduct: (1) the Single-Serve Brewers Market; (2) the Portion Packs Market; and

15  (3) the Compatible Portion Packs Market, which is the sub-market of the Portion Packs Market

16  that Keurig itself uses when evaluating the competition for its proprietary K-Cup Portion Packs.

#### 1.      The Singe-Serve Brewers Market

19      13.      Single-serve brewers ("Single-Serve Brewers") are a type of electronic coffee

20  brewer that is designed for use with single-cup portion packs, which can brew one cup of coffee

21  at a time by running hot water through a disposable, single-use cartridge containing ground

22  coffee.  These cartridges are referred to herein as "Portion Packs."  Single-Serve Brewers provide

23  consumers a quick, convenient, and simple way to brew a single cup of coffee, because the

24  consumer is not required to measure out the coffee, use a filter, clean up the filter or machine

25  after the coffee has finished brewing, or waste unused brewed coffee.

26      14.      Single-Serve Brewers constitute a unique market from traditional drip coffee

27  brewers, because, as a result of the unique convenience and efficiency offered by Single-Serve

28  Brewers, consumers are willing to pay a premium for Single-Serve Brewers and the price of

1   traditional drip coffee makers typically does not constrain prices for Single-Serve Brewers.  For

2   example, the average traditional drip coffee maker generally sells for approximately $20 to $100,

3   whereas a Keurig Single-Serve Brewer typically sells for approximately $100 to $250.

4         15.     Keurig, Inc. introduced the first commercially successful Single-Serve Brewer to

5   the United States market in or around 1998.  Keurig, Inc. also marketed, distributed and sold a

6   proprietary Portion Pack for its Single-Serve Brewer that it marketed under the name "K-Cup."

7   GMCR acquired Keurig, Inc. in or around June 2006 and operated Keurig, Inc. as a wholly-

8   owned subsidiary of GMCR.

9         16.     Since their introduction, Keurig has designed, manufactured and sold a variety of

10  different Single-Serve Brewers marketed either for use in the individual consumer's home or for

11  use outside of the home at locations such as office buildings, hotels and gas stations.  In addition

12  to the Single-Serve Brewers that utilized K-Cups (known as "K-Cup Brewers"), Keurig has also

13  designed, manufactured and sold Single-Serve Brewers utilizing different types of Portion Packs

14  that are not compatible with K-Cup Brewers, such as Vue Brewers and Rivo Brewers, but these

15  other Single-Serve Brewers have not been commercially successful.

16        17.     Keurig reported in September 2013 that it had sold over 30 million Single-Serve

17  Brewers, which are used in at least approximately 15 million U.S. households.  In fiscal year

18  2013, Keurig reported selling approximately 10.6 million Single-Serve Brewers and reported

19  selling a record 5.1 million Single-Serve Brewers in the first quarter of its 2014 fiscal year.

20        18.     Keurig also licenses its K-Cup Brewer technology to such brands as Mr. Coffee,

21  Cuisinart, and Breville.

22        19.     In addition to these Single-Serve Brewers utilizing Keurig's technology, there are

23  a number of other Single-Serve Brewers marketed and sold in the United States by other

24  manufacturers, including the "Gevalia" by Hamilton Beach; the "Flavia" by Mars, Inc.; the

25  "Tassimo" by Bosch; the "Senseo" by Philips Electronics N.V.; the "Nespresso" by Nestle, Inc.;

26  the "Dolce Gusto" by Nestle, Inc.; and the "Verismo" by Starbucks.  The Portion Packs utilized

27  by these Single-Serve Brewers are not compatible with the Portion Packs utilized in K-Cup

28  Brewers.  None of these subsequent entrants to the Single-Serve Brewers Market has been able to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    obtain significant market share.

2        20.    According to a 2013 market report, Keurig controls at least 88% of the Single-

3    Serve Brewers Market for brewers used in the consumer's home, and, on information and belief,

4    nearly 100% of the Single-Serve Brewers utilized in office buildings are Keurig Single-Serve

5    Brewers.  Between July 2012 and July 2013, Keurig sold approximately 4.8 million Single-Serve

6    Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% of all

7    Single-Serve Brewer sales by dollar value.

8        21.    Keurig thus has monopoly power in the Single-Serve Brewers Market.  As

9    brokerage and investment firm Stifel has noted, Keurig's brewer market share is so "dominant"

10   that it is "unlikely any new entrant could gain meaningful share." A 2011 Morgan Stanley

11   consumer survey report similarly observed, "Green Mountain and its Keurig system dominates

12   [the Single-Serve Brewers Market]."

13       22.    There are significant barriers to entry into the Single-Serve Brewers Market. In

14   addition to access to significant capital, successful entry into the Single-Serve Brewers Market

15   requires substantial technological knowledge and design capabilities. Potential market entrants

16   also need to have access to distribution channels, which requires the fostering of relationships

17   with retailers and distributors.  Upon information and belief, many of these retailers and

18   distributors are prohibited from purchasing Single-Serve Brewers from entities other than Keurig

19   as a result of their distribution agreements with Keurig.

20                        **2.    The Portion Packs Market**

21       23.    Different types of Single-Serve Brewers utilize different types of Portion Packs.

22   Portion Packs compatible with K-Cup Brewers are referred to herein as "Compatible Portion

23   Packs."  Non-K-Cup Brewers generally use Portion Packs that have a different shape than the

24   Compatible Portion Packs.  For example, Hamilton Beach's "Gevalia" and Philips Electronics

25   N.V.'s "Senseo" brewers use a flat pod-style Portion Pack and Bosch's "Tassimo" utilizes a disc-

26   like Portion Pack referred to as a "T-Disc."

27       24.    The Portion Packs Market is comprised of all of the different types of Portion

28   Packs utilized in all types of Single-Cup Brewers, including, but not limited to, Compatible

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                      7

1   Portion Packs, pods, and T-Discs.

2        25.     The Portion Packs Market is a distinct and unique market from the market for

3   packaged coffee generally (*i.e.*, packages of ground and whole bean coffee used by consumers to

4   brew coffee in traditional drip or other multi-cup coffee makers, e.g., percolators).  Ground coffee

5   that is not sold in Portion Packs does not constrain the prices charged in the market for Portion

6   Packs.  The price-per-pound of the coffee contained in Portion Packs is typically three times

7   greater than that of ground coffee of similar quality sold in other formats.  The purchasing

8   decisions of consumers who utilize Single-Serve Brewers generally are motivated by the

9   convenience and efficiency of the disposable, single use Portion Packs and thus the pricing of

10  Portion Packs are not constrained by ground coffee sold in formats that would require the

11  consumer to measure out the ground coffee, utilize a separate filter and, after brewing is

12  complete, dispose of the grounds and clean the filter.

13       26.     Keurig controls approximately 73% of the entire Portion Packs Market and thus

14  maintains monopoly power in the Portion Packs Market.

15       27.     Potential entrants to the Portion Packs Market face significant barriers to entry.  As

16  an initial matter, a potential entrant must either (i) design Portion Packs that work in an existing

17  Single-Serve Brewer or (ii) develop its own Single-Serve Brewer.

18       28.     Designing Portion Packs that will work in an existing Single-Serve Brewer

19  requires significant technological and design skill and experience.  First, the capsule must be

20  manufactured in accordance with specific dimensions.  It must include a specific ring and filter

21  paper.  These components must be specially manufactured.  Second, a separate system must be

22  manufactured for inserting the coffee into the capsule and sealing the capsule.  This machine must

23  be specially manufactured and Plaintiff is informed and believes that only a few manufacturers of

24  such systems exist in the world.  To date, Plaintiff has spent more than $10 million to purchase

25  the equipment necessary to make Portion Packs.

26       29.     Additional barriers to entry include gaining access to the regional and nationwide

27  distribution network that distributes these types of products.  The primary markets for sale of

28  Portion Packs include large wholesale distributors such as Costco and Wal-Mart, large chain

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  grocery stores such as Safeway and Kroger, and companies that distribute coffee products to

2  office buildings, hospitality businesses and other commercial customers.  Yet another segment of

3  the market includes chain appliance stores and specialty shops that sell the K-Cup Brewers and

4  also sell Portion Packs.  The above are typical barriers to entry and Plaintiff is informed and

5  believes that there may be other barriers as well.

6  <center>**3.**       **The Compatible Portion Packs Market**</center>

7         30.       Because Portion Packs are not generally compatible across different types of

8  Single-Serve Brewers (*e.g.*, Compatible Portion Packs will not work in a Tassimo brewer and T-

9  Discs will not work in a K-Cup Brewer), the various types of Portion Packs are not reasonably

10  interchangeable with one another.  The Compatible Portion Packs Market thus is a distinct

11  submarket of the Portion Packs Market.

12         31.       Keurig's proprietary "K-Cup" is one brand of Compatible Portion Packs.  GMCR

13  first partnered with Keurig, Inc. in the late 1990s to manufacture and sell K-Cups.  At that time,

14  Keurig, Inc.'s proprietary K-Cups were protected by patents relating to the coffee filters

15  contained in those cups (the "K-Cup Patents").  GMCR acquired Keurig, Inc. and the K-Cup

16  Patents in or around June 2006 and the K-Cup Patents expired in or around September 2012.

17         32.       Since the inception of the K-Cup, Keurig has entered into licensing agreements

18  with various major players in the coffee industry ("K-Cup Licensees"), including but not limited

19  to Starbucks, Dunkin' Donuts, Tully's Coffee Corporation, and Timothy's World Coffee, in order

20  to allow K-Cups to be marketed and sold bearing the trademarks of those entities.  Keurig

21  subsequently acquired several of the most significant K-Cup Licensees.  Per the February 5, 2014

22  earnings call, there are 49 owned or licensed brands of K-Cup hot beverages.  Compatible Portion

23  Packs sold by or on behalf of Keurig and/or the K-Cup Licenses are referred to herein as "K-Cup

24  Branded Portion Packs."

25         33.       Prior to 2010, virtually all of the Compatible Portion Packs on the market were K-

26  Cup Branded Portion Packs and were manufactured by Keurig.  Thus Keurig had control of

27  approximately 100% of the market for Compatible Portion Packs.

28         34.       On information and belief, in or around September 2010, however, Sturm Foods,

1  Inc., a subsidiary of TreeHouse Foods, Inc. ("Sturm"), began manufacturing and selling

2  Compatible Portion Packs that did not utilize the filter technology protected under the K-Cup

3  Patents and thus did not require licensing from Keurig.

4       35.     In October 2011, Rogers introduced its first Compatible Portion Packs for use in

5  K-Cup Brewers into the market, in its proprietary OneCup format under its "San Francisco Bay"

6  and "Organic Coffee Company" brands.  Rogers' OneCup format has a unique shape and

7  construction:  a hemispherical filter containing coffee grounds, fitted into a circular collar, and an

8  impermeable imperforate disc.  Unlike Keurig's K-Cup, Rogers' OneCup Compatible Portion

9  Packs employed a unique fabric mesh filter rather than a plastic brewing chamber. The fabric

10  filter delivers maximum flavor extraction via free flow of hot water through the grounds for great

11  taste and reduces the per cup cost.  Rogers' initial version of OneCup reduced the environmental

12  footprint with a product that had 30 to 35 percent less packaging than other Portion Packs.  In

13  October 2013, Rogers introduced the world's first 97 percent biodegradable Portion Packs.

14       36.     Upon the expiration of the K-Cup Patents in or around September 2012, Keurig

15  faced additional competition in the market for Compatible Portion Packs from entities in the

16  coffee industry that were now free to utilize the K-Cup Patent technology without obtaining a

17  license from Keurig. Compatible Portion Packs sold by non-K-Cup Licensees, such as Rogers and

18  Sturm, are referred to herein as "Competing Portion Packs."  In addition to manufacturing and

19  selling products under their own brands, manufacturers of Compatible Portion Packs, including

20  Keurig and Rogers, also manufacture "private label" Compatible Portion Packs for other

21  companies to market and sell under their own brand names.  For example, certain retailers have

22  contracted with Keurig and Rogers to manufacture Compatible Portion Packs that they offer to

23  consumers under their store brand.

24       37.     In fiscal year 2012, Keurig took in $2.7 billion in net sales from K-Cup Branded

25  Portion Packs, which represents approximately 70% of Keurig's total net sales.

26       38.     In fiscal year 2013, Keurig's net sales included approximately $3.187 billion from

27  K-Cup Branded Portion Pack sales.

28       39.     In February 2014, Keurig's President and Chief Executive Officer, Brian Kelley,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4

10

acknowledged that, although Keurig used to control 100% of the K-Cup Brewer and Compatible

Portion Packs "system", Keurig continues to control 86% of the system.

40.     Although Keurig enjoys a monopoly in the Compatible Portion Packs Market,

certain consumers have been willing to switch to Competing Portion Packs to take advantage of

the new brand offerings, their substantially lower pricing, and/or their improved quality.  Indeed,

market reports have asserted that consumers in the Compatible Portion Packs Market "have a

high degree of price sensitivity" and are willing to try a new brand "if it [is] less expensive." A

2013 market study concluded, "91.3% of Keurig users [stated] that they would try a new

[Compatible Portion Pack] brand if it were less expensive."

41.     The same significant barriers to entry explained above with regard to the Portion

Packs Market are equally applicable to the Compatible Portion Packs Market, including large

capital expenditures, significant technological and design skill and experience, and limited access

to the equipment and components required for the mass production of Compatible Portion Packs.

In addition, potential entrants to the Compatible Portion Packs Market also face the significant

barrier of acquiring access to the distributor, retailer and on-line distribution channels, which

require industry knowledge and the development of relationships with these distributors.  Access

to these distribution channels is made more difficult, if not impossible, as a result of Keurig

requiring certain retailers and distributors to enter into distribution agreements that prohibit them

from purchasing Competing Portion Packs.

**B.     Geographic Market**

42.     The relevant geographic market is the United States.  Single-Cup Brewers, Portion

Packs and Compatible Portion Packs are all sold throughout the United States.  Upon information

and belief, Keurig distributes and sells its Single-Cup Brewers and Compatible Portion Packs

products throughout the United States and enters into exclusive arrangements with its customers

throughout the United States.  Rogers competes against Keurig in the market for Compatible

Portion Packs throughout the United States.

**C.     Interstate Commerce**

43.     Defendant manufactures and sells Single-Serve Brewers and Compatible Portion

1   Packs in the United States in a continuous and uninterrupted flow of interstate commerce,

2   including through and into this judicial district.

3       44.     Defendant's business activities substantially have affected and are affecting

4   interstate commerce in the United States and have caused and continue to cause antitrust injury

5   throughout the United States.

6       45.     Keurig had net sales of $4.358 billion for its 2013 fiscal year, which ended on

7   September 28, 2013.  This number includes $3.187 billion in Portion Pack net sales and $827.6

8   million in Keurig Single-Serve Brewer and accessories net sales.  Keurig had the top four best-

9   selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.

10      46.     Keurig has a presence in states throughout the United States.  Keurig maintains a

11  production and distribution facility in California; sales offices in Massachusetts; a production and

12  distribution facility in Tennessee; its headquarters and production and distribution facilities in

13  Vermont; a production and distribution facility in Virginia; and a production and distribution

14  facility in Washington.

15                    **KEURIG'S ANTICOMPETITIVE CONDUCT**

16      47.     At least from the time GMCR began distributing K-Cups for Keurig, Inc., Keurig's

17  business model has relied upon utilizing Keurig, Inc.'s monopoly power in the Single-Serve

18  Brewers Market to exclude competition and enjoy the benefits of supracompetitive pricing in the

19  market for Portion Packs and, more specifically, Compatible Portion Packs.  In order to effectuate

20  this strategy, Keurig has engaged in an aggressive and comprehensive course of anticompetitive

21  conduct to secure and maintain its monopoly in the Portion Pack and Compatible Portion Packs

22  Markets, including at least the following conduct:  (i) aggressively acquiring competing brands in

23  the Compatible Portion Packs Market; (ii) litigating meritless intellectual property claims against

24  competitors; (iii) coercing distributors, retailers and other customers into entering exclusive

25  dealing agreements; and (iv) providing customers and potential customers with false and

26  disparaging information regarding its competitors, including Rogers, and their products.  In

27  addition, Keurig has announced plans to further restrain competition in the Compatible Portion

28  Packs Market by introducing a new technology feature in its K-Cup Brewers that would lockout

1   competitors by making the new model K-Cup Brewers incompatible with Competing Portion

2   Packs.

3       **A.      Keurig's Business Model Depends Upon Obtaining Supracompetitive Pricing
             on Its Sales of K-Cups**

4

5       48.     As Keurig has acknowledged in public statements to investors, Keurig sells K-Cup

6   Brewers at cost (or even at a loss) in order to saturate the market with Single-Serve Brewers that

7   require Compatible Portion Packs to operate.  Once consumers purchase a K-Cup Brewer, they

8   have no choice but to purchase Compatible Portion Packs in order to utilize the brewer.

9       49.     K-Cup Branded Portion Packs account for the vast majority of Keurig's earnings

10  and the profit margin on its sales of K-Cups is significantly higher than the profit margin, if any,

11  obtained through its other operations.  Keurig is able to more than make up for the lost profits

12  resulting from selling its K-Cup Brewers at cost by setting as much as a 50% profit margin or

13  more on the sale of its K-Cups.

14      50.     This strategy has allowed Keurig to obtain at least an 88% share of the Single-

15  Serve Brewers purchased by consumers for use at home and, on information and belief, a nearly

16  100% share of the K-Cup Brewers utilized in office buildings.  On information and belief, Keurig

17  sells between seven to nine billion K-Cups per year.  It has been estimated that over 35 million K-

18  Cup brewers and over 20 billion Compatible Portion Packs have been sold in offices and homes

19  in North America since Keurig entered the market in or around 1998.

20      **B.      Keurig Aggressively Acquired Its Competitors**

21      51.     Following its introduction of K-Cup Brewers in or around 1998, Keurig, Inc.

22  licensed various coffee company competitors, including GMCR, to manufacture and sell its

23  proprietary filtered K-Cups.

24      52.     After acquiring Keurig, Inc. in or around June 2006, GMCR aggressively

25  eliminated potential competitors through successive acquisitions of entities to whom Keurig, Inc.

26  had previously provided a license.  As one market analyst put it, "GMCR eliminated the licensees

27  by buying them. ... GMCR paid high prices to avoid having to compete with the licensees post

28  patent expiration."

28  MORGAN, LEWIS &
    BOCKIUS LLP
    ATTORNEYS AT LAW
    SAN FRANCISCO

53.     On or about March 27, 2009, Keurig purchased certain assets of Tully's Coffee Corporation, including Tully's coffee brand, a licensee, producer and vendor of K-Cups.

54.     On November 13, 2009, through a wholly owned subsidiary, Keurig acquired the wholesale coffee and beverages business of Timothy's Coffees of the World, Inc., through which Keurig acquired rights to Timothy's World Coffee, which also marketed a licensed brand of K-Cup.

55.     In May of 2010, Keurig acquired licensee Diedrich Coffee, Inc., which also included rights to Diedrich Coffee, Coffee People brands, and Gloria Jean's coffee brand.

56.     On September 14, 2010, Keurig announced a share purchase agreement pursuant to which it would acquire all of the outstanding shares of LJVH Holdings, Inc., which included the following licensed K-Cup brands:  Van Houtte, Bigelow, and Wolfgang Puck.

57.     Keurig completed each of these acquisitions with the goal and purpose of maintaining its monopoly in the Compatible Portion Packs Market by eliminating the threat of competition from the K-Cup Licensees, thereby suppressing competition and allowing Keurig to charge supracompetitive pricing.

C.     **Keurig Vigorously Pursued Objectively Baseless Patent Claims Against Its Competitors**

58.     Keurig also employed a "scorched earth" litigation strategy for eliminating competition.  Keurig initiated and vigorously litigated objectively baseless patent infringement lawsuits against both Sturm and Rogers within weeks of the introduction of their respective Competing Portion Pack products with the intent of using the meritless litigation to obtain a competitive advantage.

59.     First, Keurig sued Sturm in the United States District Court for the District of Delaware ("District of Delaware"), alleging without basis that Sturm's Competing Portion Packs infringed certain of Keurig's utility patents.  The asserted patents, however, covered intellectual property related to Single-Serve Brewers and methods of using the brewers.  Keurig went so far as to allege that consumers of its own Single-Serve Brewer product were infringing these Single-Serve Brewer patents by using Sturm's Competing Portion Packs, and that Sturm was thus also

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    liable for "inducing" infringement by these consumers.

2       60.    Keurig also asserted baseless trademark infringement and false advertising claims

3    against Sturm based upon a statement on the packaging of Sturm's Competing Portion Packs that

4    the product was "[f]or use by owners of Keurig coffee makers."

5       61.    Keurig employed the same strategy against Rogers.  In November 2011, only

6    weeks after Rogers began selling Competing Portion Packs, Keurig filed a lawsuit in the United

7    States District Court for the District of Massachusetts ("District of Massachusetts") alleging that

8    the sale of Rogers' Competing Portion Packs to consumers infringed and induced infringement of

9    the same Single-Serve Brewer utility patents that Keurig asserted against Sturm.  In addition,

10   Keurig also asserted claims for infringement of a design patent against Rogers.

11      62.    In September 2012, the District of Delaware granted summary judgment in favor

12   of Sturm on Keurig's patent claims, which decision Keurig then appealed to the United States

13   Court of Appeals for the Federal Circuit ("Federal Circuit").

14      63.    Rogers offered to stay its case pending the appeal of the District of Delaware's

15   September 13, 2012 decision granting summary judgment due to patent exhaustion. Keurig

16   refused, and accelerated the pace and expense of the litigation.

17      64.    Keurig took Rule 30(b)(6) depositions (Noticed on November 30, 2012) over the

18   course of two days on January 10 and 11, 2013, of Rogers' Chief Operations Officer and Director

19   Pete Rogers and Chief Financial Officer, Michael Sarina.

20      65.    In March and April 2013, Keurig took eleven more depositions including virtually

21   all of Rogers' senior management.

22      66.    Continuing with its strategy of vexatious litigation, Keurig filed a meritless Motion

23   to Compel JBR to Supplement its Production, to Produce Witnesses, and for Sanctions.  The

24   motion included a request for documents clearly covered by the work product and attorney client

25   privilege.  Keurig dropped this motion once the district court granted JBR summary judgment that

26   the patents were exhausted and that the design of the capsules was so dissimilar that Keurig could

27   not prevail on its design patent claim.

28      67.    In May 2013, the United States District Court for the District of Massachusetts

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                        15

1    granted Rogers' Motion for Summary Judgment and entered judgment for Rogers upon

2    determining that Rogers' designs were "sufficiently distinct."  The Court chastised Keurig for

3    "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used

4    in Keurig brewers.  Supreme Court precedent prevents plaintiffs from undertaking such an end

5    run."  *Keurig, Inc. v JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D.

6    Mass. May 24, 2013).

7         68.    Keurig appealed the District of Massachusetts' decision to the Federal Circuit,

8    including the patent exhaustion decision that was already pending before the Federal Circuit in

9    the *Sturm* case.

10        69.    On October 17, 2013, the Federal Circuit affirmed the District of Delaware's

11   ruling in the *Sturm* case and criticized Keurig for attempting to make an "end-run" around the

12   proper use of the patent laws with "a tactic that the Supreme Court has explicitly admonished."

13   *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

14        70.    Although Keurig agreed not to pursue further its appeal related to the utility

15   patents in light of the Federal Circuits decision in *Sturm*, it continued to pursue its appeal of the

16   District of Massachusetts' decision regarding the design patent.  On March 12, 2014, only six

17   days after the Federal Circuit heard arguments on Keurig's appeal, the Federal Circuit entered a

18   judgment affirming the District of Massachusetts' grant of summary judgment in Rogers' favor

19   and stated that none of the relief sought in Keurig's appeal would be granted.

20        71.    Keurig's vexatious litigation strategy was successful in maintaining its competitive

21   advantage.  Both Rogers and Sturm were forced to spend money and time defending the lawsuits.

22   Moreover, the lawsuits were used by Keurig to sow doubt and confusion about the viability of

23   competing unlicensed Portion Packs.  On information and belief, Keurig used the existence of the

24   lawsuit in order to convince distributors and third parties to stop doing business with Rogers and

25   Sturm.

26        72.    Based upon these facts, it is abundantly clear that the purpose of Keurig's

27   objectively baseless lawsuits against its competitors in the Compatible Portion Packs Market was

28   not to protect its intellectual property but rather to intimidate its competitors and force them to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                   16

expend significant resources that they otherwise would be able to devote to competing against Keurig.  The lawsuits further were intended to protect Keurig's monopoly and thereby harmed consumers by creating uncertainty in the market with regard to Competing Portion Packs and intimidating other potential market entrants from entering the market.

**D.**  **Keurig Coerced Its Compatible Portion Pack Customers Into Entering Exclusive Agreements**

73.  Keurig also requires all or nearly all of the entities that distribute or resell its Compatible Portion Packs to enter into anticompetitive exclusive agreements that severely restrict competition in the Compatible Portion Packs Market.  Keurig utilizes its monopoly power to force its customers and distributors to enter into these agreements and then threatens the customers with a loss of access to Keurig's market-dominant K-Cup Brewers and/or K-Cup Branded Portion Pack products if the customer even considers also purchasing Competing Portion Packs.

**1.**      **Away From Home Consumption**

74.  Keurig utilizes a force of approximately 500 Keurig Authorized Distributors (KADs) to distribute its K-Cup Brewers and K-Cup Branded Portion Packs for use at commercial, "away from the home" facilities, such as hotels, office buildings and hospitals.  Examples of KADs include office supply distributors and food-service management companies.

75.  Keurig requires these distributors to enter into multi-year KAD Agreements, which include exclusive provisions that prohibit them from promoting, marketing, selling or otherwise making available any amount or type of Competing Portion Packs.  Specifically, on information and belief, all of Keurig's KAD Agreements contain a "Keurig Loyalty" requirement with language similar to the following:

> 3.2 Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

76.  Keurig regularly reminds KADs of the exclusivity provisions and closely monitors

the KADs to ensure compliance.  For example, on March 26, 2012, Keurig sent a letter to KADs warning that "Any portion pack that you promote, market, sell or otherwise make available that is not made by a Licensed Roaster subjects you to termination of your Keurig Agreement." Although the letter claims that Keurig seeks to enforce the exclusivity provisions "because we have not run these portion packs through our rigorous testing and approval process.  Therefore, we have no confidence that these non-licensed portion packs ensure the quality, consistency and safety of our brewing systems for our mutual end use customers," this explanation is entirely pretextual.  Competing Portion Packs were introduced into the market years before this letter was sent and had not created any quality or safety issues for consumers or the K-Cup Brewers.  To the extent Keurig truly was concerned with any potential threat to "the quality, consistency and safety" of K-Cup Brewers posed by Competing Portion Packs, Keurig could and should have actually submitted the Competing Portion Packs to testing.  It is clear that Keurig's attempts to enforce the exclusivity provisions are motivated solely by its desire to restrain competition and maintain its market share.

77.     Moreover, it is clear that Keurig leverages its monopoly power to force the distributors to enter into these exclusionary KAD Agreements.  Market research indicates that distributors feel "generally unhappy" with and "restricted" by the terms of Keurig's multi-year KAD Agreements.  Distributors described their relationship with Keurig as "contentious" and expressed dissatisfaction with Keurig's "arrogance."

## 2.     At-Home Consumption

78.     Keurig forced its distributor and retailer customers responsible for sales of K-Cup Branded Portion packs to consumers for in-home use to enter into similarly restrictive exclusive distribution agreements.  Pursuant to these agreements these distributors and retailers are prohibited from marketing or selling any Competing Portion Packs.

79.     In connection with Rogers' marketing of its Competing Portion Packs, multiple potential customers have informed Rogers of the exclusive provisions in their agreements with Keurig and stated that Keurig has threatened to terminate their access to K-Cup Branded Portion Packs if the potential customer purchases any Competing Portion Packs.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

80.     There is no legitimate business purpose for these broad and pervasive exclusionary provisions that severely limit Rogers' and other competitors' access to the Compatible Portion Packs Market.  Instead, Keurig leverages its monopoly power to force these exclusive dealing provisions on its customers and thereby forecloses its competitors from competing in a substantial portion of the Compatible Portion Packs Market.

**E.     Keurig Has Made/Makes False and Disparaging Accusations About Rogers' Competing Portion Packs To Their Customers and Potential Customers**

81.     In addition to restricting Rogers' and other potential competitors' access to the Compatible Portion Packs Market through exclusive dealing contract provisions, Keurig also attempts to foreclose competitors from the market by making false and disparaging comments about competitors' products.

82.     As noted above, on March 26, 2012, Keurig sent a letter to its distributors suggesting that Competing Portion Packs have not been subjected to "our rigorous testing and approval process" and therefore may not "ensure the quality, consistency and safety of our brewing systems for our mutual end use customers."  The obvious implication of this widely distributed false representation to Keurig's customers (and Rogers' customers or potential customers) was that Rogers' and other competitors' Competing Portion Packs would damage K-Cup Brewers and would not provide the same quality experience for the consumer.  There is no basis in fact for Keurig's threat, and Keurig did not test – and chose not to test – Competing Portion Packs in order to determine the truth.  Competing Portion Packs have been on the market for years and have not caused any damage to the K-Cup Brewers of consumers using these products or complaints about the quality of the product.  Indeed, in spite of Keurig's anticompetitive practices described herein, Competing Portion Packs have been well-received and reviewed by those consumers that have been able to obtain access to Competing Portion Packs.

83.     In addition to these general threats, Rogers has been informed by multiple potential customers that Keurig expressly asserted to them false information about Rogers' Competing Portion Packs.  According to these customers, Keurig told them specifically that Rogers' Competing Portion Packs were not safe to use in K-Cup Brewers and, over time, would

1  cause the K-Cup Brewers to malfunction.  Keurig's statements about Rogers' Competing Portion

2  Packs were and are false, and were made without any factual support and thus were made with

3  the intent to deceive Rogers' potential customers and influence the potential customers'

4  purchasing decisions.

5     **F.    Keurig Has Announced Plans to Introduce Technology into Its K-Cup**
          **Brewers That Would Foreclose Any Competition in the Compatible Portion**
6        **Packs Market**

7        84.    In the wake of the expiration of its K-Cup Patents, Keurig has announced plans to

8  exclude all competition from the Compatible Portion Packs Market by imposing an exclusionary

9  technological barrier that would prevent any Competing Portion Packs from being compatible

10  with Keurig's K-Cup Brewers.  It is clear from the timing, context and details of this

11  announcement that the sole purpose of the proposed change in technology is to protect Keurig's

12  monopoly and exclude all Competing Portion Packs from the Compatible Portion Packs Market.

13       85.    In November 2013, Keurig announced that it would "launch a new lineup" of K-

14  Cup Brewers utilizing new technology referred to as "2.0" (referred to herein as "2.0 K-Cup

15  Brewers") with an anticipated release date in Fall 2014.  Keurig's President and Chief Executive

16  Officer, Brian Kelley, made clear that Keurig "will *replace* [its] current lineup of both K-Cup and

17  Vue brewers" with 2.0 K-Cup Brewers "over fiscal 2014 and early 2015" (emphasis added).

18       86.    According to Keurig, the 2.0 K-Cup Brewers will utilize Compatible Portion Packs

19  that have a special, proprietary taggant ink tag built into the lid of the Portion Packs container

20  ("2.0 Compatible Portion Packs").  This tag purportedly will be read by "interactive technology"

21  in the 2.0 K-Cup Brewer and thus allow communication between the 2.0 K-Cup Brewer and the

22  2.0 Compatible Portion Packs.

23       87.    Keurig claims that the 2.0 K-Cup Brewers will lockout all Competing Portion

24  Packs by being programmed to only work if a Compatible Portion Pack containing the proprietary

25  taggant ink is inserted into the 2.0 K-Cup Brewer.  Keurig contends that manufacturers of

26  Compatible Portion Packs will be required to obtain a license from Keurig in order for their

27  Compatible Portion Packs to work with the 2.0 K-Cup Brewers.

28       88.    The 2.0 technology does not represent a technological innovation that will benefit

1    consumers, but rather is a ploy by Keurig to eliminate competition in the Compatible Portion

2    Packs Market by entirely foreclosing any competition for 2.0 Compatible Portion Packs by

3    technologically tying the 2.0 K-Cup Brewers to the 2.0 Compatible Portion Packs through the use

4    of the proprietary tag.  In this way, Keurig seeks to regain its nearly 100% monopoly in the

5    Compatible Portion Packs Market by leveraging its monopoly power in the Single-Serve Brewers

6    Market to control the Compatible Portion Packs Market by excluding any competition from a

7    non-licensed entity in the sales of 2.0 Compatible Portion Packs.

8         89.    During a February 5, 2014 investor call, Mr. Kelley made clear that Keurig

9    intended to use its monopoly power in the Single-Serve Brewers Market to ensure the success of

10    its 2.0 K-Cup Brewers.  When asked if the 2.0 K-Cup Brewers might "have a more narrow retail

11    footprint," because retailers might not carry the 2.0 K-Cup Brewers if "it might not support their

12    private label brand [Compatible Portion Packs]," Mr. Kelley responded, in part, that the 2.0 K-

13    Cup Brewers "will be the Keurig system and so it's replacing the current Keurig system that's out

14    there. And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry."

15        90.    In a report, investment firm Stifel acknowledged that Keurig's "re-closing" of the

16    Compatible Portion Packs Market "is primarily driven by share gains from unlicensed brands ...

17    since patent expiration," and not by the superiority of the technology or resulting consumer

18    experience.

19        91.    Bank of America similarly stated that foreclosing any competition for the sale of

20    2.0 Compatible Portion Packs "is the strongest action management has taken to strengthen the

21    moat around its profit pool," and noted its "impression [ ] that management felt a sense of

22    urgency to [] protect its market share (and profits) from the incursion of unlicensed portion pack

23    competitors…."

24        92.    As industry news editor, Keith Nunes, explained, "Keurig 2.0 is the company's

25    answer" to how it would "protect its market share."

26        93.    Keurig also intends to use the 2.0 technology to increase its monopoly power in

27    the Portion Packs Market and Compatible Portion Packs Market by (i) requiring competitors to

28    become licensees and (ii) forcing more retailers to enter into exclusive distributor agreements.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                                21

This strategy was confirmed by Stifel, which explained that Keurig views its "introduction of Keurig 2.0 ... as an opportunity to convert unlicensed [Competing Portion Packs makers] to licensed partners" and noted that Keurig "is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

94.     As part of Keurig's announcement of the 2.0 technology, Mr. Kelley stated that Keurig "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert ... as many [Competing Portion Pack makers] as [it] can."

95.     On information and belief, in order to become a licensee, Keurig demands a significant royalty payment or other consideration from the Compatible Portion Packs maker, which has the effect of raising Keurig's competitors' costs, increasing prices, and restraining competition on the merits.

96.     Keurig has already begun taking advantage of its anticompetitive lockout technology by using the purportedly forthcoming 2.0 technology as leverage with retailers and distributors to try to convince them not to purchase Competing Portion Packs and/or to pressure the manufacturers of Competing Portion Packs to obtain a license from Keurig.

97.     Multiple potential customers have informed Rogers that they were pressured by Keurig not to purchase Rogers' Competing Portion Packs or use Rogers to manufacture their private label Portion Packs because any such Portion Packs would not work in the soon to be released 2.0 K-Cup Brewers and thus would be difficult for the customer to sell to consumers.

98.     On information and belief, Keurig has urged retailers and distributors to pressure manufacturers of Competing Portion Packs to contact Keurig to obtain a license and become an authorized dealer so that they will be able to manufacture 2.0 Compatible Portion Packs.

99.     Keurig has failed to provide any justification for how the proposed new technology would benefit consumers.  Instead, as explained above, it is apparent that the technology is being introduced solely to protect and strengthen Keurig's monopoly power and thus actually will harm consumers by restricting competition and consumer choice and increasing Keurig's ability to control the market and impose supracompetitive pricing.

100.    Keurig claims that the "interactive technology" proposed, which allows the 2.0 K-Cup Brewers to communicate with "licensed portion packs" will allow 2.0 K-Cup Brewers to "deliver the perfect beverage" by allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed portion packs."

101.    Based upon the context of this announcement and prior market experience, it is clear that this claim is entirely pretextual.  As Stifel recently noted, the 2.0 technology is an "underwhelming innovation."

102.    Although Keurig has referred to it as a "breakthrough innovation," it is not even new to Keurig.  In or around February 2012, Keurig introduced its Vue Single-Serve Brewer to the market, which allegedly also allowed for communication between the Vue brewer and the proprietary Portion Packs that it utilized.  The Vue V1200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage."

103.    The Vue brewer was not well-received by the market.  Market research shows that Vue brewers captured only a very small percentage of the Single-Serve Brewers Market and consumers have stated that they are unlikely or very unlikely to purchase a Vue brewer.  As one analyst notes, the "Vue platform was a poorly planned, researched and designed platform."

104.    There thus is no indication that the interactive technology that Keurig seeks to reintroduce to the market is desired by consumers or will provide any benefit to them.  Yet Keurig has vowed to use its market power in the Singe-Serve Brewer Market to force it upon consumers by *replacing* its market-dominant K-Cup Brewers with the 2.0 K-Cup Brewers rather than offering it as an alternative as it did with the Vue brewers.

105.    Even if Keurig was able to identify some consumer benefit to the technology, it would not outweigh the significant and unnecessary anticompetitive effects that Keurig's proposed plan of making the 2.0 K-Cup Brewers compatible *only* with K-Cup Branded Portion Packs would have.

106.    There can be no doubt given Keurig's monopoly power in the Single-Serve Brewers Market that the introduction of 2.0 K-Cup Brewers that are only compatible with K-Cup

1   Branded Portion Packs would restrict competition in the Compatible Portion Packs Market and

2   thereby reduce consumer choice and increase prices.

3        107.    Keurig itself has emphasized the importance of consumer choice.

4        108.    Commenting on the lack of success of Keurig's Vue brewer in a May 2013 call

5   with investors, Mr. Kelley explained that consumers "want the ability to have more choice. They

6   want to have all of the brands available to them. And a lot of consumers who have [the] Keurig

7   today, they don't want to give up the K-Cup. They love the K-Cup ... And the most important

8   thing they tell us about Vue is, give us more choice."

9        109.    As one financial analyst recently observed, "the introduction of a new closed

10   system, dubbed Keurig 2.0, which will only use licensed K-Cups ... will effectively hold

11   consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage

12   to higher prices. With the new machines, Keurig is effectively cutting off competition. I know, I

13   know — a monopoly is good, but marketplace/consumer confusion isn't."

14        110.    Moreover, these anticompetitive effects are entirely unjustified because Keurig

15   itself has acknowledged that there is absolutely no reason why the 2.0 K-Cup Brewers cannot

16   work both with 2.0 Compatible Portion Packs and Competing Portion Packs.

17        111.    As Mr. Kelley has admitted, even with the 2.0 K-Cup Brewers, "a K-Cup will be a

18   K-Cup." In an October 2013 article on the new technology, Mr. Kelley admitted that Keurig was

19   "still deciding on exactly how [it would] handle the unlicensed pod" and that "it could range from

20   not brewing them at all to brewing them a few times before they no longer work."

21        112.    It thus is clear that the lockout feature of the technology proposed by Keurig,

22   which easily could be programmed to work with Competing Portion Packs, is meant solely to

23   protect and increase Keurig's monopoly power in the Compatible Portion Packs Market.

24        **THE HARM CAUSED BY KEURIG'S ANTICOMPETITIVE CONDUCT**

25        113.    Keurig's anticompetitive acts identified above have had serious anticompetitive

26   effects on Rogers and on competition in the Portion Packs Market, and in particular the

27   Compatible Portion Packs Market, more generally. In addition to Rogers, Keurig's

28   anticompetitive conduct has harmed other Competing Portion Packs manufacturers, potential

1    market entrants, distributors, retailers, and, most importantly, consumers.

2    **A.    Restraints On Price Competition Have Caused Supracompetitive Prices and
         Reduced Consumer Choice Harming Retailers, Distributors and Consumers**

3

4        114.    As a result of its monopoly power and effective restraint on competition in the

5    Compatible Portion Packs Market, Keurig has been able to charge supracompetitive prices for K-

6    Cup Branded Portion Packs.  K-Cup Branded Portion Packs generally are priced substantially

7    higher than comparable Competing Portion Packs.

8        115.    Consumers of Compatible Portion Packs both for in home consumption and in

9    commercial settings thus have been forced to pay at as much as 58% more for K-Cup Branded

10   Portion Packs than they would have for Rogers' One Cup or other Competing Portion Packs.

11       116.    On information and belief, market research has shown that "Keurig users remain

12   highly price sensitive and willing to try new K-Cup brands if they are less expensive." In fact,

13   "90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive.

14   This is more supportive evidence that K-Cup users would not necessarily be loyal to a particular

15   brand if they found a more inexpensive option."  Thus, consumers do not voluntarily pay the

16   supracompetitive prices charged by Keurig for the K-Cup Branded Portion Packs but rather are

17   forced into paying these supracompetitive prices based upon the lack of access to Competing

18   Portion Packs that results from Keurig's anticompetitive conduct.

19       117.    Keurig's anticompetitive conduct has severely limited consumers' access to

20   Competing Portion Packs.  This restricted access has been especially harmful to consumers who

21   prefer the taste, flavor, and/or quality of Competing Portion Packs over K-Cup Branded

22   Compatible Portion Packs. As one market study observed, "[w]hile there are more licensed K-

23   Cups in the top 100 on Amazon, unlicensed [Competing Portion Packs] actually had a better

24   average ranking."  For example, Rogers' OneCups have an average rating of 4.5 stars on

25   Amazon.com and Rogers' San Francisco Bay Coffee Fog Chaser is recognized as the "#1 Best

26   Seller" in Beverages on Amazon.com.

27       118.    By restraining competition and the availability of Competing Portion Packs,

28   Keurig also has harmed retailers, grocers, and distributors, by depriving them of the benefits of

1    competition in the Compatible Portion Packs Market, including, but not limited to, price

2    competition, promotional offers, and consumer choice.

3    **B.    <u>Harm Specific to Rogers</u>**

4    119.    As a direct and proximate result of Keurig's anticompetitive conduct aimed at

5    restraining competition in the Portion Packs Market, and specifically the Compatible Portion

6    Packs Market, Rogers has been financially injured by being foreclosed from a substantial portion

7    of the Compatible Portion Packs Market as a result of Keurig's anticompetitive exclusive dealing

8    agreements with distributors and retailers.

9    120.    Rogers also has been harmed as a result of Keurig making disparaging and false

10   accusations to Rogers' customers and potential customers, which has upon information and belief

11   interfered with Rogers' business relationships and prevented Rogers from obtaining orders of its

12   products and from obtaining contracts to manufacture other entities' private label products.

13   121.    Rogers has been harmed further as a result of having to defend itself against

14   Keurig's meritless patent litigation undertaken by Keurig solely to obtain a competitive advantage

15   against Rogers.

16   **C.    <u>Threat of Future Harm</u>**

17   122.    Keurig's invocation of the forthcoming 2.0 technology with retailers and

18   distributors as a reason for the retailers and distributors to discontinue or not commence business

19   relationships with manufacturers of Competing Portion Packs, has already had a substantial and

20   direct impact on competition in the Compatible Portion Packs Market.  On information and belief,

21   Keurig has induced certain entities to discontinue business with or refrain from doing business

22   with Rogers and other manufacturers of Competing Portion Packs.

23   123.    Moreover, the introduction of Keurig's 2.0 K-Cup Brewer threatens to further

24   harm competition in the future. Keurig, which already controls approximately 86% of the

25   Compatible Portion Packs Market, is threatening to entirely foreclose competition from

26   Competing Portion Pack manufacturers by unnecessarily and unjustifiably making the 2.0 K-Cup

27   Brewers incompatible with Competing Portion Packs.

28   124.    The elimination of Competing Portion Packs from competition for Keurig's 2.0 K-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4

Cup Brewers will harm consumers by raising the prices of Compatible Portion Packs and by eliminating consumer choice. It will also harm retailers, distributors, and unlicensed suppliers of Competing Portion Packs by denying them the benefits of competition and consumer choice.

125. The Competing Portion Packs business is critical to the continued existence of Rogers. Unless permanently enjoined, Defendant's continued promotion, marketing, and introduction of the 2.0 K-Cup Brewers in a manner that suggests to the market that the new products will not be compatible with Competing Portion Packs unfairly threatens Rogers' continued success in the Compatible Portion Packs Market and interferes with Rogers' business relationships.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Monopolization
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

126. Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 125 as fully set forth herein.

127. As detailed above, Keurig has monopoly power in the Portion Packs Market and the Compatible Portion Packs Market, including the power to control prices and exclude competition.

128. As explained above, Keurig has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

129. Keurig has effectively restrained, and threatens to restrain further, competition in the Portion Packs Market and Compatible Portion Packs Market by:

    a. coercing distributors and retailers to enter into anticompetitive exclusive agreements that restrain market entry, exclude competitors, and unreasonably restrain competition;

    b. filing objectively and subjectively baseless litigations and appeals against manufacturers of Competing Portion Packs, including Rogers, for the purpose of obtaining a competitive advantage in the Compatible Portion

1          Packs Market;

2      c.     interfering with Rogers' business relationships by making false and

3          disparaging comments to customers and potential customers regarding

4          Rogers' products and attempting to dissuade retailers and distributors from

5          doing business with Rogers on the basis that Rogers' Competing Portion

6          Packs will not be compatible with 2.0 K-Cup Brewers;

7      d.     threatening to unreasonably restrain competition through the introduction

8          of new technology that unnecessarily and unjustifiably excludes

9          competitors from the Compatible Portion Packs Market and that cannot be

10          justified based on any legitimate, non-pretextual consumer benefit; and

11      e.     raising competitors' costs above those that would exist under competitive

12          conditions by requiring the makers of Competing Portion Packs to enter

13          purported licensing agreements.

14      130.    Each of these anticompetitive acts is sufficient to constitute an antitrust violation,

15  and, taken together, they clearly establish illegal monopolization in violation of the federal

16  antitrust laws.

17      131.    As a direct, foreseeable, and proximate result of Keurig's anticompetitive and

18  monopolistic conduct, Rogers has been injured in its business with damages in amounts to be

19  proven at trial.  In particular, Rogers has been substantially foreclosed from competing in the

20  Portion Packs Market and Compatible Portion Packs Market; Rogers has had to incur substantial

21  costs and attorneys' fees to defend against the objectively baseless patent litigation pursued by

22  Keurig; and Rogers has lost business as a result of Keurig's interference with its relationships

23  with retailers and distributors and its claims that Competing Portion Packs will be incompatible

24  with 2.0 K-Cup Brewers.

25      132.    As a direct, foreseeable, and proximate result of Keurig's anticompetitive and

26  monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and

27  consumers in the Portion Packs Market and in the Compatible Portion Packs Markets have been

28  harmed by, among other things: (1) Keurig's ability to charge supracompetitive prices for K-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Cups; and (2) the reduced output and availability of consumers' preferred Compatible Portion Packs.

133.    Unless Keurig is enjoined from enforcing its anticompetitive exclusive dealing agreements, from making false and disparaging statements about Rogers and its products and from implementing the lockout feature of its proposed 2.0 K-Cup Brewers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business and goodwill, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive conduct.  Given the nature of the irreparable harm to Rogers in the form of lost business and goodwill, this harm will be difficult to quantify.

## SECOND CLAIM FOR RELIEF

### Exclusive Dealing
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### and Section 3 of The Clayton Act, 15 U.S.C. § 14

134.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 133 as fully set forth herein.

135.    As detailed above, Keurig has monopoly power in the Portion Packs Market and the Compatible Portion Packs Market, including the power to control prices and exclude competition.

136.    Keurig has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with distributors and retailers of Compatible Portion Packs.

137.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.  In particular, Keurig's exclusive dealer agreements prohibit retailers and distributors from marketing or selling any Competing Portion Packs and thereby Rogers' Competing Portion Pack products are entirely foreclosed from competing in a substantial portion of the Compatible Portion Packs Market not as a result of competitive forces but solely on the bases of these anticompetitive agreements.

138.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because the restrictions imposed by Keurig do not apply to the sales of any products into any market other

DB2/ 24817747.4

29

than the Compatible Portion Packs Market. Instead, Keurig's exclusive dealing agreements are forced upon Keurig's business partners for the sole purpose of protecting its monopoly in the Portion Packs Market and Compatible Portion Packs Market.

139.   This conduct has substantially foreclosed competition in the Portion Packs Market and Compatible Portion Packs Market.

140.   Unless Keurig is enjoined from enforcing these exclusive dealing agreements, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of these anticompetitive exclusive dealing agreements.  Given the nature of the irreparable harm to Rogers in form of lost business, this harm will be difficult to quantify.

## THIRD CLAIM FOR RELIEF

**Monopoly Leveraging**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

141.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 140 as fully set forth herein.

142.   As detailed above, Keurig has monopoly power in the Single-Serve Brewers Market, including the power to control prices and exclude competition.

143.   Keurig has willfully and intentionally used its monopoly power in the Single-Serve Brewers Market to maintain or attempt to maintain monopoly power in the Portion Packs Market and Compatible Portion Packs Markets.  Specifically, Keurig has engaged in a strategy of selling its K-Cup Brewers at or below cost in order to lock consumers into the Compatible Portion Packs Market, then coercing companies, based upon its monopoly in the Single-Serve Brewers Market, to sign anticompetitive exclusive agreements prohibiting them from dealing with Keurig's competitors in the Compatible Portion Packs Market.

144.   Keurig is threatening to further leverage its monopoly power in the Single-Serve Brewers Market to maintain its monopoly power in the Portion Packs Market and Compatible Portion Packs Market by programming its 2.0 K-Cup Brewers to work exclusively with K-Cup Branded Portion Packs not on the basis of any legitimate consumer benefit but for the sole

1    purpose of monopolizing the Compatible Portion Packs Market.

2        145.    Keurig willfully acquired and maintained monopoly power by the exclusionary

3    conduct detailed above, rather than through efficiency or innovation.

4        146.    Unless Keurig is enjoined from enforcing its anticompetitive exclusive dealing

5    agreements and from implementing the lockout feature of its proposed 2.0 K-Cup Brewers,

6    Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its

7    business, which would be lost not as a result of fair competition but rather as a result of Keurig's

8    anticompetitive leveraging of its monopoly power in the Single-Serve Brewers Market.  Given

9    the nature of the irreparable harm to Rogers in form of lost business, this harm will be difficult to

10   quantify.

11                              **FOURTH CLAIM FOR RELIEF**

12                                    **Sham Litigation**
                    **Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
13

14       147.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1

15   through 146 as fully set forth herein.

16       148.    Just weeks after Rogers entered the Compatible Portion Packs Market, Keurig

17   willfully and intentionally asserted meritless claims against Rogers, alleging in bad faith, with no

18   objective or subjective basis, that Rogers' Competing Portion Packs infringed Keurig's utility and

19   design patents directed at K-Cup Brewers and methods of using brewers and that Rogers induced

20   consumers to infringe these Single-Serve Brewer patents by using Competing Portion Packs that

21   allegedly infringed the patents.  Keurig's non-patent claims were likewise objectively and

22   subjectively baseless.

23       149.    Despite the fact that Keurig had a pending appeal of the District of Delaware case

24   against Sturm Foods on Keurig's utility patent claims – which were related to the most significant

25   claims asserted by Keurig against Rogers in the District of Massachusetts lawsuit – Keurig

26   refused to agree to a stay of discovery in the District of Massachusetts case pending resolution of

27   Keurig's appeal of the District of Delaware case and instead vigorously pursued costly, time-

28   consuming and burdensome discovery and pushed for a *Markman* hearing on the utility patents.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                    31

1    Such discovery included, but was not limited to, the taking of 13 days worth of depositions of

2    Rogers' employees and top executives.

3        150.    In May 2013, the United States District Court for District of Massachusetts granted

4    summary judgment in favor of Rogers on Keurig's patent claims. The Court chastised Keurig for

5    "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used

6    in Keurig brewers.  Supreme Court precedent prevents plaintiffs from undertaking such an end

7    run." *Keurig, Inc. v JBR, Inc.*, No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D.

8    Mass. May 24, 2013).

9        151.    Keurig then appealed the District of Massachusetts' ruling to the Federal Circuit.

10   Although Keurig agreed not to pursue its appeal related to the utility patents given the Federal

11   Circuit's ruling in the District of Delaware case, Keurig continued to pursue its appeal related to

12   the equally meritless claims asserted based upon the design patent.  The Federal Circuit entered a

13   judgment on March 12, 2014, just six days after oral argument, affirming the district court's grant

14   of summary judgment in favor of Rogers and denying Keurig all of the relief sought in its appeal.

15       152.    Rogers has incurred substantial litigation costs and attorneys' fees based on

16   Keurig's objectively baseless claims.

17       153.    No reasonable litigant could have realistically expected to succeed on the merits of

18   Keurig's claims against Rogers, and thus Keurig's litigation and pursuit of its appeal were

19   objectively baseless.

20       154.    On information and belief, Keurig's litigation against competitor Sturm was

21   equally as baseless.

22       155.    On information and belief, Keurig instituted its meritless lawsuit against Rogers as

23   part of its overall anticompetitive scheme to interfere directly with Rogers' ability to compete in

24   the Compatible Portion Packs Market, to intimidate market entrants, to raise its rival's costs, to

25   harm Rogers' reputation and interfere with its business relations, and to deprive Rogers of

26   resources that would have otherwise been spent on bringing Competing Portion Packs to

27   consumers at favorable prices.

28       156.    As a result of this sham litigation and appeal, Rogers was forced to incur litigation

fees and costs, rather than use those resources to compete against Keurig.  Competition in the market for Compatible Portion Packs has thus been harmed.

## FIFTH CLAIM FOR RELIEF

**Patent Misuse**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

157.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 156 as fully set forth herein.

158.   The *Keurig v. JBR, Inc.* litigation alleged that Keurig's patents directed at brewers and methods of using brewers were infringed by Rogers and Keurig's consumers using Rogers' Competing Portion Packs in K-Cup Brewers.

159.   As noted above, the United States Court of Appeals for the Federal Circuit has already affirmed both district courts' grants of summary judgment.  Keurig was not properly seeking enforcement of any patent rights, but rather was trying to make an "end-run" around the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  Keurig's improper "end run" against Sturm and Rogers constitutes patent misuse.

160.   By seeking to "impermissibly restrict" purchasers of K-Cup Brewers from using Competing Portion Packs on the basis of its brewer and brewing method patents, (and similarly having sought to restrict suppliers of those Competing Portion Packs, like Rogers and Sturm) Keurig willfully, intentionally, and unlawfully broadened the scope of its patents and, moreover, threatens to do so again in the future.

161.   In addition, by seeking to condition consumers' use of its K-Cup Brewers on the use of its K-Cups through its K-Cup Brewer patents and not any patents held on the K-Cups themselves, Keurig engaged in, and threatens to continue to engage in, an unlawful tying arrangement, constituting per se patent misuse.

162.   As a result of Keurig's patent misuse, competition has been harmed because, among other things, Keurig's patent misuse has substantially foreclosed its competitors from the Compatible Portion Packs Market, Rogers has been forced to incur legal costs and attorneys' fees that otherwise could have been spent bringing more Competing Portion Packs to the market, and

consumers have had reduced access to Competing Portion Packs.

## SIXTH CLAIM FOR RELIEF

**Technological Tying**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**and Section 3 of The Clayton Act, 15 U.S.C. § 14**

163.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 162 as fully set forth herein.

164.    Keurig intends to tie 2.0 K-Cup Brewer purchases to the purchase of K-Cup Branded Compatible Portion Packs by introducing new technology to the 2.0 K-Cup Brewer that unnecessarily and unjustifiably would make the 2.0 K-Cup Brewer incompatible with Competing Portion Packs.  By willfully and intentionally imposing a technological tie between the 2.0 K-Cup Brewers and K-Cup Branded Portion Packs, Keurig will condition the use of the 2.0 K-Cup Brewers on a consumer's purchase of K-Cup Branded Portion Packs.  2.0 K-Cup Brewer consumers will be forced to forgo purchasing Competing Portion Packs, because Keurig purportedly will refuse to unlock the brewers to allow those cups to work with the 2.0 K-Cup Brewers.

165.    Keurig's tying arrangement will affect a substantial volume of interstate commerce.

166.    Keurig's tying arrangement will have the effect of: (i) inhibiting or preventing the sale of Competing Portion Packs; (ii) decreasing research and investment by Competing Portion Packs makers in the Compatible Portion Packs Market; (iii) discouraging or preventing new entry into the Compatible Portion Packs Market; (iv) maintaining supracompetitive K-Cup Branded Portion Packs prices and increasing average prices overall to consumers; (v) reducing the amount of consumer choice for purchasers of 2.0 K-Cup Brewers, particularly those with a preference for Competing Portion Packs; (vi) allowing Keurig to coerce competitors and third parties to take licenses from, and pay royalties to, Keurig; and (vii) increasing Keurig's share and monopoly power over the Compatible Portion Packs Market.

167.    The anticompetitive effects of Keurig's conduct outweigh any procompetitive benefits, if any, particularly given that Keurig has made clear that exclusion of Competing

Portion Packs is not necessary to allow consumers to take advantage of any advantage that will be offered by 2.0 K-Cup Brewers.

168.    Keurig's tying arrangement is intended to maintain and increase its monopoly power in the Portion Packs Market and Compatible Portion Packs Market.

169.    Keurig's tying arrangement threatens to cause Rogers substantial damages as a direct and proximate cause of this unlawful conduct, and indeed has already caused Rogers damages because Keurig has used this impending lock-out as a basis to interfere with Rogers' business relationships, thereby diverting sales from Rogers to Keurig.

170.    Unless Keurig is enjoined from implementing the lockout feature of its proposed 2.0 K-Cup Brewers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive practice of tying its 2.0 K-Cup Brewers to its Compatible Portion Packs.  Given the nature of the irreparable harm to Rogers in form of lost business, this harm will be difficult to quantify.

### SEVENTH CLAIM FOR RELIEF
**Anticompetitive Product Redesign**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

171.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 170 as fully set forth herein.

172.    As detailed above, Keurig has monopoly power in the Single-Serve Brewers Market, Portion Packs Market, and Compatible Portion Packs Market, including the power to control prices and exclude competition.

173.    As alleged herein, Keurig has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Packs Market and Compatible Portion Packs Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

174.    Keurig has further threatened to willfully and intentionally exclude competition from the Portion Packs Market and Compatible Portion Packs Market through the use of

1   anticompetitive and exclusionary interactive lock-out technology intended to render Competing

2   Portion Packs incompatible with 2.0 K-Cup Brewers.

3       175.    Keurig has expressed a strategy to eliminate alternative K-Cup Brewers by

4   replacing prior generations of K-Cup Brewers with 2.0 K-Cup Brewers, thereby locking in

5   consumers and forcing them to use K-Cup Branded Portion Packs exclusively.

6       176.    On information and belief, the lockout feature of the proposed 2.0 "interactive

7   technology" will not materially benefit consumers, but rather will harm consumers by resulting in

8   reduced availability of preferred brands and increased pricing of available products. Any

9   purported consumer benefit asserted by Keurig for this lock-out technology is pretextual,

10  particularly given that Keurig has made clear that the technology could be introduced without

11  locking out Competing Portion Packs.

12      177.    Through the threat of the new technology, Keurig seeks to force Competing

13  Portion Packs makers to take a purported "license" from and to pay royalties to, Keurig in order

14  to avoid the exclusionary effects of the new technology.

15      178.    Keurig also has sought to leverage the threat of the exclusionary effects of

16  "interactive technology" to cause distributors and retailers to stop dealing with Keurig's

17  competitors, including Rogers.

18      179.    Unless Keurig is enjoined from implementing the lockout feature of its proposed

19  2.0 K-Cup Brewers and using such redesign as a threat to Rogers' customers and potential

20  customers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of

21  its business and goodwill, which would be lost not as a result of fair competition but rather as a

22  result of Keurig's anticompetitive product redesign and threats.  Given the nature of the

23  irreparable harm to Rogers in form of lost business and goodwill, this harm will be difficult to

24  quantify.

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

## EIGHTH CLAIM FOR RELIEF

### Attempted Monopolization In The Alternative
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

180.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 179 as fully set forth herein.

181.    As detailed above, Keurig has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Packs Market and Compatible Portion Packs Market, including the power to control prices and exclude competition.

182.    Keurig has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Packs Market and Compatible Portion Packs Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

183.    Keurig's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Packs Market and Compatible Portion Packs Market. Keurig's anticompetitive conduct presents a dangerous probability that Keurig will succeed, to the extent it has not already, in its attempt to monopolize the Portion Packs Market and Compatible Portion Packs Market.

184.    As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, Rogers has been injured in its business with resultant damages in amounts to be proven at trial.  In particular, Rogers has been substantially foreclosed from competing in the Portion Packs Market and Compatible Portion Packs Market; Rogers has had to incur substantial costs and attorneys' fees to defend against the baseless patent litigation pursued by Keurig; and Rogers has lost business as a result of Keurig's interference with its relationships with retailers and distributors and its claims that Competing Portion Packs will be incompatible with 2.0 K-Cup Brewers.

185.    As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and consumers in the Portion Pack and Compatible Portion Packs Markets have been harmed by, among other things: (1) Keurig's ability to charge supracompetitive prices for K-Cups; and (2)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4

the reduced output and availability of consumers' preferred Compatible Portion Packs.

## NINTH CLAIM FOR RELIEF

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

186.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 185 as fully set forth herein.

187.    In widely distributed promotional material sent by Keurig to its distributor and/or retailer customers, which were also customers or potential customers of Rogers, Keurig falsely stated that Rogers' Compatible Portion Packs would destroy or "gum up" K-Cup Brewers.

188.    On information and belief, Keurig has made additional, knowingly false and unsupported statements to its customers and potential customers regarding Rogers and its Competing Portion Packs.

189.    These statements are likely to mislead, and in fact, misled certain of Rogers' potential customers and thereby negatively influenced their purchasing decisions with regard to Rogers' products.

190.    Through these false and misleading statements, Keurig has caused injury to Rogers both through decreased sales and a loss of goodwill associated with Rogers' products.

## TENTH CLAIM FOR RELIEF

### Violation of the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq.

191.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 190 as fully set forth herein.

192.    The conduct constituting violations of Section 2 of the Sherman Act set forth above also constitutes violations of the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq.

## ELEVENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

193.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 192 as fully set forth herein.

194.    The conduct constituting violations of Sections 2 of the Sherman Act and Section

1  43(a) of the Lanham Act set forth above also constitute violations of common law tort of unfair

2  competition.

3  **TWELFTH CLAIM FOR RELIEF**

4  **Violation of the Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq.**

5      195.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1

6  through 194 as fully set forth herein.

7      196.    Section 17200, *et seq.* of the California Business & Professions Code is written in

8  the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, or

9  unfair, or fraudulent.  The statute's intent and purpose is to protect both consumers and

10  competitors by promoting fair competition in commercial markets for goods and services.

11      197.    Defendant is a "person" within the meaning of California Business & Professions

12  Code § 17201.

13      198.    As alleged herein, Keurig's conduct constitutes "unfair" business practices.  A

14  practice may be deemed unfair, even if not specifically proscribed by some other law.  Conduct

15  that significantly threatens or harms competition, or threatens an incipient violation of an antitrust

16  law, may be deemed to be "unfair."

17      199.    As alleged herein, Keurig's anticompetitive conduct is also "unlawful."  Within

18  the meaning of § 17200, virtually any violation of any civil or criminal federal, state or municipal,

19  statutory, regulatory, court-made, or local law can serve as a predicate for an "unlawful" claim.

20      200.    By reason of, and as a direct and proximate result of Keurig's unfair and unlawful

21  practices and conduct, Rogers has suffered, and will continue to suffer, financial injury to its

22  business or property.

23      201.    Keurig's unfair and unlawful conduct has caused harm to Rogers, competition, and

24  consumers.  Unless Keurig is enjoined from further engaging in this anticompetitive conduct,

25  Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its

26  business and goodwill, which would be lost not as a result of fair competition but rather as a

27  result of Keurig's anticompetitive practices.  Given the nature of the irreparable harm to Rogers

28  in form of lost business and goodwill, this harm will be difficult to quantify.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4                                              39

202.   A substantial amount of the harm alleged herein occurred in California.

### THIRTEENTH CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Advantage

203.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 202 as fully set forth herein.

204.   Keurig knew that its distributor and retailer customers also were the customers or potential customers of the manufacturers of Competing Portion Packs, including Rogers.  Indeed, Keurig knows that certain of these customers are also Rogers' customers.

205.   With this knowledge, Keurig has intentionally undertaken at least the following acts with malice and with the intent of disrupting Rogers' business relationship with these customers and potential customers by, for example, inducing them to breach their contracts with Rogers and/or refrain from doing business with Rogers:

a.   Keurig made intentionally false and disparaging statements to Rogers' customers and potential customers regarding the quality of Rogers' Competing Portion Packs;

b.   Keurig encouraged Rogers' customers to refrain from making purchases from Rogers or to make less purchases from Rogers by claiming that Rogers' Competing Portion Packs would not be compatible with Keurig's forthcoming 2.0 K-Cup Brewers; and

c.   Keurig vigorously pursued objectively baseless patent litigation against Rogers and other competitors in which it falsely maintained that consumers infringed Keurig's patents by using Rogers' products.

206.   Such actions have disrupted Roger's relationships with both customers and potential customers by causing them to refrain from making purchases or to purchase less of Rogers' Competing Portion Packs and by causing a loss of goodwill with regard to Rogers and its products.

207.   As a result of Keurig's conduct, Rogers has suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:

A.      Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has monopolized, or in the alternative, attempted to monopolize; created unreasonable and unenforceable restraints of trade through exclusive dealing agreements; unlawfully tied sales of Keurig 2.0 Brewers to K-Cup Branded Portion Packs; and leveraged its monopoly power in the Single-Serve Brewers Market to monopolize the Compatible Portion Packs Market and the Portion Packs Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq. and the California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq.;

B.      Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has engaged in patent misuse and a declaration that Keurig's brewer and method patents are unenforceable as to Rogers' OneCups;

C.       Pursuant to 15 U.S.C. § 26, Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing the unlawful acts in violation of the Sherman Act, the Lanham Act, 15 U.S.C. § 1125(a), the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq. and the California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq., including but not limited to the implementation of the announced 2.0 K-Cup Brewer lock-out technology that threatens to block Competing Portion Packs from working in 2.0 K-Cup Brewers, the tying of sales of 2.0 K-Cups to sales of 2.0 K-Cup Brewers, and the false misrepresentations to Rogers' potential customers regarding the quality of Rogers' Compatible Cups;

D.      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

E.      Damages sustained to Rogers, as provided by the federal and state antitrust and unfair competition laws, and a joint and several judgment in favor of Plaintiff shall be entered against Defendant in an amount to be trebled in accordance with such laws, including Section 4 of

1   the Clayton Act;

2   F.   Pre-judgment and post judgment interest at the maximum legal rate;

3   G.   Rogers' costs, expenses, and reasonable attorneys' fees in bringing this action;

4   H.   An award of punitive damages; and

5   I.   Such other relief as this Court may deem just and proper.

6

7   **JURY TRIAL DEMANDED**

8   Plaintiff hereby demands a trial by jury on all issues triable by jury.

9

10   Dated:  March 13, 2014                     Respectfully submitted,

11                                              MORGAN, LEWIS & BOCKIUS LLP

12                                              By: ____/s/ Daniel Johnson, Jr._____

13

14                                              Daniel Johnson, Jr. (State Bar No. 57409)
                                                Kent M. Roger (State Bar No. 95987)
15                                              One Market, Spear Street Tower
                                                San Francisco, CA 94105
16                                              Tel:  (415) 442-1000
                                                Fax: (415) 442-1001
17
                                                *Attorneys for JBR, Inc. (d/b/a Rogers Family Company)*
18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 24817747.4

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:14-cv-00677-KJM-CKD

| | |
|---|---|
| JBR, Inc. v. Keurig Green Mountain, Inc. | Date Filed: 03/13/2014 |
| Assigned to: Judge Kimberly J. Mueller | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Carolyn K. Delaney | Nature of Suit: 410 Anti-Trust |
| Cause: 15:2 Antitrust Litigation | Jurisdiction: Federal Question |

<u>Plaintiff</u>

JBR, Inc.
Doing business as
Rogers Family Company

represented by Daniel Johnson , Jr.
Morgan Lewis and Bockius LLP
Spear Street Tower
One Market Street
Suite 28
San Francisco, CA 94105
415-442-1392
Fax: 415-442-1001
Email: djjohnson@morganlewis.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Kent M. Roger
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
5th Floor
San Francisco, CA 94105
415-442-1000-1140
Fax: 415-442-1001
Email: kroger@morganlewis.com
ATTORNEY TO BE NOTICED

V.

<u>Defendant</u>

Keurig Green Mountain, Inc.
as successor to Keurig, Incorporated
formerly known as
Green Mountain Coffee Roasters Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2014 | 1 | COMPLAINT - Demand for Jury Trial against Keurig Green Mountain, Inc. by JBR, Inc.. Attorney Johnson, Daniel added. (Filing fee $ 400, receipt number 0972-5225639) (Attachments: # 1 Civil Cover Sheet)(Johnson, Daniel) Modified on 3/13/2014 (Zignago, K.). (Entered: 03/13/2014) |
| 03/13/2014 | 2 | SUMMONS ISSUED as to *Keurig Green Mountain, Inc.* with answer to complaint due within *21* days. Attorney *Daniel Johnson, Jr.* *Morgan Lewis & Bockius LLP* *One Market, Spear Street Tower* *San Francisco, CA 94105*. (Zignago, K.) (Entered: 03/13/2014) |
| 03/13/2014 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 7/31/2014 at 02:30 PM in Courtroom 3 (KJM) before Judge Kimberly J. Mueller. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Zignago, K.) (Entered: 03/13/2014) |
| 03/17/2014 | 4 | SUMMONS RETURNED EXECUTED: Keurig Green Mountain, Inc. served on 3/14/2014. (Johnson, Daniel) (Entered: 03/17/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/20/2014 09:08:46 | | | |
| PACER Login: | rk3333 | Client Code: | 110176-0000 |
| Description: | Docket Report | Search Criteria: | 2:14-cv-00677-KJM-CKD |
| Billable Pages: | 1 | Cost: | 0.10 |