IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Linda Major, on behalf of herself and all others similarly situated, | Civil Action No. _____ |
| *Plaintiff,* | CLASS ACTION |
| v. | DEMAND FOR JURY TRIAL |
| KEURIG GREEN MOUNTAIN, INC.; GREEN MOUNTAIN COFFEE ROASTERS, INC.; and KEURIG, INCORPORATED, | |
| *Defendants.* | |

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................. 1

II.   PARTIES ............................................................................................................. 5

    A.   Plaintiff ................................................................................................... 5

    B.   Defendants ............................................................................................... 5

III.  JURISDICTION, VENUE, AND COMMERCE .................................................. 6

IV.  CLASS ACTION ALLEGATIONS ..................................................................... 7

V.   THE RELEVANT MARKETS AT ISSUE ARE THE MARKETS FOR THE SALE OF SINGLE-SERVE COFFEE BREWERS AND COMPATIBLE CARTRIDGES IN THE UNITED STATES .............................................................................................. 9

        1.   Single-Serve Coffee Brewer Market ......................................... 9

        2.   The Keurig Compatible Coffee Cartridge Market ..................... 10

VI.  GREEN MOUNTAIN POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS ........................................................................................................ 12

    A.   Monopoly Power in the Single-Serve Coffee Brewer Market ............... 12

    B.   Monopoly Power in the Keurig Compatible Coffee Cartridge Market ............... 13

VII. GREEN MOUNTAIN ENGAGED IN AN OVERALL SCHEME TO MONOPOLIZE THE MARKET FOR COMPATIBLE CARTRIDGES ........................................ 15

    A.   Anticompetitive Acquisitions ............................................................... 16

    B.   Sham Litigation ..................................................................................... 17

    C.   Exclusionary Arrangements .................................................................. 18

    D.   Technological Lockout .......................................................................... 19

VIII. GREEN MOUNTAIN'S MONOPOLISTIC SCHEME HAS HAD SIGNIFICANT ANTICOMPETITIVE EFFECTS ON THE PRICE OF K-CUPS ......................... 20

IX.  CAUSE OF ACTION FOR VIOLATION OF SECTION TWO OF THE SHERMAN ANTITRUST ACT ............................................................................................. 21

X.   Request FOR RELIEF ....................................................................................... 22

    A.   Judgment of Violation of the Sherman Antitrust Act ........................... 22

    B.   Judgment of Antitrust Injury and Standing Under Sections 4 and 16 of the Clayton Antitrust Act ........................................................................... 23

    C.   Certification of Direct Purchaser Plaintiff Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure ......................................................... 23

    D.   Treble Damages .................................................................................... 23

    E.   Costs of Suit .......................................................................................... 23

    F.   Pre- and Post-Judgment Interest ........................................................... 23

    G.   Reasonable Attorney's Fees .................................................................. 23

       H.      Other Just and Proper Relief ................................................................. 23

XI.    DEMAND FOR JURY TRIAL .......................................................................... 24

## I.     NATURE OF THE ACTION

1.     Plaintiff Linda Major brings this Class Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and a Class of all other similarly situated persons or entities who bought Keurig coffee cartridges, a/k/a "K-Cups," directly from Defendants (defined below) from September 17, 2012 through the present (the "Class Period").  Plaintiffs' claims against that Defendants Keurig Green Mountain, Inc., Green Mountain Coffee Roasters, Inc., and Keurig, Incorporated (collectively "Green Mountain" or "Defendants") arise under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, for Defendants' anticompetitive conduct to willfully maintain their monopoly power in the market for the sale of single-serve disposable coffee cartridges for use in Keurig coffee brewers in the United States.

2.     Green Mountain manufactures and sells Keurig single-serve coffee brewers, as well as single-serve disposable coffee cartridges for use in the brewers, called K-Cups.  It controls at least 89% of the market for the sale of single-serve coffee brewers in the United States ("Single-Serve Coffee Brewer Market") and at least 86% (and as much as 92%) of the market for the sale of all single-serve disposable coffee cartridges for use in its brewers ("Keurig Compatible Coffee Cartridge Market") (collectively, the "Relevant Markets").

3.     Green Mountain entered the Relevant Markets in 2006 when it acquired Keurig as a wholly-owned subsidiary.  In doing so, Green Mountain acquired Keurig's patent portfolio, which insulated, and would continue to insulate, Green Mountain's sales of Keurig single-serve coffee brewers and K-Cup disposable beverage cartridges, from potential competition until the date the patents expired—September 16, 2012.  Insulated from potential competition, Green Mountain's sales increased an average of 65% per year from 2006 through 2012.

4.    Green Mountain had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013. Green Mountain had the top four best-selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.



**Keurig Coffee Brewer**          **K-Cup**

**Illustration of a single-serve coffee brewer and a single-serve disposable coffee cartridge (K-Cup), manufactured and sold by Green Mountain/Keurig.**

5.    Green Mountain makes the overwhelming majority of profits and revenues in the Keurig Compatible Coffee Cartridge Market, and it analyzes this discrete market for competitive purposes. The revenues associated with sales of Keurig Compatible Coffee Cartridges are approximately four times Keurig Single-Serve Brewer sales. Using what is known as a "razor and blades" strategy, Green Mountain sells its coffee-brewers for little or no profit and sells the disposable cartridges at a very high profit. Green Mountain sells the brewers to create an installed base of customers. The customers, in order to use the expensive brewer they bought, must purchase Keurig Compatible Coffee Cartridges. The ability to control Keurig Compatible Coffee Cartridge sales results in greater profits for Green Mountain.

6.    Green Mountain's phenomenal growth story is not the result of superior business acumen. Rather, Green Mountain's growth was, and is, fostered by an anticompetitive scheme to willfully maintain its monopoly power in the market for Keurig Compatible Coffee Cartridges.

7.  When Green Mountain acquired Keurig, it knew that Keurig's patents were set to expire in September 2012.  To maintain the monopoly power it enjoyed by virtue of its patents beyond the date that its patents expired, Green Mountain devised and implemented an ongoing multi-pronged strategy to foreclose and impair competition.  The strategy includes anticompetitive acquisitions of competitors, sham litigation, exclusive dealing arrangements, and the eventual launching of a new Single-Serve Brewer, called Keurig 2.0, that is incompatible with rival Compatible Coffee Cartridges.

8.  **Anticompetitive Acquisitions.**  Green Mountain aggressively eliminated and impaired potential competition through successive and increasingly expensive acquisitions or rivals, including of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (Van Houtte) (2010).  Because these companies were all licensees of Keurig patents, they would have had the knowledge, technical capability and capacity to be strong competitors to Green Mountain in the Keurig Compatible Coffee Cartridge Market after patent expiration.  By acquiring these companies, Green Mountain intentionally nipped this competitive threat in the bud.

9.  **Sham Litigation.**  In 2010, non-infringing competitors, particularly competitors making and selling filterless K-Cups, had begun to emerge.  Within just a matter of weeks after filterless, non-infringing, Keurig Compatible Coffee Cartridges hit the shelves, on October 1, 2010, Green Mountain sued the leading Keurig Compatible Coffee Cartridge manufacturer, Sturm, alleging that Sturm's Keurig Compatible Coffee Cartridges infringed Keurig's patents directed at brewers and methods of using brewers.  Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup brewers by using Sturm's unlicensed Keurig Compatible Coffee Cartridges, and that Sturm was thus also liable for inducing

3

infringement by these consumers. Although these allegations were objectively and subjectively baseless, brought simply to impede competition on baseless grounds and not for legitimate reasons, they had their intended effect of suppressing actual and potential competition.

10. **Exclusionary Arrangements.** On information and belief, Green Mountain has entered into exclusionary arrangements with companies at every level of the Keurig Compatible Coffee Cartridge distribution system. These arrangements operate to exclude and suppress competition and thus allow Green Mountain to maintain its monopoly power and monopoly pricing of K-Cups. To maintain and extend its monopoly power into the post-patent world, Green Mountain has continued to increase its network of exclusionary agreements, which has significantly impeded the ability of competition to emerge.

11. **Keurig 2.0.** To ensure a continuing monopoly well into the future, Green Mountain has announced it will be launching Keurig 2.0, a successor single-serve brewing system. The Keurig 2.0 will be embedded with technology to ensure that no Keurig Compatible Coffee Cartridges can be used with Keurig brewers (aside from Green Mountain approved K-Cups). As current generation Keurig brewers become obsolete, the only ones newly available will lock customers into to purchasing K-Cups and lock out competition into the future.

12. Through this anticompetitive scheme, Green Mountain has insulated its own Keurig Compatible Coffee Cartridges from competition well after the expiration of its patent. This conduct has allowed Defendants to charge artificially inflated prices for K-Cups, which prices have been (and continue to be) higher than they would have been, but for the illegal monopolization alleged herein.

13. Plaintiff and members of the Class directly paid Green Mountain supracompetitive prices for K-Cups, which materially and proximately caused Plaintiff and

members of the Class injury to their business and property, within the meaning of Section 4 of the Clayton Antitrust Act.

14.    Plaintiff and members of the Class are threatened with impeding future harm in the form of additional overcharges, within the meaning of Section 16 of the Clayton Act, if Green Mountain's continuing scheme to monopolize is allowed to continue unabated.

## II.    PARTIES

### A.    Plaintiff

15.    Plaintiff Linda Major is a natural person who resides in the State of New York. During the Class Period, Ms. Major purchased K-Cups directly from one or more of the Defendants and suffered antitrust injury and damages as a result of the anticompetitive conduct alleged herein.

### B.    Defendants

16.    Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.

17.    Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.

18.    Defendant Keurig, Incorporated, is a corporation organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.

19.    On March 10, 2014, Defendants announced that "we have changed our company name to Keurig Green Mountain, Inc.  The fundamental reason for the change is that we are now an integrated company; a technology company in the beverage business.  It was this combination that made our unique and powerful business model possible."

20.     Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## III.     JURISDICTION, VENUE, AND COMMERCE

21.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,  and for damages under Section 4 of the Clayton Act,  15 U.S.C. § 15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337.

22.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found or incorporated, or had agents in this District.

23.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.  During the Class Period, Defendants used the instrumentalities of interstate commerce to effectuate their illegal scheme.

24.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme throughout the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on behalf of herself and, under Rules 23(a) and (b) of

the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities in the United States and its territories who purchased one or
> more K-Cups directly from one or more Defendants at any time from September
> 17, 2012 through the present (the "Class").   Excluded from the Class are
> Defendants, and their officers, directors, management, employees, subsidiaries, or
> affiliates, and all federal governmental entities.   Also excluded are the Judge
> presiding over this action, his or her law clerks, spouse, and any person within the
> third degree of relationship living in the Judge's household and the spouse of such
> a person.

26.     Members of the Class are so numerous and geographically dispersed that joinder

is impracticable.  Further, the Class is readily identifiable from information and records in

Defendants' possession.

27.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff

and members of the Class were damaged by Defendants' same wrongful conduct, i.e., they paid

artificially inflated prices for K-Cups and were deprived of the benefits of more robust

competition as a result of Defendants' wrongful conduct.

28.     Plaintiff will fairly and adequately protect and represent the interests of the Class.

The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

29.     Plaintiff is represented by counsel with experience in the prosecution of class

action antitrust litigation, and with particular experience with class action antitrust litigation.

30.     Questions of law and fact common to the members of the Class predominate over

questions that may affect only individual Class members, thereby making overcharge damages

with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class

include, but are not limited to:

a.   The relevant markets for analyzing Green Mountain's conduct;

b.   Whether Green Mountain has market power in each relevant market;

c.   Whether Green Mountain willfully maintained it monopoly power in the Keurig Compatible Coffee Cartridge Market;

d.   Whether Green Mountain has the power to control prices or exclude competition in the Keurig Compatible Coffee Cartridge Market;

e.   Whether Green Mountain exercised its ability to control prices or exclude competition in the Keurig Compatible Coffee Cartridge Market; and

f.   Whether Green Mountain caused antitrust injury to Plaintiff and the members of the Class; and, if so, the quantum of damages; and whether

g.   Whether Green Mountain has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

31.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

**32.**     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.  THE RELEVANT MARKETS AT ISSUE ARE THE MARKETS FOR THE SALE OF SINGLE-SERVE COFFEE BREWERS AND COMPATIBLE CARTRIDGES IN THE UNITED STATES

33.     Two relevant markets exist in which to evaluate Defendants' anticompetitive conduct: (1) the market for the sale of single-serve coffee brewers ("Single-Serve Coffee Brewer Market") in the United States, and (2) the market for the sale of single-serve disposable coffee cartridges for use in such brewers (the "Keurig Compatible Coffee Cartridge Market") in the United States.

### 1.  Single-Serve Coffee Brewer Market

34.     The single-serve brewer is a quick, convenient, and simple way for consumers to brew a single cup of coffee or other beverage ("Single-Serve Coffee Brewer").  Single-Serve Coffee Brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

35.     To make coffee with such brewers, one inserts a cartridge filled with coffee into the brewer, then the brewer forces hot water through the cartridge, and a single serving of coffee is dispensed directly to the cup.

36.     In part because of the unique convenience offered by Single-Serve Coffee Brewers, the price of traditional drip coffee makers does not fully constrain prices for Single-Serve Coffee Brewers.  A small but significant, non-transitory price increase for Single-Serve Coffee Brewers would not have caused a loss of sales to traditional drip coffee makers to make such a price increase unprofitable.

37.     Single-Serve Coffee Brewers do not exhibit strong, positive cross-elasticity of demand with respect to price as to traditional drip coffee makers.  Consumers pay a premium for Single-Serve Coffee Brewers over the price of traditional drip coffee makers.  While traditional

drip coffee makers are frequently sold around a price point of $20 to $30, Single-Serve Coffee Brewers typically cost anywhere from $80 to several hundred dollars.

38.     Green Mountain designs, manufactures, and sells a variety of Single-Serve Coffee Brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers, each of which uses a different type of coffee cartridge that is incompatible with the other types of brewers.

39.     Keurig offers a variety of Single-Serve Coffee Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector.

40.     Green Mountain sells Keurig-brand and other K-Cup Single-Serve Coffee Brewers from $89.95 to $249.95 online.  In addition to the manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

41.     Other manufacturers sell Single-Serve Coffee Brewers, but they use coffee cartridges incompatible with the K-Cup Brewer.  This remainder of the market collectively represents a small share of the Single-Serve Coffee Brewer Market.  Additional Single-Serve Coffee Brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavia" Bosch's "Tassimo," and Philips Electronics's "Senseo."  Prices across these Single-Serve Coffee Brewers can vary by as much as several hundred dollars.

### 2.     The Keurig Compatible Coffee Cartridge Market

42.     The Keurig Compatible Coffee Cartridge Market is a relevant market.  Keurig Compatible Coffee Cartridges (both K-Cups and other Keurig Compatible Coffee Cartridges) are coffee cartridges that are used only in Single-Serve Coffee Brewers that are K-Cup Brewers.  And Single-Serve Coffee Brewers that are K-Cup Brewers use only K-Cups and other Keurig Compatible Coffee Cartridges.

43.    The ability to increase Keurig Compatible Coffee Cartridge prices above their competitive levels cannot be constrained by cartridges or pods used with non-Keurig Single-Serve Coffee Brewers since those cartridges or pods are incompatible with Keurig Single-Serve Coffee Brewers.

44.    Although there are different types of Coffee Cartridges, such as K-Cups, T-Discs, and pods, each of these Coffee Cartridges is generally only compatible with a corresponding type of Single-Serve Brewer.  For example, Keurig Compatible Coffee Cartridges generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of Single-Serve Coffee Brewers.

45.    Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Coffee Cartridges, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Keurig Compatible Coffee Cartridges for use in K-Cup Brewers.

46.    In addition, the ability to increase Keurig Compatible Coffee Cartridge prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers.  The price-per-pound of Keurig Compatible Coffee Cartridge coffee is nearly five times greater than that of ground coffee.  This has been the case because consumers who utilize Single-Serve Coffee Brewers and compatible cartridges generally find such packs to be substantially more convenient and desirable in their quality as compared with the brewed coffee from multiple-serve formats.

47.    As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high.  The New York Times has noted that "Folgers [K-Cups], with 8 grams per

capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."

48.     Keurig Compatible Coffee Cartridges designed for use in K-Cup Brewers are not reasonably interchangeable with other coffee cartridge formats, such as T-Discs, pods, or capsules, and consumers who purchase K-Cup Brewers do not view other types of Coffee Cartridges as being reasonably interchangeable with Keurig Compatible Coffee Cartridges.

49.     Small but significant non-transitory increases in the price of Keurig Compatible Coffee Cartridges do not significantly increase demand for T-Discs, pods, or other types of coffee cartridge that are not compatible with a K-Cup Brewer. The reason is that most consumers of Keurig Compatible Coffee Cartridges own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute to coffee cartridge that are incompatible. The prices of T-Discs, pods, or other coffee cartridge that are incompatible with K-Cup Brewers do not reasonably constrain the price of Keurig Compatible Coffee Cartridges. The leading Keurig Compatible Coffee Cartridge manufacturer seeks to price its Keurig Compatible Coffee Cartridges significantly lower than K-Cups.

## VI.     GREEN MOUNTAIN POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS

### A.     Monopoly Power in the Single-Serve Coffee Brewer Market

50.     Green Mountain has the power to control prices and exclude competition in the Single-Serve Coffee Brewer Market.

51.     Green Mountain controls the dominant share of the Single-Serve Coffee Brewer Market. From July 2012 to July 2013, Green Mountain sold approximately 4.8 million Single-Serve Coffee Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and

93% by dollar value. In the first quarter of 2014, Green Mountain sold a record 5.1 million Keurig Single-Serve Coffee Brewers.

52.     As brokerage and investment firm Stifel has noted, Green Mountain's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share." A 2011 Morgan Stanley consumer survey report similarly observed, "Green Mountain and its Keurig system dominates [the Single-Serve Coffee Brewer Market]."

53.     Green Mountain reported in September 2013 that it had sold over 30 million Keurig Single-Serve Coffee Brewers, which are used in at least approximately 15 million U.S. households. In fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Coffee Brewers.

54.     As of September 2013, Keurig Single-Serve Coffee Brewers represented the top four best-selling coffeemakers in the United States by dollar volume.

55.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market. For example, Green Mountain still holds patents that cover its K-Cup Brewers. Successful entry into the Single-Serve Coffee Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment. Moreover, because retailers are reluctant to stock brewers unless the coffee cartridges they use are readily and widely available, and coffee cartridges that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular, potential market entrants face a substantial competitive disadvantage as regards established brewer suppliers.

**B.     Monopoly Power in the Keurig Compatible Coffee Cartridge Market**

56.     Green Mountain has the power to control prices or exclude competition in the Single-Serve Coffee Brewer Market.

57.     Green Mountain controls from 86% to 92% of the Keurig Compatible Coffee Cartridge Market.  CEO Brian Kelley has stated the company has an 86% market share in K-Cup sales.  A Citibank analyst reports that Green Mountain controlled 92% of the K-Cup market in 2013.

58.     The remaining 8% to 14% of the Keurig Compatible Coffee Cartridge Market is composed of sellers of unlicensed and private label Keurig Compatible Coffee Cartridges that are compatible with K-Cup Brewers.

59.     In addition to its own K-Cups, Green Mountain also licenses the right to manufacture, distribute, and/or sell K- Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks.  Green Mountain either owns or licenses some forty-nine brands.

60.     Green Mountain has been able to exercise its monopoly power by profitably raising K-Cup prices above competitive levels for extended periods of time without losing significant market share or increasing demand for Coffee Cartridges other than Keurig Compatible Coffee Cartridges or Single-Serve Coffee Brewers other than K-Cup Brewers.  In fact, Green Mountain raised K-Cup prices by approximately 10-15% in September 2010 and has been able to profitably maintain that price increase for an extended period of time.

61.     Barriers to entry for the Keurig Compatible Coffee Cartridge Market are high and difficult to surmount.  Potential manufacturers must either develop and manufacture their own brewers to be compatible with their own Keurig Compatible Coffee Cartridges, or alternatively make Keurig Compatible Coffee Cartridges.  Potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Keurig Compatible Coffee Cartridges

14

because Green Mountain has a number of patents covering brewer technology. Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures. There also is substantial technological knowledge, research and design, and capital investment required to design, manufacture, and sell a Keurig Compatible Coffee Cartridge.

## VII. GREEN MOUNTAIN ENGAGED IN AN OVERALL SCHEME TO MONOPOLIZE THE MARKET FOR COMPATIBLE CARTRIDGES

62.     The expiration of Green Mountain's patent protection in the Keurig Compatible Coffee Cartridge Market was expected to and should have placed downward pressure on K-Cup prices. Once the patents expired consumers would no longer be required to purchase K-Cups but rather would be able to purchase cheaper competitive alternatives. This point was understood and recognized by investors as Green Mountain's share price plunged temporarily (by as much as 50%) in the months leading up to patent expiration on the expectation that patent expiration would have ended Green Mountain's monopoly, causing prices and thus profits to drop dramatically. Investors did not know during this time, however, that Green Mountain had successfully insulated itself from competition through the anticompetitive scheme alleged herein.

63.     To willfully maintain its monopoly in the Keurig Compatible Coffee Cartridge Market and avoid the inevitable lower prices and profits resulting from unfettered competition, Green Mountain devised and implemented an ongoing scheme to inhibit or thwart potential competition from Keurig Compatible Coffee Cartridges, in violation of Section 2 the Sherman Antitrust Act. This anticompetitive scheme has been successful as K-Cup prices remain at supracompetitive levels and Green Mountain's share prices has bounced back to prior levels.

## A. Anticompetitive Acquisitions

64. After acquiring Keurig in 2006, Green Mountain embarked on an aggressive plan to eliminate and restrain competition in the market for the sale of Keurig Compatible Coffee Cartridges by acquiring its primary potential competition—companies that were then licensing the as-yet unexpired Keurig patents.

65. Specifically, Green Mountain acquired the following potential competitors from March 2009 through December 2010:

| DATE | TARGET | PRICE |
|---|---|---|
| March 27, 2009 | Tully's Coffee | $40.3 million |
| November 13, 2009 | Timothy's Coffee | $155.7 million |
| May 11, 2010 | Diedrich | $305.3 million |
| December 17, 2010 | Van Houtte | $907.8 million |

66. According to one analyst's presentation, Green Mountain "eliminated the licensees by buying them. Green Mountain paid high prices to avoid having to compete with the licensees."

67. The most valuable asset the target companies had was the license to make K-Cups. The licenses had limited value, as they would not be needed after the Green Mountain patents expired. The very high allocations to Goodwill in Green Mountain's accounting raised suspicion in the investment community. The objective economic explanation from an antitrust perspective, is that the extraordinarily large "goodwill"—in the case of Van Houtte nearly $500 million—was money paid to keep potential competition from entering market once Green Mountain's key patents expired in September 2012.

68.     Having grown into a billion dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices.

**B.     Sham Litigation**

69.     Prior to September 2012, Green Mountain enjoyed patent protection on certain aspects of its K-Cups.  Green Mountain claimed that these patents, for example, prevented competitors from offering single-serve cups of coffee with filters.

70.     Shortly after filterless, non-infringing, Keurig Compatible Coffee Cartridges hit the shelves, on October 1, 2010, Green Mountain sued the leading filterless manufacturer, Sturm. Green Mountain alleged that Sturm's Keurig Compatible Coffee Cartridges infringed Green Mountain's patents directed at brewers and methods of using brewers.  Green Mountain also alleged that its own consumers were infringing patents by using Sturm's unlicensed Keurig Compatible Coffee Cartridges, and that Sturm was thus also liable for inducing infringement by these consumers.

71.     Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of noninfringement.

72.     In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims.  After Sturm incurred three years of litigation costs based on Green Mountain's frivolous argument that Sturm's Keurig Compatible Coffee Cartridges infringed Defendants' K-Cup Brewer patents, the Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Green Mountain was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

73.    The court cited nearly 150-year-old precedent recently reaffirmed by the Supreme

Court that the result sought by Keurig "would violate the longstanding principle that, when a

patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied

for the benefit of the patentee.'" *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S.

617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453,457 (1873))).

74.    Green Mountain also sued another early Keurig Compatible Coffee Cartridge

Market entrant, Rogers Family Co., making similar claims. In Keurig's litigation against Rogers

Family Co., a different federal district court likewise held on summary judgment that the Keurig

Compatible Coffee Cartridges at issue could not infringe Keurig's brewer method patents under

the doctrine of patent exhaustion.  On March 12, 2014, the Federal Circuit affirmed the summary

judgment ruling per curiam.

75.    As the Federal Circuit expressly concluded in the Sturm appeal, rather than

pursuing any legitimate purpose, Green Mountain was "attempting to impermissibly restrict

purchasers of Keurig brewers from using non-Keurig [Keurig Compatible Coffee Cartridges] by

invoking patent law." *Id.*

C.    **Exclusionary Arrangements**

76.    On information and belief, Green Mountain has entered into exclusionary

arrangements with companies at multiple levels of the Keurig Compatible Coffee Cartridge

distribution system.  These arrangements operate to exclude and suppress competition and thus

allow Green Mountain to willfully maintain its monopoly and monopoly pricing of K-Cups.  To

maintain and extend its monopoly power into the post-patent world, Green Mountain has

continued to increase its network of agreements and impeded the ability of competition to

emerge. Such exclusive dealing arrangements, taken together, inhibit potential competitors'

18

ability to impose price discipline on K-Cups, resulting in Green Mountain charging

supracompetitive prices to members of the Class.

**D.    Technological Lockout**

77.    In furtherance of its scheme to willfully maintain its monopoly power, Green

Mountain has announced it will be launching Keurig 2.0, a successor to the Keurig line of

brewers, which will have embedded technology that will prevent the use of any cartridge other

than a K-Cup manufactured or otherwise pre-approved by Green Mountain.  Green Mountain

thus seeks to impose an exclusionary technological barrier to further thwart, and eventually

eliminate all competition to K-Cups.

78.    As explained by Green Mountain's CEO, Brian Kelley, the new model "will not

brew unlicensed packs" because of a new "interactive technology" intended to ostensibly "ensure

the system delivers on the promise of excellent quality beverages, produced simply and

consistently every brew."  As one analyst explained, Green Mountain "has decided to 'close' the

system with its new reader technology, meaning that the new brewers will not brew unlicensed

packs."

79.    This is yet another attempted "end-run" around the patent and antitrust laws.

While Green Mountain could lower K-Cup prices and their 50% K-Cup profit margins to

compete on the merits, Green Mountain instead has announced a new anticompetitive plan to

lock out what it describes as "the many strong [Keurig Compatible Coffee Cartridge] brands that

are unlicensed."

80.    As one financial analyst recently observed, "the introduction of a new closed

system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold

consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup)

hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know a monopoly is good, but marketplace/consumer confusion isn't."

81.     Green Mountain has acknowledged that it is within its power to create or not to create a technological barrier in Keurig 2.0. Prior to formal launch, in October 2013, it was reported that Green Mountain had not made the choice as to what the fate of unlicensed pods would be in the new system. "It's fair to say we're still deciding on exactly how we will handle the unlicensed pod," Mr. Kelley was quoted to say.

82.     This plausibly suggests that even if Keurig 2.0's promised procompetitive benefits are legitimate and not pretextual, Green Mountain could have achieved any such benefits by less restrictive means than locking out all competition.

## VIII.   GREEN MOUNTAIN'S MONOPOLISTIC SCHEME HAS HAD SIGNIFICANT ANTICOMPETITIVE EFFECTS ON THE PRICE OF K-CUPS

83.     Green Mountain's overall scheme to monopolize the Keurig Compatible Coffee Cartridge Market has caused substantial anticompetitive effects and continues to do so. By its exclusionary conduct, Green Mountain has suppressed competition, insulating its own Keurig Compatible Coffee Cartridges ("K-Cups") from competition, restricting output, and allowing Green Mountain to charge higher prices for K-Cups than it would but for the monopolization alleged herein.

84.     Direct purchasers paid artificially high inflated prices directly to Green Mountain for K-Cups during the Class Period.

## IX. CAUSE OF ACTION FOR VIOLATION OF SECTION TWO OF THE SHERMAN ANTITRUST ACT

### COUNT I
### Monopolization of Keurig Compatible Coffee Cartridge Market
### Sherman Antitrust Act, 15 U.S.C. § 2

85.     Plaintiff repeats and reasserts each of the preceding allegations as fully set forth herein.

86.     Green Mountain has monopoly power in the Keurig Compatible Coffee Cartridge Market, including the power to control prices and exclude competition.

87.     Green Mountain has engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

88.     Green Mountain has effectively restrained, and further threatens to restrain, competition in the Keurig Compatible Coffee Cartridge Market through anticompetitive conduct, including:

    a.   Acquiring potential competitors to prevent competitive entry;

    b.   Prosecuting objectively and subjectively baseless litigation against a leading competitor;

    c.   Entering into a web of exclusionary arrangements up and down the supply chain; and

    d.   Threatening to unreasonably restrain competition through the implementation of an anticompetitive product redesign with lock-out technology.

89.     Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

90.     Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

91.     Plaintiff and members of the Class have paid more than they would have but for Defendants' violation of law and are threatened with future overcharges absent Court intervention.

92.     The injury and threatened injury to Plaintiff and members of the Class are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

## X.     REQUEST FOR RELIEF

93.     WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks the Court for a judgment, as follows:

### A.     Judgment of Violation of the Sherman Antitrust Act

94.     Plaintiff requests that the Court adjudge and decree that Defendants violated Section 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. § 2, and enter joint and several judgments against Defendants in favor of Plaintiff and members of the Class.

**B.     Judgment of Antitrust Injury and Standing Under Sections 4 and 16 of the Clayton Antitrust Act**

95.     Plaintiff requests that the Court adjudge and decree that Plaintiff has suffered antitrust injury and has antitrust standing under Sections 4 & 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§ 15 & 26, to sue Defendants for their violations of law.

**C.     Certification of Direct Purchaser Plaintiff Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure**

96.     Plaintiff requests that the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that he be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action be given to the Class and declare Plaintiff to be the representative of the Class.

**D.     Treble Damages**

97.     Plaintiff requests that the Court award three times the damages suffered by reason of Defendants' violations of law.

**E.     Costs of Suit**

98.     Plaintiff requests that the Court award reasonable costs of suit.

**F.     Pre- and Post-Judgment Interest**

99.     Plaintiff requests that the Court award pre- and post-judgment interest.

**G.     Reasonable Attorney's Fees**

100.     Plaintiff requests that the Court award reasonable attorneys' fees.

**H.     Other Just and Proper Relief**

101.     Plaintiff requests that the Court grants such other, further and different relief as is just and proper.

## XI.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and members of the proposed Class, demands a trial by jury on all issues so triable.

Respectfully Submitted.

Jeffrey S. Goddess (No. 630)
Jessica Zeldin (No. 3558)
P. Bradford deLeeuw (No. 3569)
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
bdeleeuw@rmgglaw.com

Eric L. Cramer
Michael J. Kane
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mkane@bm.net

***Counsel for Plaintiff and the Proposed Class***

Dated: March 19, 2014

U.S. District Court
District of Delaware (Wilmington)
CIVIL DOCKET FOR CASE #: 1:14-cv-00348-UNA

Major v. Keurig Green Mountain Inc. et al          Date Filed: 03/19/2014
Assigned to: Unassigned Judge                      Jury Demand: Plaintiff
Related Case: 1:10-cv-00841-SLR-MPT                Nature of Suit: 410 Anti-Trust
Cause: 15:2 Antitrust Litigation                   Jurisdiction: Federal Question

<u>Plaintiff</u>

Lisa Major                          represented by Jeffrey S. Goddess
on behalf of herself and all others                Rosenthal, Monhait & Goddess, P.A.
similarly situated                                 Mellon Bank Center, Suite 1401
                                                   P.O. Box 1070
                                                   919 Market Street
                                                   Wilmington, DE 19899-1070
                                                   (302) 656-4433
                                                   Email: jgoddess@rmgglaw.com
                                                   LEAD ATTORNEY
                                                   ATTORNEY TO BE NOTICED

                                                   Jessica Zeldin
                                                   Rosenthal, Monhait & Goddess, P.A.
                                                   Mellon Bank Center, Suite 1401
                                                   P.O. Box 1070
                                                   919 Market Street
                                                   Wilmington, DE 19899-1070
                                                   (302) 656-4433
                                                   Fax: (302) 658-7567
                                                   Email: jzeldin@rmgglaw.com
                                                   ATTORNEY TO BE NOTICED

                                                   Peter Bradford deLeeuw
                                                   Rosenthal, Monhait & Goddess, P.A.
                                                   Mellon Bank Center, Suite 1401
                                                   P.O. Box 1070
                                                   919 Market Street
                                                   Wilmington, DE 19899-1070
                                                   (302) 656-4433
                                                   Email: bdeleeuw@rmgglaw.com
                                                   ATTORNEY TO BE NOTICED

V.

<u>Defendant</u>

Keurig Green Mountain Inc.

<u>Defendant</u>

Green Mountain Coffee Roasters Inc.

<u>Defendant</u>

Keurig Incorporated

| Date Filed | # | Docket Text |
|---|---|---|
| 03/19/2014 | 1 | CLASS ACTION COMPLAINT filed with Jury Demand against Green Mountain Coffee Roasters Inc., Keurig Green Mountain Inc., Keurig Incorporated - Magistrate Consent Notice to Pltf. ( Filing fee $ 400, receipt number 0311-1481614.) - filed by Lisa Major. (Attachments: # 1 Civil Cover Sheet)(cla, ) (Entered: 03/19/2014) |
| 03/19/2014 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (cla, ) (Entered: 03/19/2014) |
| 03/19/2014 | | Summons Issued with Magistrate Consent Notice attached as to Green Mountain Coffee Roasters Inc. on 3/19/2014; Keurig Green Mountain Inc. on 3/19/2014; Keurig Incorporated on 3/19/2014. Requesting party or attorney should pick up issued summons at the Help Desk, Room 4209, or call 302-573-6170 and ask the Clerk to mail the summons to them. (cla, ) (Entered: 03/19/2014) |
| 03/19/2014 | 3 | SUMMONS Returned Executed by Lisa Major. Keurig Green Mountain Inc. served on 3/19/2014, answer due 4/9/2014. (Goddess, Jeffrey) (Entered: 03/19/2014) |
| 03/19/2014 | 4 | SUMMONS Returned Executed by Lisa Major. Green Mountain Coffee Roasters Inc. served on 3/19/2014, answer due 4/9/2014. (Goddess, Jeffrey) (Entered: 03/19/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/20/2014 11:24:45 | | | |
| PACER Login: | rk3333 | Client Code: | 110176-0000 |
| Description: | Docket Report | Search Criteria: | 1:14-cv-00348-UNA Start date: 1/1/1970 End date: 3/20/2014 |
| Billable Pages: | 2 | Cost: | 0.20 |